# Exhibit A

# Exhibit A

# ETHIOPIA 2012 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Ethiopia is a federal republic.  On August 20, Prime Minister Meles Zenawi died.  The ruling Ethiopian People's Revolutionary Democratic Front (EPRDF) elected then deputy prime minister Hailemariam Desalegn to take Meles's place as chairman of the party.  The EPRDF subsequently nominated him for the post of prime minister.  On September 21, parliament elected Hailemariam as prime minister.  In national parliamentary elections in 2010, the EPRDF and affiliated parties won 545 of 547 seats to remain in power for a fourth consecutive five-year term.  Although the relatively few international officials allowed to observe the elections concluded technical aspects of the vote were handled competently, some also noted that an environment conducive to free and fair elections was not in place prior to the election.

Security forces generally reported to civilian authorities; however, there were instances in which special police and local militias acted independently of civilian control.

The most significant human rights problems included restrictions on freedom of expression and association through politically motivated trials and convictions of opposition political figures, activists, journalists, and bloggers, as well as increased restrictions on print media.  In July security forces used force against and arrested Muslims who protested against alleged government interference in religious affairs.  The government continued restrictions on civil society and nongovernmental organization (NGO) activities imposed by the Charities and Societies Proclamation (CSO law).

Other human rights problems included arbitrary killings; allegations of torture, beating, abuse, and mistreatment of detainees by security forces; reports of harsh and at times life-threatening prison conditions; arbitrary arrest and detention; detention without charge and lengthy pretrial detention; a weak, overburdened judiciary subject to political influence; infringement on citizens' privacy rights, including illegal searches; allegations of abuses in the implementation of the government's "villagization" program; restrictions on academic freedom; restrictions on freedom of assembly, association, and movement; alleged interference in religious affairs; limits on citizens' ability to change their government; police, administrative, and judicial corruption; violence and societal discrimination against women and abuse of children; female genital

mutilation/cutting (FGM/C); exploitation of children for economic and sexual purposes; trafficking in persons; societal discrimination against persons with disabilities; clashes between ethnic minorities; discrimination against persons based on their sexual orientation and against persons with HIV/AIDS; limits on worker rights; forced labor; and child labor, including forced child labor.

Impunity was a problem.  The government, with some reported exceptions, generally did not take steps to prosecute or otherwise punish officials who committed abuses other than corruption.

Factions of the Ogaden National Liberation Front (ONLF), an ethnically based, violent, and fragmented separatist group operating in the Somali Region, were responsible for abuses.  Members of the separatist Afar Revolutionary Democratic Union Front (ARDUF) claimed responsibility for a January attack on a group of foreign tourists in the Afar Region.

**Section 1. Respect for the Integrity of the Person, Including Freedom from:**

**a. Arbitrary or Unlawful Deprivation of Life**

Members of the security forces committed killings and used lethal force to quell protests (see section 2.b.).  During the year, scattered fighting continued between government forces, primarily regional government-backed militia, and residual elements of the ONLF.  Also, clashes between ethnic groups during the year resulted in 100 to 150 deaths (see section 6).

Ethiopian security forces reportedly killed as many as six persons in retaliation for an April 28 attack by armed gunmen that killed at least five persons and injured numerous others at the Saudi Star compound in the Gambella Region.

On February 12, members of the Somali Region Special Police allegedly opened fire on a local assembly in the Ogaden area of the Somali Region, killing 20 persons.  The villagers reportedly were gathered to discuss the murder of a village elder the previous day.  Many others were detained during the same incident.

Members of the ARDUF claimed responsibility for a January 18 attack on a group of foreign tourists in the Afar Region.  The attack resulted in the deaths of five Europeans and the kidnapping of two Europeans and two Ethiopians.  The kidnapped Europeans later were released; the whereabouts and well-being of the Ethiopian hostages remained unknown at year's end.

**b. Disappearance**

There was a reported case of a politically motivated disappearance of two persons in which security officials detained opposition activists and held them temporarily incommunicado.

On June 15, in the North Gondar area of the Amhara Region, federal police reportedly arrested Meles Ashire, deputy chairman of the opposition All Ethiopia Unity Party (AEUP) for the Chilga District, and Tadlo Tefera, an AEUP executive member for the North Gondar zone. Following their arrest, Meles and Tadlo's whereabouts were reportedly unknown; however, authorities released them in August.

**c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment**

The constitution and law prohibit such practices; however, there were numerous reports security officials tortured and otherwise abused detainees.

Authorities reportedly tortured Ahmedin Jebel, an editor and a columnist with *Muslim Affairs* magazine (see section 2.a.).

In 2010 the UN Committee Against Torture reported it was "deeply concerned" about "numerous, ongoing, and consistent allegations" concerning "the routine use of torture" by police, prison officers, and other members of the security forces-- including the military--against political dissidents and opposition party members, students, alleged terrorists, and alleged supporters of violent separatist groups like the ONLF and the Oromo Liberation Front (OLF). The committee reported that such acts frequently occurred with the participation of, at the instigation of, or with the consent of commanding officers in police stations, detention centers, federal prisons, military bases, and unofficial or secret places of detention. Some reports of such abuses continued during the year.

Sources widely believed police investigators often used physical abuse to extract confessions in Maekelawi, the central police investigation headquarters in Addis Ababa. Authorities continued to restrict access by diplomats and NGOs to Maekelawi.

According to a Human Rights Watch report, soldiers arbitrarily arrested and raped persons following the April 28 attack by armed gunmen at the Saudi Star compound in the Gambella Region (see section 1.a). There was no additional reporting to corroborate the report of rape.

**Prison and Detention Center Conditions**

Prison and pretrial detention center conditions remained harsh and in some cases life threatening. There were numerous reports of authorities beating prisoners. Medical attention following beatings reportedly was insufficient in some cases.

<u>Physical Conditions</u>: As of September there were 70,000-80,000 persons in prison, of whom approximately 2,500 were women and nearly 600 were children incarcerated with their mothers. Juveniles sometimes were incarcerated with adults, and small children were sometimes incarcerated with their mothers. Male and female prisoners generally were separated.

Severe overcrowding was common, especially in sleeping quarters. The government provided approximately eight birr ($0.44) per prisoner per day for food, water, and health care. Many prisoners supplemented this amount with daily food deliveries from family members or by purchasing food from local vendors, although there were reports of some prisoners being prevented from receiving supplemental food from their families. Medical care was unreliable in federal prisons and almost nonexistent in regional prisons. Prisoners had limited access to potable water, as did many in the country. Also, water shortages caused unhygienic conditions, and most prisons lacked appropriate sanitary facilities. Many prisoners had serious health problems in detention but received little treatment. Information released by the Ministry of Health during the year reportedly stated nearly 62 percent of inmates in various jails across the country suffered from mental health problems as a result of solitary confinement, overcrowding, and lack of adequate health care facilities and services.

The country has six federal and 120 regional prisons. There also are many unofficial detention centers throughout the country, including in Dedessa, Bir Sheleko, Tolay, Hormat, Blate, Tatek, Jijiga, Holeta, and Senkele. Most are located at military camps.

Pretrial detention often takes place in police station detention facilities, where the conditions varied widely. Reports regarding pretrial detention in police stations

indicated poor hygiene, lack of access to visitors (including family members and legal counsel), and police abuse of detainees.

Administration:  It was difficult to determine if recordkeeping was adequate due to the lack of transparency regarding incarceration.  Authorities did not employ alternative sentencing for nonviolent offenders.  Prisons did not have ombudspersons to respond to complaints.  Legal aid clinics existed in some prisons for the benefit of prisoners.  Authorities generally permitted visitors.  In some cases family visits to prisoners were restricted to a few per year.  Family members of prisoners charged with terrorist activity alleged instances of blocked access to the prisoners; there were also reports those charged with terrorist activity were denied visits with their lawyers or representatives of the political parties to which they belonged.  Prisoners generally were permitted religious observance, but this varied by prison, and even by section within a prison, at the discretion of prison management.  There were some allegations that while in custody, detainees were denied adequate locations in which to pray.  Prisoners were permitted to voice complaints about prison conditions or treatment to the presiding judge during the trial.

Monitoring:  During the year the International Committee of the Red Cross (ICRC) visited regional prisons throughout the country.  The visits occurred after a general assessment by the government reopened the path to regular ICRC access; the government had limited such access since 2004.

Regional authorities allowed government and NGO representatives to meet regularly with prisoners without third parties present.  The Ethiopian Human Rights Commission (EHRC) monitored federal and regional detention centers and interviewed prison officials and prisoners in response to allegations of widespread human rights abuses.  The domestic NGO Justice For All-Prison Fellowship Ethiopia (JFA-PFE) was granted access to various prison and detention facilities.

Improvements:  The government and prison authorities generally cooperated with efforts of the JFA-PFE to improve prison conditions.  The JFA-PFE ran model prisons in Adama and Mekele, with significantly better conditions than those found in other prisons.  The government undertook renovations to prisons in the Tigray, Amhara, and Oromia regions and in the Southern Nations, Nationalities, and People's Region (SNNPR) during the year.

**d. Arbitrary Arrest or Detention**

Although the constitution and law prohibit arbitrary arrest and detention, the government often ignored these provisions in practice.  There were multiple reports of arbitrary arrest and detention by police and security forces.

