# Exhibit B

# Exhibit B

ETHIOPIA

# "One Hundred Ways of Putting Pressure"

Violations of Freedom of Expression and Association in Ethiopia

**HUMAN RIGHTS WATCH**



# "One Hundred Ways of Putting Pressure"

## Violations of Freedom of Expression and Association in Ethiopia

Copyright © 2010 Human Rights Watch
All rights reserved.
Printed in the United States of America
ISBN: 1-56432-610-1
Cover design by Rafael Jimenez

Human Rights Watch
350 Fifth Avenue, 34th floor
New York, NY 10118-3299 USA
Tel: +1 212 290 4700, Fax: +1 212 736 1300
hrwnyc@hrw.org

Poststraße 4-5
10178 Berlin, Germany
Tel: +49 30 2593 06-10, Fax: +49 30 2593 0629
berlin@hrw.org

Avenue des Gaulois, 7
1040 Brussels, Belgium
Tel: + 32 (2) 732 2009, Fax: + 32 (2) 732 0471
hrwbe@hrw.org

64-66 Rue de Lausanne
1202 Geneva, Switzerland
Tel: +41 22 738 0481, Fax: +41 22 738 1791
hrwgva@hrw.org

2-12 Pentonville Road, 2nd Floor
London N1 9HF, UK
Tel: +44 20 7713 1995, Fax: +44 20 7713 1800
hrwuk@hrw.org

27 Rue de Lisbonne
75008 Paris, France
Tel: +33 (1)43 59 55 35, Fax: +33 (1) 43 59 55 22
paris@hrw.org

1630 Connecticut Avenue, N.W., Suite 500
Washington, DC 20009 USA
Tel: +1 202 612 4321, Fax: +1 202 612 4333
hrwdc@hrw.org

Web Site Address: http://www.hrw.org



**MARCH 2010**

1-56432-610-1

# "One Hundred Ways of Putting Pressure"
## Violations of Freedom of Expression and Association in Ethiopia

**Summary** ................................................................................................ 1

**Recommendations** .................................................................................. 5
   To the Government of Ethiopia .................................................................. 5
   To Ethiopia's Federal Government and the Regional Governments of Amhara, Oromia, and Southern Nations, Nationalities and Peoples' Regions .............................. 5
   To the United States, Canada, Norway, European Union member states, and the World Bank .......................................................................................................... 6
   To the European Union Election Observation Mission ................................... 6

**Methodology** ........................................................................................... 7

**Background** ............................................................................................. 9
   The First Decade ..................................................................................... 10
   2005 Elections ........................................................................................ 11
   2008 Local Elections .............................................................................. 16
   Repressive Legislation in 2009 ................................................................ 19
   2010 Pre-Electoral Period ...................................................................... 20

**Constricting Political Space** ................................................................... 22
   Expanding Ruling Party Control ............................................................... 22
      Apparatus of Control ......................................................................... 22
      Leveraging Resources and Services .................................................... 24
      Mobilizing Civil Servants ................................................................... 28
      Mobilizing Teachers and Students ...................................................... 30
   Intimidation of Political Opposition ......................................................... 32
      Violence, Arbitrary Arrest, and Detention of Opposition Supporters ........ 35

**Stifling Independent Voices** ................................................................... 39
   Repression of Civil Society ...................................................................... 39
      Failure to Conduct Credible Investigations into Abuses ....................... 41

Charities and Societies Proclamation ......................................................................... 44

Domestic Election Observers ..................................................................................... 46

Muffling the Media .................................................................................................... 48

Government Response to Alleged Repression of Civil Society and the Media ................53

**International Response** ............................................................................................ **54**

Quiet Diplomacy and Elections ..................................................................................54

Election Observers ...............................................................................................57

**Acknowledgements** ....................................................................................................**60**

# Summary

*"They don't come with a gun and say sign this document [party membership]
but there are one hundred ways of putting pressure."*
—Aid official, Addis Ababa, June 16, 2009

On May 23, 2010, Ethiopian citizens will vote in the first parliamentary elections in Ethiopia since 2005, when the post-election period was marred by controversy and bloodshed. At least 200 people were killed in June and November 2005, the vast majority by security forces during protests over alleged election fraud, and the government arrested an estimated 30,000 people.

Over the past five years the Ethiopian government has restricted political space for the opposition, stifled independent civil society, and intensified control of the media. As this report describes, this has been a long-term policy with the relative freedom of the 2005 pre-election period standing out as an anomaly. Repression has gained greater momentum as the 2010 elections approach, with the government taking measures to avoid a replay of the events of 2005.

Opposition supporters have been attacked and arbitrarily detained and high-profile incidents have garnered some international attention. For example, Birtukan Midekssa, leader of the Unity for Democracy and Justice (UDJ) party, was re-arrested in December 2008 for allegedly violating the terms of her pardon and is now serving a life sentence. However, repression is usually much more subtle and insidious, involving threats, harassment, closure of offices, breaking up of meetings, and denying individuals access to state resources unless they are linked to the ruling party. In 2009, harsh new legislation affecting civil society and the media was enacted that constricts the ability of individuals to expose and criticize continuing serious violations of human rights in Ethiopia. These punitive measures restrict the rights to freedom of expression and association, have silenced independent voices, and contribute to chilling freedom of speech and opinion more broadly.

In the nearly 20 years that the Ethiopian People's Revolutionary Democratic Front (EPRDF) has been in power, Ethiopia's government has taken steps to promote economic development and has introduced the technical framework of democracy. The 1995 constitution incorporates a wide range of human rights standards, and government officials frequently voice the state's commitment to meeting its human rights obligations. But these

steps, while important, have not ensured that Ethiopia's citizens are able to enjoy their fundamental rights.

As this report shows, in practice, Ethiopia's citizens are unable to speak freely, organize political activities, and challenge their government's policies—through peaceful protest, voting, or publishing their views—without fear of reprisal. Democracy's technical framework will remain a deceptive and hollow façade so long as Ethiopia's institutions lack independence from the ruling party and there is no accountability for abuses by state officials.

The Ethiopian government claims that the country is moving toward democracy—albeit slowly, given the many challenges it faces. But despite the lip service given to democracy and human rights, respect for core civil and political rights such as freedom of expression and association in Ethiopia is deteriorating.

This report, based on research in Ethiopia in 2009 and drawing on more than 12 years of documentation by Human Rights Watch and other organizations, presents an assessment of patterns of human rights abuses that will impact the environment in which the 2010 elections will be held. It traces the ways in which the ruling EPRDF's total control of local and district administration has been used to monitor and intimidate individuals at a household level, punish and undermine the livelihoods of citizens who do not abide by the ruling party, and create a climate of fear that suppresses freedom of expression and opinion.

Human Rights Watch interviews with residents of more than 50 *kebeles* (a village or neighborhood usually containing several hundred households) in three different regions of Ethiopia consistently point to a complex and multi-layered strategy aimed at preventing political opposition and dissent. *Kebele* councils are the primary unit of administration; they are a crucial mechanism for control over the rural communities that constitute 85 percent of Ethiopia's population. In Ethiopia's strict hierarchical society, challenging these officials was virtually unthinkable for decades.

Today, *kebele* officials wield a massive amount of power over their constituents in a myriad of ways, in a system where the line between state and ruling party is usually non-existent. *Kebele* officials determine eligibility for food assistance, recommend referrals to secondary health care and schools, and provide access to state-distributed resources like seeds, fertilizers, and other essential agricultural inputs. They also run the community social courts, which deal with minor claims and disputes at the *kebele* level; local prisons; and, in some places, local-level militia that are used to maintain law and order.

These broad powers have been consistently used to punish and ostracize those perceived to support the political opposition. Since 2005, state resources have also been used to press individuals to join the ruling party so that they can benefit from access to services, jobs, and economic activity. Between 2005 and 2008, when the *kebele* and *woreda* (district) elections were held, the EPRDF's party membership more than quadrupled, from approximately 760,000 to more than 4 million members in just three years. In these local elections in 2008, the EPRDF first expanded the number of available positions on *kebele* and *woreda* councils and then won more than 99.9 percent of the 3.5 million seats, thus consolidating its control of the local administrative structure. The practical implication of this development is that in an average *kebele*, one of every 10 residents—almost one member of every family—is now both a *kebele* official and EPRDF member.

The 2010 elections are viewed as an important benchmark by many observers inside and outside the country. For the EPRDF, now in its nineteenth year in power, the elections present an opportunity to distance the country from the political turmoil and negative publicity of 2005 and consolidate an effectively single-party state. For international donors, who consider Ethiopia a key strategic partner in the volatile Horn of Africa, the elections will provide a test of their policy of increasing development aid while insisting on "quiet diplomacy" in the face of Ethiopia's deteriorating human rights record.

But for many Ethiopians, election day is likely to be far less meaningful; a veneer of democratic pretension hiding a repressive state apparatus. Key developments affecting the result of the elections will have occurred long before election day, and will impact their lives long after the last vote is counted.

The government of Ethiopia regularly denies that many of the abuses documented in this report are taking place. In both public statements as well as in meetings with Human Rights Watch, Ethiopian government officials have dismissed allegations that opposition supporters are subjected to intimidation and assault as efforts to discredit the election, and have disputed the characterization of Ethiopia's democratic space as "diminishing." The government also defends the new legislation it has enacted, arguing that the Charities and Societies Proclamation does not infringe on freedom of association and will promote "indigenous" Ethiopian organizations.

Despite their public silence, many diplomats privately concur with Human Rights Watch's concerns about the pre-election environment, telling Human Rights Watch that the May elections are a "foregone conclusion." Yet with a few exceptions, most governments and

international donors have failed to consistently raise the worsening human rights situation as an urgent priority.

Although there are just two months remaining before polling day, the government and its international partners can still take key steps to improve the electoral environment and begin the long-term reforms needed to improve respect for human rights in Ethiopia. Among other measures, the government could instill greater confidence in the electoral process by immediately releasing persons detained for the peaceful expression of their political views; by publicly calling on all government officials and EPRDF members to cease attacks and intimidation of political opposition, independent civil society, and the media; and by supporting independent efforts to investigate and publicly report on incidents of abuse, including by international electoral observers. Donors should urgently press for these steps to be implemented.

In the medium- and long-term, concerned governments need to conduct a fundamental reappraisal of the nature of the Ethiopian government's mechanisms of control, the impact of its policies on civil and political rights, and the subsequent impact of political repression on their own strategies and goals for engagement with Ethiopia.

# Recommendations

## To the Government of Ethiopia

- Issue a clear and public statement to all government officials and members of the ruling EPRDF party to refrain from any intimidation of and attacks on opposition supporters, independent civil society, and the media, and state that such incidents will be immediately investigated and prosecuted.

- Promptly and impartially investigate all reports of violence against opposition members and supporters and prosecute those responsible. Facilitate an independent investigation into the killing on March 2, 2010, of Arena-Tigray candidate Aregawi Gebreyohannes.

- Release all persons arbitrarily detained for the peaceful exercise of their fundamental rights, including those arrested following the 2005 elections.

- Unconditionally release political opposition leader Birtukan Midekssa.

- Amend the Charities and Societies Proclamation, the Mass Media and Freedom of Information Proclamation, and the Anti-Terrorism Proclamation to bring them into line with Ethiopia's constitution and its obligations under international law regarding freedom of expression, association, and peaceful assembly.

- Amend the electoral law so that any properly constituted organization—and not only those that are "mass-based"—may observe elections, and remove restrictions on organizations conducting both voter education and election observation.

- Guarantee unrestricted access to Ethiopia to international media and independent human rights investigators, and cease harassment of Ethiopian media.

## To Ethiopia's Federal Government and the Regional Governments of Amhara, Oromia, and Southern Nations, Nationalities and Peoples' Regions

- Issue clear, public orders to all *woreda* and *kebele* officials stating that access to government services—including water, education, justice, agricultural inputs, the safety net program, and humanitarian assistance—should be fair, equitable, and based solely on need and never on political affiliation.

- Discipline or prosecute as appropriate any state or party officials implicated in violations of human rights or partisan allocation of services.

- Ensure that government institutions, vehicles, and officers are not used for partisan political purposes, and take appropriate action against those who do so.

## To the United States, Canada, Norway, European Union member states, and the World Bank

- Publicly express concern over the restrictions of freedom of association, expression, and assembly and urge the Ethiopian government to make a public statement calling on all government officials and EPRDF members to refrain from harassing or threatening opposition supporters, independent civil society, and the media.

- Press for the immediate, unconditional release of Birtukan Midekssa and other political prisoners.

- Publicly call for the amendment of the Charities and Societies Proclamation.

- Publicly condemn the intimidation and harassment of journalists, civil society organizations, and opposition political parties. Conduct independent assessments of the EPRDF's use of government services and other donor-supported programs as tools to entrench single-party rule and restrict the rights to freedom of assembly, expression, and association.

## To the European Union Election Observation Mission

- In monitoring the Ethiopian elections, take into account the long-term human rights and governance context in which polls are being conducted, including longstanding restrictions on opposition parties to campaign or organize, and on the ability of individuals to freely express and the media to freely report on political opinions.

- Report clearly and publicly about findings in relation to the election environment and the conduct of the polls, including the rationale for any eventual decision not to observe the elections.

# Methodology

This report is based on three separate research trips to Ethiopia by Human Rights Watch researchers between June and December 2009 and further research in London and Washington, DC. Human Rights Watch interviewed more than 200 individuals in the course of this research: in Ethiopia during missions by two researchers totaling five and 10 weeks, respectively; in further interviews by telephone; and during in-person interviews in London and Washington, DC.

Ethiopia is one of the most challenging environments for human rights research on the African continent. As described in this report, the government's administrative structures reach into every community and even every household. Families must often register visitors with *kebele* officials, and in most rural villages there is pervasive fear of voicing critical views even when surveillance may not be as comprehensive as villagers believe. It is almost impossible for outsiders to visit a rural village without generating questions—and potentially serious repercussions—for local residents from local security and *kebele* officials. It is therefore extremely difficult to conduct research outside of Addis Ababa, the capital, in a manner that ensures confidentiality and security for the victims and witnesses of abuses. Due to the high risk of reprisals, Human Rights Watch has therefore omitted the names and other identifying details of most of the individuals who met with our researchers.

In order to ensure that information was not organized or prepared, Human Rights Watch interviewed a wide range of individuals from 53 *kebeles* in 27 *woredas* in Amhara and Oromia regions, and in the Southern Nations, Nationalities and Peoples' Region. Human Rights Watch also interviewed people from the two largest cities of Addis Ababa and Dire Dawa. Human Rights Watch used different interpreters and intermediaries to locate witnesses in order to minimize any risk that the information could be distorted. In some cases, rural residents traveled to larger towns for the interviews, where the meetings would attract less attention.

The majority of the interviews with victims and witnesses were conducted privately in secluded locations. Those interviewed included rural farmers, villagers vulnerable to food insecurity, students, teachers, civil servants, and businesspeople; the interviews also included members of the ruling party, opposition parties, and people unaffiliated to any political party living in rural villages and urban areas. Human Rights Watch also met with human rights activists, Ethiopian and foreign journalists, diplomats, international aid

officials, opposition politicians, serving and retired Ethiopian government officials, and members of Ethiopia's House of Peoples' Representatives.

In December 2009, a Human Rights Watch delegation led by Executive Director Kenneth Roth met with Prime Minister Meles Zenawi. Members of the delegation also met with his senior advisor Bereket Simon, officials from the Ministry of Foreign Affairs, the Ethiopian Human Rights Commission, the Charities and Societies Agency, the Office of the Ombudsman, and the National Electoral Board of Ethiopia, among others. The discussions were wide-ranging and Human Rights Watch presented concerns over the pre-election environment, the impact of new legislation on civil society, and other issues that are described in this report. Their responses and perspectives are included throughout the text.

# Background

In May 2010, Ethiopia will conduct its fourth national parliamentary elections since the ruling Ethiopian People's Revolutionary Democratic Front (EPRDF), a coalition of ethnic-based political parties, came into power. Led by the Tigrayan People's Liberation Front (TPLF), a Marxist-Leninist guerrilla movement that originated within the student movement at Addis Ababa University, the EPRDF ousted the "Derg," the military dictatorship of Mengistu Haile Mariam, in 1991 and established a four-year transitional period.