Civilians, international NGOs, and other aid organizations operating in the Somali Region reported government security forces, local militias, and the ONLF committed abuses such as arbitrary arrest.

**Role of the Police and Security Apparatus**

The Federal Police reports to the Ministry of Federal Affairs, which is subject to parliamentary oversight.  The oversight was loose in practice.  Each of the country's nine regions has a state or special police force that reports to the regional civilian authorities.  Local militias operated across the country in loose coordination with regional and federal police and the military, with the degree of coordination varying by region.  In many cases these militias functioned as extensions of local EPRDF political bosses.

Security forces were effective, but impunity remained a serious problem.  The mechanisms used to investigate abuses by the federal police were not known. Numerous complaints of human rights abuses were lodged against the Somali Region Special Police.  Several of its members reportedly were arrested for acts of indiscipline.  The government rarely publicly disclosed the results of investigations into abuses by local security forces, such as arbitrary detention and beatings of civilians.

The government continued its efforts to provide human rights training for police and army recruits.  During the year the government continued to accept assistance from the JFA-PFE and the EHRC to improve and professionalize its human rights training and curriculum by including more material on the constitution and international human rights treaties and conventions.  The JFA-PFE and the EHRC conducted human rights training for police commissioners, prosecutors, judges, prison administrators, and militia in Tigray, Amhara, Oromia, Afar, SNNPR, Gambella, and Addis Ababa.

**Arrest Procedures and Treatment While in Detention**

Although the constitution and law require detainees be brought to court and charged within 48 hours of arrest, sometimes this requirement was not respected in practice.  With court approval, persons suspected of serious offenses can be

detained for 14 days without being charged and for additional 14-day periods if an investigation continues.  Under the antiterrorism proclamation, police may request to hold persons without charge for 28-day periods, up to a maximum of four months, while an investigation is conducted.  The law prohibits detention in any facility other than an official detention center; however, local militias and other formal and informal law enforcement entities used dozens of unofficial local detention centers.

A functioning bail system was in place.  Bail was not available for murder, treason, and corruption.  In one high-profile case, a judge denied bail for *Feteh* editor in chief Temesgen Dessalegn due to concerns the defendant might continue to write articles offending the government if he was released.  The judge also based the denial on concerns he posed a flight risk, although he had been free for more than a month during the pretrial phase.  Authorities dropped the charges against him on August 28 (see section 2.a.); they reopened the case in December, and it continued at year's end.  In most cases authorities set bail between 500 and 10,000 birr ($28 and $550), which was not affordable for most citizens.  Police officials did not always respect court orders to release suspects on bail.  The government provided public defenders for detainees unable to afford private legal counsel, but only when their cases went to court.  While detainees were in pretrial detention, authorities sometimes allowed them little or no contact with legal counsel, did not provide full information on their health status, and did not provide for family visits.

<u>Arbitrary Arrest</u>:  Authorities regularly detained persons without warrants and denied access to counsel and in some cases to family members, particularly in outlying regions.

<u>Pretrial Detention</u>:  Some detainees reported being held for several years without being charged and without trial.  Trial delays were most often caused by lengthy legal procedures, the large numbers of detainees, judicial inefficiency, and staffing shortages.

<u>Amnesty</u>:  On September 11, in keeping with a long-standing tradition of issuing pardons at the Ethiopian New Year, the federal government pardoned 1,993 prisoners.  Regional governments also pardoned persons during the year.  For example, the SNNPR regional government pardoned 5,395 prisoners, the Oromia regional government pardoned 4,700 prisoners, and the Amhara regional government pardoned 2,607 prisoners.

**e. Denial of Fair Public Trial**

The law provides for an independent judiciary.  Although the civil courts operated with a large degree of independence, the criminal courts remained weak, overburdened, and subject to political influence.  The constitution recognizes both religious and traditional or customary courts.

**Trial Procedures**

By law accused persons have the right to a fair public trial by a court of law within a "reasonable time," a presumption of innocence, the right to be represented by legal counsel of their choice, and the right to appeal.  The law gives defendants the right to present witnesses and evidence in their defense, cross-examine prosecution witnesses, and access government-held evidence.  In practice the government did not always allow defendants the right of access to evidence it held.  The court system does not use jury trials.  Judicial inefficiency and lack of qualified staff often resulted in serious delays in trial proceedings and made the application of the law unpredictable.  The government continued to train lower court judges and prosecutors and made effective judicial administration the primary focus of this training.  Defendants were often unaware of the specific charges against them until the commencement of the trial; this also caused defense attorneys to be unprepared to provide adequate defense.

The Public Defender's Office provided legal counsel to indigent defendants, although its scope and quality of service remained limited due to the shortage of attorneys.  Numerous free legal aid clinics around the country, based primarily at universities, provided advice to clients.  In certain areas of the country regional legislative bodies passed laws allowing volunteers, such as law students and professors, to represent clients in court on a pro bono basis.

During the year the government concluded trials against 31 persons who had been charged with terrorist activities under the antiterrorism proclamation.  These trials included cases against12 journalists, opposition political figures, and activists based in the country, as well as an Ethiopian employee of the UN.  All were found guilty.  Eighteen persons living abroad were convicted in absentia.  The government also invoked the antiterrorism proclamation in charging 28 Muslims identified with protests and one Muslim accused of accepting funds illegally from a foreign embassy.  Several international human rights organizations and foreign diplomatic missions raised concerns over the conduct of the trials.  Observers found the evidence presented at trials to be either open to interpretation or indicative of acts of a political nature rather than linked to terrorism.  Human rights

groups also noted the law's broad definition of terrorism, as well as its severe penalties, its broad rules of evidence, and the discretionary powers afforded police and security forces.

In some sensitive cases deemed to involve matters of national security, notably the high-profile trials of activists in the Muslim community, detainees stated authorities initially denied them the right to see attorneys.  The trial of the 28 Muslims identified with protests and one Muslim accused of accepting funds illegally from a foreign embassy was not fully open to family and supporters, although it was initially open to the press and diplomats.  The trial of 11 persons (including six persons in absentia) charged on May 19 with being members of the terrorist organizations al-Qa'ida and al-Shabaab was not open to the public.

Many citizens residing in rural areas generally had little access to formal judicial systems and relied on traditional mechanisms of resolving conflict.  By law all parties to a dispute must agree to use a traditional or religious court before such a court may hear a case, and either party can appeal to a regular court at any time. Sharia (Islamic law) courts may hear religious and family cases involving Muslims.  Sharia courts received some funding from the government and adjudicated the majority of cases in the Somali and Afar regions, which are predominantly Muslim.  In addition other traditional systems of justice, such as councils of elders, continued to function.  Some women stated they lacked access to free and fair hearings in the traditional justice system because they were excluded by custom from participation in councils of elders and because there was strong gender discrimination in rural areas.

**Political Prisoners and Detainees**

Estimates by human rights groups and diplomatic missions regarding the number of political prisoners varied.  Domestic and international NGOs estimated there were up to 400 political prisoners and detainees at year's end.  The government did not permit access by international human rights organizations.

Twelve of the journalists, opposition members, and activists convicted under the antiterrorism proclamation during the year remained in prison.  Several international human rights organizations and foreign diplomatic missions raised concerns about the conduct of the trials.

On January 19, a court convicted journalists Woubishet Taye and Reyot Alemu and opposition figure Zerihun Gebre-Egziabher Tadesse on terrorism charges.  It

also convicted Hirut Kifle Woldeyesus, who denied the prosecution's claim she was an opposition political figure. Journalist and blogger Elias Kifle was tried and convicted in absentia in the same case. On January 26, Woubishet and Reyot were each sentenced to 14 years in prison, while the other two defendants present received sentences of 17 and 19 years. Reyot appealed her case to the Supreme Court, which later overturned two of the three charges and reduced her sentence to five years. She subsequently appealed the Supreme Court's decision to the Court of Cassation, arguing a fundamental error of law had been made in her trial. The other defendants chose not to appeal.

On June 27, the Federal High Court found journalist and blogger Eskinder Nega, vice chairman of the opposition front Medrek Andualem Arage, and Unity for Democracy and Justice Party (UDJ) official Natnael Mekonnen guilty on all counts of terrorism and treason. On July 13, Eskinder and Natnael were each sentenced to 18 years in prison, while Andualem received a life sentence. Eskinder and Andualem appealed their conviction to the Supreme Court; the case remained ongoing at year's end. In September the government announced it had asked the Federal High Court to freeze the assets of Eskinder and Andualem while investigating whether their assets had been used in conjunction with the commission of the crimes for which they were convicted. Court proceedings regarding the assets also remained ongoing at year's end.

Bekele Gerba and Olbana Lelisa, two well-known political opposition figures from the Oromo ethnic group, as well as seven other individuals, were convicted under the criminal code of conspiracy to overthrow the government and incite unrest. Bekele was sentenced to eight years in prison; Olbana was sentenced to 13 years. A separate trial of 69 members of Oromo political opposition parties, charged in 2011 under the criminal code with "attacking the political or territorial integrity of the state," remained ongoing at year's end.

**Civil Judicial Procedures and Remedies**

The law provides citizens the right to appeal human rights violations in civil court; No such cases were filed during the year.