The advent of the EPRDF was an opportunity for Ethiopia to distance itself from decades of repressive autocratic and military rule. The Derg was responsible for the deaths of millions of Ethiopians, including through famine, mismanaged economic programs, coercive resettlement programs, and the "Red Terror"—the targeted elimination of thousands of suspected opposition supporters in urban areas. Some regions of Ethiopia such as Tigray, Oromia, and Somali region also experienced 30 years of brutal counterinsurgency campaigns causing massive civilian loss of life under both the Derg and its predecessor, the monarchy of Emperor Haile Selassie.[1]

The EPRDF's promises of respect for human rights, democratization, and ethnic federalism— a decentralized administrative structure that provides political and cultural recognition to ethnic groups long marginalized by the central government—heralded a new era for many of Ethiopia's people. For the first time, major ethnic groups like the Oromo were allowed to teach their own language—Afan Oromo—and were provided meaningful autonomy.

In the nearly two decades that the EPRDF has been in power, Ethiopia's government has demonstrated a real commitment to economic development and has introduced the technical framework of democracy. The 1995 constitution incorporates a wide range of human rights standards, including Ethiopia's international treaty obligations, and there are an increasing number of institutions tasked with promoting and protecting human rights.[2] But these steps, while important, do not ensure that Ethiopia's citizens are genuinely able to

---

[1] For a detailed description of abuses during the three decades of internal conflict, see Africa Watch (now Human Rights Watch/Africa), *Evil Days: 30 Years of War and Famine in Ethiopia* (New York: Human Rights Watch, 1991), http://www.hrw.org/node/78194.

[2] Ethiopia's constitution includes the right to freedom of thought, opinion, and expression (art. 29) and freedom of association (art. 31), which is limited only when associations "undertake acts that needlessly subvert the rule of law and constitutional rule." Ethiopia ratified the International Covenant on Civil and Political Rights (ICCPR), the International Covenant on Economic, Social and Cultural Rights (ICESCR), and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment during the 1991-95 transitional period.

enjoy their rights. In practice, ordinary citizens are unable to speak freely, organize political activities, and challenge their government's policies—whether through peaceful protest, voting, or publishing their views—without fear of reprisal. Democracy's technical framework will remain a deceptive and hollow façade so long as Ethiopia's institutions lack independence from the ruling party and there is no accountability for abuses by state officials.

More than 12 years ago, in its first major assessment of human rights conditions during the EPRDF's first years in power, Human Rights Watch documented a pattern of crackdowns on the private press, political and labor movements, and nongovernmental organizations.[3] That report noted that "these crackdowns reflect a central government effort to limit criticism of its policies and to hinder the establishment of civil institutions not linked to the ruling party."[4] The patterns described in 1997 remain sadly relevant in 2010, as described below.

Governmental repression has long followed a two-pronged approach. First, the authorities arrest and detain several high-profile opposition and civil society leaders in Addis Ababa, often without charge or on the basis of alleged security-related offenses. These cases have a chilling effect but also tend to attract some international attention. Second, in the rural areas, the state's extensive administrative apparatus subjects a much larger number of people to threats and arbitrary arrest and detention.[5] These actions create a pervasive climate of fear. In some areas of Ethiopia, people are fearful of even speaking their opinion for risk of reprisal. Under these conditions, the state is often able to suppress the rights to free speech, opinion, and peaceful dissent without the need for overt action by the security forces or government officials.

The government has publicly proclaimed that the country is moving toward democracy—albeit slowly given the many challenges it faces—but the evidence shows that civil and political rights have been deteriorating in Ethiopia, not improving. Ethiopia's democratic transition is not merely stalled, it is regressing.

## The First Decade

As early as 1992, tensions began to emerge between the TPLF-dominated EPRDF and some of its earlier anti-Derg allies such as the Oromo Liberation Front (OLF) and the Ogaden National

---

[3] Human Rights Watch, *Ethiopia: The Curtailment of Rights,* vol. 9, no. 8(A), December 1997, http://www.hrw.org/node/78531.

[4] Ibid., p. 37.

[5] Ibid., p. 29.

Liberation Front (ONLF).[6] As these and other regionally-based groups tried to transform themselves into legal political opposition movements, they found that the EPRDF was extending its grip in the regions through its ethnic-based member parties.[7]

In 1992, elections were held for officials at the *woreda,* or district level. Where opposition political parties contested posts, such as in Oromia, they were subjected to extensive intimidation and violence, including assaults on opposition candidates and supporters, threats against their families, arbitrary detention, and closure of party offices.[8] In much of the country, no opposition even emerged.

Ethiopia conducted federal and regional elections under EPRDF rule in 1995 and 2000. Both polls were dominated by EPRDF member parties, while opposition parties largely boycotted the elections, criticizing an uneven playing field.[9]

The 2000 elections differed from previous polls only because a number of opposition parties did compete in about half the electoral districts and won several dozen seats in Ethiopia's parliament, the House of Peoples' Representatives.[10] But while observers lauded the logistical and technical capacity of the National Electoral Board of Ethiopia (NEBE) to conduct elections,[11] the polls showed little significant progress from the previous polls in terms of meaningful multi-party competition.

## 2005 Elections

The year 2005 was a crossroads for Ethiopia's evolving political system, and a nuanced appreciation of events that year is fundamental to understanding the current political landscape. The 2005 parliamentary campaign, as well as the elections themselves, were the most democratic the country has ever experienced. But this was followed by a violent post-election period that rolled back all of this progress and sparked a trend toward increasing government repression that continues to the present day.

---

[6] Human Rights Watch, *Suppressing Dissent: Human Rights Abuses and Political Repression in Ethiopia's Oromia Region,* vol. 17, no. 7(A), May 2005, http://www.hrw.org/node/11760, pp. 8-9.

[7] Human Rights Watch, *The Curtailment of Rights*, p. 7. Each region soon had its EPRDF affiliate, for instance in Oromia, it is the Oromo Peoples Democratic Organization (OPDO); in Amhara, the Amhara National Democratic Movement (ANDM).

[8] Human Rights Watch, *Suppressing Dissent*, pp. 9-10.

[9] For a detailed analysis of the first decade of elections, see Siegfried Puasewang, Kjetil Tronvoll, and Lovise Aalen, eds., *Ethiopia Since the Derg: A Decade of Democratic Pretension and Performance* (London: Zed Books, 2002).

[10] Leonardo R. Arriola, "Ethnicity, Economic Conditions, and Opposition Support: Evidence from Ethiopia's 2005 Elections," *Northeast African Studies*, vol. 10, no. 1 (New Series), 2008, p. 118.

[11] Pausewang, Tronvoll, and Aalen, eds., *Ethiopia Since the Derg.*

The pre-electoral period in 2005 was a limited but historic opening of democratic space for political opposition parties, civil society, and the media. Despite continuing obstacles to their activities in many areas, they benefited from the ruling party's desire for a clean election that would show Ethiopia's democratic progress. As an Ethiopian analyst noted in December 2005, "the EPRDF saw the elections as an international opportunity for its image, it didn't see it as an internal issue, but it was the opposite."[12]

Despite continuing repression of opposition activity in many areas, opposition parties were able to campaign, access national government-controlled media, and hold rallies in a number of key geographic areas of the country. Two major coalitions of opposition parties emerged—the Coalition for Unity and Democracy (CUD, known as *Kinijit*) and the United Ethiopian Democratic Forces (UEDF). Several independent parties and candidates also participated.[13] Voters across many parts of Ethiopia experienced a real choice at the polls for the first time. Civil society organizations used the opening to conduct extensive voter education efforts which likely contributed to the high turnout of voters on May 15—90 percent according to the National Electoral Board.[14]

The Ethiopian media expanded in the pre-electoral period with a proliferation of new newspapers, even if almost all were concentrated in Addis Ababa and many lacked objectivity and professionalism. Robust debates between the ruling party and opposition, some broadcast on television, challenged the public perception that the ruling party, like every other Ethiopian government in the country's history, was omnipotent and unchallengeable.[15] Many of the most contentious issues in Ethiopian society, such as the constitutional right of peoples to self-determination and secession, land ownership, and ethnic federalism were openly debated. In the context of Ethiopia, it is difficult to overstate just how unprecedented and remarkable all of this was; the country had never before witnessed a comparable opening up of political space and public debate.

---

[12] Human Rights Watch interview with Ethiopian political analyst, Addis Ababa, December 16, 2005.

[13] The CUD, which fielded candidates nationally, included four parties: the All Ethiopian Unity Party (AEUP), led by Hailu Shawal; the United Ethiopia Democratic Party-Medhin (UEDP-Medhin), led by Admassu Gebeyehu; the Ethiopian Democratic League (EDL), led by Chekol Getahun; and Rainbow-Ethiopia, led by Birhanu Nega. The UEDF included five domestic and nine diaspora parties. Led by Merera Gudina of the Oromo National Congress (ONC) and Beyene Petros of the Ethiopian Social Democratic Federal Party (ESDFP), the UEDF's support was concentrated in Oromia and SNNPR.

[14] "Board Chairman Praises Voters and Election Staff," National Electoral Board of Ethiopia press release, May 15, 2005, http://www.electionsethiopia.org/Whats%20New26.html (accessed February 6, 2010).

[15] For a detailed analysis of the political dynamics in 2005, see Lovise Aalen and Kjetil Tronvoll, "The End of Democracy? Curtailing Political and Civil Rights in Ethiopia," *Review of African Political Economy*, vol. 36, June 1, 2009, pp. 193-207.

The final days of campaigning were marred by an intensification of "hate speech" by some leading politicians from both the EPRDF and the opposition,[16] but overall the pre-electoral period and voting day itself were a significant, positive step forward for Ethiopian democracy.[17] The post-electoral period, however, showed that the brief democratic interlude before the elections was an anomaly.

As poll results began accumulating, it became clear that the opposition coalitions had won an unprecedented number of seats, although not the victory they claimed.[18] The opposition won 80 percent of the constituencies in Addis Ababa in a landslide victory, but more surprisingly and alarmingly for the EPRDF, they also won some constituencies in some rural areas, particularly Amhara region and Southern Nations, Nationalities and Peoples' Region (SNNPR).

By May 16, although counting was ongoing, both opposition and ruling party officials made early predictions of election wins.[19] Bereket Simon, then-minister of information and EPRDF campaign manager, declared the ruling party had won a majority with more than 300 parliamentary seats; this conclusion was widely broadcast on state media although the National Electoral Board had yet to make a pronouncement and most constituency results had not yet been published.[20]

On May 16, Prime Minister Meles Zenawi imposed a month-long ban on public demonstrations in Addis Ababa. Tension over the election results began to mount amid opposition allegations that the NEBE was rigging and delaying results in favor of the ruling

---

[16] In April and May 2005, several members of the EPRDF, including then-Deputy Prime Minister Addisu Legesse and Prime Minister Meles Zenawi, stoked fears of anti-Tigrayan sentiments with comments comparing opposition parties to the genocidal Rwandan Interahamwe. At least one opposition party used similar rhetoric against the government. See EU Election Observer Mission, *Final Report of Ethiopia's Legislative Elections* (EUEOM report), September 2005, p. 16.

[17] The European Union's Election Observer Mission concluded that "the 2005 parliamentary elections were the most competitive elections Ethiopia has ever experienced, with an unprecedented high voter turnout. While the pre-election period saw a number of positive developments and voting on May 15 was conducted in a peaceful and largely orderly manner, the counting and aggregation processes were marred by irregular practices, confusion and a lack of transparency." EUEOM report, p. 1.

[18] Analysts have presented a number of different rationales for the opposition's gains. Some academics contend that opposition support was more of a vote against the government; others identify ethnicity as an important factor. Based on analysis of survey data, Leonardo Arriola contends that economic conditions were a key criterion, and that "the unemployed and those whose perceived living standard declined over the previous five years were more likely to vote for the opposition, regardless of ethnicity or region." Leonardo R. Arriola, "The Ethiopian Voter: An Assessment of Economic and Ethnic Influences with Survey Data," *International Journal of Ethiopian Studies,* vol. III, no. 1, p. 75.

[19] EUEOM report, p. 21.

[20] Ibid., p. 21. The NEBE announced official results for 307 of the 524 seats up for election on July 8, 2005. The ruling party was leading with 139 seats and the two large opposition coalitions had a total of 135 seats. "NEBE Releases Official Results for 307 Federal Seats," NEBE press release, July 8, 2005, http://www.electionsethiopia.org/Whats%20New36.html (accessed February 6, 2010).

party. Despite the ban on demonstrations, students in Addis Ababa began staging protests at the delay in the election results. On June 8, the demonstrations widened and turned bloody.[21] Prime Minister Meles took personal control of the security forces, who killed at least 36 people and detained several thousand in the capital and other cities in the following days as protests intensified, sometimes aggravated by rock-throwing and looting by protestors.[22] Opposition leaders and supporters were targeted for harassment, intimidation, and house arrest.

The government feared, with some justification, that opposition leaders were inciting supporters in a bid to stage a "color revolution" and overthrow the government.[23] For their part, some of the CUD leadership did hope to achieve this aim by mobilizing popular support, and at least one CUD leader, Berhanu Nega, has explicitly advocated for the violent overthrow of the government from exile in the US since his release from prison in 2007.[24]

The final election results were announced in September after a controversial complaints process of re-counting and re-elections in certain constituencies that was strongly criticized by the European Union observer mission.[25] The EPRDF and its affiliated regional parties won a parliamentary majority of 372 and the opposition gained an unprecedented third of the parliamentary seats—172—and control over the nation's capital.[26]

Some of the opposition politicians opted to take their seats in parliament and capitalize on the historic opportunity to share power and govern Addis Ababa. Others, particularly the more hard-line leaders of the CUD and diaspora communities, called for the opposition to boycott parliament and organize public protests in reaction to what they called a stolen

---

[21] "Shops in Ethiopia's capital closed following deadly riots," *New York Times*, June 9, 2005. In an interview with the BBC in July 2005, Prime Minister Meles noted that there was no indication that the June protestors were armed. See Stephen Sackur interview with Meles Zenawi, *BBC HARDtalk*, July 5, 2005.

[22] "Ethiopia: Crackdown Spreads Beyond Capital," Human Rights Watch news release, June 15, 2005, http://www.hrw.org/node/70541.

[23] The so-called color revolutions were peaceful, popular protests calling for democratic change that succeeded in ousting corrupt or unpopular governments in several states of the former Soviet Union. Civil society and students played an important role in the protests. The federal police commissioner, Workneh Gebeyehu, explicitly accused the opposition of "plans to stage the Orange Revolution of Ukraine in Ethiopia" in his report to parliament on November 15, 2005. Report on file with Human Rights Watch.

[24] See the website of GINBOT 7 Movement for Justice Freedom and Democracy, of which Berhanu Nega is a founding member, www.ginbot7.org and http://www.ginbot7.org/pdf/Ene_Le_Wegene_Flyer.pdf (accessed March 14, 2010).

[25] The EU observer mission noted, "Despite efforts by the NEBE to establish a system to deal with complaints, overall the process failed to provide an effective remedy to contestants, given that it took place in the context of serious violations of human rights and freedoms, namely of opposition leaders and supporters, which undermined the opposition's ability to participate effectively in the process." EUEOM report, p. 3.