**f. Arbitrary Interference with Privacy, Family, Home, or Correspondence**

The law requires authorities to obtain judicial warrants to search private property; in practice police often ignored the law, and there were no records of courts

excluding evidence found without warrants.  Opposition political party leaders reported suspicions of telephone tapping and other electronic eavesdropping.

The government reportedly used a widespread system of paid informants to report on the activities of particular individuals.  During the year opposition members reported ruling party operatives and militia members made intimidating and unwelcome visits to their homes.

Security forces continued to detain family members of persons sought for questioning by the government.  There were reports unemployed youths who were not affiliated with the ruling coalition sometimes had trouble receiving the "support letters" from their kebeles (neighborhoods or wards) necessary to get jobs.

The government interfered with citizens' family rights.  Medical abuses to facilitate international adoption were documented.  This included the diagnosis of new mothers as mentally unfit by unqualified medical professionals and the subsequent forced relinquishment of children.

The national government and regional governments continued to put in place "villagization" plans in the Afar, Benishangul-Gumuz, Gambella, SNNPR, and Somali regions.  These plans involved the relocation of scattered rural populations from arid or semiarid lands vulnerable to recurring droughts into designated clusters by regional governments.  The stated purposes of villagization are to improve the provision of government services (i.e., health care, education, and clean water), protect vulnerable communities from natural disasters and attacks, and change environmentally destructive patterns of shifting cultivation.  Some observers stated the purpose was to enable the large-scale leasing of land for commercial agriculture, a claim the government denied.  The government described the villagization program as strictly voluntary.

Assessments by international donors continued to find no systematic evidence of human rights violations in this program.  They did find problems such as delays in establishing promised infrastructure from rushed program implementation. Communities and individual families appeared to have agreed to move based on assurances from authorities of food aid, services, and land, although in some instances communities moved before adequate basic services and shelter were in place in the new locations.  For example, an early August visit to a site in South Omo in the SNNPR suggested the process was voluntary but found that promised infrastructure, such as access to water, education, and healthcare, were not in place

by the time persons moved.  A subsequent October visit to the same site revealed improved conditions, including installation of a water pump, a newly built school, and a health services tent stocked by UNICEF.  A January Human Rights Watch report that drew upon information gathered in 2011 characterized the process as "far from voluntary."  The report described a process in which security forces and local militia attended meetings with those communities that initially had indicated they did not want to move and later went with villagers to the new locations, where they oversaw the construction of tukuls (traditional huts) by the villagers. According to the report, security forces beat (sometimes to death), threatened, arrested without charge, and detained persons who were critical of the planned villagization of their communities.  Additional Human Rights Watch reporting stated the government harassed, mistreated, and arbitrarily arrested persons in South Omo in order to clear or prepare land for commercial agriculture; development partners did not find evidence to support this claim during visits.

## Section 2. Respect for Civil Liberties, Including:

### a. Freedom of Speech and Press

**Status of Freedom of Speech and Press**

The constitution and law provide for freedom of speech and press; however, authorities arrested, detained, and convicted journalists and other persons whom they perceived as critical of the government.

Freedom of Speech:  Authorities arrested and harassed persons for criticizing the government.  The government attempted to impede criticism through various forms of intimidation, including detention of journalists and opposition activists and monitoring and interference in the activities of political opposition groups.  Some villagers continued to report local authorities threatened retaliation against anyone who reported abuses by security forces.

In July authorities charged Jemal Kedir with "fomenting dissent, arousing hatred, and stirring up acts of political, racial, or religious disturbances" for sending text messages on his cell phone stating "Allahu Akbar, seventeen times our voice should be heard and prisoners who are in jail should be released."  He was also charged with sending messages claiming police had prevented Muslims from entering the Grand Anwar Mosque in Addis Ababa, calling for additional protests, and calling for a boycott of the elections to the Ethiopian Islamic Affairs Supreme Council (EIASC) until detainees were released.  On September 13, a court found

him guilty.  The judge referred to the crime as "rumor mongering with his cell phone," and sentenced him to one year in prison.

In October police arrested seven individuals after they gave radio interviews regarding reported land grabs in Lega Tofo in the Oromia Region.  The individuals stated they were forced off their land without adequate compensation.  The police later released them.

Freedom of Press:  *Ethio-Channel*, *Negadras*, *Feteh*, and two Muslim newspapers closed due to government pressure.  The remaining 15 newspapers had a combined weekly circulation in Addis Ababa of more than 100,000, down from 150,000 in 2011.  Most newspapers were printed on a weekly or biweekly basis, with the exception of the state-owned Amharic and English dailies.

The government controlled the only television station that broadcast nationally, which, along with radio, was the primary source of news for much of the population.  Three private FM radio stations broadcast in the capital city, and at least 13 community radio stations broadcast in the regions.  State-run Ethiopian Radio has the largest reach in the country, followed by Fana Radio, which is affiliated with the ruling party.

Government-controlled media closely reflected the views of the government and the ruling EPRDF.  The government periodically jammed foreign broadcasts, including after the death of Prime Minister Meles Zenawi.  The broadcasting law prohibits political and religious organizations and foreigners from owning broadcast stations.  The investment law also prohibits foreigners from owning broadcast stations.

Violence and Harassment:  The government continued to arrest, harass, and prosecute journalists.  Several UN special rapporteurs and the UN High Commissioner for Human Rights expressed concern about the government's use of the antiterrorism proclamation against journalists and opposition members.

On August 9, the Ministry of Justice filed three charges against *Feteh* editor in chief Temesgen Dessalegn.  These charges included inciting and agitating the country's youth to engage in violence, defamation of government, and destabilizing the public by spreading false reports, based on articles published between December 2011 and August.  Temesgen was detained on August 23, but the charges were dropped on August 28 and he was released the same day.  The

government reopened its case against Temesgen on December 11, and the case remained ongoing at year's end.

On July 20, authorities arrested *Muslim Affairs* editor Yusuf Getachew and *Muslim Affairs* columnist Ahmedin Jebel.  Ahmedin Jebel reportedly was tortured.  At year's end, they remained imprisoned along with 27 other Muslim activists accused of terrorist activity.

Also in July two editors from *Muslim Affairs*, Akmel Negash and Yishak Eshetu, left the country, citing fear of arrest.  After these arrests and departures, the publication ceased operation.

Courts found journalists Woubishet Taye, Reyot Alemu, and Eskinder Nega, who were arrested in 2011, as well as six journalists/bloggers tried in absentia, guilty of charges under the antiterrorism proclamation in separate cases (see section 1.e.).

Censorship or Content Restrictions:  Government harassment of journalists caused them to avoid reporting on sensitive topics.  Many private newspapers reported informal editorial control by the government through article placement requests and calls from government officials concerning articles perceived as critical of the government.  Private sector and government journalists routinely practiced self-censorship.

In April the state-run Berhanena Selam Printing Press, which accounted for approximately 90 percent of newspaper printing in the country, instituted a new standard printing contract with its private publisher clients.  The contract stipulated the printing press had the right to refuse to print newspapers containing material deemed "illegal."  Editors of privately owned newspapers refused to sign the contract, deeming it censorship and in violation of the constitutional protection of press freedom.  Berhanena Selam stopped printing publications that did not sign the updated contract.

On July 20, the Ministry of Justice banned the distribution of that week's issue of the *Feteh* newspaper via court order.  Reports indicated the ban was based on the issue's contents--which authorities deemed objectionable and sensitive--which dealt with the late prime minister's health and the ongoing protests by some members of the Muslim community.  Although the Ministry of Justice issued no further injunctions, Berhanena Selam refused to print subsequent issues of *Feteh*.

Berhanena Selam refused to print the August 31 edition of *Finote Netsanet*, the newspaper of the Unity for Democracy and Justice (UDJ) party, one of the largest opposition political parties, citing complaints filed against the newspaper by the public related to coverage of the death of the prime minister in the previous issue. In September Berhanena Selam refused to print the UDJ newspaper, claiming the printer was too busy to do the work.  The newspaper resumed publication in October after reaching an agreement with a private publisher, but ceased publication by November.

Libel Laws/National Security:  The government used the antiterrorism proclamation to suppress criticism.  Journalists feared covering five groups designated by parliament in June 2011 as terrorist organizations (Ginbot 7, the ONLF, the OLF, al-Qaida, and al-Shabaab), citing ambiguity on whether reporting on these groups might be punishable under the law.  Several journalists, both local and foreign correspondents, reported an increase in self-censorship.

In September the government pardoned Swedish freelancers Johan Persson and Martin Schibbye.  In December 2011 a court convicted them of rendering support to a terrorist organization and illegally entering the country.

The government used libel laws during the year to suppress criticism.

**Internet Freedom**

The government restricted access to the Internet and blocked several Web sites, including blogs, opposition Web sites, and Web sites of Ginbot 7, the OLF, and the ONLF.  The government also temporarily blocked news sites such as the *Washington Post*, the *Economist*, and Al Jazeera, and temporarily blocked links to foreign government reporting on human rights conditions in the country.  Several news blogs and Web sites run by opposition diaspora groups were not accessible. These included Addis Neger, Nazret, Ethiopian Review, CyberEthiopia, Quatero Amharic Magazine, Tensae Ethiopia, and the Ethiopian Media Forum.  A foreign government news Web site was only available periodically, although users could generally access it via proxy sites.  Authorities took steps to block access to Virtual Private Network (VPN) providers that let users circumvent government screening of Internet browsing and email.  According to the government, 4 percent of individuals subscribed to Internet access.