[26] Aalen and Tronvoll, "The End of Democracy?," *Review of African Political Economy*, p. 196.

election, despite the government's June warnings that it was prepared to deploy the security forces with deadly force.[27] Street protests intensified again in early November 2005 as negotiations between the opposition and ruling party stalled and some of the CUD leadership called for stay-at-home strikes and for drivers to honk their horns. The protests started peacefully but escalated into violence and led to the destruction of a large number of city buses and some other property.[28] Nearly 200 people were killed by security forces in Addis Ababa, and six police officers died. The police closed CUD offices and confiscated party membership lists.[29]

Following the November protests, the authorities arrested an estimated 30,000 people in Addis Ababa and other towns and transported them to military camps outside of Addis Ababa, where most were held for 10 to 14 days and then released without charge. In the camps they were interrogated and screened: some former detainees told Human Rights Watch that they were questioned by investigators from their local city council, the *kefle ketema*, who checked their identification cards and names against a list. They were videotaped introducing themselves by name and *kebele* (village or neighborhood) and their heads were shaved so that they could be identified if they tried to escape. Before their release they were warned not to "involve yourself in politics."[30]

The government established an inquiry into the post-election violence, which initially concluded that the security forces used excessive force on demonstrators, many of whom were shot or beaten to death. Two members of the panel fled the country after presenting this conclusion to government officials and receiving threats. The final report presented to parliament reversed the panel's finding, clearing the police of having used excessive force and instead blaming the violence on the demonstrators.[31]

---

[27] Opposition leaders accused the government of manipulating the electoral process and parliamentary procedures. For a detailed analysis of the events and political dynamics in 2005, see International Crisis Group, *Ethnic Federalism and Its Discontents,* Africa Report No. 153, September 4, 2009, http://www.crisisgroup.org/home/index.cfm?id=6300 (accessed March 12, 2010).

[28] The federal police commissioner reported to Parliament on November 15, 2005, that protestors used grenades, guns, rocks, and homemade explosives in the "street action" in November and that the events were coordinated and launched simultaneously in 55 different localities in Addis Ababa. He said that 42 people died, including seven policemen. The report also accused the Oromo Liberation Front, a banned insurgent group, of instigating simultaneous protests in Oromia. Transcript of report on file with Human Rights Watch.

[29] Although the protests and violence in Addis Ababa had concluded by late November, it was the beginning of months of protests and violence in certain areas of Oromia. While this violence had its own historic context, one analysis concludes that the deployment of federal police in response to protests exacerbated the intensity of the violence and the number of wounded. Leonardo R. Arriola, "Ethnic Protest in Ethiopia: The Politics of Mobilization and Policing in Oromia Region," May 2009, draft article on file with Human Rights Watch.

[30] Human Rights Watch interviews with former detainees from Dedessa, Addis Ababa, December 23, 2005.

[31] Anthony Mitchell, "Inquiry Triples Toll in Ethiopia Protests," Associated Press, October 18, 2006.

In the days after the November 2005 protests, 131 CUD opposition leaders, journalists, and civil society leaders were arrested and charged with a variety of offenses, including treason and "outrages against the constitutional order." Almost two years later, after a lengthy, flawed trial in which the opposition leaders refused to recognize the court or defend themselves, the politicians were convicted but subsequently pardoned and released from prison.[32] Two civil society activists and human rights defenders, Netsanet Demissie and Daniel Bekele, were convicted of lesser charges after presenting a defense. They were sentenced to more than two years in prison, which they had already served by March 2008 when they were released.[33]

In the aftermath of the 2005 elections, using the same strategy it has used to target independent civil society organizations (see the text box, Campaign against the Ethiopian Teachers' Association), the government also supported administrative efforts that have weakened several opposition parties. Both the CUD and the Oromo National Congress, which was founded by Dr. Merera Gudina, were undermined when the National Electoral Board of Ethiopia awarded the names of both parties to government-allied splinter groups or rivals of the original founders. Dr. Merera was forced to found a new organization called the Oromo People's Congress and the events sowed considerable confusion about the party's profile.[34]

## 2008 Local Elections

Elections for the local-level *woreda* and *kebele* administrations were initially scheduled to take place in early 2006. In the aftermath of 2005, however, the government postponed them for two years.[35] Consolidating control of the local government structures was the EPRDF's first step to controlling the environment in which the 2010 elections would take place.

Although these local elections received virtually no international media attention and were not observed by international groups, they were critical for the daily lives of the 85 percent of

---

[32] The defendants signed a pardon apologizing for their "attempt to change government organs instituted in accordance with the Constitution, by unconstitutional means." Unofficial translation of the pardon letter, on file with Human Rights Watch.

[33] A third civil society leader, Kassahun Kebede, an official from the Ethiopian Teachers' Association, and a number of other opposition politicians and journalists were released in April 2007 when the court ruled that there was insufficient evidence to detain them.

[34] Human Rights Watch interviews with Merera Gudina, June and September 2009. See also Lovise Aalen and Kjetil Tronvoll, "The 2008 Local Elections: The Return of Electoral Authoritarianism," *African Affairs*, 108/430 (2008).

[35] The polls included by-elections for the Addis Ababa city council and the national and regional parliamentary seats that had been boycotted by the CUD since 2005. For further analysis of these elections, see also Aalen and Tronvoll, "The 2008 Local Elections," *African Affairs*, pp. 111-120.

Ethiopia's citizens who live in rural villages and communities. As early as December 2005, independent observers and opposition leaders alike predicted that after the unexpected gains made by the opposition in the May elections, the government would be loath to hold these rural polls until it had time to reassert control through its extensive administrative infrastructure.[36]

Administratively, Ethiopia is divided into regions, zones, *woredas* or districts, and then *kebeles*. When the EPRDF ousted Mengistu from power in 1991, it retained the peasant associations, or *kebele* structures, that the Derg had initially established in 1975 as a tool of development and land reform for millions of rural peasants, but which quickly transformed into a useful method of control and repression.[37]

The *kebele* council is the primary unit of administration at the village or neighborhood level. *Kebele* officials wield a great deal of power over constituents in a myriad of ways.[38] In Ethiopia's strict hierarchical society, challenging these officials was virtually unthinkable for decades and the line between state and ruling party was non-existent.

*Kebele* officials determine eligibility for food assistance, recommend referrals to secondary health care and schools, and help provide access to state-distributed resources such as seeds, fertilizers, credit, and other essential agricultural inputs. They also run the community social courts (*kebele*-level courts that deal with minor claims and disputes), local prisons, and, in some places, local militia that are used to maintain law and order.

In some areas of Ethiopia, the *kebele* system has been further replicated at an even lower level. Prior to the 2005 elections, Human Rights Watch documented in Oromia the regional government's creation of a sub-*kebele* level of administrative structures called *gott* and *garee*. The *gott* vary in size but usually encompass between 60 and 90 households. Each *gott* is divided into smaller groups of roughly 30 households called *garee*.[39] In 2005, the structure was imposed from above and used to organize forced labor of farmers, compel

---

[36] One observer noted, "The ruling party is not enthusiastic about the *woreda* elections, they need time to convert the rural population back." Human Rights Watch interviews, Addis Ababa, December 2005.

[37] Human Rights Watch, *The Curtailment of Rights*, p. 8.

[38] Each *woreda* is made up of a varying number of *kebeles*; the *woredas* are the constituencies for parliamentary seats. For further description of the *kebele* system and its role in rural communities, see Human Rights Watch, *Suppressing Dissent*; and also, René Lefort, "A short survey of the relationship between powers and peasants in a peasant community of Northern Shoa," *Nord-Sud Aktuell*, Quartal 2005, pp. 211-221.

[39] See Human Rights Watch, *Suppressing Dissent*, p. 30.

attendance at political meetings, restrict freedom of movement, punish and denounce citizens suspected of opposition sympathies, and monitor speech and association.[40]

Prior to the 2008 elections, the EPRDF began a massive campaign to recruit new party members. It increased its membership from 760,000 in 2005 to more than 4 million in just three years.[41] Simultaneously, the government vastly expanded the number of seats on *kebele* and *woreda* councils. As academics Aalen and Tronvoll noted:

> In the *kebele* council, for example, the numbers were increased from 15 to a maximum of 300, making up approximately 3.4 to 4 million candidates for *kebele* elections across the country [sources differ on the exact numbers]. Thus, it was only the EPRDF that was able to field candidates in all constituencies, while the opposition parties were unable to enter candidates for the great majority of posts...perhaps as many as one-third of *kebele* inhabitants will now be members of local government councils controlled by the EPRDF. Consequently, the ruling party has more or less a totalitarian control of the rural majority of the Ethiopian population.[42]

In addition to this massive expansion of ruling party dominance, the run-up to the 2008 *woreda* and *kebele* elections saw a resurgence of old patterns of intimidation and harassment of opposition parties. Officials also had a new and potent tool to threaten and intimidate: with the polling data from 2005, they knew which communities had voted against the ruling party in 2005.

In Oromia, for example, opposition candidates were regularly assaulted, arbitrarily detained, and accused of being supporters of the Oromo Liberation Front (OLF), a banned organization that continues to wage a low-level insurgency against the government.[43] One of the two major opposition coalitions, the United Ethiopian Democratic Forces (UEDF), pulled out altogether days before the election, complaining that intimidation and other obstacles restricted most of their candidates from registering.[44] Human Rights Watch documented

---

[40] Ibid., pp. 30-41.

[41] Aalen and Tronvoll, "The End of Democracy?," *Review of African Political Economy*, p. 203.

[42] Ibid.

[43] "Ethiopia: Repression Sets Stage for Non-Competitive Elections," Human Rights Watch news release, April 9, 2008, http://www.hrw.org/node/74763.

[44] Ibid. The other major coalition from 2005, the CUD, splintered in the wake of the arrest of its leadership in 2005 and did not stand in the 2008 elections. The CUD's difficulties were exacerbated by internal fragmentation, but also by the NEBE's

similar complaints in several areas of Oromia, particularly where opposition candidates had won seats in 2005. Notably, in some areas, representatives of the National Electoral Board colluded with local officials to bar opposition candidates from registering, bolstering the concern that the NEBE lacked neutrality.[45]

In the April 2008 local elections, the EPRDF and its affiliated regional parties eventually won more than 99.9 percent of the *kebele* and *woreda* seats.[46] According to the National Electoral Board results, the EPRDF and its affiliates won approximately 3.5 million *kebele* council seats and more than 56,000 *woreda* council seats. Opposition or independent candidates won four *kebele* seats and eight *woreda* seats nationwide.[47]

An official from a foreign aid agency noted, "The 2008 local elections were the nail in the coffin of any independent social and economic activities—now nearly all enterprises are party controlled at some level. The control is now total. The party and the state have become totally fused—they are one. The most recent figure for [EPRDF] party membership was the official figure at the time of the 2008 elections—4.5 million—but it must be higher now."[48]

## Repressive Legislation in 2009

In addition to enhancing its control of the administrative structure in the rural areas, the government in 2009 adopted two alarming pieces of legislation that have a significant impact on core political freedoms enshrined in the Ethiopian constitution and international law, particularly freedom of expression, association, and assembly. These were the Charities and Societies Proclamation (CSO law) and the Anti-Terrorism Proclamation.

Human Rights Watch has analyzed both laws elsewhere,[49] but the implications of the laws for the ability of the political opposition, civil society, and the media to operate freely in the upcoming electoral period are discussed in more detail below (see Stifling Independent Voices).

---

decision to assign the CUD party name and license to a splinter group of the CUD and the party's ballot symbol to another former CUD coalition party—Lidetu Ayalew's EDP-Medhin. See Aalen and Tronvoll, "The 2008 Elections," *African Affairs*, p. 113.

[45] Ibid.

[46] National Electoral Board of Ethiopia, "Official Results of the Local Elections and By-Elections Held on April 13 and April 20, 2008," document on file with Human Rights Watch.

[47] Ibid., p. 4.

[48] Human Rights Watch interview with official from foreign aid agency, Addis Ababa, September 8, 2009.

[49] Human Rights Watch, "Analysis of Ethiopia's Draft Civil Society Law," October 13, 2008, http://www.hrw.org/node/88963; and Human Rights Watch, "Analysis of Ethiopia's Draft Anti-Terrorism Law," June 30, 2009, http://www.hrw.org/node/84132.

## 2010 Pre-Electoral Period

The environment in the months leading up to the May 2010 elections raises a number of concerns about the fairness of the electoral playing field. These include constraints on free assembly, association, and speech, as described below. But broader concerns also include the detention of political prisoners, including UDJ opposition leader Birtukan Midekssa; the impartiality of the National Electoral Board; the role of international observers; funding for political parties; the independence of the judiciary (in the event of disputes); and the role of the police and military.

The ruling party has rejected concerns raised about the relevance of these issues and instead has promoted the code of conduct that it signed with some opposition parties on October 30, 2009, as evidence that it is committed to free, fair, and credible elections.[50] For its part, the main opposition coalition, the Forum for Democratic Dialogue (*Medrek*), walked out of the talks early on because they claimed that most of their concerns were not on the agenda. The government insisted that the talks were to be only about the code of conduct, but the Forum wanted parallel talks on the other issues.[51]

Eventually three opposition parties signed the code of conduct—the All Ethiopian Unity Party (AEUP), the Ethiopian Democratic Party (EDP), and the Coalition for Unity and Democracy Party (CUD).[52] The Forum stated that a code signed by four parties out of the 90 registered by the National Electoral Board cannot be said to be representative.[53] The government later claimed that 65 political parties had participated in the talks.[54]

Irrespective of the claims and counterclaims by the ruling party and opposition, the existence of a code of conduct is only one small element in the framework for elections. The

---

[50] The Ethiopian Ministry of Foreign Affairs wrote in its weekly briefing that the "Code of Conduct, now enshrined in law, is the most distinctive feature in the evolution of the Ethiopian electoral process, and indeed the legislation is unprecedented. It is designed to ensure that the forthcoming election, as well as all future elections, will be free, fair and credible. The result of an historic agreement by 65 political parties who have a genuine stake in the success of the upcoming election, it expresses the very clear determination by nearly all the main actors in the Ethiopian political process that the electoral process should succeed." *A Week in the Horn*, January 22, 2010.

[51] Human Rights Watch interviews with diplomats, members of the "Ethiopian Partners Group," Addis Ababa, September 8 and October 6, 2009; and with opposition leaders, December 2009.

[52] Currently the major opposition coalition is the Forum for Democratic Dialogue (*Medrek*), which includes the Unity for Democracy and Justice party formed by some of the former CUD leadership and led by Birtukan Midekssa; the OFDM, led by Bulcha Demeksa; the UEDF, led by Beyene Petros and Merera Gudina; Arena-Tigray, led by Gebru Asrat; and the Coalition of Somali Democratic Forces. The three opposition parties that signed the Code of Conduct and are not part of the FDD are former CUD members: Hailu Shawl's AEUP, Lidetu Ayalew's EDP-Medhin and the CUDP.

[53] See Melaku Demissie and Firew Abebe, "Parties sign pact on electoral code of conduct," *The Reporter,* October 31, 2009, http://en.ethiopianreporter.com/content/view/1837/26/ (accessed January 30, 2010), which includes text of the code.

[54] *A Week in the Horn*, January 22, 2010.

human rights context of the elections—the ability of parties to freely organize and campaign; candidates to register; and, ultimately, voters to have access to objective and varied sources of information and a meaningful choice at the polls—is influenced far more significantly by the broader conditions and patterns of respect or abuse of human rights.

# Constricting Political Space

The government denies that political space in Ethiopia is narrowing and points to the introduction of the electoral law, the press law, the increasing number of political parties, and the recent adoption of an electoral code of conduct to support its claims.[55] However, over many years the ruling EPRDF has pursued a carrot-and-stick strategy to effectively limit the ability of independent voices to peacefully express their views.

The carrot offered by local officials is access to jobs and government-controlled resources and services to encourage people into joining the ruling party. This approach encourages dependency on the government for people struggling for social and economic survival. As for the stick, government officials and EPRDF supporters use threats, harassment, and the cutting off of government resources to single out those individuals who support the opposition, fail to support the ruling party, or for whatever reason otherwise step out of line.

Particularly in Ethiopia's rural areas, where the local administration maintains a strong grip on communities, this combination of tactics is extremely effective at both restricting opposition activity where it exists, and preventing it from arising.

## Expanding Ruling Party Control

Since the 2005 elections, the EPRDF has pursued a vigorous strategy of shutting down opposition parties, purging dissent from within its own ranks, and using all means at its disposal to recruit the population into the party.