**Academic Freedom and Cultural Events**

The government restricted academic freedom, including through decisions on student enrollment, teachers' appointments, and the curriculum.  Speech, expression, and assembly frequently were restricted on university and high school campuses.

According to sources, the ruling party, via the Ministry of Education, continued to give preference to students loyal to the party in assignments to postgraduate programs.  While party membership was not as common at the undergraduate level, some university staff members commented priority for employment after graduation in all fields was given to students who joined the party.

The government also restricted academic freedom in other ways.  Authorities limited teachers' ability to deviate from official lesson plans.  Numerous anecdotal reports suggested non-EPRDF members were more likely to be transferred to undesirable posts and bypassed for promotions.  There were some reports of teachers not affiliated with the EPRDF being summarily dismissed for failure to attend nonscheduled meetings.  There continued to be a lack of transparency in academic staffing decisions, with numerous complaints from individuals in the academic community alleging bias based on party membership, ethnicity, or religion.

According to multiple credible sources, teachers and high school students in grade 10 and above were required to attend training on the concepts of revolutionary democracy and EPRDF party ideology.

There were no changes to the 2010 Ministry of Education directive prohibiting private universities from offering degree programs in law and teacher education. The directive also requires public universities to align their curriculum offerings with the previously announced policy of a 70-to-30 ratio between science and social science academic programs.  As a result the number of students studying social sciences and the humanities continued to decrease and private universities focused heavily on the social sciences.  Ministry officials originally cited a need to maintain quality standards as the reason for the directive.

**b. Freedom of Peaceful Assembly and Association**

**Freedom of Assembly**

The constitution and law provide for freedom of assembly; however, the government restricted this right.  On several occasions during the year, authorities

injured and arrested protesters who reportedly were demonstrating without a permit.  Security forces used lethal force against civilians (see section 1.a.).

Organizers of large public meetings or demonstrations must notify the government 48 hours in advance and obtain a permit.  Local government officials, almost all of whom were affiliated with the EPRDF, controlled access to municipal halls, and there were many complaints from opposition parties local officials denied or otherwise obstructed the scheduling of opposition parties' use of halls for lawful political rallies.  There were numerous credible reports of owners of hotels and other large facilities citing unspecified internal rules forbidding political parties from utilizing their space for gatherings, for example, claiming that hotel meeting space could only be used for weddings.

Regional governments, including the Addis Ababa regional administration, were reluctant to grant permits or provide security for large meetings.

Beginning in late 2011 and continuing throughout much of the year, some members of the Muslim community, alleging government interference in religious affairs, held peaceful protests following Friday prayers at several of Addis Ababa's largest mosques, the Aweliya Islamic Center in Addis Ababa, and at other locations throughout the country.  Most demonstrations occurred without incident, although some were met with arrests and alleged use of unnecessary force by police.

In late July authorities arrested as many as 1,000 Muslim demonstrators, including members of a self-appointed committee claiming to represent the interests of the Muslim community, for protesting alleged government interference in religious affairs.  The majority of the protesters subsequently were released without charge.  On October 29, authorities charged 29 individuals under the Anti-Terrorism Proclamation; 28 of the individuals were identified with the protest movement, while one was accused of accepting funds illegally from a foreign embassy.

On October 21, in the South Wollo Zone of the Amhara Region, police and protesters clashed during a gathering during elections for the local Islamic council.  Accounts of the event differed.  One report indicated protesters threw stones at the houses of Muslims who participated in the election.  In response to the stone throwing, police arrested the protest organizer.  A crowd then marched on the police station, demanding his release.  Protesters reportedly entered the police station by force, killing one police officer and seriously injuring another.  Police reportedly killed two protesters, including the detained protest organizer.

**Freedom of Association**

Although the law provides for freedom of association and the right to engage in unrestricted peaceful political activity, the government limited this right in practice.

In accordance with the CSO law, anonymous donations to NGOs are not permitted. All potential donors were therefore aware their names would be public knowledge. The same was true concerning all donations made to political parties.

The Ministry of Foreign Affairs screens registration applications from international NGOs and submits a recommendation on whether to approve or deny registration.

**c. Freedom of Religion**

See the Department of State's *International Religious Freedom Report* at www.state.gov/j/drl/irf/rpt.

**d. Freedom of Movement, Internally Displaced Persons, Protection of Refugees, and Stateless Persons**

Although the law provides for freedom of movement within the country, foreign travel, emigration, and repatriation, the government restricted some of these rights in practice.

The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to internally displaced persons (IDPs), refugees, returning refugees, asylum seekers, stateless persons, and other persons of concern.

In-country Movement:  The government continued to relax but did not completely remove restrictions on the movement of persons into and within the Ogaden area of the Somali Region, continuing to argue the ONLF posed a security threat (see section 2.d., Internally Displaced Persons).  Deliveries of food and medicine were halted temporarily in the limited areas affected by fighting due to security concerns.

The government expanded an out-of-camp policy allowing Eritrean refugees to live outside of a camp to all refugees.  According to the Administration for

Returnees and Refugee Affairs (ARRA), which managed the out-of-camp program, 3,412 refugees lived outside of the camps during the year, compared with 1,294 in 2011 and 723 in 2010.  Prior to this policy, such permission was given primarily to attend higher education institutions, undergo medical treatment, or avoid security threats at the camps.

Exile:  Several citizens sought political asylum in other countries or remained abroad in self-imposed exile (see section 2.a.).

**Internally Displaced Persons (IDPs)**

The total number of IDPs in the country during the year was not known.  Many persons who had been displaced due to conflict in the Gambella, Oromia, SNNPR, and Somali regions remained displaced.  Drought also caused displacements during the year.

A land rights dispute in the Bench Maji Zone of the SNNPR spurred ethnic conflict, causing the displacement of 463 ethnic Amharas in March.  These IDPs were sent to Addis Ababa, where the government provided them with food and essential items.  Shortly after their arrival, the regional government informed the IDPs they should return to their areas of origin--referring not to where they had been living before being displaced, but to the Amhara Region, which their families had left during the time of the Derg (1974-91).  The regional government later decided to relocate most of the IDPs to Tsegede in North Gondar Zone of the Amhara Region.

Temporary displacements due to flooding were reported from parts of Amhara, Oromia, and SNNPR between mid-July and August.  Most of those displaced later returned to their homes.

In July communal conflict in the Moyale area in the south of the country displaced tens of thousands of persons.  Following an initial response by the Federal Disaster Risk Management and Food Security Sector (DRMFSS), Moyale town was put under federal control while the conflict was mediated, leading to deployment of a team from the Ministry of Federal Affairs to help coordinate the humanitarian response.  According to the results of a joint assessment conducted by the DRMFSS and development partners, most of those displaced returned home by early September, although some 1,000 households remained without shelter.  Some 58,000 persons required food assistance due to the impact of the conflict, and more than 78,000 required provision of potable water.

During the year, drought caused displacements in the Somali Region, a situation exacerbated in some cases by the continuing conflict.

The government at the federal level did not recognize IDPs as a distinct group, and there was no specialized office charged with managing matters such as IDP protection, return, resettlement, or durable solutions.  The government did not maintain data on IDPs.  The DRMFSS, under the authority of the Ministry of Agriculture and Rural Development, is the main government agency responsible for emergencies, in collaboration with the Ministry of Health and the Ministry of Water and Energy, and has responsibility for coordinating the provision of humanitarian assistance to displaced persons.

Restrictions limiting the access of human rights organizations, the media, humanitarian agencies, and diplomatic missions to conflict-affected areas continued, particularly with regard to the Somali Region conflict zones of Fik, Degahbur, Korahe, and parts of Warder.  The partial relaxation of those restrictions that began the previous year continued, with humanitarian access in the Somali Region improving in particular.  Journalists were required to register before entering conflict regions.  The government lacked a clear policy on NGO access to sensitive areas, leading regional government officials and military officials frequently to refer requests for access to the federal government.  There were isolated reports of regional police or local militias blocking NGOs' access to particular locations on particular days, citing security concerns.

**Protection of Refugees**

Access to Asylum:  The law provides for the granting of asylum or refugee status, and the government has established a system for providing protection to refugees.

According to the UNHCR, the country hosted 376,410 refugees at year's end.  The majority of refugees were from Somalia (223,243), with others coming from Sudan and South Sudan (66,177, in addition to an estimated 20,000 unregistered refugees residing along the South Sudan-Ethiopia border), Eritrea (62,996), and other nations (3,994), particularly Kenya.  New arrivals from Somalia numbered approximately 50,000 for the year, a significant decrease from 100,000 in 2011.

The UNHCR, the government, and humanitarian agencies continued to care for Sudanese arrivals fleeing from conflict in Sudan's Blue Nile State.

Eritrean asylum seekers continued to arrive at the rate of approximately 700 new arrivals per month, according to the UNHCR.  Hundreds of Eritrean refugees reportedly departed monthly on secondary migration through Egypt and Sudan to go to Israel, Europe, and other final destinations.  The UNHCR and ARRA assisted in the reception and transportation back to My Ayni or Adi Harush camps of approximately 700 Eritrean refugees in 2011 and 952 during the year who had been detained in Egypt and deported by the Egyptian authorities.  The UNHCR reported the population of unaccompanied minors who fled Eritrea into the country was 1,200 at year's end.  Unaccompanied minors in the 15- to17-year-old age group represented more than 75 percent of the total population of such minors.