This has led to the systematic politicization of much of the civil service, most government services, and large areas of Ethiopian civic life, so that fewer and fewer economic activities, community meetings, or civic associations occur outside the purview of the EPRDF.

### Apparatus of Control

As described above, the *kebele* and *woreda* structure provides a potent and intrusive mechanism for the ruling party to gather information on and control communities. Alessa Mengesha, an opposition leader and former member of the transitional government after the fall of the Derg regime, explained:

---

[55] Human Rights Watch interview with Bereket Simon, minister of Government Communication Affairs Office, Addis Ababa, December 22, 2009.

> To understand the context of intimidation you have to understand the government structure in the *kebele*. There are seven cabinet members in the *kebele* administration: a social court, a committee for administration and security, an armed militia group, development agents (from the Ministry of Agriculture) who live and work in the *kebele*, school directors of the schools in the *kebele*, representatives of sectoral departments like health workers and teachers. If you see the political affiliation of all of these persons, no one not in the ruling party can assume these positions—except possibly teachers. This structure is there to tie the farmer-peasant hand to foot.[56]

The introduction of new sub-*kebele* levels of administration, like the *gott* and *garee* in Oromia, appears to have gathered pace in the lead-up to the 2010 elections. During the second half of 2009, Human Rights Watch researchers spoke to villagers in three of Ethiopia's most populated regions—Amhara, the Southern Nations, Nationalities and Peoples' Region (SNNPR), and Oromia—who described a system of cells comprising between 10 and 50 households, headed by a party-appointed official who would report to the *kebele* chairman. Civil servants in the regional governments of Amhara and SNNPR confirmed that this was now a common feature across both regions and, to their knowledge, also operated in other regions of the country.[57] Gebru Asrat, the leader of Arena-Tigray, a Tigrayan opposition party, also told Human Rights Watch that the cell structure is well entrenched across the Tigray region.[58]

Farmers from 53 different *kebeles* in Amhara, SNNPR, and Oromia regions described a similar pattern in 2009, noting that the sub-*kebele* structure was imposed from above and used as a tool of control as well as development. As one opposition leader from Awassa told Human Rights Watch:

> You need to understand the structure in the village. The *kebele* is split into groups of 100 or 200. Each group has its leader who is responsible to the *kebele* chairman, and he has five militia members under his command. They follow up on each person. The purpose is to prevent any other opposition party from entering in. It is to control the population, ahead of the election.

---

[56] Human Rights Watch interview with Alessa Mengesha, chairman of the Gedeo Peoples Democratic Organization, Addis Ababa, September 25, 2009.

[57] Human Rights Watch interviews, Amhara, SNNPR, and Addis Ababa, September 2009.

[58] Human Rights Watch interview with Gebru Asrat, Addis Ababa, October 7, 2009.

They started this system six months ago [in early 2009], and said it was in preparation for the election. The *kebele* leader coordinates the cell leaders. If you are discovered to be SLM [Sidamo Liberation Movement, an opposition party based in SNNPR] or any other opposition party you will be chased out. When one of our members goes for a meeting, they watch and inform; the militia, the neighbors, they are controlling the people. Our people cannot go anywhere![59]

Several farmers described a similar structure in their villages in SNNPR and in Amhara. A farmer from SNNPR said that those who do not participate in cell meetings are punished:

There are cells in our *kebele*, each cell has five members and the one who is not active in that cell will be discriminated against... the leader of each cell is a ruling party member. All the civil servants in the *kebele* are ruling party members.[60]

A teacher in Gonder, Amhara region, expressed similar views:

You have to understand that at the grassroots level, everything is organized according to the EPRDF ideology, everything is organized and controlled by cells; if you are opposition you are excluded.[61]

### Leveraging Resources and Services

Within the tightly controlled world of a rural *kebele*, finding an alternative means of organizing social life or earning a living outside the sanctioned structures is extremely difficult. The government services, jobs, allocation of aid, and resources—and therefore livelihoods—that are controlled by those same structures are also tools used to discourage opposition to government policies, deny the opposition political space, and punish those who do not follow the party line.

Human Rights Watch was told repeatedly over the past year that the EPRDF was using financial incentives and organized government-affiliated associations in many rural communities to consolidate support for the ruling party. "At the *kebele*, youths are paid per

---

[59] Human Rights Watch interview with SLM leaders, Awassa, September 28, 2009.

[60] Human Rights Watch interview with farmer and opposition SLM member, Awassa, September 30, 2009.

[61] Human Rights Watch interview with teacher, Gonder, September 18, 2009.

diems to attend meetings," said the teacher from Gonder.[62] An Oromia resident who said he was not an opposition supporter, explained:

> I don't think elections will be like in 2005. The government has mobilized all structures: women's leagues, youth leagues. In Ambo there are mini-associations. If you are absent from a meeting then there's a serious evaluation of why you're not present.[63]

Opposition parties have long complained that *kebele* and sub-*kebele* structures are run for political purposes and resources are awarded on a political basis. Bulcha Demeksa, a leading opposition politician and head of the Oromo Federalist Democratic Movement (OFDM) told Human Rights Watch that resources are used to punish perceived opposition support and as an incentive to join the ruling party:

> People are told if they don't vote EPRDF, then no fertilizers, clinics. If you get sick, they don't get a referral note from the *kebele* official for hospital in Addis Ababa.[64]

Human Rights Watch first documented patterns of abuses in the *kebele* structures in Oromia in 2005, but in 2009 the pattern also emerged in a much broader investigation in 27 *woredas* across Amhara, SNNPR, and Oromia regions.[65] Opposition supporters in Amhara described a trend of discriminatory resource allocation, with farmers unable to access seeds and fertilizers if perceived to support the opposition. They noted, however, that in their *kebeles* such discriminatory treatment did not extend to the health or education sectors. One farmer described the restrictions faced by opposition supporters in Amhara:

> The co-operative gets [the hybrid maize seeds] from the government, but the co-op selects whom to give them to and UDJ [Unity for Democracy and Justice] members cannot get them. The same with fertilizer or seedlings for cattle fodder from the rural development office. Those who do not support the government get nothing.[66]

---

[62] Ibid.

[63] Human Rights Watch interview with student, Addis Ababa, June 23, 2009.

[64] Human Rights Watch interview with Bulcha Demeksa, Addis Ababa, June 26, 2009.

[65] The politicized distribution of aid resources will be described in more detail in a forthcoming Human Rights Watch report.

[66] Human Rights Watch interview with farmer from Merawi *woreda*, Bahir Dar, September 16, 2009.

A farmer from Merawi *woreda*, also in Amhara, told Human Rights Watch that the harassment and discriminatory treatment stemmed from the pattern of voting in the 2005 election.[67] "This *woreda*, in the eyes of the EPRDF, is against them because it voted CUD in 2005, so the government handles it roughly," he said.[68]

Supporters of southern opposition parties reported similar complaints. An opposition party leader from the Awassa area told Human Rights Watch:

> Our members are not getting safety net [food for work] assistance, they are telling us, "It is not my choice but I need food, I need fertilizer, I am leaving for the sake of my family." This is the main cause of losing our members at the moment. Family members, students, graduates cannot get work if they are in opposition, so it makes the problem worse.[69]

A teacher from North Wollo, in Amhara region, who is unaffiliated to any political party, told Human Rights Watch:

> In the *woreda* where I was [living], many opposition supporters were discriminated against on safety net.... They were distinguished by the conversation as well as their official affiliation. The government is trying to run everything in a political sense. Everything becomes political.[70]

A member of the EPRDF from Dilla zone in SNNPR who was receiving safety net assistance in return for work said:

> There is not a single opposition person in the safety net program with me. I don't know the exact number of people but the *kebele* is always making lists saying this person is opposition, this person is this party, this person is that party.[71]

---

[67] According to official results, more than 60 percent of voters supported the CUD in Merawi *woreda*, which is located in West Gojjam zone, Amhara region. See Election results, National Electoral Board website, http://www.electionsethiopia.org/Amhara.aspx (accessed October 5, 2009).

[68] Human Rights Watch interview with farmer from Merawi *woreda*, Bahir Dar, September 16, 2009.

[69] Human Rights Watch interview with Sidamo Liberation Movement leaders, Awassa, September 28, 2009.

[70] Human Rights Watch interview with teacher, Amhara region, September 18, 2009.

[71] Human Rights Watch interview with farmer, EPRDF member, Dilla, October 3, 2009.

Another EPRDF member from Sidama zone said he had joined the ruling party just to get food aid:

> I am a member of the EPRDF, but I do support the opposition party. Being a member does not mean anything. I am a member of EPRDF because I need relief assistance…. The list of receipts—the proof that I am paying my dues to the party—are required to get relief assistance. I am paying because I do not want to be suppressed or ignored.[72]

Opposition farmers in West Haraghe zone in Oromia told Voice of America that residents' committees were denying food aid to citizens that did not vote for EPRDF or its allies in recent elections.[73]

Opposition supporters of the Tigrayan opposition party, Arena-Tigray, alleged that they had done work under the food-for-work program but had been denied payment because of their political affiliation. When they tried to meet with a Human Rights Watch researcher to explain their experiences in December 2009, they were detained and reportedly threatened.[74] The Human Rights Watch researcher was deported. An international journalist who then tried to interview the farmers was also subsequently detained and threatened with deportation.[75]

A farmer who voted for the opposition in 2005, but has since left the party as a result of intimidation, described still being denied resources simply for not joining the EPRDF even though he had left the opposition party:

> Those who are not supporters are like prisoners or paralyzed persons in that *kebele*. The children of those who are not supporting, when they finish school, they cannot get work, they cannot compete, they return home and try to farm, they do not have any place to go. In the *kebele*, they put people in groups of 100 and they have one leader with militia there and they are agitating people to become party members…. If there is any problem,

---

[72] Human Rights Watch interview with farmer and EPRDF member, Awassa, October 1, 2009.

[73] Jalene Gemeda, "Needy West Haraghe residents accuse officials of corruption in food aid distribution," Voice of America, January 15, 2009.

[74] Human Rights Watch telephone interview with Gebru Asrat, Arena-Tigray leader, December 26, 2009. See also Jason McClure, "Ethiopia jails seven for complaining of aid abuses," Bloomberg News, December 29, 2009.

[75] Human Rights Watch email correspondence with Jason McClure, January 11, 2010.

criminal or otherwise, there is no justice, no investigation, they destroy any chance of justice, we don't have rights.[76]

Ethiopian officials have denied that there is any policy of discrimination against the opposition in access to services and resources and stated that such allegations would be investigated and punished. Prime Minister Meles told Human Rights Watch in December 2009 that the policy guidelines to authorities at the local level are very clear and that any individual who violates them would be expelled from the party, while noting that he cannot vouch for every party member.[77]

However, two former senior officials in the federal and a regional government both told Human Rights Watch that the linkage between livelihoods and party membership is well understood by all government employees and party workers. The former federal official said:

> You get work if you are EPRDF. When you apply for a job you are asked for a letter from an organization within the ruling EPRDF: OPDO, ANDM, TPLF, etc. You have to come with a documentation letter from one of those parties. Any layman can tell you, if you are not a member of the EPRDF then your degrees don't matter.[78]

## Mobilizing Civil Servants

The claim that the politicization of government services and resources at local levels is the work of a few "bad apples" is not borne out by the consistent examples of the same abuses, and the same excuses, from *woreda* and *kebele* officials at opposite ends of the country. Moreover, it is not simply programs in the rural areas that suffer from political interference.

The civil service has become highly politicized since 2005. Civil servants are subject to propaganda meetings ostensibly to learn about government policy, but in reality this is part and parcel of a process of indoctrination and ultimately a request or threat to join the EPRDF. A resident of Gonder told Human Rights Watch:

> Last week all of the Amhara region civil servants, teachers, students [tenth grade and up] were in a meeting "to create awareness of government strategy

---

[76] Human Rights Watch interview with farmer, Awassa, September 30, 2009.

[77] Human Rights Watch interview with Prime Minister Meles Zenawi, Addis Ababa, December 22, 2009.

[78] Human Rights Watch interview with former Ministry of Agriculture official, Addis Ababa, September 21, 2009.

and policy" but the alternative agenda was to force people to join EPRDF or face the consequences. At the end of the meeting they were given a form to join EPRDF.[79]

Another civil servant in Gonder independently confirmed the description of the meeting, noting that the conference was "really about revolutionary democracy." He further explained, "The reality is that it is indoctrinating civil servants about EPRDF.... The conference is the first phase of the elections. After the meeting they distributed papers, forms to join the party, they said 'Fill this' like it was an order."[80]

Yet another participant in the Amhara state conference told Human Rights Watch:

> In the conference they classified all political parties into two categories: those who support revolutionary democracy and those who espouse liberal democracy. Revolutionary democracy is considered as a means of development and liberal democracy is considered as a means for rent-seeking. A security official in the Gonder security office said, "One cannot live being neutral, either you must join the EPRDF or the rent-seekers."[81]

Residents of SNNPR described similar conferences and trainings taking place in late 2009 in Awassa, the capital of the SNNPR. Local residents told Human Rights Watch:

> There are cadres currently being trained in Awassa, there are batches of hundreds or even thousands, up to 3,000 each month.... The payment is governmental, government transport, government buildings, it is an unfair use of state resources. It is visible, everyone in town can see them moving in government cars, they have a dormitory at the university.[82]

Another Awassa resident who spent time at the teachers' college where the training was taking place said:

---

[79] Human Rights Watch interview with Gonder resident, Gonder, September 17, 2009.

[80] Human Rights Watch interview with civil servant, Gonder, September 18, 2009.

[81] Human Rights Watch interview with teacher, Gonder, September 18, 2009.

[82] Human Rights Watch interview with residents, Awassa, September 29, 2009.

> One of the trainings is for the party cadres from government, from civil
> service from *woreda* up to regional level... The name is "capacity building"—
> it's the talk of the town that they are being prepared for the coming election.
> Every government meeting is now about that and the theory of revolutionary
> democracy.[83]

## Mobilizing Teachers and Students

Human Rights Watch has monitored and documented the EPRDF's sustained crackdown on academic freedom over more than a decade, including its campaign to dismantle the Ethiopian Teachers' Association (see the text box, Campaign against the Ethiopian Teachers' Association).[84] The intensified targeting of teachers and students for party membership likely reflects the disproportionate influence of these educated individuals in a country where only a small percentage of the population completes secondary school. But the government's sustained efforts to control the education sector may also derive from the TPLF's recognition of its own origins as a student movement and its concerns over students as a source of political dissent.

Many people interviewed by Human Rights Watch in 2009, including teachers, students, and concerned parents in different regions of Ethiopia, noted that the ruling party's efforts to mobilize EPRDF supporters and restrict opposition support have in recent years been specifically targeted at students and teachers.

Teachers living in different *woredas* and in different regions repeatedly told Human Rights Watch that they were under immense pressure by local administrations to join the ruling party, pay annual party contributions, and attend training conferences that included EPRDF indoctrination.

In Ambo, a town in western Oromia, a teacher complained of what he called "an intimidation campaign by *woreda* administrators and *woreda* school supervisors to enlist teachers as EPRDF members." And once you become a member, he said, the party "deducts [party dues] from our salary—most comply because it's not prudent to be openly defiant. Some have done it, though, and they pay the price."[85]

---

[83] Human Rights Watch interview with teacher, Awassa, September 29, 2009.

[84] Human Rights Watch, *Lessons in Repression: Violations of Academic Freedom in Ethiopia*, vol. 15, no. 2(A), January 2003, http://www.hrw.org/node/12373.

[85] Human Rights Watch interview with teacher, Ambo, November 14, 2009.