Employment:  The government does not grant refugees work permits.

Access to Basic Services:  Refugees in camps were provided with schooling and health services.  For those outside of camps, there were no reports of discrimination in access to public services.

Durable Solutions:  The government granted refugee status to asylum seekers from Eritrea, Somalia, South Sudan, and Sudan.  The government welcomed refugees to settle permanently in the country, but did not offer a path to citizenship.  During the year approximately 5,543 refugees departed the country for resettlement.

**Section 3. Respect for Political Rights: The Right of Citizens to Change Their Government**

The constitution and law provide citizens the right to change their government peacefully.  In practice the ruling party's electoral advantages limited this right.

**Elections and Political Participation**

Recent Elections:  On August 20, Prime Minister Meles Zenawi died.  The ruling EPRDF elected Hailemariam Desalegn, the deputy prime minister, to take Meles's place as chairman of the party and subsequently nominated him for the post of prime minister.  On September 21, parliament elected Hailemariam as prime minister.

In the 2010 national parliamentary elections, the EPRDF and affiliated parties won 545 of 547 seats to remain in power for a fourth consecutive five-year term.  Independent observation of the vote was severely limited due to government restrictions.  Although the relatively few international officials allowed to observe

the elections concluded technical aspects of the vote were handled competently, some also noted an environment conducive to free and fair elections was not in place prior to election day.  Several laws, regulations, and procedures implemented since the 2005 national elections created a clear advantage for the EPRDF throughout the electoral process.  There was ample evidence unfair government tactics, including intimidation of opposition candidates and supporters, influenced the extent of the EPRDF victory.  In addition, voter education was limited to information about technical voting procedures and was done only by the National Electoral Board just days before voting began.

The African Union, whose observers arrived one week before the vote, deemed the elections to be free and fair.  The European Union, some of whose observers arrived a few months before the vote, concluded the elections fell short of international standards for transparency and failed to provide a level playing field for opposition parties.  The EU observed a "climate of apprehension and insecurity," noting the volume and consistency of complaints of harassment and intimidation by opposition parties was "a matter of concern" and had to be taken into consideration "in the overall assessment of the electoral process."

Political Parties:  Political parties were predominantly ethnically based.  EPRDF constituent parties conferred advantages upon their members; the parties directly owned many businesses and were broadly perceived to award jobs and business contracts to loyal supporters.  Several opposition political parties reported difficulty in renting homes or buildings in which to open offices, citing visits by EPRDF members to the landlords to persuade or threaten them not to rent property to these parties.

During the year, there were credible reports teachers and other government workers had their employment terminated if they belonged to opposition political parties.  According to Oromo opposition groups, the Oromia regional government continued to threaten to dismiss opposition party members, particularly teachers, from their jobs.  Government officials made allegations many members of legitimate Oromo opposition political parties were secretly OLF members and more broadly that members of many opposition parties had ties to Ginbot 7.  At the university level members of Medrek and its constituent parties were able to teach.

Registered political parties must receive permission from regional governments to open and occupy local offices.

In early 2010 a system of public campaign finance was announced.  Under this system parties are to receive public funds from the National Electoral Board based in part on the number of parliamentary seats they hold.  In 2011 the EPRDF decided to redistribute its share of the funds, which accounted for approximately 75 percent based on its dominance of the parliament and regional councils, to other political parties that were members of the Joint Council of Political Parties, whether or not they had seats in parliament.  Because of an ongoing dispute with the EPRDF, Medrek, the largest opposition front, remained outside the Joint Council.  Despite this Medrek was offered a small amount of funds, which it refused to accept.

Participation of Women and Minorities:  No laws or cultural or traditional practices prevented women or minorities from voting or participating in political life on the same basis as men or nonminority citizens.  The Tigray Regional Council held the highest proportion of women nationwide, at 48.5 percent.

The government policy of ethnic federalism led to the creation of individual constituencies to provide for representation of all major ethnic groups in the House of People's Representatives.  There were more than 80 ethnic groups, and small groups lacked representation in the legislature.  There were 24 nationality groups in six regional states (Tigray, Amhara, Beneshangul-Gumuz, SNNPR, Gambella, and Harar) that did not have a sufficient population to qualify for constituency seats based on the 2007 census result; however, in the 2010 elections, individuals from these nationality groups competed for 24 special seats in the House of People's Representatives.  Additionally, these 24 nationality groups have one seat each in the House of Federation.

## Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for official corruption; despite the government's prosecution of numerous officials for corruption, some officials continued to engage in corrupt practices.  Corruption, especially the solicitation of bribes, remained a problem among low-level bureaucrats.  Police and judicial corruption also continued to be problems.  Some government officials appeared to manipulate the privatization process, and state- and party-owned businesses received preferential access to land leases and credit.

The Ministry of Justice has primary responsibility for combating corruption, largely through the Federal Ethics and Anti-Corruption Commission (FEACC).

On September 5, five members of the Dire Dawa City Administration Council were sentenced in connection with corruption charges filed by the FEACC. The council members, found guilty of crimes including illegally giving away government land, manipulating tender processes, and accepting bribes, received prison sentences ranging from one to seven years.

The law requires that all government officials and employees officially register their wealth and personal property. The president, prime minister, and all cabinet-level ministers had registered their assets. By year's end a total of 32,297 federal government officials had registered their assets, according to the FEACC.

The law provides for public access to government information, but access was largely restricted in practice. The law includes freedom of information provisions.

The government publishes its laws and regulations in the national gazette prior to their taking effect. The Government Communications Affairs Office managed contacts between the government, the press, and the public; the private press reported the government rarely responded to its queries.

**Section 5. Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights**

A few domestic human rights groups operated, but with significant government restrictions. The government was generally distrustful and wary of domestic human rights groups and international observers. State controlled media were critical of international human rights groups such as Human Rights Watch. The government strongly criticized Human Rights Watch on several occasions during the year for what it described as biased and inaccurate reporting. The government also criticized an International Crisis Group (ICG) report that analyzed the impact of the death of Prime Minister Meles, claiming the ICG applied "very questionable standards" and did not reflect the reality on the ground.

The CSO law prohibits charities, societies, and associations (NGOs or CSOs) that receive more than 10 percent of their funding from foreign sources from engaging in activities that advance human and democratic rights or promote equality of nations, nationalities, peoples, genders, and religions; the rights of children and persons with disabilities; conflict resolution or reconciliation; or the efficiency of justice and law enforcement services. There were 3,522 organizations registered before the CSO law was adopted, although not all were active. Upon enactment of the CSO law, all charities were required to reregister with the government's

Charities and Societies Agency (ChSA).  The implementation of the law continued to result in the severe curtailment of NGO activities related to human rights.  In July the UN high commissioner for human rights expressed concern that civil society space "has rapidly shrunk" since the CSO law came into existence.

As of October 2,852 CSOs, both old and new, had been registered under the law.  Of these, 389 were foreign charities, 491 were "resident" charities, 1,865 were "local" charities, 60 were adoption agencies, and 47 were consortia.  The government maintained that the majority of organizations that did not reregister were not functional organizations prior to the passage of the law.  Some human rights defender organizations adjusted to the law by registering either as local charities, meaning they could not raise more than 10 percent of their funds from foreign donors but could act in the specified areas, or as resident charities, which allowed foreign donations above 10 percent but prohibited activities in those areas.

One of several sets of implementing regulations under the law, the so-called 70/30 rule, caps administrative spending at 30 percent of an organization's operating budget.  The regulations define training of teachers, agricultural and health extension workers, and other government officials as an "administrative" cost, contending the training does not directly affect beneficiaries, thus limiting the number of training programs that can be provided by development assistance partners who prefer to employ train-the-trainer models to reach more persons.  After discussions with development assistance partners, the government agreed to address application of this regulation on a case-by-case basis.  A Civil Society Sector Working Group cochaired by the Ministry of Federal Affairs and a representative of the donor community convenes periodically to monitor and discuss challenges that arise as the law is implemented.

In October the ChSA announced it had closed 10 CSOs over the past two years because of improper payment of taxes and lack of adherence to the CSO law and related regulations.  The agency also reportedly issued warnings to an additional 476 CSOs.

On October 19, the Supreme Court upheld the ChSA's 2010 freezing of funds received by the Human Rights Council (HRCO) and the Ethiopian Women Lawyers' Association (EWLA) from foreign sources.

The government denied NGOs access to federal prisons, police stations, and political prisoners, with the exception of JFA-PFE, one of only three organizations granted an exemption enabling them to raise unlimited funds from foreign sources

and engage in human rights advocacy.  JFA-PFE was permitted to visit prisoners and played a positive role in improving prisoners' chances for clemency.

Restrictions that limited the access of human rights organizations, the media, humanitarian agencies, and diplomatic missions to conflict-affected areas continued, particularly with regard to the Somali Region conflict zones of Fik, Degahbur, Korahe, and parts of Warder.  The partial relaxation of those restrictions that began in the previous year continued, with humanitarian access in the Somali Region improving in particular.  Journalists were required to register before entering conflict regions.  The government lacked a clear policy on NGO access to sensitive areas, leading regional government officials and military officials frequently to refer requests for access to the federal government.  There were isolated reports of regional police or local militias blocking NGOs' access to particular locations on particular days, citing security concerns.