A teachers' training conference in Awassa, in SNNPR, included three days of discussions of EPRDF policies and programs. According to one teacher who attended, "the last day was about joining the EPRDF party."[86] Other teachers from Ambo, Dessie, and Gonder described similar conferences with an overtly political agenda.[87]

Most concerning of all perhaps, was that all high school students above grade 10, around the age of 14 and older, have been required to participate in the meetings too. Every school in every region visited by Human Rights Watch, including in Addis Ababa, had at some point during 2009 held a conference on the same topic of "awareness of government policy and strategy." Three students interviewed by Human Rights Watch researchers talked about the "propaganda." One student told Human Rights Watch about one of these conferences, for which each student was paid 25 Birr (US$2) for attending:

> They were not teaching us subjects, but their policy and their aims for the 2010 election and their educational policy.... They took our names and they called us and they said that anytime when they want us they have our phones, names, addresses, and they will call us. And they give us a party form—all of us in the seminar fill out the form. No one refused to fill. We were not forced, but we are not free. The party identification is very important for us. At university level they will ask for this and if you want other opportunities you will need it.[88]

A teacher in Gonder complained to the authorities at the teachers' conference about the indoctrination of students. He said:

> EPRDF advocates their ideology in primary and secondary schools. I asked why they were pushing the political program of one party in schools—it should be a place of education not political indoctrination. They even have cells of teachers (10) and cells of students (10) in the school.[89]

The party mobilization is successful. A teacher at a college in SNNPR described proctoring an entrance exam, and how when students were asked to place their identity cards on their

---

[86] Human Rights Watch interview with teacher, Awassa, September 29, 2009.

[87] Human Rights Watch interviews, September and October 2009.

[88] Human Rights Watch interview with high school student, Awassa, October 1, 2009.

[89] Human Rights Watch interview with teacher, Gonder, September 18, 2009.

desks during the exam, most put their party identification cards on display, rather than their national identity cards. The teacher described his reaction:

> I was shocked. I'm not blaming the children, they merely thought that was what was expected of them.... They are victims, they are not doing this willingly or knowingly—party membership is becoming the order of the day, it is what they are growing up with. We are not teaching them about freedom, making independent choices.[90]

## Intimidation of Political Opposition

Cases of violent attacks and arbitrary detention of opposition supporters continue to take place, but the most common forms of repression are more subtle. Local officials and EPRDF members regularly target opposition party offices and officials through a variety of tactics: threats and harassment, closing party offices, breaking up meetings, denying them access to state resources, and generally making it difficult, if not impossible, for them to carry out their political activities.

These actions not only restrict lawful opposition activity, they send a potent message to the general population that supporting the opposition will bear a heavy cost. In many rural communities, this prevents the emergence of political opposition altogether. The structure of *woreda*, *kebele,* and sub-*kebele* administrations, especially the cells—the *gott* and *garee* system—contributes to a climate of intimidation where the cost of exercising one's right to freedom of expression or association is high.

Opposition members and supporters from a variety of regions had similar complaints of inability to open party offices or hold meetings due to government harassment and intimidation. An opposition leader from the UEDF party described the current conditions for opposition parties in Hadiya and Wolayita zones in SNNPR:

> It's difficult to rent office space, people are threatened if they want to rent. In Hadiya and Wolayita the deals for office space fell through because of threats.... Three months ago, constituencies were asked to open offices but it puts people in trouble.[91]

---

[90] Human Rights Watch interview with teacher, SNNPR, September 29, 2009.

[91] Human Rights Watch interview with Beyene Petros, Addis Ababa, June 24, 2009.

Similar problems were described by the Sidamo Liberation Movement (SLM), which is active in Awassa and some surrounding *woredas* in SNNPR. The SLM had party offices closed and were denied permission to open offices in Goreche, Dara, and Bursa *woredas*. In Bursa, 49 SLM supporters were arrested and detained after demanding that they be allowed to open an office. "The authorities accused them of gathering without permission," an SLM official told Human Rights Watch.[92]

In Gamo Gofa zone, SNNPR, AEUP officials described having offices shut down and their officers detained in several locations because the national flag they were flying was not considered to be the correct one—it lacked a star in the center (the EPRDF's adaptation of the Ethiopian flag).[93] Officials from another southern opposition party, the Sidama Hadicho Peoples Democratic Organization, also based around Awassa in Sidama zone, told Human Rights Watch:

> We are trying to get ready for the election, but there is no freedom. We have an office, but if we try and meet, our members cannot come—they are not free to talk. If they try to meet, the *kebele* people will prevent them.... We tried to meet in the *kebeles* twice [July 2006 and January 2007] but the government came and cancelled the meeting and arrested some of our members, both times, so we haven't tried since. We reported this to every office including the NEB but nothing was done.[94]

Residents of Amhara region described similar threats. A UDJ supporter from a *woreda* in Amhara region said:

> We tried to open an office, they frustrated us, no one would dare sit there. We can meet amongst ourselves but hold a public meeting? No way! We are being followed all the time during the day, how can we call a meeting in this situation—it is unthinkable![95]

Often the government intimidation is less tangible. A number of opposition party supporters complained of intense surveillance and the pervasive culture of fear, particularly in the rural

---

[92] Human Rights Watch interview with SLM officials, Awassa, September 28, 2009.

[93] Human Rights Watch interview with AEUP officials, Awassa, June 24, 2009.

[94] Human Rights Watch interview with SHPDO official, Awassa, September 28, 2009.

[95] Human Rights Watch interview with UDJ member, Bahir Dar, September 16, 2009.

areas where the *kebele* and cell structure facilitates information gathering on every individual. One opposition party leader explained to Human Rights Watch:

> I know the people who are following us, we see them every day at the office and everywhere we go. The purpose is to intimidate us, frustrate us. The conditions get worse as you go further from Addis Ababa, in the regions, the zones, the *woredas* and *kebeles*. They want us to know we are being watched, to know that we cannot hide from them.[96]

A farmer in SNNPR described this form of intimidation in more detail:

> The *kebele* has made 60 people spies. They spy on the opposition party members, they report on what we do, where we go, etc. We are scared, even scared to go out much. They are like militias, they are armed with guns. They say to us, "This year, we will see who is going to win, we know what you are doing and who you are in touch with, and we will see what happens."They do not harm us, they don't touch us, but they talk to us like this and make us afraid.[97]

A UDJ official described trying to hold a meeting in Amhara region:

> On March 8 [2009] we tried to hold a rally in Debre Markos, the vehicles went around with loudspeakers announcing the meeting but the police prevented the vehicles from moving. Finally the UDJ members went to a hall and people came by word of mouth.[98]

Even in locations where opposition offices are allowed to exist, the level of intimidation sometimes renders them irrelevant. A UDJ official in Amhara region explained:

> We are constantly being intimidated by EPRDF cadres and told to leave UDJ and join the ruling party.... If someone joins our party they will lose their job. The office is open but we cannot do any activities.... The government officially sanctions our rallies but when we try to hold meetings the security

---

[96] Human Rights Watch interview with opposition party leader, Addis Ababa, September 25, 2009.

[97] Human Rights Watch interview with farmer from SNNPR, Awassa, October 2, 2009.

[98] Human Rights Watch interview with opposition party supporter, Bahir Dar, September 15, 2009.

people are everywhere telling the people not to attend or warning them of the consequences if they join the party. In the rural areas it is dangerous to come to our rallies.[99]

A member of the Gedeo People's Democratic Organization (GPDO) described people being summoned to the *kebele* office and ordered to quit the GPDO. He showed Human Rights Watch researchers letters written by *kebele* officials with the stamp of the government addressed to their members requiring them to quit the GPDO and issue a public apology in writing. GPDO officials claimed that their members who refused were denied identification cards, safety net participation, and were ostracized by their neighbors. "The party acts like the state and assumes state authority in many *kebeles*," he said.[100]

In some rural areas, opposition members have tried to organize. But, as a farmer from West Shewa zone, near Ambo, said, "There is no opposition activity in our area. Some have tried to join the opposition and mobilize support in rural areas, but the clampdown had been swift."[101]

According to a teacher in Ambo, reflecting the views of many with whom Human Rights Watch spoke: "Opposition activity has been curtailed for all practical purposes. There is only room for the EPRDF."[102]

## Violence, Arbitrary Arrest, and Detention of Opposition Supporters

Violent attacks were a feature of previous pre-electoral periods in Ethiopia. In the course of its research in 2009, Human Rights Watch received a number of allegations of recent assaults on opposition supporters, often by *kebele* militia, who are controlled by local *kebele* officials and are an integral part of the local security apparatus. Many of these allegations are difficult to investigate due to the increasing challenges for independent researchers and media to access rural areas and interview witnesses to incidents (see below, Stifling Independent Voices).

In visits to Gamo Gofa zone in SNNPR, and East Gojjam, another zone in Amhara region, Human Rights Watch researchers documented attacks on opposition supporters by

---

[99] Human Rights Watch interview with UDJ organizer, Amhara, September 14, 2009.

[100] Human rights Watch interview, SNNPR, October 3, 2009; and with Alessa Mengesha, GPDO chairman, Addis Ababa, September 25, 2009.

[101] Human Rights Watch interview with farmer, Ambo, November 14, 2009.

[102] Human Rights Watch interview with teacher, Ambo, November 14, 2009.

members of the *kebele* militia. In Lante and Derashe *woredas* in SNNPR, *kebele* militia were reportedly displacing people from their homes and confiscating land.[103] In East Gojjam, priests, farmers, and opposition officials reported violent attacks on opposition supporters in Dangla *woreda*.[104] In one town in Amhara (name withheld for the safety of the victim), a young woman manning an opposition office described how she was sexually assaulted by a member of the *kebele* militia, an EPRDF member, who said to her afterwards, "Let Birtukan come and deliver you from this mess!"—a reference to detained UDJ leader Birtukan Midekssa.[105]

A local human rights activist told Human Rights Watch:

> In East Gojjam (Debre Markos), the militia are very active in [assaulting] people who had been opposition supporters in 2005. If you had any contact with the opposition in 2005, that still follows you. Militia are raiding homes, beating people, even killing. Other notorious areas are South Wollo, Dessie, Derashe, Nekemte, Ambo, and North Shoa.[106]

Opposition parties including the UDJ and AEUP publicly complained about politically motivated violence against their members,[107] after both parties had compiled dossiers in June 2009 documenting arbitrary arrests, intimidation, and violence. The AEUP reported violent attacks, including the murders of seven of their members in North Gonder, South Gonder, and West Gojjam in Amhara, and Gedeo in SNNPR.[108] Human Rights Watch was unable to confirm the allegations, but these serious charges should be impartially and credibly investigated.

Arbitrary detentions also remain a serious concern. Ethiopia's most prominent political prisoner is Birtukan Midekssa, the leader of the UDJ party. Birtukan was among the Coalition for Unity and Democracy leadership arrested in 2005, convicted of "outrages against the constitution," and released in 2007 after receiving a pardon. She was re-arrested in December 2008 for allegedly violating the terms of her pardon, according to the

---

[103] Human Rights Watch interviews with farmer, Arba Minch, June 24, 2009; and displaced farmers, Derashe, June 25, 2009.

[104] Human Rights Watch interviews, Bahir Dar, September 16, 2009.

[105] Human Rights Watch interview, location withheld, date withheld.

[106] Human Rights Watch interview with human rights activist, Addis Ababa, September 8, 2009.

[107] Barry Malone, "Ethiopia Opposition says nearly 450 members jailed," Reuters, November 3, 2009.

[108] "Human Rights Violations Committed Against Members of AEUP and its Institutions by EPRDF Government Institutions and its Party Cadres," AEUP, June 2009; and "Violations of human and democratic rights perpetrated against UDJ activists in the SNNPR, Oromiya and Amhara regions," UDJ, June 2009, both on file with Human Rights Watch.

government.[109] In December 2009, the United Nations Working Group on Arbitrary Detention adopted an opinion finding that Birtukan was being arbitrarily detained.[110]

As elections have gotten closer, politically motivated arrests have increased. In November 2009, four opposition parties produced lists of over 450 people jailed, they said, for political reasons or trumped-up charges designed to frustrate their political activities.[111] Then, in January 2010, the Oromo Federalist Democratic Movement (OFDM) chairman, Bulcha Demeksa, told Voice of America radio that would-be candidates were being arrested in Oromia to prevent them from registering as candidates for the election.[112]

Rights activists in southern Oromia reported to Human Rights Watch that several hundred students, farmers, and businesspeople had been detained in prisons in the towns of Yabello and Negelle Borena. They claimed over 150 people, mostly affiliated with the Oromo People's Congress (OPC), were in Yabello jail as of January 25, and several hundred in Negelle Borena. The arrests had reportedly started in response to protests about the activities of mining companies in the region, which the authorities attributed to the opposition.[113]

On March 2, 2010, an opposition candidate from the Arena-Tigray party, Aregawi Gebreyohannes, was stabbed to death by five unidentified men.[114] Aregawi was a candidate for the federal parliament running in Shire district, Tigray region. He had previously been detained twice in connection with his political activities, officials from his party told Human Rights Watch. He had reported to his colleagues that he was experiencing rising intimidation and harassment in the days preceding his murder, and that he feared for his own safety.[115]

The government stated that Aregawi's death was the result of a personal dispute unrelated to politics.[116] More broadly, the government has generally dismissed allegations of

---

[109] "UDJ's Chairwoman, Judge Birtukan Mideksa, arrested," Ethiopian News Agency, December 29, 2008, http://www.ethiofact.com/index.php?/20081229241/news/birtukan-mideksa.html (accessed February 26, 2009).

[110] UN Human Rights Council, "Report of the Working Group on Arbitrary Detention," A/HRC/18/30, January 15, 2010, http://www2.ohchr.org/english/bodies/hrcouncil/docs/13session/A.HRC.13.30_AEV.pdf (accessed January 30, 2010).

[111] Malone, "Ethiopian Opposition says nearly 450 members jailed," Reuters, November 3, 2009.

[112] Peter Heinlein, "Ethiopian Opposition says would-be candidates arrested," Voice of America, January 12, 2010.

[113] Confidential communication, "Mass arrests in the Southern region of Ethiopia - Oromia," January 25, 2010, on file with Human Rights Watch.

[114] Jason McClure, "Candidate is Stabbed to Death in Ethiopia," Bloomberg News, March 2, 2010.

[115] Human Rights Watch telephone interview with Arena-Tigray official, March 4, 2010.

[116] McClure, "Candidate is Stabbed to Death in Ethiopia," Bloomberg News, March 2, 2010.

government attacks on and repression of opposition supporters, arguing that the allegations are "baseless" opposition tactics designed to discredit the elections.[117]

The Ethiopian government has also contended that the revocation of Birtukan Mideksa's pardon and her incarceration for life was legitimate, although she had no trial before she was re-imprisoned for life in December 2008. Prime Minister Meles Zenawi has contested any characterization of her arrest as politically motivated, and in December 2009 Meles said in a press conference that any discussion of her release was "a dead issue."[118]

---

[117] Barry Malone, "Analysis: Ethiopian opposition impotent as elections loom," Reuters, November 3, 2009.

[118] Xan Rice, "Jailed but not forgotten: Ethiopia's most famous political prisoner," *Guardian* (UK), January 9, 2010.

# Stifling Independent Voices

Civil society has never been strong in Ethiopia, but prior to 2005 civil society institutions managed to grow, proliferate, and gain significance in spite of considerable government hostility. Likewise, in the run up to the 2005 elections, the government-controlled media offered unprecedented access to opposition figures and perspectives, while private media rapidly expanded.

These trends were abruptly reversed after the 2005 elections. Conditions for civil society have further deteriorated since the passing, in 2009, of the repressive Charities and Societies Proclamation (CSO law), which gave legal weight to government efforts to control civil society. While this report focuses on the law's impact on human rights activism, many of the abusive practices also affect other sectors of civil society. For example, in its 2009 Annual Survey of violations of trade union rights, the International Trade Union Confederation noted that the Ethiopian government "blatantly interfered in trade union affairs in all sectors. Many trade union leaders are regularly intimidated, and most are removed from their posts and/or forced to leave the country, whilst others have been detained without trial."[119]

## Repression of Civil Society

Even before the EPRDF came to power in 1991, there was little tradition of an active civil society in Ethiopia. Yet over the past two decades a few important organizations have managed to establish themselves. The Ethiopian Teachers' Association trade union brought together teachers across the country in one of the country's oldest independent associations, and was increasingly bold about challenging government policies and actions. Mecha Tulema, an Oromo self-help association with roots in traditional culture, grew in terms of respect, resources, and the number of communities it touched. The Mekene Yesus church in western Oromia and SNNPR developed a powerful human rights component to its community-based work. Student activism and protest, at the secondary as well as the university level, became a regular feature of the political landscape in many parts of the country. The Ethiopian Human Rights Council stood as one of the few independent human rights organizations with a national focus for its investigative reporting.