There were credible reports security officials intimidated or detained local individuals to prevent them from meeting with NGOs and foreign government officials who were investigating allegations of abuse.

Government Human Rights Bodies:  The government-established EHRC, which is funded by the parliament and subject to parliamentary review, is a semiautonomous body that investigates human rights complaints and produces annual and thematic reports.  The commission operated 112 legal aid centers in collaboration with 17 universities and two civil society organizations, the EWLA and the Ethiopian Christian Lawyers Fellowship.  The commission also completed the preparatory measures to sign collaborative agreements with two additional universities.  The EHRC reported its Addis Ababa headquarters resolved 90 percent of the 952 complaints submitted to it during the year.

The Office of the Ombudsman has authority to receive and investigate complaints with respect to administrative mismanagement by executive branch offices.  The office received 2,094 complaints in Addis Ababa from September 2011 to September 2012.  Of these, the ombudsman opened investigations into 784, and the office reported it resolved the remaining cases through alternative means.  The majority of complaints dealt with social security, labor, housing, and property disputes.  The Office of the Ombudsman did not compile nationwide statistics.  The Ombudsman's Office opened five new offices around the country during the year.

In May the government completed drafting of a National Human Rights Action Plan, with an implementation coordinating office to be housed at the Ministry of Justice.

## Section 6. Discrimination, Societal Abuses, and Trafficking in Persons

The constitution provides all persons equal protection without discrimination based on race, nation, nationality or other social origin, color, gender, language, religion, political or other opinion, property, birth, or status.  However, in practice the government did not fully promote and protect these rights.

### Women

Rape and Domestic Violence:  The law criminalizes rape and provides for penalties of five to 20 years' imprisonment, depending on the severity of the case; however, the law does not expressly address spousal rape.  The government did not fully enforce the law, partially due to widespread underreporting.  Recent statistics on the number of abusers prosecuted, convicted, or punished were not available.  Anecdotal evidence suggested reporting of rapes had increased since the 2004 revision of the criminal code but the justice system was unable to keep up with the number of cases.

Domestic violence, including spousal abuse, was a pervasive social problem.  The government's 2011 Demographic and Health Survey (DHS) found that 68.4 percent of women believe wife beating was justified.  The previous survey, conducted in 2005, found 81 percent approval, showing a downward trend.  The 2011 DHS revealed 45 percent of men felt that wife beating was justified, down from 52 percent found in the 2005 DHS data.

Although women had recourse to the police and the courts, societal norms and limited infrastructure prevented many women from seeking legal redress, particularly in rural areas.  The government prosecuted offenders on a limited scale.  Domestic violence is illegal, but government enforcement of laws against rape and domestic violence was inconsistent.  Depending on the severity of damage inflicted, legal penalties range from small fines to imprisonment for up to 10 to 15 years.

Domestic violence and rape cases often were delayed significantly and given low priority.  In the context of gender-based violence, significant gender gaps in the justice system remained, due to poor documentation and inadequate investigation.

During the year, "child friendly" benches were established specifically to hear cases involving violence against children and women.  Police officers were required to receive domestic violence training from domestic NGOs and the Ministry of Women's Affairs.  There was a commissioner for women's and children's affairs in the EHRC.

Women and girls experienced gender-based violence, but it was underreported due to cultural acceptance, shame, fear, or a victim's ignorance of legal protections.

The government established a National Commission for Children's and Women's Affairs in 2005, as part of the EHRC, to investigate alleged human rights violations against women and children.

Harmful Traditional Practices:  The most prevalent harmful traditional practices, besides FGM/C, were uvulectomy (cutting or removal the uvula, the piece of flesh that hangs down at the rear of the mouth), tonsillectomy (cutting or removal of the tonsils), and marriage by abduction.

Marriage by abduction is illegal, although it continued in some regions, including Amhara, Oromia, and SNNPR, despite the government's attempts to combat the practice.  Forced sexual relationships accompanied most marriages by abduction, and women often experienced physical abuse during the abduction.  Abductions led to conflicts among families, communities, and ethnic groups.  In cases of marriage by abduction, the perpetrator did not face punishment if the victim agreed to marry the perpetrator.

Female Genital Mutilation/Cutting (FGM/C):  One of the most prevalent harmful traditional practices, FGM/C, is illegal, but the government did not actively enforce this prohibition or punish those who practiced it.  The practice was still widespread; however, according to a 2010 Population Council survey the rates continued to fall.  Eighty percent of women ages 40 to 49 reported they were subjected to FGM/C, while 58 percent of girls and women ages 15 to 19 reported the same.  The prevalence of FGM/C was highest in the Afar, SNNPR, and Oromia regions.

Sexual Harassment:  Sexual harassment was widespread.  The penal code prescribes penalties of 18 to 24 months' imprisonment; however, authorities generally did not enforce harassment laws.

## ETHIOPIA

Reproductive Rights:  Individuals have the right to decide freely and responsibly the number, spacing, and timing of children and to have the information and means to do so free from discrimination, coercion, and violence.  The 2011 DHS indicated a contraceptive prevalence of 29 percent nationwide among married women, a twofold increase from the survey done six years earlier.  The 2011 DHS indicated the maternal mortality rate was 676 per 100,000 live births as compared with 673 per 100,000 reported in the 2005 DHS.  Principle causes of maternal mortality included excessive bleeding, infection, hypertensive complications, and obstructed labor, with the underlying cause being the prevalence of home births. Only 9 percent of women reported delivering in a health facility or with a skilled birth attendant.  According to the Federal Minister of Health, a government program known as the Health Development Army resulted in this figure reaching approximately 50 percent in the Tigray Region.

Discrimination:  Discrimination against women was most acute in rural areas, where an estimated 85 percent of the population lives.  The law contains discriminatory regulations, such as the recognition of the husband as the legal head of the family and the sole guardian of children more than five years old.  Courts generally did not consider domestic violence by itself a justification for granting a divorce.  Irrespective of the number of years the marriage existed, the number of children raised, and joint property, the law entitled women to only three months' financial support if a relationship ended.  There was limited legal recognition of common-law marriage.  A common-law husband had no obligation to provide financial assistance to his family, and as a result, women and children sometimes faced abandonment.  Notwithstanding progressive provisions in the formal law, traditional courts continued to apply customary law in economic and social relationships.

According to the constitution all land belongs to the government.  Both men and women have land-use rights, which they can pass on as an inheritance.  Land law varies among regions.  All federal and regional land laws empower women to access government land.  Inheritance laws also enable widowed women to inherit joint property they acquired during marriage.

In urban areas women had fewer employment opportunities than men, and the jobs available did not provide equal pay for equal work.  Women's access to gainful employment, credit, and the opportunity to own or manage a business was further limited by their generally lower level of education and training and by traditional attitudes.

The Ministry of Education reported female participation in undergraduate and postgraduate programs increased to 144,286 during the 2011-12 academic year, compared with 123,706 in 2010-11, continuing the trend of increasing female participation in higher education.

**Children**

Birth registration:  Citizenship is derived from one's parents.  The law requires that all children be registered at birth.  In practice children born in hospitals were registered while most children born outside of hospitals were not.  The overwhelming majority of children, particularly in rural areas, were born at home.

Education:  As a policy, primary education was universal and tuition-free; however, there were not enough schools to accommodate the country's youth, particularly in rural areas.  The cost of school supplies was prohibitive for many families, and there was no legislation to enforce compulsory primary education. The number of students enrolled in schools expanded faster than trained teachers could be deployed.

Child Abuse:  Child abuse was widespread.  In March a YouTube video of a young girl being repeatedly abused by a female caretaker went viral, spurring the establishment of a Facebook group called Ethiopians Against Child Abuse.  A 2009 study conducted by the African Child Policy Forum revealed prosecuting offenders for sexual violence against children was difficult due to inconsistent interpretation of laws among legal bodies and the offender's right to bail, which often resulted in the offender fleeing or coercing the victim or the victim's family to drop the charges.  During the year, "child friendly" benches were established specifically to hear cases involving violence against children and women.

Child Marriage:  The law sets the legal marriage age for girls and boys at 18; however, this law was not enforced uniformly, and rural families were sometimes unaware of this provision.  In several regions it was customary for older men to marry young girls, although this traditional practice continued to face greater scrutiny and criticism.

According to the 2011 DHS the median age of first marriage among women surveyed between the ages of 20 and 49 was 17.1 years.  The age of first marriage appeared to be rising.  In 2005 the median age of marriage for women surveyed between 20 and 24 was 16.5 years, and while 39 percent of women between 45 and

49 reported being married by age 15, only 8 percent of young women between 15 and 19 reported being or having been married.

In the Amhara and Tigray regions, girls were married routinely as early as age seven. Child marriage was the most prevalent in the Amhara Region, where the median first marriage age was 15.1 years per the 2011 DHS, compared with 14.7 years in 2005. Regional governments in Amhara and, to a lesser extent, Tigray offered programs to educate young women on issues associated with early marriage.