---

[119] See International Trade Union Confederation-CSI-IGB, "2009 Annual Survey of violations of trade union rights: Ethiopia," http://survey09.ituc-csi.org/survey.php?IDContinent=1&IDCountry=ETH&Lang=EN (accessed February 12, 2010).

The Ethiopian government began working assiduously to roll back the influence of these organizations long before the crackdown after the 2005 elections. For more than a decade, the Ethiopian Human Rights Council, the Ethiopian Women Lawyers Association, and other prominent Ethiopian human rights groups have faced repeated bureaucratic efforts to shut them down. As early as 1991, when the EPRDF came into power, and throughout most of the 1990s, the government refused the Ethiopian Human Rights Council's application for registration, froze its bank accounts, and publicly denounced it as a "political group."[120] The Ethiopian Women Lawyers Association, an organization providing legal aid to women and girls, was temporarily suspended in 2001.[121]

Other nascent human rights organizations were shut down or driven into exile. The Ethiopian Human Rights League, a human rights group established among the Oromo community in Addis Ababa in 1996, was refused registration and at least seven of its founders and staff, as well as a number of Oromo elders involved in Mecha Tulema, were arrested in a 1997 crackdown on alleged supporters of the Oromo Liberation Front.[122] Other organizations tried to operate clandestinely or were forced into exile after repeated government harassment, threats to staff, and raids on their offices.[123]

After 15 years of legal maneuvering, the government managed to dismantle the Ethiopian Teachers' Association and replace it with a government-controlled entity in 2008. A similar effort has rendered insignificant the Ethiopian Bar Association, replacing what was a largely independent association with a government-controlled group. The government repeatedly cracked down on Mecha Tulema, imprisoning much of its leadership on trumped-up charges of orchestrating violence against the government; the organization was effectively destroyed. Student protests have regularly been put down by force and schools in troublesome areas subjected to intrusive patterns of surveillance and control.

Since the adoption of the CSO law in 2009, these efforts have intensified toward Ethiopia's few remaining human rights groups, both in terms of targeted attacks on specific individuals and organizations, as well as the bureaucratic threat posed by the CSO law. In June 2009, the government singled out for official vitriol several organizations and activists in the context of a new governmental effort to crack down on independent human rights monitoring.

---

[120] Human Rights Watch, *The Curtailment of Rights*, p. 45.

[121] Letter from Human Rights Watch to Prime Minister Meles Zenawi, October 16, 2001, http://www.hrw.org/node/66954.

[122] Human Rights Watch, *The Curtailment of Rights*, p. 45. Four leaders of Mecha Tulema were also arrested in May 2004 for allegedly supporting the OLF. See Human Rights Watch, *Suppressing Dissent*.

[123] Human Rights Watch, *Ethiopia: Targeting Human Rights Defenders*, May 19, 2001, http://www.hrw.org/node/77373.

*Failure to Conduct Credible Investigations into Abuses*

The government has vehemently denied reports of serious abuses and, with the exception of the inquiry into the 2005 post-election violence (see above, Background), it has refused to conduct credible and impartial inquiries or prosecute those responsible for serious human rights violations.

In 2008, in an apparent effort to minimize the perceived damage to Ethiopia's image from increasing allegations of human rights violations, the government began conducting politicized investigations that threatened the security of victims and their families.

The policy appears to have originated within the Ministry of Foreign Affairs, which mounted an inquiry in late 2008 in response to Human Rights Watch's June 2008 report on war crimes in Ethiopia's Somali Region.[124] While there is no single set of international standards for the conduct of investigations into alleged war crimes and violations of human rights, international law provides that any investigation be prompt, thorough, and impartial.[125]

The ministerial inquiry did not conduct its investigation in accordance with these basic international principles. It reportedly traveled to Somali Region and visited some of the sites mentioned in Human Rights Watch's report and interviewed an unknown number of individuals. The inquiry was accompanied by an Ethiopian Television camera crew as well as regional government officials.

Given the government's record of horrific abuses in Somali Region and the general climate of fear in the area, any government inquiry would require special precautions to assure victims and witnesses that they could speak openly to investigators without fear of reprisal.[126] The inquiry did not take such precautions and instead acted in a highly public manner.

Unsurprisingly, the inquiry failed to find serious abuses and concluded that Human Rights Watch's research and methodology was flawed. Despite repeated calls for an independent

---

[124] Ministry of Foreign Affairs, "Flawed Methodology, Unsubstantiated Allegations: the results of an investigation by the Government of Ethiopia into allegations by Human Rights Watch on human rights in the Somali Regional State," November 2008, http://www.mfa.gov.et/Press_Section/Flawed_Methodology_Unsubstantiated_Allegations.pdf (accessed March 10, 2010).

[125] These principles have been enunciated by various United Nations entities, including the General Assembly, the former Commission on Human Rights, treaty bodies, and special human rights envoys. They have also been set out by regional human rights mechanisms, such as the European Court of Human Rights and the Inter-American Court of Human Rights.

[126] Human Rights Watch, *Collective Punishment: War Crimes and Crimes against Humanity in the Ogaden area of Ethiopia's Somali Region*, ISBN: 1-56432-322-6, June 2008, http://www.hrw.org/node/62176.

investigation into the allegations in the Ogaden, including at the UN Human Rights Council in Geneva, the government continues to refuse to facilitate such an inquiry.[127]

There was a similar response to the US State Department's Human Rights Country Report on Ethiopia, published in February 2009. This highly critical report included cases of beatings, killings, and torture of opposition supporters.[128] The Ministry of Foreign Affairs issued a lengthy rebuttal and the government-controlled Ethiopian Television Agency ran a three-part television series denouncing the State Department report and several Ethiopian human rights organizations, which it claimed were providing the State Department with erroneous information.[129]

Invariably, in the cases presented in the government rebuttal and television series, individuals either recanted their previous testimony or were presented as security suspects linked to the OLF or as criminals. The government further accused Ethiopian nongovernmental organizations of supplying false information to the US government for "bread" and of having a "concubinage-like relationship" with US authorities.[130] The television footage is chilling: family members, friends, and community members with knowledge of victims appear visibly intimidated by the nature of the government's "inquiry." Human Rights Watch learned from a credible source that some of the people interviewed refused to recant their previous statements despite the pressure, but that these interviews were not included in the report or the television footage.[131]

The not-so-subtle threats in official communications combined with the rumors of imminent criminal charges prompted an exodus of human rights activists (and journalists, see below) from the country in 2009. One human rights activist who later fled the country told Human Rights Watch:

---

[127] UN Human Rights Council, "Report of the Working Group on Universal Periodic Review: Ethiopia," January 10, 2010, A/HRC/13/17.

[128] US State Department, Bureau of Democracy, Human Rights, and Labor, "Country Reports on Human Rights Practices – 2008: Ethiopia," February 25, 2009, http://www.state.gov/g/drl/rls/hrrpt/2008/af/119001.htm (accessed March 8, 2010).

[129] Government Communication Affairs Office, "Ethiopia's Response to the US State Department Report on the Human Rights Situation in Ethiopia," 2009, on file with Human Rights Watch.

[130] The commentary to the program also said, "As stated earlier, internal groups such as CUD, AEUP, OFDM, OPC, ONLF, OLF; the former Ethiopian Teachers' Association, ETA, EHRCO, EWLA, private media and other NGOs, evangelical association groups [...] and outside sources such as UNHCR, HRW, CPJ and UNICEF are at the forefront of the list of entities that are feeding the US government with unsubstantiated claims." A copy of the television series and an unofficial transcript of the television series are on file with Human Rights Watch.

[131] Human Rights Watch interview with diplomat, Addis Ababa, December 15, 2009.

One month after the US Department of State human rights report came out, a policeman in [SNNPR] warned me, "We will take any action against you if you continue to cause trouble." One of the cases in the US report was investigated by me.[132]

---

### Campaign against the Ethiopian Teachers' Association

The government's campaign against the Ethiopian Teachers' Association (ETA), one of Ethiopia's oldest trade unions, illustrates the strategy of personal attacks on senior or high-profile officials and sustained legal and bureaucratic efforts to dismantle the association that has characterized government attacks on other organizations.[133]

Established in 1949, at its peak the ETA boasted a membership of at least 80,000 teachers.[134] Soon after the EPRDF took power in 1991, it criticized the new government's educational policy, called for increased salaries and benefits, and threatened a strike.[135] In response, the government refused to re-register the organization, blocked its bank account, and registered a new group loyal to the ruling party under the ETA name in March 1993.[136]

Teachers were pressed to join the new ETA and security forces actively harassed ETA staff, ransacked its head office in Addis Ababa and some members' homes.[137] In 1996, senior ETA officials, including its president, Dr. Taye Wolde Semayet, were arrested and detained on charges of leading a clandestine insurgent group.[138] In May 1997, the ETA's acting director, Assefa Maru, was shot and killed by police while walking to work, in what Human Rights Watch determined was an extrajudicial execution.[139] International calls for an independent investigation, including from the International Labour Organization (ILO), fell on deaf ears.

Since 1998, the original ETA has struggled to survive in the face of repeated arrests and detentions of its staff—some of whom were tortured—and disruptions of their meetings and conferences.

---

[132] Human Rights Watch interview with human rights investigator, Addis Ababa, September 9, 2009.

[133] Human Rights Watch has monitored the situation of the ETA closely over more than a decade. For details, see Human Rights Watch, *The Curtailment of Rights*; and Human Rights Watch, *Lessons in Repression*. The attention to teachers may be partly due to the role that teachers played within the TPLF during the long conflict with the Derg. The TPLF, which itself originated as a student movement, is very much aware of the potential for student unrest and teacher mobilization to generate a more influential movement.

[134] Human Rights Watch, *The Curtailment of Rights*, p. 47.

[135] Ibid., pp. 47-52.

[136] Ibid.

[137] Ibid., p. 51.

[138] Dr. Taye spent more than five years in prison and was released in 2002.

[139] The government alleged that Maru was involved with an insurgent group called the Ethiopian Patriotic Front and had been shot in the process of being apprehended, an account which was contradicted by considerable eyewitness testimony obtained by Human Rights Watch.

Teachers who continue to support the old ETA have been forced to pay dues to the government-backed ETA, and some have been demoted, transferred, and fired.[140]

The ILO's Committee on Freedom of Association has since 1996 annually called on the Ethiopian government to allow the ETA to function freely, to provide due process to detained ETA members, to cease harassment and intimidation of ETA members, and to investigate the killing of Assefa Maru, to no avail.

The ETA was dealt a fatal blow when in June 2008 the Ethiopian Supreme Court upheld the decisions of two federal courts that the Ethiopian Teachers' Association's name and assets should be transferred to the rival government-supported association with the same name. Some of the former members of the original ETA formed a new association which they named the National Teachers' Association and applied for registration. The application was denied by the Ministry of Justice.[141]

## Charities and Societies Proclamation

In January 2009, the Ethiopian parliament adopted a new law called the Proclamation to Provide for the Registration and Regulation of Charities and Societies (CSO law). The final text included language that had been discussed and debated among Ethiopia's donors, nongovernmental organizations, and aid agencies for more than a year. More than any other issue, the CSO law set alarm bells ringing among Ethiopian and international civil society activists and Ethiopia's donors, who lobbied the government unusually assertively—though typically in private—to remove some of the most alarming provisions.[142] These efforts ultimately failed and the legislation restricts and criminalizes the activities of nongovernmental organizations and associations in ways that violate the rights to freedom of expression and association.[143]

---

[140] Human Rights Watch, *Lessons in Repression*.

[141] See International Trade Union Confederation-CSI-IGB, "2009 Annual Survey of violations of trade union rights: Ethiopia."

[142] Ethiopia is one of a growing number of countries with repressive governments that have passed laws restricting civil society activity in the past five years, generally in order to restrict independent criticism, investigation, and advocacy activity by nongovernmental groups. Russia, Singapore, Zimbabwe, Jordan, and many other countries have adopted similar legislation. See Human Rights Watch's analyses of these laws on the various country pages at http://www.hrw.org. See also the International Center for Not-for-Profit Law at http://www.incl.org.

[143] "Ethiopia: New Law Ratchets Up Repression," Human Rights Watch news release, January 8, 2009, http://www.hrw.org/node/79133; and Human Rights Watch, "Analysis of Ethiopia's Draft Civil Society Law," October 13, 2008. The most alarming of the law's provisions distinguish between Ethiopian and foreign organizations on the basis of the sources of their funding; bar non-Ethiopian organizations from engaging in a variety of human rights, advocacy, and good governance activities; provide criminal penalties for failure to comply with reporting requirements; create a new supervisory agency with broad powers to regulate, suspend, and dissolve nongovernmental organizations; and limit the right of appeal of the agency's decisions.

In response to the unprecedented criticism the measure received, the government contends that the CSO law is necessary to improve transparency and accountability and promote indigenous organizations, all of which are clearly legitimate goals. But the rationale behind the law, as laid out in an EPRDF newsletter and described to Human Rights Watch staff by government officials, is more insidious and essentially equates nongovernmental organizations with political parties, arguing that they should be restricted from foreign funding in the same way as political parties in order to restrict foreign influence in Ethiopia's "developmental democracy."[144]

The new law already had an impact well before the year-long grace period ended in February 2010. A number of organizations began preemptively taking steps in 2009 to change their mandates and activities and reduce staff in anticipation of problems when the law came into force. Others decided to wait, then register and assess the process; some were given three-month licenses to continue operating in the interim period.

In November 2009, the new Charities and Societies Agency (CSA) began registering organizations, although the agency's board—to which organizations are supposed to direct their complaints and appeals—had not yet been established, nor had some of the directives needed to interpret the law been issued.[145] This gave the CSA officials enormous latitude to interpret their mandate individually and force organizations to bargain over their statutes and activities and even their names in a desperate attempt to register.[146] As one legal analyst told Human Rights Watch, the government "thinks they will still get NGO support and foreign funding despite the NGO law, and the NGOs and donors are proving them right. [Various NGOs] are re-negotiating their mission statements; they are making major adjustments to compromise with the law."[147]

Although international donors had planned to establish a monitoring mechanism to assess the impact of the law, it had yet to be established by late December 2009, when the registration period was more than half complete and most organizations had already

---

[144] EPRDF, "The Rationale Behind the Charities and Societies Proclamation," *New Vision*, September-October 2008 (unofficial translation). This lengthy article presents Ethiopia as a developmental democracy in contrast to what it calls the "rent-seeking neo-liberalist interests" who seek to paralyze the state and replace it. In a revealing paragraph, the article states: "An association of exclusively Ethiopian membership and leadership would ultimately be run by foreign forces if it draws its funding from foreign sources. It is because of this reason that all countries, including those that are very developed and democratically advanced including the United States prohibit political parties and persons not to receive any finance or material from any foreign source or citizen to run their activities and punish them legally where they receive them."

[145] Human Rights Watch interview with staff of the Charities and Societies Agency, Addis Ababa, December 17, 2009.

[146] Human Rights Watch interviews with Ethiopian NGO staff, Addis Ababa, December 2009.

[147] Human Rights Watch interview with Addis Ababa University lecturer, Addis Ababa, September 22, 2009.

finished their negotiations and either dissolved or radically changed their scope and type of activities.

Notably, the Ethiopian Human Rights Council, Ethiopian Women Lawyers Association, and a number of the other prominent organizations targeted by the government had to wait more than two months for their applications to be approved. The same day that EHRCO received its license in December, its bank accounts were frozen, although the funds were from pre-existing grants and the law was not due to take effect until February 2010. CSA officials informed EHRCO staff that as an "Ethiopian organization" under the CSO law, this retroactive application of the law was legitimate, although the CSO law provides the CSA with no such powers.[148] The CSA's letter to the bank to freeze EHRCO's account was dated three days before EHRCO received its registration, suggesting the action was well-planned. EHRCO has now closed nine of its 12 field offices, and has had to lay off many of its staff, several of whom have fled the country.