Harmful Traditional Practices:  Societal abuse of young girls continued to be a problem. Harmful practices included FGM/C, early marriage, marriage by abduction, and food and work prohibitions. A 2006 African Child Policy Forum retrospective survey indicated 68.5 percent of girls surveyed in the country had been abused sexually and 84 percent had been abused physically.

The majority of girls in the country had undergone some form of FGM/C. FGM/C was much less common in urban areas, where only 15 percent of the population lived. Girls typically experienced clitoridectomies seven days after birth (consisting of an excision of the clitoris, often with partial labial excision) and faced infibulation (the most extreme and dangerous form of FGM/C) at the onset of puberty. A 2008 study funded by Save the Children Norway reported a 24 percent national reduction in FGM/C cases over the previous 10 years, due in part to a strong anti-FGM/C campaign. The campaign continued to have an effect in the SNNPR and Afar regions during the year, although reliable sources in SNNPR reported infibulation still was administered on most girls. The penal code criminalizes practitioners of clitoridectomy, with imprisonment of at least three months or a fine of at least 500 birr ($28). Infibulation of the genitals is punishable with imprisonment of five to 10 years. However, no criminal charges have ever been brought for FGM/C. The government discouraged the practice of FGM/C through education in public schools, the Health Extension Program, and broader mass media campaigns.

Sexual Exploitation of Children:  The minimum age for consensual sex is 18 years, but this law was not enforced. The law provides for three to 15 years in prison for sexual intercourse with a minor. The law provides for one year in prison and a fine of 10,000 birr ($550) for trafficking in indecent material displaying sexual intercourse by minors. The law prohibits profiting from the prostitution of minors and inducing minors to engage in prostitution; however, commercial sexual exploitation of children continued, particularly in urban areas. Girls as young as

age 11 reportedly were recruited to work in brothels.  Customers often sought these girls because they believed them to be free of sexually transmitted diseases. Young girls were trafficked from rural to urban areas.  They also were exploited as prostitutes in hotels, bars, resort towns, and rural truck stops.  Reports indicated family members forced some young girls into prostitution.

Infanticide:  Ritual and superstition-based infanticide continued in remote tribal areas, particularly the South Omo Valley.  Local governments worked to educate communities against the practice.

Displaced Children:  According to a 2010 report by the Ministry of Labor and Social Affairs, approximately 150,000 children lived on the streets, of whom 60,000 were in the capital.  The ministry's report stated families' inability to support children due to parental illness or insufficient household income exacerbated the problem.  These children begged, sometimes as part of a gang, or worked in the informal sector.

A 2010 Population Council Young Adult Survey found that 82.3 percent of boys who lived or worked on the streets had been to or had enrolled in school, 26.4 percent had lost one parent, and 47.2 percent had lost both parents.  Among these boys, 72 percent had worked for pay at some point in their lives.  Government and privately run orphanages were unable to handle the number of street children.

Institutionalized Children:  There were an estimated 5.4 million orphans in the country, according to a 2010 report by the Central Statistics Authority.  The vast majority lived with extended family members.  Government orphanages were overcrowded, and conditions were often unsanitary.  Due to severe resource constraints, hospitals and orphanages often overlooked or neglected abandoned infants.  Institutionalized children did not receive adequate health care, and several infants in SNNPR died due to lack of adequate medical attention.

International Child Abductions:  The country is not a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction.

**Anti-Semitism**

The Jewish community numbered approximately 2,000; there were no reports of anti-Semitic acts.

**Trafficking in Persons**

See the Department of State's *Trafficking in Persons Report* at
www.state.gov/j/tip.

## Persons with Disabilities

The constitution does not mandate equal rights for persons with disabilities.
However, two laws prohibit discrimination against persons with physical and
mental disabilities in employment and mandate access to buildings.  It is illegal for
deaf persons to drive.

The Right to Employment of Persons with Disabilities Proclamation prohibits
employment discrimination based on disability.  It also makes employers
responsible for providing appropriate working or training conditions and materials
to persons with disabilities.  The law specifically recognizes the additional burden
on women with disabilities.  The government took limited measures to enforce the
law, for example, by assigning interpreters for hearing-impaired civil service
employees.

The Building Proclamation mandates building accessibility and accessible toilet
facilities for persons with physical disabilities, although specific regulations that
define the accessibility standards have not been adopted.  Buildings and toilet
facilities were usually not accessible.  Landlords are required to give persons with
disabilities preference for ground-floor apartments, and this was respected in
practice.

Women with disabilities were more disadvantaged than men with disabilities in
education and employment.  An Addis Ababa University study from 2008 showed
that female students with disabilities were subjected to a heavier burden of
domestic work than their male peers.  The 2010 Population Council Young Adult
Survey found young persons with disabilities were less likely to have ever attended
school than young persons without disabilities.  The survey indicated girls with
disabilities were less likely than boys with disabilities to be in school; 23 percent
of girls with disabilities were in school, compared to 48 percent of girls without
disabilities and 55 percent of boys without disabilities.  Overall, 47.8 percent of
young persons with disabilities surveyed reported not going to school due to their
disability.  Girls with disabilities also were much more likely to suffer physical and
sexual abuse than girls without disabilities.  Thirty-three percent of sexually
experienced disabled girls reported having experienced forced sex.  According to
the same survey, some 6 percent of boys with disabilities had been beaten in the

three months prior to the survey, compared to 2 percent of boys without disabilities.

There were several schools for hearing and visually impaired persons and several training centers for children and young persons with intellectual disabilities.  There was a network of prosthetic and orthopedic centers in five of the nine regional states.

Several domestic associations, such as the Ethiopian National Association of the Blind, Ethiopian National Association of the Deaf, and Ethiopian National Association of the Physically Handicapped, like other civil society organizations, continued to be affected negatively by the CSO law.

**National/Racial/Ethnic Minorities**

The country has more than 80 ethnic groups, of which the Oromo, at approximately 35 percent of the population, is the largest.  The federal system drew boundaries roughly along major ethnic group lines.  Most political parties remained primarily ethnically based.

Clashes between ethnic groups during the year resulted in 100 to 150 deaths and the displacement of persons.  Water shortages contributed to interethnic conflict.

On March 12, armed gunmen ambushed a passenger bus in Bonga, near the capital of the Gambella Region.  After stopping the vehicle, the gunmen forced passengers off the bus and divided "highlanders" from locals (the term "highlanders" generally referred to persons from the Tigray or Amhara regions, although in Gambella the term also was applied more broadly to refer to those from outside the region).  The gunmen opened fire on the highlanders, killing 21 persons and wounding nine.

Early in the year, around Moyale town, on the country's border with Kenya, long-standing ethnic tensions erupted into large-scale violence as rival groups vied for resources.  A series of retaliatory attacks on the Kenyan side of the border forced thousands of ethnic Borena (Borana) and Gebre (Gabbra) to flee into Ethiopia.  In July rival Borena, Gebre, and Garre groups clashed on the Ethiopian side of the border, leading to as many as 85 deaths and displacing tens of thousands before federal forces contained the fighting.

## Societal Abuses, Discrimination, and Acts of Violence Based on Sexual Orientation and Gender Identity

Consensual same-sex sexual activity is illegal and punishable by imprisonment under the law.  There were some reports of violence against lesbian, gay, bisexual, and transgender (LGBT) individuals; reporting was limited due to fear of retribution, discrimination, or stigmatization.  Persons did not identify themselves as LGBT persons due to severe societal stigma and the illegality of consensual same-sex sexual activity.  Activists in the LGBT community stated they were followed and at times feared for their safety.  There were periodic detainments of some in the LGBT community, combined with interrogation and alleged physical abuse.

The AIDS Resource Center in Addis Ababa reported the majority of self-identified gay and lesbian callers, the majority of whom were male, requested assistance in changing their behavior to avoid discrimination.  Many gay men reported anxiety, confusion, identity crises, depression, self-ostracism, religious conflict, and suicide attempts.

## Other Societal Violence or Discrimination

Societal stigma and discrimination against persons living with or affected by HIV/AIDS continued in the areas of education, employment, and community integration.  Despite the abundance of anecdotal information, there were no statistics on the scale of the problem.

## Section 7. Worker Rights

### a. Freedom of Association and the Right to Collective Bargaining

The constitution and the law provide workers, except for certain categories of workers, with the right to form and join unions, conduct legal strikes, and bargain collectively; however, such rights are severely restricted or excessively regulated by other laws.  The 2003 Labor Proclamation specifically excludes managerial employees, teachers, and civil servants (including judges, prosecutors, and security service workers) from organizing unions.  The International Labor Organization (ILO) Committee of Experts on the Application of Conventions and Recommendations noted that the CSO law gives the government power to interfere in workers' right to organize, including through the registration, internal administration, and dissolution of organizations.

A minimum of 10 workers is required to form a union.  While the law provides all unions with the right to register, the government may refuse to register trade unions that do not meet its registration requirements.  The law stipulates a trade union organization may not act in an overtly political manner.  The law allows administrative authorities to appeal to the courts to cancel union registration for engaging in prohibited activities, such as political action.  Seasonal and part-time agricultural workers cannot organize into labor unions.  While the law prohibits antiunion discrimination by employers and provides for reinstatement for workers fired for union activity, it does not prevent an employer from creating or supporting a workers' organization for the purpose of controlling it.