The impact of the law has been felt well beyond the specific measures taken. As one aid worker noted, "Where the law has been quite successful is in creating a huge layer of fear. It has also been successful in creating a lot of self-censorship among NGOs."[149] Even prior to November, the fear of government reprisals led three of the four major human rights groups that had contributed to the Universal Periodic Review process at the UN Human Rights Council in Geneva in 2009 to pull out of submitting further reports. As one activist told Human Rights Watch, "This is an example of the CSO law having an impact—it keeps everyone guessing."[150]

## Domestic Election Observers

In contrast to the May 2005 pre-electoral period, initiatives by Ethiopian civil society to conduct voter education and election observation will be severely constrained in 2010.

Civil society activists were galvanized by the opening of democratic space in early 2005. A coalition of nongovernmental organizations began preparing to observe the elections with approximately 2,000 observers who they planned to send throughout the country. The initiative stalled temporarily when the National Electoral Board of Ethiopia issued new rules stating that only those nongovernmental organizations that had included election

---

[148] Human Rights Watch interview, Addis Ababa, December 19, 2009.

[149] Human Rights Watch interview with aid worker, Addis Ababa, September 22, 2009.

[150] Human Rights Watch interview with human rights activist, Addis Ababa, September 8, 2009.

observation within their mandate at the time of registration and were viewed by the NEBE as impartial could observe the election in 2005.[151]

Led by the Organization for Social Justice in Ethiopia (OSJE), a coalition of 35 nongovernmental organizations brought a lawsuit before the Federal Supreme Court challenging the NEBE's ruling in April 2005. The OSJE argued that the NEBE's new rules violated Ethiopia's election law, and on May 3, 2005, in an unexpected victory for the nongovernmental organizations, the court ruled in their favor.[152] However, the ruling came less than two weeks before the elections and gave the organizations little time to muster their observers in Ethiopia's rural areas, although teams did observe the polls in Addis Ababa and some other locations.

In the aftermath of the 2005 elections, the government took two measures to ensure that such initiatives would not be repeated. As mentioned above, in December 2005 officials arrested Netsanet Demissie, the director of OSJE, and Daniel Bekele of ActionAid, who led the civil society efforts to observe the elections, spearheaded the lawsuit against the NEBE, and later tried to help negotiate a compromise between the government and the opposition. The arrest and eventual conviction of the two activists sent a clear warning to civil society.

The government also changed the legal framework for domestic observers, making it much more difficult for organizations to participate, and prohibiting election observers from issuing any reports prior to the elections. The amended electoral law essentially reverses the 2005 court decision, stipulates that organizations cannot do both voter education and election observation,[153] and gives the NEBE power to license nongovernmental organizations that apply to do either activity.[154] It also includes vague criteria for an organization to be licensed as an observer and gives the elections board considerable leeway to refuse an application, with no right of appeal.[155] In 2008, the Ethiopian Human Rights Council, which

---

[151] Amnesty International, "The 15 May 2005 elections and human rights - recommendations to the government, election observers and political parties," AI Index: AFR 25/002/2005, April 28, 2005, http://www.amnesty.org/en/library/info/AFR25/002/2005/en (accessed March 12, 2010), p. 7.

[152] EUEOM report, p. 15.

[153] Proclamation to Amend the Electoral Law of Ethiopia, Proclamation 532/2007, Federal Negarit Gazeta, June 2007, art. 90(4).

[154] NEBE officials told Human Rights Watch that the NEBE would play the primary role in civic and voter education itself and would begin licensing other organizations for election observation in late December. Human Rights Watch interview with NEBE officials, Addis Ababa, December 21, 2009.

[155] Article 79(1) provides four criteria that must be met for observation. Two of them are entirely legitimate: legal registration and politically non-partisan. But under article 79(1)(c), the NEBE can license an organization only if it has "made preparations that create a conducive atmosphere for a free, fair and peaceful election"; article 79(1)(d) states that the elections board can investigate the "capability of the election observers deployed by the organization to observe the election impartially." Proclamation to Amend the Electoral Law of Ethiopia.

applied for observer status for the local elections, said that the NEBE ignored its request and never provided the written response it is required to give by law.[156]

The 2009 Charities and Societies Proclamation added yet another threshold that domestic nongovernmental organizations must meet in order to observe the elections, stipulating that organizations must be "mass-based" in order to "participate in the process of strengthening democratization and election [sic], particularly in the process of conducting educational seminars on current affairs, understanding the platforms of candidates, observing the electoral process and cooperating with electoral organs."[157] The law defines "mass-based societies" to include "professional associations, women's associations, youth associations, and other similar Ethiopian societies."[158] Although Human Rights Watch has not yet conducted its own investigation into the nature of the growing number of women's and youth associations in Ethiopia, many members of independent civil society organizations fear that these groups are thinly veiled fronts for the EPRDF.[159]

The NEBE underlined the prohibition on any public statements before the NEBE has pronounced on the elections in a code of conduct for international observers published in February 2010.[160] The code is an effort to control and intimidate international observers in 2010, for example by seeking to preclude their making statements on the conditions prior to or on the conduct of the polls until after the NEBE has announced the results. The government harbors deep resentment toward the 2005 European Union Election Observer Mission and specifically its chief, European Parliamentarian Ana Gomes, for what it views as its biased and pro-opposition statements in 2005.

## Muffling the Media

When the EPRDF came to power in 1991, they quickly liberalized the media environment, ending the censorship that had prevailed for decades at the hands of both the Derg and

---

[156] See Ethiopian Human Rights Council, "UPR Submission by the Ethiopian Human Rights Council," April 2009; and the Proclamation to Amend the Electoral Law of Ethiopia, art. 79(2).

[157] Proclamation to Provide for the Registration and Regulation of Charities and Societies, Proclamation 621/2009, Federal Negarit Gazeta, February 13, 2009, art. 57(7).

[158] Ibid., art. 2(5).

[159] Human Rights Watch interviews with civil society activists, Addis Ababa, June and December 2009.

[160] National Electoral Board of Ethiopia, Code of Conduct of International Observers, February 25, 2005, http://www.electionsethiopia.org/PDF/Code%20of%20Conduct%20of%20IEO.pdf (accessed March 10, 2010).

imperial rulers. Yet since the early 1990s, the relationship between the EPRDF and the private press has been one of deep mistrust.[161]

The media environment in Ethiopia was heavily polarized even prior to the 2005 elections. Clampdowns on the private press occurred regularly in the 1990s, with dozens of journalists arrested and accused of publishing false information or violating other provisions of the 1992 press law, which allowed government authorities to detain journalists without charge.[162]

The government often blames the Ethiopian press for a lack of professional objectivity and standards, an accusation that has some merit. For its part, the independent media has struggled to establish itself in the face of constant government hostility and an inability to access information from government officials.[163]

As with civil society and political opposition, the high point of freedom for Ethiopian media was in the prelude to the 2005 elections up through polling day.[164] In the aftermath of the post-election violence, many journalists were arrested alongside the CUD leadership in November 2005, charged, and tried for "outrages against the constitution" and other crimes, a number of them in absentia.[165] Fines were also imposed on the publishing houses. Although the journalists and publishers were eventually pardoned and released in 2007, the government continued to demand the payment of the fines. In a case that went to the Supreme Court, on March 9 the court ruled against the publishing houses, overturning a 2007 ruling that the pardon included the fines.[166]

---

[161] For a detailed analysis of the history of Ethiopian media, see Nicole Stremlau, *The Press and Consolidation of Power in Ethiopia and Uganda,* May 2008, doctoral thesis, Development Studies Institute, London School of Economics (LSE), on file with Human Rights Watch.

[162] Human Rights Watch, *The Curtailment of Rights*, pp. 30-34.

[163] Ibid.

[164] A former journalist with the government-run Ethiopian Radio described the abrupt shift of position to Nicole Stremlau, an expert on Ethiopian media: "Before the election was the nicest time of my life. I received more than 300 calls on the day of the election. We followed every activity of polling stations with 22 radio reporters. We received news from ENA and Walta [government media]; everyone was so motivated and it was free. The next day everything was different. The TV announced that the EPRDF has won and then things got bad. The Prime Minister announced a one month state of emergency…. A few days after polling we were told we were 'back to editorial.' 'Back to editorial' meant we would no more accommodate opposition ideas. The ruling party considered it to be out of their generosity and charity that the opposition got to use the government media. It was a problem of attitude." Stremlau, *The Press and Consolidation of Power in Ethiopia and Uganda.*

[165] Six publishing houses were also charged. Several journalists were released in April 2007 after 18 months of imprisonment, along with other defendants from the political opposition, when the court ruled that there was insufficient evidence against them. Five journalists from the Voice of America and several other detainees were discharged in 2006.

[166] International Press Institute, "Ethiopia Supreme Court orders Publishing Houses to pay highest ever fines, say publishers," March 8, 2010, http://www.freemedia.at/singleview/4813/ (accessed March 10, 2010).

In July 2008, Ethiopia's parliament adopted the Mass Media and Freedom of Information Proclamation, which had been debated for years. The press law, as the proclamation is known, makes some positive changes such as barring the pre-trial detention of journalists, but it added alarming new features, such as a broad government power to initiate defamation suits (regardless of the defamed official's interest), crippling financial penalties, and power to arbitrarily deny licenses and registration.

Since 2008, almost every private newspaper has dealt with a barrage of lawsuits that keep many of their editors constantly in court.

The new Anti-Terrorism Proclamation, adopted in July 2009, adds further concerns of abusive legal action. The law contains an overly broad definition of terrorism which can encompass even peaceful expressions of dissent and political protest. But it is particularly worrying for the media because it provides discretion to authorities to prosecute those who "promote" or encourage terrorism. Under the law's broad definition, this could include editors and journalists who publish articles referring to armed opposition movements, such as the Oromo Liberation Front or the Ogaden National Liberation Front, or any other individuals or groups deemed as terrorists, "anti-people," or "anti-peace" by the government.[167]

Concerns that the law could be used to target media became a reality in late 2009 when several newspaper editors were reportedly summoned to security officials and warned that certain articles could be deemed to promote terrorism.

A journalist working for a newspaper in Addis Ababa described the fear and uncertainty that prevail among many working in the independent media:

> There is a significant element of self-censorship, there are many stories we cannot write, many things we cannot say. We are not told the red lines, we have to guess. Their interpretation of terrorism [in the anti-terrorism law] is so broad that it is dangerous for us. For example, if they label a particular political party a terrorist organization then we cannot write about them.... Newspapers are not allowed to do polling or predict anything before the National Electoral Board has announced it.[168]

---

[167] Human Rights Watch, "Analysis of Ethiopia's Draft Anti-Terrorism Law," June 30, 2009.

[168] Human Rights Watch interview with *Addis Neger* journalist, Addis Ababa, September 22, 2009.

In December 2009, the *Addis Neger*, one of the few remaining independent Amharic weekly newspapers, closed after its senior staff received threats and fled the country.[169] According to credible sources, they were afraid that they might be prosecuted under the anti-terrorism law.

Other journalists fled the country in 2009. The New York-based Committee to Protect Journalists reported in 2009 that four Ethiopian journalists were currently in detention, the most in sub-Saharan Africa after Eritrea, and that at least a dozen Ethiopian journalists were forced to flee the country in 2009 due to threats and harassment.[170] Many journalists flee because they have little faith in the independence of the judiciary, should they be arrested and brought to trial.

The international media is also on tenterhooks. The government has regularly expelled or threatened to deport reporters from the international media for publishing articles that paint its policies and actions in less than a flattering light.[171] Most recently, in January 2010, the Bloomberg correspondent in Ethiopia was detained for two days and threatened with deportation after he attempted to interview seven Tigrayan farmers who had been arrested after they alleged that they had been denied access to food aid because they did not support the EPRDF.[172]

To prevent criticism by foreign media outlets, the government has taken unusual steps in retribution for unfavorable reports. In 2008, it severed diplomatic relations with Qatar in part because it claimed "the output of its media outlets, notably Al-Jazeera television, provided direct and indirect assistance to terrorist organizations," after a series of broadcasts on the plight of civilians in the Ogaden.[173] In 2009, the Ethiopian government sparked a diplomatic upset when it pressured the Nation Media Group in Kenya to stop its broadcast on national

---

[169] Among other threats, several editorials in the pro-government media had made pointed references to *Addis Neger*.

[170] Committee to Protect Journalists, "CPJ Urges Ethiopia's Zenawi to Pursue Press Reforms," February 16, 2010, http://cpj.org/2010/02/cpj-urges-ethiopias-zenawi-to-pursue-press-reforms.php (accessed February 16, 2010).

[171] Journalists from *The New York Times* and *The Telegraph* (UK) were detained and deported after trying to investigate the situation in the Ogaden area of Somali Region in 2008. An Associated Press correspondent, Anthony Mitchell, was deported in 2006 when his coverage of the post-election violence riled the government. The BBC has also had correspondents forced to leave after their permits were not extended.

[172] Jason McClure, "Ethiopia jails seven for complaining of aid abuses," Bloomberg News, December 29, 2009.

[173] "Ethiopia Breaks Ties with Qatar," *Al Jazeera*, April 21, 2008, http://english.aljazeera.net/news/africa/2008/04/2008614234048573869.html (accessed August 22, 2009).

television of a program on the OLF, claiming the investigative report promoted terrorism; they refused.[174]

While a few independent print media remain, domestically the government retains a monopoly over television and radio news broadcasts, which, with few exceptions, toe the government line. Radio remains the principal news medium in predominantly rural Ethiopia and occasionally the government has jammed shortwave broadcasts by Deutsche Welle and Voice of America, both of which are the only independent media to broadcast in Amharic as well as in several of the other most widely spoken Ethiopian languages.

On March 4, 2010, Voice of America announced that its Amharic broadcasts had been jammed since February 22 and that Deutsche Welle's Amharic broadcasts had also been affected in recent days. It noted that previous VOA broadcasts had been jammed during the 2005 elections and before the 2008 *woreda* and *kebele* elections.[175]

The government also controls the electronic media and has used that control to limit access to information and opinion. The government-owned telecommunications monopoly, the Ethiopian Telecommunications Corporation (ETC), operates the sole internet server. Since 2005, access to certain internet sites has been blocked within Ethiopia. Although most blocked sites are those run by Ethiopians in the diaspora who are highly critical of the government, ETC has also intermittently blocked access to other sites. In 2008, the Committee to Protect Journalists site was blocked for several months after it reported the arrest and beating of the editor-in-chief of *The Reporter*. For almost two years following the 2005 elections, the ETC, which is also the sole telephone provider in the country, blocked mobile phone text-messaging. The government accused the Coalition for Unity and Democracy, the largest electoral opposition at the time, of coordinating anti-government demonstrations using text messages.[176] The ETC resumed messaging service in September 2007.[177]

---

[174] Peter Leftie, "TV Series Sparks Diplomatic Row," Daily Nation, August 6, 2009, http://www.nation.co.ke/News/-/1056/635812/-/item/0/-/2yf1wz/-/index.html (accessed February 22, 2010).

[175] Peter Heinlein, "VOA Amharic Broadcasts Jammed in Ethiopia," Voice of America, March 4, 2010.

[176] US State Department, Bureau of Democracy, Human Rights, and Labor, "Country Reports on Human Rights Practices – 2007: Ethiopia," March 11, 2008, http://www.state.gov/g/drl/rls/hrrpt/2007/100481.htm (accessed March 8, 2010).

[177] US State Department, Bureau of Democracy, Human Rights, and Labor, "Country Reports on Human Rights Practices – 2008: Ethiopia," February 25, 2009, http://www.state.gov/g/drl/rls/hrrpt/2008/af/119001.htm (accessed March 8, 2010).