While the law recognizes the right of collective bargaining, this right is severely restricted.  Negotiations aimed at amending or replacing a collective agreement must be completed within three months of its expiration, or the provisions on wages and other benefits cease to apply.  Civil servants, including public school teachers, have the right to establish and join professional associations, but are not allowed to negotiate for better wages or working conditions.  Furthermore, the arbitration procedures in the public sector are more restrictive than those in the private sector.

Although the constitution and law provide workers with the right to strike to protect their interests, it contains detailed provisions prescribing excessively complex and time-consuming formalities that make legal strike actions difficult to carry out.  A minimum of 30 days' advance notice must be given before striking when the case is referred to a court or a labor relations board.  The law requires aggrieved workers to attempt reconciliation with employers before striking and includes a lengthy dispute settlement process.  These provisions applied equally to an employer's right to lock workers out.  Two-thirds of the workers involved must support a strike for it to occur.  If a case has not already been referred to a court or labor relations board, workers retain the right to strike without resorting to either of these options, provided they give at least 10 days' notice to the other party and the Ministry of Labor and Social Affairs and make efforts at reconciliation.

The law also prohibits strikes by workers who provide essential services, including air transport and urban bus service workers, electric power suppliers, gas station personnel, hospital and pharmacy personnel, firefighters, telecommunications personnel, and urban sanitary workers.  Such a discretionary list of essential services exceeds the ILO definition of essential services.  The law prohibits retribution against strikers, but also provides for excessive civil or penal sanctions

for unions and workers involved in nonauthorized strike actions.  Unions can be dissolved for carrying out strikes in "essential services."

The informal labor sector, including domestic workers, is not unionized and is not protected by labor laws.  Lack of adequate staffing prevented the government from effectively enforcing applicable laws during the year.  Court procedures were subject to lengthy delays and appeals.

Freedom of association and the right to collective bargaining were not respected in practice.  Although the government permits unions, the major trade unions were government-established and -controlled entities.  The government continued to use its authority to refuse to register the National Teachers' Association (NTA) during the year on the grounds a national teacher association already existed.  According to the Education International report to the ILO in 2011, members of the NTA were subjected to surveillance and harassment by government security agents, with the goal of intimidating teachers to abandon the NTA and forcing them to give up their long-standing demand for the formation of an independent union.  In November the ILO Committee on Freedom of Association expressed its concern with regard to serious violations of the NTA's trade union rights, including continuous interference in its internal organization that prevented it from functioning normally and interference by way of threats, dismissals, arrest, detention, and mistreatment of NTA members.  The committee urged the government to register the NTA without delay; to ensure the CSO law was not applicable to workers' and employers' organizations; and to undertake civil service reform to fully ensure the right of civil servants to establish and join organizations of their own choosing.

While the government allowed citizens to exercise the right of collective bargaining freely, representatives negotiated wages only at the plant level.  It was common for employers to refuse to bargain.  Unions in the formal industrial sector made some efforts to enforce labor regulations.

Despite the law prohibiting antiunion discrimination, unions reported that employers frequently fired union activists.  For example local government backed management at Balcha Hospital, Addis Ababa, that reportedly made efforts to establish a "yellow union" or employer-controlled union and to force workers to join it with the purpose of weakening the existing union.  The chairperson of the factory workers' union at a sugar factory in East Wellega in the Oromia Region was reportedly dismissed due to his union activities.  There were reports most Chinese employers generally did not allow workers to form unions and often

transferred or fired union leaders, as well as intimidated and pressured members to leave unions.  Lawsuits alleging unlawful dismissal often take years to resolve because of case backlogs in the courts.  Employers found guilty of antiunion discrimination were required to reinstate workers fired for union activities and generally did so in practice.  While the law prohibits retribution against strikers, most workers were not convinced the government would enforce this protection. Labor officials reported that, due to high unemployment and long delays in the hearing of labor cases, some workers were afraid to participate in strikes or other labor actions.

**b. Prohibition of Forced or Compulsory Labor**

The law prohibits most forms of forced or compulsory labor, including by children; however, the law also permits courts to order forced labor as a punitive measure. The government did not effectively enforce the forced labor prohibition, and forced labor occurred in practice.  Both adults and children were forced to engage in street vending, begging, traditional weaving, or agricultural work.  Children also worked in forced domestic labor.  Situations of debt bondage also occurred in traditional weaving, pottery, cattle herding, and other agricultural activities, mostly in rural areas.

Also see the Department of State's *Trafficking in Persons Report* at www.state.gov/j/tip.

**c. Prohibition of Child Labor and Minimum Age for Employment**

By law the minimum age for wage or salary employment is 14 years.  The minimum age provisions, however, only apply to contractual labor and do not apply to self-employed children or children who perform unpaid work.  Special provisions cover children between the ages of 14 and 18, including the prohibition of hazardous or night work.  The law defines hazardous work as work in factories or involving machinery with moving parts or any work that could jeopardize a child's health.  Prohibited work sectors include passenger transport, electric generation plants, underground work, street cleaning, and many other sectors.  The lack of labor inspectors and controls prevented the government from enforcing the law, leading to increasing numbers of children working in these sectors, particularly construction.  The law expressly excludes children under age 16 attending vocational schools from legal protection with regard to the prohibition of young workers from performing hazardous work.  The law does not permit

children between the ages of 14 and 18 to work more than seven hours per day or between 10 p.m. and 6 a.m., on public holidays or rest days, or overtime.

The government did not effectively enforce these laws in practice.  The resources for inspections and the implementation of penalties were extremely limited. Despite the introduction of labor inspector training at Gondar University in 2011, insufficient numbers of labor inspectors and inspections resulted in lax enforcement of occupational safety and health measures and prohibitions against child labor.

The Ministry of Labor and Social Affairs (MOLSA) covers child labor issues, with support from the Ministry of Women, Children, and Youth Affairs.  Cooperation, information sharing, and coordination between the ministries improved during the year.  The National Action Plan (NAP) to Eliminate the Worst Forms of Child Labor was signed at the end of the year.  The government conducted activities to raise awareness regarding child labor and piloted a child labor-free zone.

To underscore the importance of attending school, joint NGO and government-led community-based awareness raising activities targeted communities where children were heavily engaged in agricultural work.  During the year the government invested in modernizing agricultural practices and constructing schools to combat the problem of children in agricultural sectors.

Child labor remained a serious problem, in both urban and rural areas.  In both rural and urban areas, children often began working at young ages.  Child labor was particularly pervasive in subsistence agricultural production, traditional weaving, fishing, and domestic work.  A growing number of children worked in construction.  Children in rural areas, especially boys, engaged in activities such as cattle herding, petty trading, plowing, harvesting, and weeding, while other children, mostly girls, collected firewood and fetched water.  Children in urban areas, including orphans, worked in domestic service, often working long hours, which prevented many from attending school regularly.  They also worked in manufacturing, shining shoes, making clothes, portering, directing customers to taxis, parking, public transport, petty trading, and occasionally herding animals. Some children worked long hours in dangerous environments for little or no wages and without occupational safety protection.  Child laborers often faced physical, sexual, and emotional abuse at the hands of their employers.

Also see the Department of Labor's *Findings on the Worst Forms of Child Labor* at www.dol.gov/ilab/programs/ocft/tda.htm.

**d. Acceptable Conditions of Work**

There is no national minimum wage.  Some government institutions and public
enterprises set their own minimum wages.  Public sector employees, the largest
group of wage earners, earned a monthly minimum wage of approximately 420 birr
($23); employees in the banking and insurance sector had a minimum monthly
wage of 336 birr ($18).  The official estimate for the poverty income level is
approximately 315 birr ($17) per month.

Only a small percentage of the population, concentrated in urban areas, was
involved in wage-labor employment.  Wages in the informal sector generally were
below subsistence levels.

The law provides for a 48-hour maximum legal workweek with a 24-hour rest
period, premium pay for overtime, and prohibition of excessive compulsory
overtime.  The country has 13 paid public holidays per year.  The law entitles
employees in public enterprise and government financial institutions to overtime
pay; civil servants receive compensatory time for overtime work.  The government,
industries, and unions negotiated occupational safety and health standards.
Workers specifically excluded by law from unionizing, including domestic
workers and seasonal and part-time agricultural workers, generally did not benefit
from health and safety regulations in the workplace.

The MOLSA's inspection department was responsible for enforcement of these
standards.  The country had 380 labor inspectors.  However, due to lack of
resources, these standards were not enforced effectively.  The MOLSA's severely
limited administrative capacity; lack of an effective mechanism for receiving,
investigating, and tracking allegations of violations; and lack of detailed, sector-
specific health and safety guidelines hampered effective enforcement of these
standards.  In addition penalties were not sufficient to deter violations.

Compensation, benefits, and working conditions of seasonal agricultural workers
were far below those of unionized permanent agricultural employees.  Although
the government did little to enforce the law, in practice most employees in the
formal sector worked a 39-hour workweek.  However, many foreign, migrant, and
informal sector workers worked more than 48 hours per week.

Workers have the right to remove themselves from dangerous situations without
jeopardizing their employment.  Despite this law most workers feared losing their

jobs if they were to do so.  Hazardous working conditions existed in the agricultural sector, which was the primary base of the country's economy.  There were also reports of hazardous and exploitative working conditions in the construction and fledgling industrial sectors.