## Government Response to Alleged Repression of Civil Society and the Media

The Ethiopian government rejects concerns that the CSO law, anti-terrorism bill, and media law have had or will have an adverse impact on civil society and the media. Ethiopian officials have claimed that the CSO and media legislation will "empower" the Ethiopian people,[178] and that the CSO law resembles legislation in industrialized democracies. Human Rights Watch repeatedly raised its concerns over the CSO law and anti-terrorism bill with numerous Ethiopian officials in and outside of Ethiopia in the course of 2009, culminating with a discussion in December 2009 with Prime Minister Meles.[179]

There appear to be two key arguments at the core of the government's position on the CSO law. The first is a conflation of "political" and nongovernmental activity. In other words, the government argues that the law is in line with legislation denying foreign funding to political activities in other countries. However, in most western democracies, the relevant comparable legislation restricts foreign funding to political parties, not to nongovernmental organizations, which are governed by regulations that require some form of registration, and transparent reporting on activities, structure, and financial accountability. But these regulations by no means exert the kind of extensive restriction over fields of activity and ability to form associations that is posed by the Ethiopian law.

A second argument made by the government is that cutting off foreign funding to independent civil society in a country as poor as Ethiopia is necessary to promote "indigenous" civil society, which will survive despite the challenges posed by the CSO law, and reduce the reach of "foreign transplants." Prime Minister Meles told Human Rights Watch that "most NGOs are established by people who write reports in English with contacts in the donor community, they are not membership-based, and are accountable only to donors."[180] While this allegation might be true of some Ethiopian organizations, it contrasts sharply with the profile of organizations described above, such as the Ethiopian Teachers' Association, a membership-based association of more than 80,000 teachers at its peak, or the Ethiopian Women Lawyers Association and the Ethiopian Human Rights Council, which have always been staffed by Ethiopians working locally. These organizations have been substantially reduced since the CSO law took effect.

---

[178] Peter Heinlein, "US Says Draft Ethiopian NGO Law Would 'Close Political Space,'" Voice of America, October 22, 2008.

[179] Human Rights Watch interviews with Ethiopian officials and diplomats, Addis Ababa, Washington, DC, and New York, 2009.

[180] Human Rights Watch interview with Prime Minister Meles Zenawi, Addis Ababa, December 22, 2009.

# International Response

## Quiet Diplomacy and Elections

Ethiopia's international partners and major donors have failed to adequately respond to the country's deteriorating human rights situation. In 2005, following the violent crackdown, western donors suspended direct budget support and issued warnings to the government. But within six months, they had resumed aid flows under a new program that funneled cash to regional governments rather than the central government and quickly ramped up spending, all while keeping mute on human rights.[181]

The conventional wisdom is that rather than broach uncomfortable truths, western donors preferred to keep good relations with what many consider to be the Horn of Africa's most stable state and—given its borders with Sudan, Eritrea, Somalia, and Kenya—the most reliable partner in a volatile and troubled sub-region.

European and North American diplomats extol the value of "quiet diplomacy," generally making representations to the government only behind closed doors, refusing to publicly criticize the Ethiopian government, and insisting that they have little leverage.[182] This assessment of international leverage aside, to date quiet diplomacy has been unsuccessful in stemming Ethiopia's slide toward increasing political oppression.

The passage of the highly repressive CSO law in January 2009 is the starkest example of this failure. Diplomats spent considerable time asking the government to amend the worst provisions of the law, recognizing that it would effectively shut down most independent nongovernmental activity on human rights, good governance, and conflict resolution. The efforts failed. Only when the bill passed did the United States, Canada, and European states make public criticisms, and they were very mild. The European Union, for example, issued a statement that it "hope[d] that the law will be implemented in an open-minded and constructive spirit" while the same day announcing €250 million in new aid.[183] A number of states, such as Norway, the United States, the Netherlands, and Canada, later called for the

---

[181] For an instructive summary of this recent history, see Aalen and Tronvoll, "The End of Democracy?," *Review of African Political Economy*.

[182] Human Rights Watch interviews with diplomats, Addis Ababa, June, September, October, and December 2009.

[183] EU Presidency Declaration on Ethiopia's adoption of the Charities and Societies Proclamation, Ref: CL09-028EN, January 30, 2009, http://www.europa-eu-un.org/articles/en/article_8459_en.htm (accessed February 2, 2010). See also, Letter from Human Rights Watch to foreign ministers of European Union member states, February 10, 2009, http://www.hrw.org/node/80698.

law to be amended or repealed at the Universal Periodic Review of Ethiopia at the UN Human Rights Council in December 2009—recommendations that the Ethiopian government rejected—but no state followed up with concrete action.[184]

Allegations of repression of the opposition and politicized distribution of development and food aid have generated similarly weak international responses. After Gareth Thomas, UK state minister for development, visited Ethiopia in late 2009, he said, "I have heard allegations from the international community about distribution of food aid and the [food-for-work] program and I have already raised those accusations with the deputy prime minister."[185]

In January 2010, another mild statement from the UK followed: "I think quite rightly the UK has substantial investments in development in Ethiopia... But I don't think that precludes us from raising issues of concern when that opportunity arises. I can assure you they are raised on a regular basis."[186] Britain's state minister for Africa, Glenys Kinnock, similarly assured Human Rights Watch in an interview that she had a "robust exchange" with Prime Minister Meles on human rights and the forthcoming elections. However, despite acknowledging shrinking political space and the inadequate conditions for the holding of free and fair elections, Kinnock did not put forth possible initiatives as to how the UK might help reverse the increasing repression.[187]

Concerns over violations of freedom of speech and the reduction in political space have generated some public concern from the United States and Sweden. Karl Wycoff, US deputy assistant secretary of state for East African Affairs, told reporters during a visit to Ethiopia in November 2009, "The US is concerned by what we see as reduction in political space and the ability of opposition parties to operate and do what opposition parties should do."[188]

On December 10, 2009, International Human Rights Day, the United States issued a relatively strong statement noting its concerns over "the recent closure of the *Addis Neger* newspaper, and the allegations of harassment and intimidation of private media." It continued, "The outstanding charges against private journalists, editors, publishers, and media houses may also contribute to a perception that space for independent media in

---

[184] UN Human Rights Council, "Report of the Working Group on Universal Periodic Review: Ethiopia," January 10, 2010.

[185] "Ethiopia: Gov't rejects politicized food aid claims," *IRIN*, November 24, 2009.

[186] Barry Malone, "Ethiopia opposition says jailed leader ignored by West," Reuters, January 29, 2010.

[187] Human Rights Watch interview with Baroness Glenys Kinnock, UK state minister for Africa, London, February 2, 2010.

[188] "Ethiopia Polls: US Concerned," *News24*, November 20, 2009.

Ethiopia is constrained."[189] The Swedish government echoed these concerns: "Freedom of expression is increasingly being limited in Ethiopia."[190]

Many diplomats privately concede that they have deep concerns about the pre-election environment, telling Human Rights Watch that "[i]ntimidation is all over, in every area. There is politicization of housing, business, education, agriculture,"[191] and that "[t]his government is about total control."[192] Another diplomat noted:

> People are ignoring the fact that in practice and in theory this government is a sort of communist regime that does not believe in individual rights. They believe in Ethiopia's right to develop. [The government] has a long-term plan for this country and they think they are the only ones who can implement it, and if some people die in the pursuit of Ethiopia's right to develop then so be it. It is revolutionary.[193]

Some officials from donor governments acknowledge that some aid programs may be misused by the government to consolidate control and that monitoring of aid programs is difficult and almost impossible at the *kebele* level.[194]

Some diplomats in Addis Ababa also concede that the 2010 elections "are a foregone conclusion,"[195] and that "[t]here is clearly no level playing field. The only option is to limit the damage."[196] Yet despite such analyses from diplomats, their governments have failed to develop a strategy to press the government to begin putting in place measures that could open up the political environment, if not for the 2010 elections, then in ensuing years.

In the short term, donors should underline the key policy and institutional reforms that the EPRDF should address and make clear that preliminary steps—such as releasing individuals who have been arbitrarily detained, supporting independent investigations of abuses, and

---

[189] "U.S. Urges Further Ethiopian Action on Human Rights," US Embassy, Addis Ababa, December 10, 2009, on file with Human Rights Watch.

[190] Swedish Ministry of Foreign Affairs, "Gunilla Carlson on freedom of expression in Ethiopia," December 16, 2009, http://www.sweden.gov.se/sb/d/587/a/137158 (accessed February 26, 2010).

[191] Human Rights Watch interview with diplomat, Addis Ababa, September 24, 2009.

[192] Human Rights Watch interview with diplomat, Addis Ababa, September 22, 2009.

[193] Human Rights Watch interview with diplomat, Addis Ababa, September 23, 2009.

[194] Human Rights Watch interviews with donor government officials, Addis Ababa, June, September, and December 2009.

[195] Human Rights Watch interview with diplomat, Addis Ababa, October 6, 2009.

[196] Human Rights Watch interview with European diplomat, Addis Ababa, October 6, 2009.

issuing clear public statements to government officials and EPRDF members that attacks or intimidation of opposition supporters will not be tolerated—are needed prior to the upcoming election.

In the medium- and long-term, concerned governments need to conduct a fundamental reappraisal of the nature of the Ethiopian government's mechanisms of control, the impact of its policies on civil and political rights, and the subsequent impact of political repression on their own strategies and goals for engagement with Ethiopia.

*Election Observers*

Prior to the last elections in 2005, the Ethiopian government expelled three US monitoring organizations and refused to allow one Norwegian group to observe that had monitored Ethiopian elections since 1992. It also forced the resignation of a respected member of the European Union monitoring mission.[197] Eventually, the European Union and the Carter Center sent international observers, and Ethiopian nongovernmental organizations fielded observers in Addis Ababa (see above). The European Union mission publicly voiced strong criticisms of the government response to the post-election violence.

Despite this history, in the run-up to 2010, Ethiopia invited the African Union and both the European Union and the Carter Center to observe the elections.[198] Both the European Union and the Carter Center planned to send exploratory missions to assess whether or not the elections would be competitive enough to merit observation, before making a final decision on whether to deploy an observer mission. The organizations sought to send these exploratory missions in December 2009 and January 2010. The Ethiopian government told both that they could not visit until February 2010, three months before the polls, stating that the relevant government officials were overwhelmed with other duties.[199]

By February 2010, however, crucial stages in the pre-election phase had already passed without any international observation, such as the registration of candidates and parties and the election of public observers to man polling stations and monitor voting.[200] Voter registration was due to be completed by the end of February. Candidate registration, in

---

[197] See Human Rights Watch, *Suppressing Dissent*, p. 43.

[198] Human Rights Watch interviews with diplomats, Addis Ababa, December 2009.

[199] "Carter Center decides not to observe 2010 elections," *The Reporter* (Ethiopia), February 20, 2010.

[200] According to the National Electoral Board, 45 political parties were registered between December 25, 2009, and January 7, 2010. See "Over 40 parties register for 2010 Ethiopian elections," Agence de Presse Africaine, January 9, 2010, http://www.apanews.net/public/spip.php?article115183 (accessed February 2, 2010).

particular, is typically a crucial time for abuses, with candidates receiving pressure and intimidation to stop them from registering.

Given its inability to deploy long-term observers within the timeframe allowed, the Carter Center declined to observe the elections and cancelled sending its exploration mission. The European Union, however, deployed an assessment mission in February 2010.[201]

Election observers pose a dilemma for both the Ethiopian government and for the country's donors. Opposition leader Seeye Abraha said: "Meles's major concern is that the election should be credible in the eyes of the international community. He doesn't care if it is not credible in the eyes of the population... and the donors want to cover their backs and tell their constituents that they are dealing with an elected government. You see his dilemma. You see their dilemma. It's a dilemma for both of them."[202] The government wants international election observers to provide an "impartial seal of approval," but is equally apprehensive about the observers reaching a different conclusion.

Human Rights Watch recognizes that competent international election observers can be an important addition to domestic monitoring of the polling process. However, particularly with the restrictions placed on domestic observers, in addition to other constraints, observer organizations may decide not to observe or conclude that they are prevented from doing so in a meaningful way. Whatever the reason, a decision not to participate should not be taken as an indicator that all is well.

The donors' approach to the 2008 local elections was poor in this respect, and a similar outcome should be avoided this time. The Ethiopian government refused to allow international observers to monitor the 2008 local elections and donors made little response.[203] However, according to Norwegian experts Aalen and Tronvoll, "by not supporting or deploying observers, the donor community could justifiably keep quiet in the aftermath of the elections as they supposedly did not have any 'substantial' and 'independent' observations to pass judgment."[204]

---

[201] "EU Considers Observing Ethiopia Election as Campaign Heats Up," Voice of America, February 17, 2010.

[202] Human Rights Watch interview with Seeye Abraha, former minister of defence and UDJ opposition leader, Addis Ababa, October 6, 2009.

[203] "Repression Sets Stage for Non-Competitive Elections," Human Rights Watch news release, April 9, 2008.

[204] Aalen and Tronvoll, "The End of Democracy?," *Review of African Political Economy*, p. 207

The US, for example, issued a statement saying it was "troubled" by the claims of irregularities in the elections, but at the same time said, "We did not have observers out for local elections. So it's very difficult to make a judgment about the claims of irregularities in these local elections."[205] But whether elections are free and fair is not determined solely on election day. As this report should make clear, the crucial human rights context of an election is evident long before any voting takes place.

---

[205] "US Concerned By Claims of Irregularities in Ethiopian Polls," Agence France-Presse, May 21, 2008.

# Acknowledgements

This report was researched and written by Ben Rawlence, researcher in the Africa Division of Human Rights Watch, and Leslie Lefkow, senior researcher and Horn of Africa team leader in the Africa Division. The report was reviewed and edited by Chris Albin-Lackey, senior researcher in the Business and Human Rights Program; Andrew Mawson, deputy program director; and James Ross, legal and policy director. McKenzie Price, associate in the Africa Division, provided production assistance and support. Grace Choi, publications director, and Fitzroy Hepkins, mail manager, produced the report.

Human Rights Watch would like to thank all of the people who agreed to be interviewed for this report, including Ethiopian government officials who met with our staff in the US and Addis Ababa. We express our thanks to Ato Teferi Melese of the Ministry of Foreign Affairs for facilitating meetings with Ethiopian officials.

Above all, we extend our deep appreciation to the courage of those Ethiopians who shared their experiences with our researchers, despite the enormous challenges to freedom of speech and opinion in their country.

**HUMAN RIGHTS WATCH**
350 Fifth Avenue, 34th Floor
New York, NY 10118-3299

**www.hrw.org**

**H U M A N**

**R I G H T S**

**W A T C H**

# "One Hundred Ways of Putting Pressure"

## Violations of Freedom of Expression and Association in Ethiopia

On May 23, 2010, Ethiopian citizens will vote in the first parliamentary elections in Ethiopia since 2005, when the post-election period was marred by controversy and bloodshed.

As the elections have drawn nearer, government efforts to restrict political space for the opposition, stifle independent civil society, and control the media have intensified. Despite constitutional protections, respect for freedom of expression and association in Ethiopia is deteriorating. In practice, most Ethiopians are unable to speak freely, organize political activities, and challenge their government's policies—whether through peaceful protest, voting, or publishing their views—without fear of reprisal.

Based on recent field research in Ethiopia and documentation collected over the past decade, "One Hundred Ways of Putting Pressure" traces the ways in which the ruling Ethiopian People's Revolutionary Democratic Front (EPRDF) has used its near total control of local and district administration to monitor individuals at a household level, punish and undermine the livelihoods of citizens who do not support the ruling party, and create a climate of fear that suppresses freedom of expression and opinion. It also examines recently enacted laws that further restrict the activities of non-governmental organizations and the media.

In this report, Human Rights Watch calls on the Ethiopian government to take urgent steps to improve the electoral environment by immediately releasing persons detained for the peaceful expression of their political views. The government should publicly tell all government officials and EPRDF members to cease attacks and intimidation of political opposition, independent civil society, and the media; and should support independent efforts to investigate and publicly report on incidents of abuses, including by international electoral observers.