# Exhibit C

# Exhibit C



# HUMAN RIGHTS IN ETHIOPIA: THROUGH THE EYES OF THE OROMO DIASPORA



**December 2009**



# Human Rights in Ethiopia:

## Through the Eyes of the Oromo Diaspora

The Advocates for Human Rights
December 2009



## ABOUT THE ADVOCATES FOR HUMAN RIGHTS

The mission of The Advocates for Human Rights is to implement international human rights standards in order to promote civil society and reinforce the rule of law. By involving volunteers in research, education, and advocacy, we build broad constituencies in the United States and select global communities.

The Advocates for Human Rights helps individuals fully realize their human rights in the United States and around the world. Since 1983, The Advocates for Human Rights' innovative programming has touched the lives of refugees and immigrants, women, ethnic and religious minorities, children, and other marginalized communities whose rights are at risk. The Advocates strengthens accountability mechanisms, raises awareness, and fosters tolerance. Adapting traditional human rights methodologies to conduct cutting-edge research, The Advocates has produced over 75 reports documenting human rights practices in over 25 countries.

The Advocates understands that changing the world means not only recognizing our shared humanity, but also raising awareness about human rights abuses in other communities. Through Special Consultative Status with the United Nations, The Advocates brings the "local to the global" by participating in human rights mechanisms that focus international attention on the human rights concerns in the communities in which we work.

The Advocates for Human Rights gives individuals the chance to actively participate in promoting the human rights of others through direct, hands-on volunteer work. The Advocates' accomplishments are the result of thousands of people coming together to make a difference and to advance the principles of the Universal Declaration of Human Rights.

**Saving lives. Fighting injustice. Restoring peace. Building the human rights movement.**

The Advocates for Human Rights
650 Third Avenue South, Suite 1240
Minneapolis, MN 55402 USA
612-341-3302
www.theadvocatesforhumanrights.org

© 2009 The Advocates for Human Rights
All rights reserved. Published 2009.

ISBN: 0-929293-64-9

Cover photographs taken in Addis Ababa by Cheryl Thomas, The Advocates for Human Rights.

## TABLE OF CONTENTS

ACKNOWLEDGEMENTS ...................................................................................................................................I

PREFACE ............................................................................................................................................................II

ETHIOPIAN HEADS OF STATE .................................................................................................................... IV

TABLE OF ACRONYMS ................................................................................................................................... V

EXECUTIVE SUMMARY ....................................................................................................................................1

I.    BACKGROUND ........................................................................................................................................3

   A.   Culture, Language, and Religion of the Oromo .......................................................................3

   B.   Political History of the Oromo .....................................................................................................5

      1.   The Ethiopian Monarchy ........................................................................................................5

      2.   1974-1991: Mengistu Hailemariam and the *Derg* ............................................................7

      3.   Liberation Front Politics in Ethiopia .....................................................................................9

      4.   The Oromo Liberation Front under the EPRDF .................................................................12

      5.   Meles Zenawi and the EPRDF .............................................................................................13

      6.   May 2005 Elections ...............................................................................................................15

   C.   Ethiopia Today ...........................................................................................................................16

      1.   The Divisive Effects of Ethnic Federalism .........................................................................16

      2.   Repression of Dissent and the Press ..................................................................................17

      3.   Human Rights Violations in the Ogaden .............................................................................18

      4.   2008 Regional Elections .......................................................................................................18

      5.   Charities and Societies Proclamation of 2009 and Anti-terrorism Legislation .............19

      6.   Outlook for the 2010 Elections ............................................................................................19

   D.   Ethiopia's Diplomatic Relations ..............................................................................................20

      1.   Relationships in the Horn of Africa .....................................................................................20

      2.   Ethiopia-United States Relationship ...................................................................................22

   E.   The Oromo Diaspora .................................................................................................................24

II.   FINDINGS ................................................................................................................................................26

   A.   Violations of Civil and Political Rights .....................................................................................26

      1.   Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment .................26

      2.   Extra-Judicial Executions and Disappearances ................................................................31

      3.   Arbitrary Arrests and Incommunicado Detention ..............................................................32

      4.   Inadequate Prison Conditions .............................................................................................34

      5.   Lack of Charges and Process ...............................................................................................36

      6.   Lack of Independence of the Judiciary ...............................................................................37

   B.   The State Surveillance Apparatus: Violations of the Right to Freedom of Speech, Assembly, and Association ......................................................................................................................................39

      1.   Restrictions on Freedom of Association .............................................................................39

         a.   Government Restrictions on Associations ...................................................................40

         b.   Alleged Association with OLF Members ......................................................................41

      2.   Interference with Privacy, Movement, and Property .........................................................42

         a.   Surveillance and Monitoring .........................................................................................42

|  | b. | Monitoring of Communication and Correspondence | 44 |
|  | c. | Infringement of Freedom of Movement | 45 |
|  | d. | Search and Seizure of Property | 46 |
| 3. | Restriction of Freedom of the Press | | 48 |

C. Repression in the Schools and Universities ............................................................. 51
   1. Human Rights Violations against Oromo Teachers ........................................ 51
   2. Suppression of Academic and Employment Opportunities .............................. 53
   3. Unequal Educational Opportunities ................................................................ 54
   4. Oromo Student Protests ................................................................................ 56
      a. Police Presence in Schools ........................................................................ 59
      b. Targeting of Students' Families .................................................................. 60

D. Eroding the Oromo Culture: Violations of the Freedom of Expression ...................... 60
   1. Language ...................................................................................................... 60
   2. Cultural Figures ............................................................................................ 62
   3. Cultural Identification .................................................................................... 64

E. Relationship To Land: Environment And Economy ................................................. 65
   1. Relocation and Ethnic Federalism ................................................................ 66
   2. Destruction of Forests .................................................................................. 67
   3. Distribution of Resources .............................................................................. 68
   4. Agriculture .................................................................................................... 68
      a. Distribution of Fertilizer ............................................................................ 69
      b. Corrosive Fertilizer ................................................................................. 70
   5. Targeting of Oromo Business Leaders .......................................................... 71

CONCLUSION ......................................................................................................... 73
APPENDIX ............................................................................................................... 74
HUMAN RIGHTS STANDARDS IN ETHIOPIA ......................................................... 74
A. Civil and Political Rights ....................................................................................... 75
   1. International Declarations and Treaties .......................................................... 75
   2. Ethiopian Constitution .................................................................................. 77

B. Surveillance: Rights to Assembly and Association ................................................. 78
   1. International Declarations and Treaties .......................................................... 78
   2. Ethiopian Constitution .................................................................................. 78

C. Right to Education ................................................................................................. 79
   1. International Declarations and Treaties .......................................................... 79
   2. Ethiopian Constitution .................................................................................. 79

D. Expression ........................................................................................................... 80
   1. International Declarations and Treaties .......................................................... 80
   2. Ethiopian Constitution .................................................................................. 80

E. Relationship to Land: Environment and Economy ................................................. 82
   1. International Declarations and Treaties .......................................................... 82
   2. Ethiopian Constitution .................................................................................. 82

## ACKNOWLEDGEMENTS

The research for this report was supervised by Laura Provinzino, The Advocates for Human Rights' inaugural Wellstone Legal Fellow. After Laura finished her fellowship, she continued to work on the project as a volunteer, with important leadership assistance from Anne Lockner and Michele Garnett McKenzie.

Like all of the work of The Advocates for Human Rights, this project would not have been possible without the work of many volunteers. Our thanks go to our interview team: Lane Ayres, Amy Bergquist, Sarah Brenes, Timothy Ewald, Alan Goldfarb, Kerri Hermann, Jessica Hjarrard, Amy Schroeder Ireland, Anne Lockner, Suzette Schommer, and Nancy Wolf. In addition, members of our Oromo Study Group helped identify issues at the early stages of this project.

Our thanks also go to the research, editing, and layout team at Robins, Kaplan, Miller & Ciresi L.L.P., led by Anne Lockner and Laura Provinzino, and including Kate Jaycox, David Pinto, Marta Chou, Katherine Bruce, Melissa Goodman, Scott Flaherty, Melissa Wendland, Annie Huang, Rachel Osband, Kelly Pierce, Daniel Allen, Earl Smith, Michelle Schroeder, Dawn Van Alstine, and Chris Sullivan. This team provided invaluable help in bringing together the work of our many volunteers. Thanks as well belong to Mark Kalla of Dorsey & Whitney, LLP, who line edited the final draft of this report.

Outside readers Michael Clough and Jeremy Prestholdt generously provided valuable insight. Special thanks to Jim Dorsey, Kathleen Seestedt, Dr. Tadessa Eba, and Robsan Itana, for their vision. A host of interns provided research assistance throughout the years, including Heidi Christine, Andrea Amidon, Nicole Herter-Spiro, and Fowsi Hassan. Special thanks go to Midwest Human Rights Fellow Laura Matson for her research and editing at the close of the project.

Numerous members of The Advocates for Human Rights staff contributed to this report, including Amy Meyer, Michele Garnett McKenzie, Rosalyn Park, Robin Phillips, and Laura Young.

## PREFACE

This report documents human rights violations against the Oromo people of Ethiopia as seen through the eyes of the Oromo diaspora. The personal accounts of asylum seekers and other immigrants to the United States provide a window to the human rights conditions in Ethiopia. These accounts not only establish the basis for protection of individuals but also provide evidence to hold the Government of Ethiopia accountable for violations of its international human rights obligations. This report seeks to give voice to the experiences of Oromo people in the diaspora, to highlight a history of systematic political repression in Ethiopia, and ultimately, to support improvement of human rights conditions in Ethiopia.

Since the early 1970s, Oromos have come to the United States, many arriving as refugees or asylum seekers in Minnesota. Throughout the 1990s, The Advocates for Human Rights increasingly provided legal representation to Oromos through its *pro bono* asylum project, representing Oromos and other Ethiopians who had suffered persecution in Ethiopia on account of race, religion, political opinion, membership in a particular social group, or nationality.

This report documents the experiences of members of the Oromo diaspora throughout three successive political regimes and illustrates how systematic human rights violations against the Oromo contributed to instability, civil unrest, and regional conflict. It describes decades of human rights violations against the Oromo in Ethiopia, including violations of the most basic civil and political rights – arbitrary arrest, incommunicado detention, torture, and extra-judicial executions. Reports of widespread surveillance and interference with rights to freedom of association, assembly, expression, conscience, and the press were pervasive. The perception of total monitoring of all communications into Ethiopia, including telephone, post, and e-mail, was nearly universal. Oromos reported that the current Ethiopian government's federal system has served to isolate ethnic communities including the Oromo, leaving them even more vulnerable to human rights violations and further eroding political power. These more insidious human rights violations have perpetuated longstanding oppression of the Oromo and others while shoring up the power of the central government.

This report focuses principally on the Oromo and the systematic human rights violations they have experienced in Ethiopia. Members of other ethnic groups, such as Anuak, Amhara, Ogadeni, and others also face repression as the Ethiopian government continues to consolidate its power. The repressive tactics used against the Oromo are also used too often against others in Ethiopia. By focusing on the Oromo experience, The Advocates for Human Rights seeks not to diminish the experiences of others but to illuminate the widespread pattern of human rights violations committed by the Government of Ethiopia.

Understanding the Oromo experience requires an appreciation of the complex relationship between regional and global politics and the perpetuation of human rights violations in Ethiopia. Cold War politics and post 9/11 anti-terrorism initiatives have colored United States-Ethiopia relations for decades. Longstanding power struggles in the Horn of Africa have a direct effect on the Ethiopian government's behavior toward internal political opposition.

This report also touches upon the complex relationship diaspora communities have with the human rights conditions in their homelands. Diaspora communities do not simply shut the door to their countries upon resettling in the United States. Families remain behind, and emotional, economic, and political ties are strong. Many living in

exile hope one day to return home. Some in the diaspora harbor political ambitions; indeed, the diaspora political leadership in the Oromo community has played an influential role in sustaining Oromo political movement in Ethiopia.

The experiences of Oromo people who fled their country provide an important historical context to understand the current human rights situation in Ethiopia. The project methodology focused on interviews of members of the Oromo diaspora, as well as service providers, scholars, and others working with Oromos. The Advocates assembled a group of ten lawyers, many of whom had worked on behalf of Ethiopians' asylum claims in the past and trained them on fact-finding, documentation, and interview techniques, including a review of human rights violations against the Oromo and the current country conditions in Ethiopia. The fact-finders conducted interviews with Oromo people in the diaspora, Oromo scholars and community leaders, the immigration bar, and providers of medical and community services to the Oromo.

The long arm of violators of human rights reaches directly into diaspora communities, including the Oromo. Diaspora members reported their perceptions that e-mail communication to Ethiopia was blocked or monitored by the Ethiopian government, that telephone conversations were similarly monitored, and that the Ethiopian government monitored the activities of diaspora members using local contacts referred to by the diaspora as "spies." Arrest of Ethiopians who visited the United States and were suspected of participating in diaspora political activities was reported. While most people interviewed for this report generally reported feeling safe in the United States, they did report fear of surveillance and retaliation against family in Ethiopia. In a world closely connected through electronic communications, increasingly the human rights of members of diaspora communities are threatened as their freedom of speech, assembly, and association come under attack.

International media, individuals and groups operating in Ethiopia, as well as human rights organizations such as Human Rights Watch and the International Crisis Group, report that human rights conditions have failed to improve under the current political leadership in Ethiopia. As Ethiopia moves toward national elections in 2010, the people of Ethiopia have the opportunity to hold the government accountable for the respect of human rights of every person in Ethiopia. At the same time, the Government of Ethiopia has the opportunity to demonstrate its commitment to ending decades of human rights violations and respecting its obligations to uphold international human rights standards.

# ETHIOPIAN HEADS OF STATE

| Name | Tenure | Party |
|------|--------|-------|
| **Emperor (Negus)** | | |
| Menelik II | 1889-1916 | |
| Zewditu | 1916-1939 | |
| Haile Selassie I | 3 Apr 1930 – 12 Sep 1974 | |
| | | |
| **Chairmen of the Provisional Military Administration Council** | | |
| Aman Mikael Andom | 12 Sep 1974 – 17 Nov 1974 | military |
| Mengistu Haile Mariam | 17 Nov 1974 – 28 Nov 1974 | military |
| Tafari Benti | 28 Nov 1974 – 3 Feb 1977 | military |
| | | |
| **Presidents of the Republic** | | |
| Mengistu Haile Mariam | 11 Feb 1977 – 10 Sep 1987 | military/WPE |
| Tesfaye Gebre Kidan | 21 May 1991 – 27 May 1991 | WPE (acting) |
| | | |
| **President of the Provisional Government** | | |
| Meles Zenawi | 27 May 1991 – 22 Aug 1995 | TPLF/EPRDF (interim) |
| | | |
| **President of the Republic** | | |
| Negaso Gidada | 22 Aug 1995 – 8 Oct 2001 | OPDO |
| Girma Wolde-Giorgis | 8 Oct 2001 – | EPRDF |
| | | |
| **Prime Ministers** | | |
| Makonnen Endelkacew | 1942 – 1 Nov 1957 | |
| Abebe Aragai | 27 Nov 1957 – 15 Dec 1960 | |
| Teshafi Aklilu Abte-Wold | 17 Apr 1961 – 1 Mar 1974 | |
| Endelkacew Makonnen | 1 Mar 1974 – 22 Jul 1974 | |
| Mikael Imru | 3 Aug 1974 – 12 Sep 1974 | |
| Fikre Selassie Wogderess | 10 Sep 1987 – 8 Nov 1989 | WPE |
| Haile Yimenu | 8 Nov 1989 – 26 Apr 1991 | WPE (acting) |
| Tesfaye Dinka | 26 Apr 1991 – 6 Jun 1991 | WPE (acting) |
| Tamirat Laynie | 6 Jun 1991 – 22 Aug 1995 | EPDM (acting) |
| Meles Zenawi | 22 Aug 1995 – | TPLF/EPRDF |

Based on http://www.terra.es/personal2/monolith/ethiopia.htm

iv

## TABLE OF ACRONYMS

| | |
|---|---|
| **AAPO** | All Amhara People's Organization |
| **AEUP** | All Ethiopia Unity Party |
| **ANDM** | Amhara National Democratic Movement |
| **Arena** | Arena Tigray for Democracy and Sovereignty |
| **CAT** | Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment |
| **CEDAW** | Convention on the Elimination of All Forms of Discrimination against Women |
| **CERD** | International Convention on the Elimination of All Forms of Racial Discrimination |
| **CRC** | Convention of the Rights of the Child |
| **CUD** | Coalition for Unity and Democracy |
| **EDL** | Ethiopian Democratic League |
| **EDUP** | Ethiopian Democratic Unity Party |
| **EFPJA** | Ethiopian Free Press Journalists Association |
| **EHRCO** | Ethiopia Human Rights Council |
| **ELF** | Eritrean Liberation Front |
| **ENDF** | Ethiopian National Defense Force |
| **EPLF** | Eritrean People's Liberation Front |
| **EPRDF** | Ethiopian Peoples' Revolutionary Democratic Front |
| **EPRP** | Ethiopian People's Revolutionary Party |
| **ESDFP** | Ethiopian Social Democratic Federal Party |
| **FDD** | Forum for Democratic Dialogue |
| **GPLF** | Gambella People's Liberation Front |
| **ICCPR** | International Covenant on Civil and Political Rights |
| **ICESCR** | International Covenant on Economic, Social, and Cultural Rights |
| **IFLO** | Islamic Front for the Liberation of Oromia |
| **OACC** | Oromo-American Citizen Council |
| **OFDM** | Oromo Federalist Democratic Movement |
| **OLM** | Oromo Liberation Front |
| **ONC** | Oromo National Congress |
| **OPDO** | Oromo People's Democratic Organization |
| **RE: MDSJ** | Rainbow Ethiopia: Movement for Democracy and Social Justice |
| **SDAF** | Somali Democratic Alliance Forces |
| **SEPDC** | Southern Ethiopia People's Democratic Coalition |
| **SEPDM** | Southern Ethiopia Peoples' Democratic Movement |
| **SNNPR** | Southern Nations, Nationalities, and Peoples Region |
| **TGE** | Transitional Government of Ethiopia |
| **TPLF** | Tigrayan People's Liberation Front |
| **UDJ** | Unity of Democracy and Justice |
| **UDHR** | Universal Declaration of Human Rights |
| **UEDF** | United Ethiopian Democratic Forces |
| **UEDP-Medhin** | United Ethiopian Democratic Party - Medhin |
| **UIC** | Union of Islamic Courts |
| **WPE** | The Workers' Party of Ethiopia |

## EXECUTIVE SUMMARY

The history of Ethiopia is steeped in human rights abuses by the government against its people, including members of the Oromo and other ethnic groups. Ethiopian regimes, from the Abyssinian empire to the present, have sought to consolidate power by repressing the political and cultural activities of the Oromo people and that of the many other ethnic groups which make up Ethiopia's population. The Abyssinian empire, backed by European arms, sought to colonize the territory traditionally held by the Oromo and other ethnic minorities. The Marxist Derg, which seized control from Emperor Haile Selassie in 1974, was dominated by Mengistu Hailemariam. Mengistu ruthlessly eliminated rivals, consolidated power, and erected a state security apparatus that continues to be used today.

The current Ethiopian government, which came to power in 1991, is no exception. The Ethiopian People's Revolutionary Democratic Front ("EPRDF"), dominated by members of the Tigray People's Liberation Front ("TPLF"), moved quickly to identify and eliminate its rivals. It called for its most likely challenger, the Oromo Liberation Front ("OLF"), to participate in a new coalition government. The EPRDF's move not only allowed it to appear open to political power-sharing in the regime's early days, it brought the OLF leadership and members into the open. By 1993, when the OLF finally split with the EPRDF, OLF leadership and members had been identified. By the end of 1993, the EPRDF had arrested approximately 20,000 suspected OLF members, driven most OLF leadership into exile, and effectively neutralized the OLF as a political force in Ethiopia.

CIA World Factbook

The Ethiopian government has built on its predecessor's infrastructure of repression. Torture of dissidents by the current regime, including extreme physical violence and psychological torture, was reported by those interviewed for this repor. Sexual violence also was reported. In addition, extrajudicial killings, arbitrary arrests, prolonged detention, and confinement in inadequate prison conditions reportedly have continued under the EPRDF. Basic protections of due process, including notice of charges against those accused, are absent, and the judiciary faces pressure from the government.

The state surveillance apparatus erected under the *Derg* continues to result in restrictions on Ethiopians' rights to freedom of association, privacy, movement, and property. Alleged ties to the OLF may serve as justification for arrest, detention, firing, expulsion, or confiscation of property. The government continues to monitor Ethiopians and conduct surveillance through the neighborhood associations, or *kebeles*, that were established by the *Derg* and served as the local apparatus of state security. A perception that all communications by phone, post, or e-mail are monitored by the government is nearly universal. New restrictions have been placed on foreign funding of

non-governmental organizations. Press restrictions and intimidation of the press continues. Elections held in 2005 and 2008 were marred by violence and intimidation.

The EPRDF's main political strategy has been that of ethnic federalism as a means of amassing control. This policy has provided a veneer of autonomy to Ethiopia's ethnic groups while eroding those groups' political power and potential for challenging the EPRDF and further consolidating state power. The policy of ethnic federalism has had a negative impact on the basic economic, social, and cultural rights of Ethiopians.

The government's tactics have extended to the educational system, where Oromo teachers and students face harassment and intimidation on suspicion of association with the OLF. Reports of monitoring, termination, or arrest of Oromo teachers and students were common. The mandatory use of the Oromo language in schools, reversing the decades old policy prohibiting instruction in any language other than Amharic, has not apparently lessened government suspicion that people who speak or write in the Oromo language support the OLF. The requirement of instruction in Oromo has also reportedly led to a decrease in educational opportunities for Oromo students, who are now at a disadvantage in the higher education system where Amharic or English is required.

Another impact of the Ethiopian government's ethnic federalism policies has been the relocation of Oromo farmers. A belief that the relocation programs have economically benefited Tigray and Amhara people to the detriment of the Oromo was reported. The forced relocation has also placed resources in the Oromo region under strain, resulting in denial of rights to adequate shelter, water, food, and healthcare.

As Ethiopia moves toward national elections in 2010, the people of Ethiopia have the opportunity to hold the government accountable for its human rights record in Ethiopia. At the same time, the Government of Ethiopia has the opportunity to demonstrate its commitment to ending decades of human rights violations and respecting its obligations to uphold international human rights standards.


## Recommendations

- The Government of Ethiopia should immediately cease the use of torture in its prisons, *kebele* offices, and other places of detention.
- The Government of Ethiopia should ensure that all persons detained by the Government are immediately brought before a competent and independent judicial authority to determine the lawfulness of their detention.
- The Government of Ethiopia should respect the right of all persons to assemble and to associate with others, and to ensure that all persons have the ability to meaningfully participate in the electoral process. The Government should take particular care to ensure that these rights are respected during the lead up to the elections in 2010.
- The Government of Ethiopia should ensure that all persons in Ethiopia, regardless of their ethnicity, have equal access to educational opportunities.
- The Government of the United States should ensure that military and other aid to the Government of Ethiopia is not used to support repression of ethnic groups or political opponents.

2

# I.   BACKGROUND

## A.   CULTURE, LANGUAGE, AND RELIGION OF THE OROMO

The Oromo, found predominantly in what today is the country of Ethiopia, is Ethiopia's largest ethnic group. The U.S. Department of State estimates that the Oromo constitute 40 percent of the Ethiopian population, or approximately 31 million people.[1] Although many social, economic, and religious differences exist among the Oromo people, the Oromo are united by a common linguistic tradition. Also, the Oromo share a strong sense of ethnic and national identity. In the Oromo culture, family and kinship play a central role. A patriarchal society, men are considered the head of the household, though the family's daily life depends upon the women.[2]

The common language of the Oromo binds the Oromo as a people. A Cushitic language, a subgroup of the Afro-Asiatic languages, Oromo is spoken in Ethiopia, northern Kenya, and parts of Somalia, and is spoken as a first language by approximately 20 million people in the region.[3] During

> *I was in my third year at Addis Ababa University, studying Oromo, English, and journalism and living in the dormitory on campus. In April 2001, ten Oromo students disappeared without a trace because they were suspected by the government. We waited for ten days, but they did not return. I was part of a group of Oromo students who submitted a request to the campus police to release the students. They tried to convince us that the students were alive and would be released. We refused to go and kept our question before them, staying at the security office for six hours, until midnight. Finally, they told us to choose representatives to go look for the detainees. We sent two to three students, but they were also detained. We persisted with our demands and demonstrated against the unlawful detentions inside the gates of AAU, in front of the campus police office. We were around 400 students. We protested because the student situation has gotten harsher. We couldn't bear it anymore. We didn't have any rights. We were living a life of fear. We were concerned college students. We didn't want to leave. But the government used force.*
>
> *The government sent in about five hundred armed soldiers who surrounded us so we couldn't escape. They were merciless. It was such humiliation. They used a police stick to beat us like snakes. There was no distinction between girls and boys. They beat everybody with that stick on our heads. My head looked like a basketball. I couldn't hear or see for two weeks. Finally, after two hours, police trucks took three groups of students in three different directions to detain them. I was taken with other students to a police training center about 20-30 minutes out of the city, where I was detained. We were detained in a small, suffocating room. There were no sheets, no bed, just the cold cement floor. People were shouting for help from their injuries. It was really horrible. There was no food, no help for the people dying from their injuries. They kept us for two hours kneeling on concrete with our hands up. One-by-one they interrogated us, asking questions about our political outlooks and if we had plans to overthrow the government. I was not given any specific reasons for my detention. They also took the addresses of our families and told us that they would imprison our families too. I was held for one night and one day . . .*
>
> Male Oromo University Student, 35: 2-5 & supp.

---

[1] U.S. Dep't of State, Bureau of African Affairs, *Background Note: Ethiopia* (June 2009) [hereinafter *Background Note: Ethiopia*].
[2] Susan Omura, M.D. et al., EthnoMed,  (Feb. 1994), ethnomed.org/ethnomed/cultures/oromo/oromo_cp.html#religious
[3] ETHNOLOGUE: LANGUAGES OF THE WORLD (M. Paul Lewis ed.), *available at* www.ethnologue.com (noting Oromo (Borana-Arsi-Guji) has 3,786,000 estimated speakers in Ethiopia, Kenya, and Somalia, and is alternately known as Afan Oromo; Oromo (Eastern) is spoken by an

much of the 20th Century the Oromo language was banned from use in education, the media, and public life.[4] Although Ethiopian law today permits the use of the Oromo language,[5] Amharic is still listed as the country's official language.[6]

The Oromo people are comprised of a large number of clan families, which can generally be categorized into two major branches, the Borana and the Barento/Barentuma.[7] The livelihood and culture of Oromo subgroups, or clans, varies.[8] Some are pastoralists and have a semi-nomadic lifestyle. Some have links to the Arab world through ancient trade routes and the practice of Islam. Some are settled agriculturalists converted to evangelical Christianity by missionaries, while others are more integrated into Amhara culture. The majority of Oromo living in Ethiopia are farmers or herders and live in agricultural settlements where they raise livestock and cultivate crops, including wheat, barley, and coffee.[9]  Some Oromo work in gold, silver, or other mineral mines.[10]

Traditionally, the Oromo practiced their own monotheist religion called Waaqeffannaa in which there was a belief in Waaqa (God) as the creator responsible for everything that happens to human beings.[11] Today, most Oromo practice Christianity or Islam, but as they adopted these religions, many Oromo maintained the concept of Waaqa and incorporated their beliefs into the new religions.[12]

While no longer in common practice today, the Oromo cultural identity is also rooted in the historical system of Gada (or gadda or gadaa).[13] Historically, Oromo society was guided and governed by Gada, a politico-administrative and social-stratification system that provided a framework for all areas of the Oromo way of life. Under Gada, men of certain age groups held varying roles in the community on a rotating basis.[14] A popular assembly was held every eight years at which a leader was elected to preside over the system for the next eight years.[15]

The overarching identity of the Oromo is political and has evolved in response to the history of the establishment of the modern Ethiopian state and the Oromo's long history of repression. Indeed, the pan-Oromo identity is rooted in Ethiopia's political history.[16] While individuals of Oromo descent have held prominent positions within the various ruling factions and military, those Oromo who have not assimilated with the Amhara have not had representative political power, and the Oromo as a group have had very little representation within the Ethiopian state.[17]

---

estimated 4,526,000 people in Ethiopia; and Oromo (West-Central) is spoken by an estimated 8,920,000 people in Ethiopia and Kenya. All are Afro-Asiatic, Cushitic languages).
[4] Asafa Jalata, *Struggling for social justice in the capitalist world system: the cases of African Americans, Oromos, and Southern and Western Sudanese*, 14 SOCIAL IDENTITIES 3 (2008).
[5] ETH. CONST. art. 5(2) (stating that "[a]ll Ethiopian languages shall enjoy equal state recognition.")
[6] Embassy of the Federal Democratic Republic of Ethiopia, Language,
www.ethioembassy.org.uk/Facts%20About%20Ethiopia/Facts%20About%20Ethiopia%20Homepage.htm.
[7] U.S. Bureau of Citizenship and Immigration Servs., *Ethiopia: Information on the Oromo Ethnic Group, the Oromo Liberation Front (OLF), and the Oromo People's Democratic Organization (OPDO)*, Apr. 18, 2001 [hereinafter *The Oromo and the OPDO*].
[8] KJETIL TRONVOLL, MINORITY RIGHTS GROUP INTERNATIONAL REPORT: ETHIOPIA: A NEW START? 8 (2000).
[9] *Id.*
[10] *The Oromo and the OPDO, supra* note 7.
[11] GADAA MELBAA, OROMIA: AN INTRODUCTION TO THE HISTORY OF THE OROMO PEOPLE 23-27 (1988).
[12] *Id.* at 27.
[13] TRONVOLL, *supra* note 8, at 8.
[14] MELBAA, *supra* note 11, at 17-22; TRONVOLL, *supra* note 8, at 8.
[15] MELBAA, *supra* note 11.
[16] TRONVOLL, *supra* note 8, at 8.
[17] Human Rights Watch, *Suppressing Dissent: Human Rights Abuses and Political Repression in Ethiopia's Oromia Region*, Vol. 17, No. 7(A), May 2005**,** at 7 [hereinafter *Suppressing Dissent*].

## B.  POLITICAL HISTORY OF THE OROMO

Much of the modern cultural identity of the Oromo has been shaped by the political history of Ethiopia from the late 19th century to today. Repression of the Oromo,  beginning with Menelik II's conquest of the Oromo in the 19th century, followed by the cultural domination by the Amharas under Haile Selassie and the violent attempts to crush all opposition under the *Derg*, have left the Oromo traumatized. Oromos view the Ethiopian government's policy of ethnic federalism and intolerance of political competition through this historical lens.

### 1.  THE ETHIOPIAN MONARCHY

Prior to the late 19th Century, the area that is now Ethiopia was decentralized and run as independent polities.[18] Throughout the 19th Century, Ethiopia was a monarchy ruled in succession by kings Sahle Selassie, Haile Malakot, Tewodros II, Yohannes IV, and Menelik II. It was Menelik II who worked to expand and consolidate the territory of the empire.[19] While Ethiopia was never colonized by a European power, several colonial powers had interests and designs on Ethiopia.[20] Many Oromo characterize this period as one of internal colonization of the country by the ethnic Amhara who dominated the state structure of Ethiopia, then known as the Abyssinian empire.[21] Indeed, many personal accounts by Oromos of human rights violations begin with this historical preface.

| Ethiopian Rulers 1813-1974 |
| --- |
| Sahle Selassie (r. 1813-1847) |
| Haile Malakot (r. 1847-1855) |
| Tewodros (r. 1855-1872) |
| Yohannes (r. 1872-1889) |
| Menelik II (r. 1889-1916) |
| Zewditu (r. 1916-1930) |
| Ras Tafari (regent  1917-1930; crowned Emporer Haile Selassie, r. 1930-1974) |

Beginning in the late 1800s, Menelik II began expanding the empire by conquering and forcibly incorporating southern and western areas, including what was known derogatorily as Galla Land, referring to the Oromo, into the Amhara-dominated Ethiopian empire.[22] By the beginning of the 20th Century, political power was centralized, sustained by a new central treasury and taxation system.[23] Fortified villages throughout the new territories served as administrative and military centers for the central government. Military representatives were settled in various areas to maintain control and discourage rebellion.[24] Individual peasants and pastoralists lost their land and Amhara domination became entrenched.[25]

---

[18] TRONVOLL, *supra* note 8, at 8.
[19] *Background Note: Ethiopia, supra* note 1.
[20]  HAROLD G. MARCUS, A HISTORY OF ETHIOPIA 68-115 (2002); THE NEW ENCYCLOPAEDIA BRITANNICA 580 (15th ed. 2007).
[21] *See, e.g.,* MELBAA, *supra* note 11, at 39.
[22] MARCUS, *supra* note 20, at 104-5; *see also* ETHNOLOGUE, *supra* note 3 (noting that Galla is a derogatory name for Oromo).
[23] TRONVOLL, *supra* note 8, at 12.
[24] *Id.*
[25] *Id.*

In addition to dismantling the Oromo pastoral system, the state adopted a policy of forced cultural assimilation to suppress Oromo culture[26] under the guise of bringing "civilization" to the Oromo.[27] "The local women were exposed to degrading treatment by the central army, and many were abducted, raped, and forced into 'marriages' with northern soldiers."[28] The brutality of these early policies continues to influence the perceptions by Oromo people of the power of the central government today.

When Menelik II died, his grandson Lij Iyassu took power.[29] He soon lost support, and Ethiopia's Orthodox Christian nobility deposed him in 1916.[30] The Empress Zewditu, Menelik

Emperor Menelik II, 1896, Engraved by E. Mouchon;
typographed by Atelier de Fabrication des Timbres, Paris

II's daughter, took the throne[31] and her cousin, Ras Tafari Makonnen, was made regent and successor.[32] Upon the death of Empress Zewditu in 1930, Ras Tafari Makonnen was crowned Emperor Haile Selassie I of Ethiopia.[33]



Haile Selassie ruled Ethiopia until he was overthrown by a military coup in 1974.[34] By the middle of the 20th Century, Haile Selassie accorded total dominance in the empire to the Amharic language and culture. During his reign, the policy of centralization continued. Amhara-dominated official "state culture" became entrenched with the creation of national institutions, modern communications, and a pan-Ethiopian economy.[35] Haile Selassie established the police, a large military force, and the powerful Public Security Department.[36]

By the end of his reign, Haile Selassie had become completely isolated from the realities of Ethiopian life. A reporter described how "in 1972-73 there was a famine of biblical proportions that claimed the lives of 200,000 in the province of Wollo. No one told the emperor about the famine for fear of being the bearer of bad tidings."[37] Widespread unrest throughout Ethiopia went largely unnoticed by the emperor. By September 1974 he was removed from power.

Emperor Haile Selassie, c. 1930s
Library of Congress, G. Eric and Edith Matson Photograph Collection

---

[26] *Suppressing Dissent*, *supra* note 17, at 7.
[27] TRONVOLL, *supra* note 8, at 13.
[28] *Id.*
[29] *Background Note: Ethiopia*, *supra* note 1.
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Suppressing Dissent*, *supra* note 17, at 7.
[35] TRONVOLL, *supra* note 8, at 13.
[36] *Id.*
[37] Alex Shoumatoff, *The Fall of the Black Stalin*, VANITY FAIR, Nov. 1991, at 114.

### 2.   1974-1991: MENGISTU HAILEMARIAM AND THE *DERG*

> *After the 1974 revolution, the level of human rights abuses, high under the previous regime, increased sharply. The human rights situation was at its worst in 1977 and 1978, as the government killed perhaps 10,000 men, women, and children, and imprisoned tens of thousands of others in the Red Terror, a campaign to eliminate urban opposition to the regime. Because the government has since consolidated its control over the urban centers of the country, the level of human rights abuses is now lower, although there is no legal protection against abuses.*[38]

Haile Selassie's overthrow on September 12, 1974, after seven months of civil unrest, marked the end of imperial sovereignty and the beginning of military rule in Ethiopia.[39] A provisional administrative committee of soldiers, known as the *Derg*, seized power and installed a government that was socialist in name and military in style.[40] Within a month, 33-year-old Mengistu Hailemariam, a major in the Third Army Division and member of the *Derg*, took power as head of state and *Derg* chairman. Escaping a series of assassination attempts, Mengistu consolidated his power ruthlessly. On February 3, 1977, Mengistu walked out of a meeting with the *Derg* steering committee, leaving behind his seven main rivals; his bodyguards entered the room and killed them all.[41] Mengistu's rule, lasting until 1991, would be characterized by human rights violations on a massive scale, with tens of thousands of Ethiopians tortured, murdered, or "disappeared."[42]

The *Derg* summarily executed generals and cabinet members of the former government, aristocrats, and royal family members.[43] "Mengistu overrode objections from more civilized quarters of the revolution by calling for revenge.... Fifty-nine enemies of the state, including the royal family, were condemned, dragged to the central prison, machine-gunned into a heap, and thrown into a mass grave."[44] Emperor Haile Selassie was reportedly strangled in the palace on August 22, 1975.[45]

Mengistu's years in office were defined by totalitarian leadership and brutal human rights violations.[46] The government nationalized property[47] and abolished the rights of the feudal aristocracy.[48] The use of torture, disappearance, arbitrary detention, and summary execution was pervasive under the *Derg*.[49] Widespread surveillance, including house-to-house searches, was a hallmark of the regime.[50] The government controlled and monitored closely all public speech and assembly.[51] The *Derg* organized the countryside into peasant

---

[38] U.S. DEPT. OF STATE, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES, Feb. 2, 1981, at 84 [hereinafter *1981 Ethiopia Report*].
[39] *Id.*; *Suppressing Dissent*, *supra* note 17 (section entitled "Political Competition in Oromia").
[40] "*Derg*" means "committee" in Amharic. *See Background Note: Ethiopia*, *supra* note 1; *Suppressing Dissent*, *supra* note 17 (section entitled "Political Competition in Oromia").
[41] Shoumatoff, *supra* note 37.
[42] Human Rights Watch, *Ethiopia: Reckoning Under the Law*, Nov. 1993, at 3 [hereinafter Reckoning Under the Law].
[43] *Background Note: Ethiopia*, *supra* note 1; MARCUS, *supra* note 20, at 68-115.
[44] Shoumatoff, *supra* note 37.
[45] *Background Note: Ethiopia*, *supra* note 1.
[46] *Id.*
[47] MARCUS, *supra* note 20, at 190-93.
[48] *Id.*; THE NEW ENCYCLOPAEDIA BRITANNICA, *supra* note 20, at 579.
[49] *See 1981 Ethiopia Report*, *supra* note 38, at 84.
[50] *Id.* at 87.
[51] *Id.* at 89.

associations and urban areas into *kebeles*, or neighborhood units, both designed to facilitate control by the state.[52]

The brutality of the *Derg* was stunning. In 1978 Mengistu launched the Red Terror campaign to eliminate the rival Ethiopian People's Revolutionary Party ("EPRP"), a student-dominated Marxist movement.[53] Calculated to instill fear in potential opponents, the government displayed in public places and on state-run television the bodies of prisoners it had tortured to death.[54] Human Rights Watch described Mengistu's Red Terror campaign in this way:

> During the Red Terror thousands, perhaps tens of thousands, of suspected opponents were arrested, tortured, and summarily executed, many by local *kebele* officials. A large percentage were tortured, Many of these prisoners were detained under truly unspeakable conditions, packed by the hundreds into airless, lightless cellars, where they could hear the screams of those being tortured while they awaited torture themselves. Many of those executed were simply left by the roadside with Red Terror slogans attached to their bodies to terrify potential opponents. Others were simply "disappeared." Relatives of those killed were forbidden to mourn, or compelled to pay for the killers' bullets before family members' corpses would be released.[55]

Another account of the Red Terror sums up the magnitude of the campaign:

> In 1976 he mounted the "Red Terror" campaign against opponents of his Derg regime by standing in the centre of Addis Ababa, shouting: "Death to the counter-revolutionaries", and smashing bottles filled with pigs' blood to demonstrate the fate that awaited them. Over the next few years more than half a million people were thought to have been killed in what Human Rights Watch called "one of the most systematic uses of mass murder ever witnessed in Africa". Relatives had to pay a tax called "the wasted bullet" to retrieve the bodies of the dead. The victims included the former Emperor and numerous members of the Royal Family, and Mengistu is said to have executed some of them himself.[56]

The Marxist *Derg* shifted Ethiopia's allegiance in the midst of the Cold War to the Soviet Union. With assistance from the Soviets, Cuba, and the Eastern Bloc, the *Derg* brought about massive militarization of Ethiopia.[57] In December 1976, an Ethiopian delegation in Moscow signed a military assistance agreement with the Soviet Union.[58] The following April, Ethiopia revoked its military assistance agreement with the United States and expelled all American military missions.[59] Later that year, President Jimmy Carter suspended military and development aid to Ethiopia. Mengistu turned to the U.S.S.R.; in the end, the Soviets provided an estimated $18 billion[60] in arms and military aid to Ethiopia.

Mengistu was also notable for his manipulation of the famine of 1983. The Government of Ethiopia took in a reported $30 million in port handling fees on grain donations, much of which rotted in warehouses. Mengistu,

---

[52] *Suppressing Dissent*, *supra* note 17, at 7-8.
[53] *See e.g.*, *50 Executed in Month: Ethiopia Kills 27 Dissidents*, THE VICTORIA ADVOCATE, Nov. 18, 1976.
[54] *See* Jane Perlez, *Ethiopian Ruled Ruthlessly, Killing Colleagues and Shedding Alliances*, N.Y. Times, May 22, 1991.
[55] Human Rights Watch, *Ethiopia: Reckoning Under the Law*, Nov. 1994, at 5.
[56] Martin Fletcher, *Zimbabwe's MDC plan to extradite Mengistu Haile Mariam to Ethiopia*, THE TIMES, Feb. 5, 2009.
[57] *Background Note: Ethiopia*, *supra* note 1.
[58] *Id.*
[59] *Id.*
[60] Jonathon Clayton, *Guilty of Genocide: the leader who unleashed a "Red Terror" on Africa*, THE TIMES, Dec. 13, 2006.

embroiled in continuing conflicts with Eritrean rebels, refused to allow food trucks into areas in the north held by the Eritrean People's Liberation Front (EPLF)..[61]

The Amhara-dominated *Derg*, working to consolidate its power, continued to oppress the Oromo and other opposition.[62] The Workers' Party of Ethiopia ("WPE") was established in 1984.[63] On February 1, 1987, a new Soviet-style civilian constitution was submitted to popular referendum.[64] The constitution was officially endorsed by 81 percent of registered voters.[65] On September 10, 1987, the country was renamed the People's Democratic Republic of Ethiopia,[66] and Mengistu was named president.[67]

Mengistu's dictatorship came to an end in early 1991, largely as a result of the famine in Ethiopia which caused the deaths of up to seven million Ethiopians.[68] Opposition movements in Ethiopia, particularly in the northern regions of Tigray and Eritrea, also hastened the end of the regime.[69] In May 1991, rebel forces, led by the Tigray People's Liberation Front ("TPLF") and joined by the EPLF and the Oromo Liberation Front ("OLF") among others, advanced on Addis Ababa.[70] The *Derg* collapsed.[71] Mengistu fled the country and received asylum in Zimbabwe.[72] By May 31, 1991, the TPLF-dominated coalition known as the Ethiopian People's Revolutionary Democratic Front ("EPRDF") had seized power.[73]

### 3.   LIBERATION FRONT POLITICS IN ETHIOPIA

Under the *Derg*, ethnic-based liberation movements gained traction.[74] The Oromo Liberation Front, established in 1973 by Oromo nationalists to seek independence from the Ethiopian monarchy,[75] began to mobilize against the Amhara-dominated Ethiopian government.[76] The OLF was not alone in the liberation front movement that defined Ethiopia's political opposition throughout the 1970s and 1980s. *Derg* opposition groups seeking independence for Ethiopia's major ethnic groups, including the Ogaden National Liberation Front ("ONLF"), Tigray People's Liberation Front ("TPLF"), the Eritrean People's Liberation Front ("EPLF") and its rival the Eritrean Liberation Front ("ELF"), gained power.

> *The legitimacy of the Ethiopian state is not accepted by many of its ethnic minorities, notably the Eritreans, Tigreans, Oromos, and Somalis, all of whom are in varying degrees of revolt.*
>
> U.S. Department of State Country Reports on Human Rights Practices, 1981.

---

[61] Otto Friedrich, Alastair Matheson, & Tala Skari, *Does Helping Really Help?*, TIME, Dec. 21, 1987.
[62] *Suppressing Dissent*, *supra* note 17, at 7-8.
[63] MARCUS, *supra* note 20, at 206-07.
[64] *Id*. at 210-11.
[65] *Id*. at 211.
[66] *Id*.
[67] *Id*.
[68] ETHIOPIA: A COUNTRY STUDY, Thomas P. (Ofcansky & LaVerle Berry, eds., GPO for Lib. of Congress 1991).
[69] *Background Note: Ethiopia, supra* note 1.
[70] *Id*.
[71] *Suppressing Dissent supra* note 17 (section entitled "Political Competition in Oromia").
[72] *Background Note: Ethiopia, supra* note 1; MARCUS, *supra* note 20, at 217. *See also Mengistu Found Guilty of Genocide*, BBC News, Dec. 12, 2006 (noting that after a long trial, Mengistu was found guilty of genocide).
[73] MARCUS, *supra* note 20, at 221.
[74] *See 1981 Ethiopia Report*, *supra* note 38, at 84.
[75] OLF website, www.oromoliberationfront.org/OLFMission.htm.
[76] TRONVOLL, *supra* note 8, at 14.

In 1989 the TPLF created and led a coalition with the EPLF and other ethnically-based opposition movements to form the Ethiopian Peoples' Revolutionary Democratic Front ("EPRDF").[77] The OLF participated in the struggle to overthrow the *Derg*, and, at one point, forged a loose alliance with the TPLF.[78] The two organizations were never formally affiliated, however, and each regarded the other with suspicion.[79]

In May 1991, rebel forces moved toward Addis Ababa and the collapse of the Mengistu government appeared imminent. Mengistu fled to Zimbabwe.[80] By May 27, Ethiopian envoys and leaders of the three principal insurgent groups – the EPLF, the TPLF-dominated EPRDF, and the OLF – sat down at U.S.-backed talks in London.[81] The U.S.-led peace talks concluded with agreement to a 1993 vote for Eritrean independence and the takeover of the Ethiopian government by the Tigray-dominated EPRDF.[82]



| Ethiopian Liberation Fronts | |
|---|---|
| **ELF** | Eritrean Liberation Front |
| **EPLF** | Eritrean People's Liberation Front |
| **EPRDF** | Ethiopian Peoples' Revolutionary Democratic Front |
| **GPLF** | Gambella People's Liberation Front |
| **OLF** | Oromo Liberation Front |
| **ONLF** | Ogaden National Liberation Front |
| **TPLF** | Tigrayan People's Liberation Front |

At the time of the *Derg*'s collapse in 1991, the OLF enjoyed widespread popular support in much of the Oromo region known as Oromia.[83] Following the collapse of the Mengistu government, the Tigray-dominated EPRDF invited all of the ethnically-based resistance groups in Ethiopia to a national conference to form a transitional government.[84]

The OLF joined the Transitional Government of Ethiopia (TGE) at a time when the OLF administered an area around Dembi Dollo in western Wollega, a location it had controlled in the final days of the war with the *Derg*.[85] The TGE consisted of an 87-member Council of Representatives (comprised of members of national liberation movements and political organizations) and was guided by a national charter that functioned as a transitional constitution.[86]

After the charter was adopted, the TGE issued several proclamations establishing regional political administration, where each regional authority would



Map of Ethiopia showing Oromia State

---

[77] *Background Note: Ethiopia*, *supra* note 1.
[78] *Id.*
[79] MARCUS, *supra* note 20, at 230.
[80] *Background Note: Ethiopia*, *supra* note 1; MARCUS, *supra* note 20, at 217.
[81] *See* Jennifer Parelee, *Ethiopian Rebels Tighten Noose Around Capital on Eve of Talks*, WASH. POST, May 27, 1991.
[82] *See* Nicolas Watt, *Breakaway province will test interim leader's skill*, THE TIMES, May 30, 1991; *Good Deeds in Ethiopia, Punished*, N.Y. TIMES, June 1, 1991.
[83] *Suppressing Dissent*, *supra* note 17.
[84] E. Pettersen and E. Salvesen, *Ethiopia: Parliamentary Election – May 2005*, Norwegian Centre for Human Rights/NORDEM, June 2006; *see also* Human Rights Watch, *Ethiopia – Waiting for Justice: Shortcomings in Establishing the Rule of Law*, Vol. IV, No. 7, May 8, 1992.
[85] *Id.*
[86] *Id.*; *Reckoning Under the Law*, *supra* note 42.

hold extensive political and economic power.[87] The TGE installed the regional governing structure to provide representation and a degree of autonomy to Ethiopia's major ethnic groups, especially those under-represented groups.[88]

But soon after the formation of the TGE, the coalition faltered. The TPLF's decision to create the Oromo People's Democratic Organization ("OPDO") to compete with the OLF for Oromo political support exacerbated tensions between the two groups.[89] The June 1992 national elections pitted the OPDO against the OLF in Oromia.[90] The electoral process took place against a backdrop of nine months of intermittent military clashes between the EPRDF and OLF forces.[91] Leading up to the national election in June 1992, political violence and harassment was rampant. These acts were mainly perpetrated by the EPRDF, but the OLF was also involved.[92] Several OLF candidates and their families were arrested, and were threatened with torture and execution by EPRDF officials.[93] In the small area around Dembi Dollo in western Wollega, which was under OLF control, candidates for the Oromo People's Democratic Organization ("OPDO"), the EPRDF's Oromo member organization, reportedly faced similar intimidation by OLF members.[94]

Shortly before the June 1992 elections, the OLF announced its decision to boycott the election[95] because it maintained it would not be allowed to compete fairly.[96] The All-Amhara People's Organization ("AAPO") also announced its separate decision to withdraw from the election.[97] Relations between the OLF and EPRDF quickly degenerated into open conflict.[98] On election day, the EPRDF mounted offenses in several areas formerly controlled by the OLF, such as western Wollega.[99] Civilians and unarmed OLF members were killed in the EPRDF attacks.[100] Within weeks, EPRDF forces had taken thousands of OLF fighters into custody and OLF ministers fled Ethiopia. This action nullified any challenge the OLF may have presented to the EPRDF and OLF representatives were consequently excluded from established political discourse.[101]

The detention of 20,000 Oromos, at least 1,200 of whom were later charged with anti-EPRDF activities or civilian attacks, was a tactic used by the EPRDF during the conflict. Those detained included civilians, children, the elderly, and others who disavowed any association with the OLF.[102] The EPRDF subsequently detained other individuals, as well. By the end of 1994, the trials for those facing charges were pending.[103]

---

[87] *Id.*
[88] *Id.*
[89] *Id.*
[90] *Id.*
[91] HUMAN RIGHTS WATCH, HUMAN RIGHTS WATCH WORLD REPORT 1993, *Ethiopia – Human Rights Developments* [hereinafter *HRW 1993*].
[92] *Suppressing Dissent*, *supra* note 17; *HRW 1993*, *supra* note 91.
[93] Pettersen, *supra* note 84; *HRW1993*, *supra* note 91.
[94] SIEGFRIED PAUSEWANG, KJETIL TRONVOLL, AND LOVISE AALEN, ETHIOPIA SINCE THE DERG: A DECADE OF DEMOCRATIC PRETENSION AND PERFORMANCE (2002) at 30-32; National Democratic Institute, *An Evaluation of the June 21, 1992 Elections in Ethiopia* (Washington: National Democratic Institute, 1992); *HRW 1993*, *supra* note 91.
[95] *HRW 1993*, *supra* note 91; *Suppressing Dissent*, *supra* note 17.
[96] *Suppressing Dissent*, *supra* note 17 (citing Human Rights Watch interviews with former high-ranking OLF officials, Feb. and Mar. 2005).
[97] *HRW 1993*, *supra* note 91.
[98] *Id.*
[99] *Id.*
[100] *Id.*
[101] *Suppressing Dissent*, *supra* note 17.
[102] Immigration and Naturalization Serv. Res. Ctr., *Profile Series – Ethiopia: Update on Political Conditions*, PR/ETH/94.001, Dec. 1994, *available at* www.uscis.gov/files/nativedocuments/ethiop94.pdf at 41 [hereinafter *Profile Series – Ethiopia 1994*].
[103] *Id.* at 42.

### 4.   THE OROMO LIBERATION FRONT UNDER THE EPRDF

Since 1992, the OLF has waged what it calls an "armed struggle" against the EPRDF government.[104] The OLF identifies the protracted armed resistance under its leadership as an act of "self-defense exercised by the Oromo people against successive Ethiopian governments, including the current one, who forcibly deny their right to self-determination."[105] The OLF has been outlawed by the Ethiopian government, notwithstanding the OLF's claim that its armed resistance "targets the government's coercive machinery, not innocent civilians"[106] and has an "unswerving anti-terrorism stand and opposes terrorism as [a] means of struggle to achieve the right of the Oromo people."[107] The OLF has acknowledged participating in armed resistance, including hit-and-run raids inside Ethiopia. The OLF has also been cited for several small bomb attacks, including a triple bomb blast at a hotel in Addis Ababa on September 12, 2002.[108] According to Human Rights Watch, the Ethiopian government has used accusations of support for the Oromo rebels as a pretext for cracking down on political dissent among the Oromo population.[109]

Although the United States has not designated the OLF as a terrorist organization,[110] members and supporters of the OLF increasingly find themselves barred from asylum in or immigration to the United States based on a broad interpretation of the U.S. laws defining material support to terrorist organizations. Following changes to U.S. law in the REAL ID Act of 2005, the U.S. Department of Homeland Security began applying a sweeping interpretation of what constitutes terrorist activity,[111] a terrorist organization,[112] and "material support"[113] to a terrorist organization. In its report on the impact of the U.S. government's new interpretation of the terrorist bars on refugees and asylum seekers, Human Rights First notes that "virtually all Ethiopian and Eritrean political parties and movements, past and present" have been found to be Tier III terrorist organizations.[114] Human Rights First cites examples of Oromo people whose asylum has been delayed or denied because of their connection with the OLF, including the following case:

---

[104] *Id.*; *see also OLF Policies* at www.oromoliberationfront.org/OLFPolicies.htm.

[105] *OLF Policies*, *supra* note 105.

[106] *Id.*

[107] *Id.*

[108] Oromo Liberation Front (OLF)(Ethiopia), Jane's World Insurgency and Terrorism Threat Assessment, *available at* http://www.janes.com/articles/Janes-World-Insurgency-and-Terrorism/Oromo-Liberation-Front-OLF-Ethiopia.html.

[109] *Id.*

[110] *See* U.S. Dept. of State, Foreign Terrorist Organizations, *available at* http://www.state.gov/s/ct/rls/other/des/123085.htm.

[111] As Human Rights First explains in its November 2009 report *Denial and Delay: The Impact of the Immigration Law's "Terrorism Bars" on Asylum Seekers and Refugees in the United States*, "the Immigration and Nationality Act (INA) defines 'terrorist activity' to mean 'any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves' any of a range of violent acts, including: 'the use of any … explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with the intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property." INA § 212(a)(3)(B)(iii)(V).

[112] The USA PATRIOT Act of 2001 expanded the definition of "terrorist organization" beyond those organizations designated as such by the U.S. Secretary of State. Now included in the definition of a "terrorist organization" are groups designated by the Secretary of State  as foreign terrorist organizations under § 219 of the Immigration and Nationality Act (now referred to as Tier I organizations); groups included on the Terrorism Exclusion List by publication in the Federal Register (Tier II organizations); and undesignated organizations defined as any "group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in" terrorist activity. These undesignated groups, referred to as Tier III organizations, are determined to be terrorist groups by the immigration officer or judge adjudicating the applicant's case.

[113] The USA PATRIOT Act defined "material support" to any Tier I, Tier II, or Tier III organization as "terrorist activity." "Material support" includes providing "a safe house, transportation, communications, funds, false identification, weapons, explosives, or training to any individual the actor knows or has reason to believe has committed or plans to commit an act of terrorist activity." INA Sec. 212(a)(3)(B)(ii)(III).

[114] Human Rights First, *Denial and Delay: The Impact of the Immigration Law's "Terrorism Bars" on Asylum Seekers and Refugees in the United States*, Nov. 2009, at 5.

An Oromo woman from Ethiopia, for example, was granted asylum several years ago based on the persecution she suffered there due to her peaceful activities as a member of the Oromo Liberation Front (OLF). For those activities she was jailed without charged by Ethiopian security forces, and was beaten, whipped, and stomped on. She was also raped by one of her interrogators. She believes it was as a result of this rape that she became infected with HIV, as her husband was HIV-negative. In early 2008, this woman was denied permanent residence based on the same political activities she had described in her application for asylum. Her daughter, still a minor, received a denial letter stating: 'You are the child of an inadmissible alien. For that reason, you are inadmissible…"[115]

### 5.  MELES ZENAWI AND THE EPRDF

Meles Zenawi, the *nom de guerre* adopted by Legesse Zenawi as a Marxist student activist in the 1970s Tigray People's Liberation Front, fought with the TPLF and established the EPRDF in March 1989.[116] Meles assumed power in Ethiopia upon the EPRDF's entry into Addis Ababa in May 1991, and he has held power since that time.

Following the withdrawal of the OLF and others from the Transitional Government of Ethiopia in 1993, Meles pledged to establish a multi-party democracy.[117] Elections for a 547-member constituent assembly were held in June 1994.[118] Several opposition political parties, including the OLF, and candidates boycotted the elections alleging that the conditions under which the elections were held precluded fair and open competition.[119] The elected assembly ratified the Constitution of the Federal Democratic Republic of Ethiopia in December 1994.[120]

The first general elections for members of the new federal parliament and regional councils were held in May and June of 1995.[121] The EPRDF won 483 seats in the House of People's Representatives.[122] Many opposition political parties again boycotted the elections, insisting the government was impeding their efforts to participate fairly in the electoral process.[123] As a result, the EPRDF celebrated a landslide victory.[124] Meles Zenawi was elected prime minister.[125] Dr. Negaso Gidada of the OPDO was elected President.[126] The government of the Federal Democratic Republic of Ethiopia took office in August 1995.[127]

In May 1998, fighting broke out between Ethiopia and Eritrea. The Ethiopian government began deporting Ethiopians of Eritrean heritage. By early 1999, the situation had "developed into a systematic, country-wide operation to arrest and deport anyone of full or part Eritrean descent."[128] Ethiopians married to those of Eritrean

---

[115] *Id.* at 9.
[116] Nicolas Watt, *Breakaway province will test interim leader's skill*, TIMES (U.K.), May 30, 1991
[117] *Background Note: Ethiopia, supra* note 1.
[118] *Id.*
[119] African Election Database, *Elections in Ethiopia*, http://africanelections.tripod.com/et.html; *Profile Series – Ethiopia 1994, supra* note 103.
[120] *Background Note: Ethiopia, supra* note 1.
[121] Amnesty Int'l, *Ethiopia: The 15 May 2005 Elections and Human Rights*, AFR 25/002/2005, Apr. 2005, at 2 n.3 [hereinafter *The 15 May 2005 Elections*]; Background Note: Ethiopia, *supra* note 1.
[122] African Election Database, *supra* note 119.
[123] *Id.*; *Background Note: Ethiopia, supra* note 1; Encyclopedia of the Nations, *Ethiopia – History*, http://www.nationsencyclopedia.com/Africa/Ethiopia-HISTORY.html.
[124] African Election Database, *supra* note 119; *Background Note: Ethiopia, supra* note 1.
[125] African Election Database, *supra* note 119.
[126] *Id.*; Nita Bhalla, *Ethiopian President's Position Shaky*, BBC NEWS, June 23, 2001.
[127] *Background Note: Ethiopia, supra* note 1.
[128] Amnesty Int'l, *Ethiopia/Eritrea: Amnesty International Witnesses Cruelty of Mass Deportations*, Jan. 29, 1999.

descent were forbidden permission to leave with their spouses and children.[129] Over 1,200 men were detained in prison camps rather than deported.[130]

The TPLF-controlled EPRDF retained power in Ethiopia in the next election cycle. Ethiopia's second multi-party election was held in May 2000.[131] Opposition parties contested approximately 25 percent of the parliamentary seats.[132] Five opposition groups released a joint statement shortly before the election alleging illegal activities by the government and state officials, including widespread violence, imprisonment, intimidation, and harassment.[133] International agencies reported election-related human rights abuses in the run-up to the elections, including arbitrary arrests and the execution of opposition candidates and supporters in certain strongly contested constituencies.[134] The EPRDF and affiliated parties retained 518 out of 547 seats in the House of People's Representatives and Meles was once again elected prime minister in October 2000. [135]  After taking over 95 percent of all seats in the 2000 elections, the EPRDF and its affiliated parties firmly controlled the federal parliament and regional and city councils.[136]

In 2003, violence erupted in Gambella, along Ethiopia's eastern border with Sudan. According to Human Rights Watch, the Gambella region's border became a cause of concern for the Ethiopian government: "The Oromo Liberation Front (OLF) managed to infiltrate fighters into Ethiopia through Gambella in 2002, reportedly with the help of the Eritrean government; forces led by a former *Derg* official have succeeded in destabilizing some areas along the Sudanese border; and the Anuak-led Gambella People's Liberation Front (GPLF) has launched raids into Gambella from bases in southern Sudan."[137]

Again according to Human Rights Watch: "On December 13, 2003, in an apparent reprisal for a series of ambushes of highlander civilians carried out by armed Anuak, ENDF soldiers and highlander civilians launched a brutal attack on Gambella town's Anuak population… Adult Anuak men were the primary targets of the violence but were not its only victims. Soldiers raped several Anuak women, over four hundred Anuak houses were burned to the ground and huge numbers of civilians fled into the forest or took shelter in compounds belonging to two of the town's largest churches."[138] Ethiopian government soldiers reportedly were going door to door, calling out Anuak men by name and shooting them in the street.[139]

In late 2004, the OLF was reportedly under pressure to participate in the May 2005 national elections. In the end, the OLF again boycotted the elections claiming they were rigged. After the elections, Meles Zenawi issued a public announcement that the government sought "unconditional" dialogue with the OLF, and OLF leader Daud Ibsa toured Europe and North America in pursuit of potential dialogue. But that possibility evaporated soon after street protests were met with harsh government repression.[140]

---

[129] *Id.*
[130] U.S. DEPT. OF STATE, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES, 1999, at §1(d).
[131] African Election Database, *supra* note 119; *The 15 May 2005 Elections*, *supra* note 121, at 2 n.3.
[132] *The 15 May 2005 Elections*, *supra* note 121, at 2 n.3.
[133] International Foundation for Electoral Systems (IFES), Election Guide – Election Profile for Ethiopia, http://www.electionguide.org/election.php?ID=129 (last visited May 28, 2008).
[134] *The 15 May 2005 Elections*, *supra* note 121, at 6.
[135] African Election Database, *supra* note 119.
[136] *The 15 May 2005 Elections*, *supra* note 121, at 2 n.3.
[137] *Id.*
[138] *Id.*
[139] Doug McGill, *On a Bloody Saturday, Ethiopia Chose Genocide,* THE MCGILL REPT., Jan. 1, 2004
[140] *The 15 May 2005 Elections*, *supra* note 121, at 2 n:3.

14

### 6.   MAY 2005 ELECTIONS

Elections were held in Ethiopia for the 547-member lower house of parliament and for the regional representative assemblies on May 15, 2005. The EPRDF won a majority of the seats, securing Meles' third five-year term as prime minister. In this bitterly contested election, the main opposition parties—the Coalition for Unity and Democracy (CUD) and the United Ethiopian Democratic Forces (UEDF)—gained many seats, including all 23 seats in the capital of Addis Ababa. The UEDF drew their support from the Oromo and other southern ethnic groups.[141]

Many commentators outside Ethiopia looked to these elections as a test of Prime Minister Meles' commitment to greater freedom and democracy.[142] The Government of Ethiopia allowed more than 300 international observers to monitor the elections, including a delegation led by former U.S. President Jimmy Carter.[143] Initial reports from international election monitors suggested that these elections were the most free and fair in Ethiopia's history,[144] with an estimated 90 percent of the 26 million eligible electorate participating.[145]

Despite the initial positive reports, the elections were followed by mass killings on the capital's streets as police openly fired on opposition supporters and protesters who believed that the elections were fixed."[146] Complaints of electoral fraud included, but were not limited to, "gunmen intimidating voters, people being forced to vote for certain parties, ballot boxes being stuffed or disappearing and the number of ballots exceeding those of registered voters."[147]

Immediately after election day, the government instituted a one-month ban, which was later renewed for an additional month, on all demonstrations in Addis Ababa.[148] Students at various university campuses in Addis Ababa defied the ban and publicly protested how the elections were conducted.[149] As justification for the government's harsh response, Prime Minister Meles Zenawi accused the opposition of trying to overthrow his government and claimed the violence was being instigated by the main opposition party, the CUD.[150] The government arrested tens of thousands of people—including journalists, NGO workers, and opposition activists—who spent weeks or even months in prison without charge.[151] The government charged opposition leaders with pretextual crimes, such as treason and genocide.[152] In December 2005, the government charged 131 opposition, media, and civil society leaders with capital offenses including "outrages against the constitution."[153] Key opposition leaders and almost all of the 131 were later pardoned and released from prison.[154] In the summer of 2007, the government released 71 opposition leaders, but only after they signed a letter admitting their

---

[141] *Treason Charges*, AFRICAN RESEARCH BULLETIN, Vol. 42, No. 12, Dec. 2005, at 16469.

[142] *Ethiopia: Hundreds of Complaints Delay Release of Poll Results*, THE N.Y. AMSTERDAM NEWS, June 9-15, 2005 at 2; Rob Crilly, *Confusion reigns after Ethiopia votes*, IRISH TIMES, July 21, 2005.

[143] The Carter Center, *Ethiopia Elections: Dispatch from Addis Adaba*, May 16, 2005, www.cartercenter.org/news/documents/doc2098.html.

[144] Rob Crilly, Confusion reigns after Ethiopia votes, IRISH TIMES, July 21, 2005..

[145] *Ethiopia Elections: Dispatch from Addis Adaba, supra* note 140.

[146] *A Brittle Western Ally in the Horn of Africa*, ECONOMIST, Vol. 385, Issue 8553, Nov. 3, 2007, at 31-33.

[147] *Ethiopia: Hundreds of Complaints Delay Release of Poll Results, supra* note 139; *Ethiopian Students and Police Clash Over Disputed Elections Results*, N.Y. TIMES, June 7, 2005, at A5.

[148] *Ethiopia Bans Protests*, NORTHERN TERRITORY NEWS, May 17, 2005; *22 Killed as Ethiopian Forces Opened Fire at Protest Over Vote Count*, N.Y. TIMES, June 9, 2005.

[149] *Ethiopian Students and Police Clash Over Disputed Elections Results, supra* note 144, at A5.

[150] Alex Harrington, *Ethiopia Dividing Lines*, NEW AFRICAN, Jan. 2006, at 30-31.

[151] *A Brittle Western Ally in the Horn of Africa, supra* note 146, at 31-33.

[152] *Treason Charges, supra* note 141, at 16468.

[153] *Id.*

[154] *Id.*

participation in inciting violent protests after the elections.[155]  After the student protests, the government initiated an inquiry into electoral fraud that was denounced as a sham by opposition parties claiming that those providing the evidence were being harassed and threatened and that at least one witness was killed.[156]

Despite concern at how the elections were conducted, the opposition parties managed to win nearly 200 seats in the new parliament—compared to a mere 14 seats in the previous parliament.[157] After the government lifted the two-month ban on public demonstrations, the European Union and the United States pledged to assist Ethiopia in meeting its new democratic challenges and strongly "urged that Ethiopian leaders to [sic] work together toward reconciliation and a commitment to peace and non-violence" and "to respect international principles of human rights."[158]

In October 2006, an independent report carried out by Ethiopian Judge Wolde-Michael Meshesha revealed that the government had concealed the true extent of deaths at the hands of the police after the May 2005 elections.[159] The judge described the deaths as a massacre, stated that the death toll was likely much higher than reported and that "there was no doubt that excessive force had been used."[160] Parliament denied a full hearing on the findings.[161] Subsequently, three members of the inquiry commission, Judge Wolde-Michael Meshesha, Mitiku Teshome, and Frehiwot Samuel, fled Ethiopia.[162]


## C.   ETHIOPIA TODAY

According to reports of human rights organizations, conditions in Ethiopia have not significantly improved since the 2005 elections. Unrest continues within Ethiopia and its relationships with its neighbors and the international community are strained and often hostile. The Oromo continue to report persecution. Detainees are held on mere suspicion of belonging to the OLF. [163]


### 1.   THE DIVISIVE EFFECTS OF ETHNIC FEDERALISM

Beginning with the TPLF-led national conference in 1991, which set up the framework of the transitional government, the EPRDF immediately set about restructuring political power in Ethiopia through a policy of "ethnic federalism."[164] Described by the International Crisis Group as a "central party, decentralized state," Ethiopia's "federal entities are controlled by the strongly centralized EPRDF that predetermines decisions from the prime minister's palace in the capital to remote rural *kebele*s. A dual dynamic is at work: a more visible, formally decentralized state structure and a more discreet but effective capture of the state by the EPRDF and its affiliated regional parties."[165]

---

[155] *A Brittle Western Ally in the Horn of Africa*, *supra* note 146, at 31-33; *Opposition Leaders Freed: What is Behind the Government's Change of Heart?*, AFRICA RESEARCH BULLETIN, Aug. 1-31, 2007, at 17199.
[156] Crilly, *supra* note 144.
[157] *Controversial Results*, AFRICAN RESEARCH BULLETIN, Vol. 42, No. 8, Aug. 1-31, 2005, at 16320.
[158] *Demonstration Ban Lifted*, AFRICAN RESEARCH BULLETIN, Vol. 42, No. 7, July 1-31, 2005, at 16290.
[159] *Ethiopian Protesters "Massacred,"* BBC NEWS, Oct. 16, 2006.
[160] *Id.*
[161] *Another Inquiry Commission Official Defects*, ETHIOMEDIA, Oct. 21, 2006, *available at* www.ethiomedia.com/addfile/police_arrest_human_rights_activist.html
[162] *Id.*
[163] *Ethiopia Detains 107 People Over the Past Two Months*, USA TODAY, Sept. 5, 2007.
[164] Abdi Ismail Samatar, *Ethiopian Ethnic Federalism and Regional Autonomy: The Somali Test*, 5 BILDHAAN: A J. OF SOMALI STUDIES (2005).
[165] Int'l Crisis Group, *Ethiopia: Ethnic Federalism and Its Discontents*, Sept. 4, 2009, at 15.

The EPRDF began implementing its policy of ethnic federalism immediately upon taking power. By 1994, Human Rights Watch/Africa's executive director Abdullahi An-Nalim testified before Congress that "[al]though ethnic hostilities have decreased in intensity and frequency since the TGE government was formed in 1991, they nevertheless continue despite, and perhaps because of, the adoption of the policy of ethnic federalism."[166]

The EPRDF's policy of ethnic federalism has given the appearance of autonomy to Ethiopia's ethnic groups, while at the same time eroding the political power and future viability of the EPRDF's ethnic-based political rivals. As an example, the Oromo language, once banned in public life, is now the required language in Oromia schools. While this has promoted the use of the Oromo language, it has also limited Oromo students' ability to obtain higher education in Ethiopia's universities, where fluency in Amharic or English is required.



University of Texas Library

## 2.   REPRESSION OF DISSENT AND THE PRESS

Political dissent is punished and suppression of speech is widespread. According to the Associated Press, Ethiopia tops a list of 10 countries where press freedom has deteriorated over the past five years.[167]  Three journalists for The New York Times were arrested by the Ethiopian military in 2007, held for five days, and interrogated at gunpoint.[168]  The journalists had entered the country on journalist visas and were not in a restricted area; they were never told why they were detained, and Ethiopian military officials refused to notify the American embassy of their arrest.[169]  During questioning, one female reporter was kicked in the back, and all three were repeatedly threatened. In 2006, 111 journalists and opposition leaders were jailed for treason, inciting violence, and genocide.[170]  Dozens of newspapers have been closed and a new press law has imposed restrictions on what can and cannot be printed.[171]

---

[166] U.S. HOUSE OF REP. FOREIGN AFFAIRS COMM., SUBCOMM. ON AFRICA, Testimony of Abdullahi An-Nalim, July 27, 1994.
[167] *Ethiopia Tops List of Countries Where Press Freedom is Deteriorating*, INT'L HERALD TRIB., May 2, 2007.
[168] *Ethiopia Releases Detained Times Journalists*, N.Y. TIMES, May 23, 2007.
[169] *Id.*
[170] *Freedom of Speech Suffers In Tense Ethiopia*, CHRISTIAN SCIENCE MONITOR, Dec. 13, 2006.
[171] *Id.*

### 3.   HUMAN RIGHTS VIOLATIONS IN THE OGADEN

Fueled by regional politics in the Horn of Africa and concerns by Ethiopia that the Ogaden may serve as an entry point for OLF and Ogaden National Liberation Front ("ONLF") forces based in Somalia,[172] violence in the Ogaden region exploded in 2007. "The ONLF, part of the original transitional government in Ethiopia, attacked an oil exploration camp in April 2007, killing civilians as well as Chinese workers. The Ethiopian Government responded with a fierce counter-insurgency campaign that depopulated large swathes of the region, disrupted markets, and resulted in a humanitarian emergency."[173]

Reports of human rights violations are widespread. For instance, according to Western officials, the Ethiopian government is forcing untrained civilians—including doctors, teachers, clerks, and government employees—to fight rebels in the desolate Ogaden region.[174]  One official said soldiers barged into a hospital to draft recruits, threatening to jail health workers if they did not comply. A former head accountant in a government office in the Ogaden who is now seeking asylum in Kenya said, "anybody who works for the government—teachers, doctors, clerks, administrators—has to join a militia. I left because I didn't want to die."[175]  Human Rights Watch has documented dozens of cases of severe abuse by Ethiopian troops in the Ogaden, including gang rapes, arson, and what it calls "demonstration killings" including hangings and beheadings meant to terrorize the population.[176] The New York Times reported accounts from the Ogaden describing widespread violence, with Ethiopian soldiers gang raping women, burning down huts, and killing civilians at will.[177]  A 40-year-old camel herder who was too frightened to give her last name stated that soldiers took her to a police station, put her in a cell, and twisted her nipples with pliers.[178]  According to her account, the government security forces routinely rounded up women under the pretext that they were rebel supporters so they could bring them to jail and rape them. According to Doctors Without Borders, Ethiopian soldiers have chased women and children from wells in the desert and blocked civilians from getting medical care in the Ogaden region.[179]  One physician stated that she saw soldiers kill a donkey being used to transport water, a woman who had been beaten by soldiers when she was looking for her children, and a ten-year old who had been injured by a landmine.[180]

### 4.   2008 REGIONAL ELECTIONS

Local elections in 2008 were marred with reports of EPRDF's intimidation and abuse of opposition candidates. In the 2008 elections, the opposition leader of the Oromo Federalist Democratic Movement ("OFDM") said most of his party's candidates had been threatened by the government and forced to pull out of the race.[181]  Many prominent former members of another opposition party, the Coalition of Unity and Democracy (CUD), were jailed after the 2005 elections; they did not run in the 2008 elections because many had fled abroad upon release rather

---

[172] Terrence Lyons, *The Ethiopian-Eritrean Conflict and the Search for Peace in the Horn of Africa*, 120 REV. OF AFRICAN POLITICAL ECONOMY (2009) at 173-74.
[173] *Id.*
[174] *In Rebel Region, Ethiopia Turns to Civilian Patrols*, N.Y. TIMES, Dec. 14, 2007.
[175] *Id.*
[176] *Id.*
[177] *In Ethiopia Fear and Cries of Army Brutality*, N.Y. TIMES, June 18, 2007.
[178] *Id.*
[179] *Ethiopia Blocking Civilian Access to Medicine in Conflict Zone, Agency Says*, INT'L HERALD TRIB., Sept. 4, 2007.
[180] *Id.*
[181] *Ethiopia Opposition Alleges Intimidation at the Polls*, INT'L HERALD TRIB., Apr. 14, 2008.

than remain in Ethiopia,[182] or they were unable to register as candidates in time for the 2008 elections because they remained in jail.[183] In April 2008, the United Ethiopian Democratic Forces ("UEDF"), the largest coalition of opposition parties, pulled out of the 2008 elections, alleging that intimidation by EPRDF officials and procedural irregularities limited registration to only 6,000 of its 20,000 candidates.[184] The OFDM, claimed that up to 3,000 of its candidates may have been forced to drop out as a result of the EPRDF's intimidation of its proposed candidates.[185] The EPRDF won more than 95 percent of all positions in the 2008 elections, solidifying the EPRDF's near-monopoly on political power at the local level.[186]

### 5.   CHARITIES AND SOCIETIES PROCLAMATION OF 2009 AND ANTI-TERRORISM LEGISLATION

In January 2009, the government passed the Charities and Societies Proclamation.[187] This law restricts organizations that receive more than 10% of funding from foreign sources[188] from working in the areas of human and democratic rights, conflict resolution, promotion of children's and disabled rights, and promotion of gender and religious equality.[189] The U.S. Government has already observed that this new law will severely limit its ability to promote human rights and the rule of law within Ethiopia.[190]

In addition to the Charities and Societies Proclamation, in early July, the Ethiopian government passed a new anti-terrorism law. According to Amnesty International, this new law could "restrict freedom of expression, peaceful assembly, and the right to fair trial, with serious implications in the run up to Ethiopia's 2010 election."[191] Human Rights Watch also warned that one of this law's more alarming features is how broadly and ambiguously terrorism is defined.[192] For example, under the new law, "terrorism" now includes acts that do *not* involve violence or injury to people, such as property crimes and disruption of public services.[193] Thus, a non-violent march that blocked traffic could qualify as a terrorist act, with a penalty varying between fifteen years to life in prison, or even the death penalty.[194]

### 6.   OUTLOOK FOR THE 2010 ELECTIONS

Many analysts believe that the incumbent party, the EPRDF, will win the upcoming election.[195] Meles Zenawi, the current prime minister, initially stated that he hoped not to run for re-election.[196] In an interview with Reuters, Meles stated that he hoped the EPRDF will agree to let him retire from power.[197] Following an EPRDF leadership

---

[182] *Key Leaders Absent in Ethiopia Polls*, BBC NEWS, Mar. 3, 2008.
[183] *Ethiopia Votes in Local Elections*, BBC NEWS, Apr. 13, 2008.
[184] Human Rights Watch, *Ethiopia: Repression Sets Stage for Non-Competitive Elections*, Apr. 9, 2008. [hereinafter *Ethiopia: Repression Sets Stage*]. By contrast, state-controlled media reports that the EPRDF will field more than four million candidates across the country. *Id.*
[185] *Ethiopia Opposition Group to Boycott Local Elections*, Apr. 10, 2008, SignOnSanDiego.com by the San Diego UNION-TRIB.
[186] *Background Note: Ethiopia, supra* note 1; *Ethiopia: Repression Sets Stage, supra* note 182.
[187] *Id.*
[188] Human Rights Watch, *Ethiopia: New Law Ratchets Up Repression*, Jan. 8, 2009.
[189] *Id.*
[190] *Id.*
[191] *Ethiopia Endorses Anti-Terrorism Law Unchanged*, SUDAN TRIB., July 9, 2009.
[192] Human Rights Watch, *An Analysis of Ethiopia's Draft Anti-Terrorism Law*, June 30, 2009.
[193] *Id.*
[194] *Id.*
[195] Andrew Cawthorne, *Interview-Ethiopia's Meles Eyes "Long Rest" Post-Retirement*, REUTERS, July 8, 2009.
[196] *Id.*
[197] *Id.*

meeting in September 2009, however, it appears Meles intends to stand for re-election.[198] Analysts believe that the EPRDF will win the election, partially because the opposition parties are not well organized.[199] The largest opposition party is the Unity of Democracy and Justice ("UDJ"), and recent reports indicate that this party has internal disputes and disagreements with its acting president.[200] Meanwhile, the other opposition parties formed a new alliance called the Forum for Democratic Dialogue ("FDD"). The new alliance was first initiated by the United Ethiopian Democratic Forces ("UEDF"), the Somali Democratic Alliance Forces ("SDAF"), Arena Tigray for Democracy and Sovereignty ("Arena"), together with former Ethiopian government officials.[201]

In the same interview, Meles expressed his desire for a peaceful election.[202] He stated that media air-time and public funds for opposition parties, and election monitors from both Ethiopia and abroad should help "level the playing-field" and ensure fair elections.[203]  It is not clear which countries will aid in election monitoring, but the United States has already expressed its intention to support the monitoring in 2010.[204]

Despite this rhetoric and a projected EPRDF victory, the government has still detained several opposition party supporters across the country.[205] For example, the government has reinstated treason charges against Ethiopia's foremost opposition figure and leader of the UDJ, Birtukan Mideksa, who is now in jail.[206] Due to growing human rights violations such as this, many opposition leaders have hinted that they may boycott the 2010 elections.[207]

### D.   ETHIOPIA'S DIPLOMATIC RELATIONS

#### 1.   RELATIONSHIPS IN THE HORN OF AFRICA

Ethiopia's position of power in the Horn of Africa has increased tensions with many neighboring states, including Eritrea and Somalia. These conflicts and political maneuverings are complex and intimately tied to factional struggles and power challenges within Ethiopia.

Ethiopia and Eritrea have a long standing history of complex and contentious engagement, beginning with Eritrea's bid for independence in 1961. Following the 1993 Eritrean independence referendum, part of the U.S.-brokered 1991 peace deal that turned power over to the EPRDF, and throughout the mid-1990s, the two countries enjoyed relative cooperation and public discourse.



CIA World Factbook

---

[198] Etyopian Simbiro, *Ethiopia: 2010 Election and Zenawi's New Game*; AllAfrica.com, Sept. 24, 2009.
[199] *Ethiopia's Biggest Opposition Party in Turmoil*, SUDAN TRIB., July 22, 2009.
[200] *Id.*
[201] *Id.*
[202] Andrew Cawthorne, *Interview-Ethiopia's Meles Eyes "Long Rest" Post-Retirement*, *supra* note 193.
[203] *Id.*
[204] U.S. Dep't of State, *Ethiopia, Advancing Freedom and Democracy Reports,* May 2009.
[205] *Id.*
[206] *Id.*
[207] *Ethiopia: Lidetu Says He Support Meles Over the Opposition*, JIMMA TIMES, July 12, 2009.

Nonetheless, by May 1998 Ethiopia and Eritrea went to war over border disputes.[208] The conflict quickly escalated and lasted until 2000, killing more than 70,000 people.[209] The desolate, mountainous border between the countries has the distinction of being the most militarized border in Africa.[210] In December 2000, both sides participated in the signing of a peace agreement at Algiers; in the years since, peace has remained fragile at best.[211] In fact, tensions between the states have manifested themselves through proxy involvement in other conflicts throughout the region.[212] Funding of Ethiopian insurgent groups, including the OLF and ONLF, and the Union of Islamic Courts, Ethiopia's opponent in Somalia, has been linked to the Eritrean capital of Asmara.[213]

Ethiopia and Somalia also have deeply established contentious relations and have long supported each other's insurgencies.[214] Somalia's former dictator Syad Barre's quest to "militarily reunite" the ethnically Somali Ogaden region of Ethiopia with the larger Somali republic in the late 1970s is still fresh in Ethiopia's political memory, and ongoing support within Somalia for Ethiopian factions compounds existing tensions. Both the OLF and the ONLF have active bases in Somalia,[215] and much of Eritrea's physical and financial support for these groups reportedly is funneled through Somali intermediaries.[216]



CIA World Factbook

Ethiopia has expressed concern over fundamentalist-Islamist activities in Somalia, which it has used to justify increasing involvement of Ethiopian troops in Somali territory. Ethiopian soldiers have engaged in a host of limited incursions and are alleged to have perpetrated multiple abuses of human rights. One report by Amnesty International documents Ethiopian soldiers killing 21 people, including an imam and several Islamic scholars at a mosque in Somalia. A Reuters account of the incident alleges the army slit the throats of several unarmed civilians.[217] The troops also allegedly looted a Somali children's hospital of food and cooking oil, according to a Somali security officer.[218]

The most substantial Ethiopian intervention into Somali territory occurred in December 2006 when Ethiopia, with U.S. backing, overthrew UIC leadership in Mogadishu. The overthrow led to a spike in violence in Somalia, and has decreased timely prospects for peace in the region.[219] Nonetheless, Ethiopia's strategic position and power

---

[208] Richard Reid, *Old Problems in New Conflicts: Some Observations on Eritrea and Its Relations with Tigray, from Liberation Struggle to Inter-State War*, 73 J. OF THE INT'L AFRICAN INST. (2003), at 374.
[209] *After 70,000 Deaths, Eritrea and Ethiopia Prepare for War Again*, TIMES (UK), Dec. 8, 2005.
[210] *Id.*
[211] Int'l Crisis Group, *Ethiopia and Eritrea: Preventing War* 2005.
[212] Lyons, *supra* note 172, at 173-74.
[213] *Id.*
[214] *Id.*
[215] *Id.*
[216] Peter Wallensteen and Margareta Sollenberg, *Armed Conflict, 1989-99*, 37 J. OF PEACE RESEARCH (2000), at 637.
[217] *Ethiopia Army Slits Throats in Somali Mosque*, REUTERS, Apr. 23, 2008.
[218] *Id.*
[219] Laura Hammond, *Somali Piracy: A Dangerous Internal and External Threat*, REAL INSTITO ELCANO, 162/2008 ARI, Oct. 12, 2008

dynamic in relation to Somalia has facilitated an alliance between Ethiopia and the United States, which has contributed to U.S. failure to hold Ethiopia accountable. [220]

### 2. ETHIOPIA-UNITED STATES RELATIONSHIP

Since the overthrow of Mengistu in 1991, the United States has identified Ethiopia as an ally in the Horn of Africa. Welcomed by the United States as a democratic friend following the ouster of the communist Mengistu government, and later as an ally in the "war on terror" following the terrorist attacks in the United States on September 11, 2001, Meles' Ethiopia has maintained strategic relevance to the United States over the past two decades. The most compelling evidence is the United States' attempt to change the course of Somalia's conflict through Ethiopian military influence.[221]

> *Supported by the West, mainly the United States, and using political violence, this regime has dominated and controlled the Oromo people and others…*
>
> Asafa Jalata, Being in and out of Africa: The Impact of Duality of Ethiopianism.

> The advent of the Transitional Government of Ethiopia in 1991 marked a major change in the state of relationships between the U.S. and Ethiopia. During the Mengistu period, relations had become so embittered that we no longer maintained an ambassador in Addis Ababa. The TGE, however, has maintained a strongly pro-Western foreign policy since its inception. As a result, good working relationships have been established that have been of great value on numerous regional concerns, including Sudan, Somalia, and Rwanda. These relationships have also given the Embassy excellent access within the TGE, making it an effective advocate for U.S. policy – including our efforts to promote U.S. business.[222]

Beginning in 1997, the United States sent a reported $20 million worth of military aid to the governments in the Horn of Africa, including Ethiopia, to help contain Sudanese-sponsored insurgencies.[223] Despite ongoing human rights violations, the United States has continued its support of the Meles government. It is increasingly apparent that the U.S. desires to make Ethiopia a bulwark in the region.[224] According to one analyst,

> [T]he close relationship between Washington and Addis Ababa associates the United States with the EPRDF regime in ways that distort other U.S. policies. Washington's calls for democratization and human rights in Ethiopia, for example, are not convincing when high-level officials simultaneously praise the regime's cooperation in the "global war on terrorism." The two states have different interests in the Horn of Africa. Addis Ababa and Washington share concerns regarding extremist Islamic groups in Somalia, for example, but for different reasons. Ethiopia worries about the assistance these groups provide to the regime's enemies in Eritrea and among

---

[220] *See Asafa* Jalata, *Being in and out of Africa: The Impact of Duality of Ethiopianism,* J. OF BLACK STUDIES (2008) at 18.
[221] *A Brittle Western Ally in the Horn of Africa, supra* note 146.
[222] U.S. HOUSE OF REP. FOREIGN AFFAIRS COMM., SUBCOMM. ON AFRICA, Testimony of The Hon. George Moose, Ass't Sec. of State for African Affairs, U.S. Dep't of State, July 27, 1997.
[223] Scott Peterson, *Why can't we be friends?* 90 CHRISTIAN SCIENCE MONITOR 198 (Sept. 4, 1998).
[224] *A Loveless Liaison: Ethiopia and the United States: Ethiopia's Relations with America,* ECONOMIST, Apr. 5, 2008.

Oromo and Somali insurgent groups, while the United States is concerned with links to al-Qaeda.[225]

Ethiopia also receives special attention because it hosts the African Union, its ancient Christian history attracts interest from American evangelicals, and its poverty and population attract development-minded supporters.[226]

The United States' interest in Ethiopia began in 1903 when U.S.-Ethiopian relations were established and later strengthened in 1951 with a treaty of amity and economic relations. A mutual defense assistance agreement followed in 1953. Through 1978, the U.S. provided military and economic assistance and a Peace Corps program that emphasized education.

After the overthrow of Haile Selassie in 1974, the bilateral relationship cooled due to the *Derg*'s alliance with the Soviet Union. The U.S. Ambassador to Ethiopia was recalled in July 1980. And in 1985, the U.S. implemented the International Security and Development Act of 1985, which prohibited U.S. economic assistance to Ethiopia except for humanitarian disaster and emergency relief.

Under President Ronald Reagan, the U.S. foreign policy agenda was defined by responding to the perceived Soviet threat. Moscow's closest allies in the region, including Ethiopia, were viewed by the United States as adversaries.[227] Following the collapse of the Soviet Union, U.S. policy under the first Bush administration continued to deal with Cold War politics. Assistant Secretary of State for African Affairs Herman J. Cohen mediated directly in the 1991 Ethiopian conflict, as the communist Mengistu government faltered. "During proximity talks that he organized between the collapsing Ethiopian regime and the main insurgent leaders in London in May 1991, the assistant secretary came to recognize that he could do little to save the tottering regime. In a dramatic move, Cohen sanctioned the Ethiopian People's Revolutionary Democratic Front's entrance into the capital, Addis Ababa, arguing that the insurgent group was the only force capable of preventing the city's destruction."[228]

This alliance has not prevented U.S. policymakers from all attempts to critique human rights violations in Ethiopia; the U.S. House of Representatives passed the Ethiopia Democracy and Accountability Act of 2007 (H.R. 2003 known as EDAA), condemning Ethiopia's human rights record and banning non-essential U.S. assistance.

While Ethiopia is an "important partner for the United States," writes Horn of Africa expert John W. Harbeson, the challenge is that "joint counter-terrorism initiatives must be kept separate from Ethiopia's struggles with democracy and its continuing pursuit of a post-imperial political identity."[229] For example, in 2008 the Ethiopian government purchased arms from North Korea with U.S. assent.[230] Ethiopian troops were in the midst of a military offensive against Islamic militias in Somalia.[231]

---

[225] Lyons, *supra* note 172.
[226] *Id.*
[227] Donald Rothchild, *The U.S. Foreign Policy Trajectory on Africa*, 21 SAIS REVIEW 1, at 182-83.
[228] *Id.* at 186-87.
[229] Stephanie Hanson, *U.S.-Ethiopia: A Double-Edged Partnership*, Council on Foreign Relations, Aug. 28, 2007.
[230] Ethiopia Bought Arms from North Korea with U.S. Assent, INT'L HERALD TRIB., Apr. 8, 2007.
[231] *Id.*

### E.   THE OROMO DIASPORA

According to World Refugee Surveys, Ethiopia produced almost two million refugees during the 1980s, and was one of the top three contributors of refugees in the world.[232]  In the early 1990s, Ethiopian populations in the U.S. approached half a million.[233]  Refugee migration from Ethiopia has decreased in the past ten years, but there are still substantial populations of Ethiopian refugees and asylees in Kenya, Sudan, the U.S., Germany, and Canada. Ethiopian asylum seekers most frequently seek refugee protection in South Africa, Kenya, Yemen, Eritrea, and the United States.[234] It is difficult to gauge the exact number of Oromo migrants worldwide because most statistics are organized by country of origin, not ethnicity. However, according to United Nations High Commissioner for Refugees ("UNHCR"), the majority of Ethiopians in Kenya—the largest host of Ethiopian refugees—and Yemen— one of the states most frequently applied to for asylum—are of Oromo ethnicity.[235]  Increasing global restrictions on migration have led some to pursue unconventional methods of exile from Ethiopia: a recent UNHCR article reports an increase in Oromo and Somali migrants paying traffickers to transport them by boat to Yemen, and many suffer physical abuse and theft of meager belongings along the way.[236]

Minnesota is home to perhaps the largest Oromo community in the United States.[237] It is unclear exactly how many Oromo currently live in Minnesota. Official State figures differ from those of Oromo community leaders. According to the State, there were approximately 7,500 Ethiopians living in Minnesota in 2003, but the Oromo community believes the number of Oromo alone is actually double that and possibly closer to 20,000.[238] While studies of refugee communities have noted that census figures often undercount refugees, the actual number of Oromo in the Twin Cities remains unknown.[239]

The Oromo people's arrival in Minnesota over the last 30 years has been directly related to political strife in Ethiopia. Oromo first came to the Twin Cities in the early 1970s to study at colleges and universities.[240] Before many of those who came to study could return to Ethiopia, however, the *Derg* took power and began its brutal rule, which involved numerous human rights violations including extra-judicial killings, mass arrests, executions, and detentions without trial.[241] Given the political upheaval and rampant human rights violations in Ethiopia, many Oromo in Minnesota sought political asylum in order to remain in the United States.[242]

The Oromo situation in Ethiopia did not improve during the 1980s as the *Derg* continued to hold power, and a number of Oromo came to the United States as refugees and settled in Minnesota with the help of the United Nations High Commission for Refugees and the U.S. government.[243] Persecution of the Oromo continued through

---

[232] Semir Yusuf, *Contending Nationalisms in a Transnational Era: The Case of Ethiopianist and Oromo Nationalisms,* 44 J. OF ASIAN AND AFRICAN STUDIES (2009) 299, 308.
[233] *Id.*
[234] UNHCR, *Statistical Yearbook: Ethiopia,* 2005.
[235] UNHCR, *Activities Financed by Voluntary Funds: Report for 1994-1995 and Proposed Programmes and Budget for 1996;* UNHCR, *Country Operations Plan 2008: Yemen.*
[236] Leigh Foster, *Gulf of Yemen boatpeople motivated by insecurity,* UNHCR NEWS, Mar. 27, 2008.
[237] Art Hughes, *Twin Cities Human Rights Conference Aims For Changes a World Away*, Minn. Pub. Radio, July 26, 2006; Ramadhan Mohamed, *Tensions Divide Oromos, Ethiopians*, PIONEER PRESS (St. Paul, Minn.), July 14, 2003.
[238] Gregg Aamot, *Minnesota Sees Surprise Increase of Ethiopian Refugees*, STAR TRIB. (Minneapolis, Minn.) July 16, 2006; Art Hughes, *Oromo Immigrants Strive To Be Heard*, Minn. Pub. Radio, May 18, 2005.
[239] James M. Jaranson et al., *Somali and Oromo Refugees: Correlates of Torture and Trauma History,* 94 AM. J. OF PUB. HEALTH No. 4, 592, Apr. 2004.
[240] Oromo Community of Minnesota, *How the Oromo Came to Minnesota,* http://www.oromocommunitymn.org/MinnesotaOromo.aspx.
[241] *Id.*
[242] *Id.*
[243] *Id.*

the early 1990s after the EPRDF came to power in Ethiopia.[244] After the OLF left the transitional government, the EPRDF persecuted many Oromo because of their affiliation or suspected affiliation with the OLF.[245] A significant number of Oromo also came to Minnesota during this time.

The Oromo community in Minnesota has helped to expose the human rights violations against Oromo people in Ethiopia.[246] Organizations such as the Oromo Community of Minnesota, the Oromo American Citizens Counsel, and the International Oromo Youth Association have organized rallies and marches to raise awareness of human rights violations in Ethiopia.[247] At the prompting of the Oromo diaspora, former Senator Norm Coleman and Representative Betty McCollum wrote letters urging access to education for Oromo students and criticizing human rights abuses in Ethiopia's Gambella region against the ethnic Anuak.[248] The Oromo in Minnesota have sought to maintain their identity as Oromo, rather than being lumped together as Ethiopian, and they have come to consider Minnesota "an important place for leadership and change in the community."[249]

Across the diaspora, Oromo have been actively engaged in Ethiopian politics and have attempted to encourage host governments, particularly in the United States and United Kingdom, to exert pressure regarding Ethiopia's human rights record.[250]  Diaspora communities have engaged in the organization of opposition political parties, and in 2003 a group of them hosted the First Ethiopian All-Party Conference in Washington D.C.[251]

---

[244] *Id.*
[245] *Id.*
[246] Hughes, *supra* note 237.
[247] *See* Ifrah Jimale, *Marching For the People . . . Arrested Back Home*, STAR TRIB., July 27, 2007 (stating that more than 2,000 Oromo people marched at the Minnesota State Capitol); *see also* Richard Sennott, *Ethiopians rally for homeland*, STAR TRIB., Apr. 5, 2002; Eric Black, *Oromo People of Minnesota Protest their Community's Plight in Ethiopia*, STAR TRIB., Mar. 22, 2000.
[248] *See Senator Coleman Acts To Support Oromo, available at* www.oromoamerican.org/free_oromia.html.
[249] Nancy Ngo, *Meeting Part of Oromos' Quest for Distinct Identity*, PIONEER PRESS (St. Paul, Minn.), July 29, 2001.
[250] Yusuf, *supra* note 232, 310-11.
[251] *Id.*

## II. FINDINGS

### A. VIOLATIONS OF CIVIL AND POLITICAL RIGHTS

The interviews[252] The Advocates for Human Rights conducted reveal the Ethiopian government's alarming disregard for civil and political rights through repeated accounts of extrajudicial killings, torture, arbitrary arrests, detentions for long periods with no formal charges, inhumane prison conditions, and pressure on the judiciary to rule in the government's favor. The fear engendered by the pervasive use of repressive tactics – surveillance, arbitrary arrest, prolonged incommunicado detention, torture, and extrajudicial execution – has effectively weakened political dissent, the independence of the judiciary, and civil society. For many Oromo, this repression colors their view of all Ethiopian government action.

> *When they put me in the cold room my skin became hard. They attached my hands around my legs. Then there is a little space. They put a piece of wood between my hands and the back of my knees. There were two tables. They lifted me and put the edge of the wood on both sides of the table. I was turned upside down. They started beating the bottoms of my feet with wood. They whipped me with a piece of tire. Each time they whipped me they ripped my skin. They brought a bucket full of water and bleach in it. When they stopped beating me they put my face in the bucket. I lost my breath. I thought I would die.*
>
> An Oromo man describing torture he experienced in the Harare Military Camp in 1997 for over a week until moved to Sabateigna (the 7th) Military Camp, 48:3.

### 1. TORTURE AND OTHER CRUEL, INHUMAN OR DEGRADING TREATMENT OR PUNISHMENT

The Advocates documented reports of the extensive use of torture against the Oromo in Ethiopia. International law unequivocally prohibits torture.[253] The Convention against Torture, to which Ethiopia is a party, defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person … when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."[254]

> *There is no home in Oromia that hasn't been touched by torture, disappearance, death, or detention. We are not learning from history; people are sowing seeds of conflict.*
>
> Oromo man commenting on reach of torture, 22:2.

The use of torture spans three successive Ethiopian regimes, including today's government. Interviewees shared personal experiences and stories of torture by government forces under Haile Selassie, the *Derg*, and the current government of Meles Zenawi. A healthcare provider interviewed by The Advocates observed that the torture practiced in Ethiopia falls squarely within the United Nations' definition of torture. 9:2.

---

[252] The citations refer to the interview number and page number. Interviews are on file with The Advocates for Human Rights. Supplemental material provided by interviewees is designated as "Supp." following the interview number.
[253] The prohibition against torture is part of customary international law and is also prohibited by the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984), at Art. 1 [hereinafter CAT].
[254] Ethiopia ratified the CAT on Apr. 13, 1994.

Interviewees reported beatings, painful physical exercises, punishment, whipping of the feet, prolonged hanging by the arms or legs, and mock executions. Both men and women reported sexual violence including rape, assault with foreign objects, and electric shock to the genitals. Men reported having heavy weights hung from their genitals. Other gender-specific torture while in the detention centers was reported.

> *Torture is defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."*
>
> Art. 1(1), Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

Interviews revealed a perception of worsening conditions and treatment under the current TPLF-led government. One Oromo woman asserted that there is "torture against Oromos that even [the] *Derg* regime didn't do." 13:2. Another Oromo woman told of the stories she had heard from others of their treatment under this regime. She stated:

> This regime is worse. People have been tied with their hands behind their backs and hung up and their soles are beaten. They are made to walk on sharp things while they are interrogated. They are asked whether they have supported the OLF. Almost all were not connected in any way to the OLF but were tortured just because they were Oromo. 30:3.

Interviewees reported that security officers commonly tortured prisoners during interrogations. Prolonged interrogations coupled with torture were used both to obtain information about the OLF's activities and to suppress any such activity. One male Oromo described his interrogation in Harare Military Camp in 1997:

> It was a very cold, dark room. They undressed me, and they left me with only underwear. The first time they took me [to] the room, they told me to think about it for a while: if I want to die or help them to get information. They said they would give me one hour to decide. I was completely frozen. I was shivering, and my skin got harder. They came back with pictures and asked me if I knew any of the people they showed me. When I told them I had not seen these people in my entire life, they hit me. They beat me the whole night. There were about five of them wearing military uniforms. Every fifteen minutes they were taking turns to beat me. 48:2.

One 40-year-old Oromo man told The Advocates that he had been arrested and detained with three friends and held for one week by the OPDO in 1997. They were beaten and forced to confess involvement in organizing people against the government and of participating in illegal activities with the OLF. He stated, however, that there was no evidence of their involvement. 39:2.

Another young Oromo man held at Ganda Tesfa Military Camp in 1996 said the torture and interrogations happened nearly every day for the two months and eighteen days that he was held there before being sent to Shinileh Central Prison for three-and-a-half years. "One day an officer from the Harare office came and asked me

if I know some of the names that he had. When I told him 'I don't know,' he beat me with a rock and broke my elbow. He told me if I admit that I know these people he will release me, otherwise I will stay there forever." 56:2.

Another Oromo man, during his fourth incarceration lasting from December 1992 to June 1994, was asked to admit that he had a high position in the OLF, that he knew the locations of soldiers, and that he had OLF membership lists. He denied the charges, and the soldiers shot over his head, causing him to faint. "The next morning I found myself in the same prison . . . and my trousers were spoiled because I [was] not conscious. They left me like that." 58:2.

Night was "suffering time," according to an Oromo man who was detained in 1995, when investigators would call him out by name to interrogate him. He described the frequent interrogations:

> The investigators would take you out to some different, quiet area. They would say, "This will be your last day." It was very scary. They would ask if you had a message for your wife, dad, or mom. They would say, "Please tell us. You will be killed." I would say, "I can't tell you what I don't know." Then they would say, "If you know about the OLF, tell us." I would ask them if they had any evidence—tangible or concrete. They thought I was deliberately keeping something in my mind. It would be two or three o'clock in the morning, and they would take you to a forest area. Again, they would ask if you had anything to say to your wife or parents. I said, "Good bye." They asked, "Don't you want to save your life? Are you a fool?" I was kicked from the back, and other soldiers kicked me from the front. 50:5.

An Oromo woman who was detained for two-and-a-half years explained why the interrogations happened at night. "They can't do this in the day because all the prisoners would shout. The worst is when you don't know your fate. Everyone is just sitting and waiting. Everyone thinks 'Will they come and get me in the night?' You can't sleep, can't get rest. [This] has its own psychological effect." 60:3. One young Oromo man, who was imprisoned for three months in the early 1990s at Hurso Military Garrison, noted "some of us were forced to watch executions. In the night you hear gunfire. They come into the building to drag someone out—you know that person will never come back, and then you hear a gun. Or someone being beaten, and then they come in lashed and bleeding into the room." 20:6.

Beatings, particularly with crude instruments like wire and wood, were reported to The Advocates.[255] An Oromo man described the torture inflicted on him in Shinileh, just outside Dire Dawa in Eastern Oromia. He was imprisoned for close to three years from 1996 to 1998 before arriving in Minnesota in 2000.

> They use different methods each time. They attached my hands behind my back with string. They lay me down on the ground and put cold water on me, and then they started beating me with plastic rubber [baton]. They beat me with wood and broke my arm. They did not even care when I told them my arm was broken. I know others who were beaten by wood. Some of them have pain when they urinate; the discharge is blood. When all of us transferred to the Central Prison, we got a break from the beating. Some of the prisoners were taken at night and brought back in the

---

[255] *See, e.g., Zewdie v. Ashcroft*, 381 F.3d 804, 807 (8th Cir. 2004). The Court found credible Zewdie's story that during her time in Maikelawi Prison "government officers beat the soles of her feet repeatedly with wire whips and sticks."

morning. We cannot ask them where did they go or what happened. You can tell from their faces that they were beaten the whole night. 29:2.

Oromos reported a range of torture techniques that they or close friends and family experienced. One Oromo, who was in East Africa for a conference in early 2005, met an Oromo man with his tongue cut out. According to the interviewee, "He was told by the government who did this to him to praise [the] OPDO because a tongue that praises the OLF deserved to be cut. I couldn't sleep well after I learned this level of torture." 22:3.

One Oromo man's brother-in-law was put in a prison camp in Ethiopia where, "Sometimes they would put a heavy load on his shoulder and let him stand in heavy rain for the whole day, and he'd have to remain standing for the whole day, and if he doesn't they're going to hit him with a gun or whatever tool they use." 15:8. Another male Oromo interviewee is paralyzed from repeatedly carrying a heavy rock weighing between 70-80 kilograms on his back, up and down stairs, during his fourth arrest and detention between December 1992 and June 1994. 58:1.

An immigration attorney in Minnesota who has worked on asylum cases on behalf of Oromos and members of other ethnic groups from Ethiopia noted, "One of the worst tortures that I heard of is when they pulled thousands of people that were demonstrating on the streets in 1993-94. They were forcefully shaved using crude instruments and beaten all over."[256] 32:2.

Oromos reported the use of rape and sexual violence against both women and men by the Ethiopian government. International law considers rape and other acts of sexual violence to be torture.[257] As with all torture methods, the goal is to destroy individual identity. Humiliation and shame persist, often for the rest of the victim's life.[258]

Interviewees detailed accounts of rape and other forms of sexual assault that were perpetrated against women. One Oromo woman detained in the mid-1990s at Andegna Tabiya [First Station] stated:

> There are many ugly things they were doing to us in prison. To tell this is . . . really bad. Thank God they did not do this to me. It is hard for us to talk about this. They put flashlights in the [sexual] organ of the ladies. There is a woman that [they] put flashlight batteries [in her vagina] . . . she couldn't hold her urine, and she used to urinate on herself. 60.2

The woman also told The Advocates, "There were many Oromo women they took in the night and group rape[d] them. I know of those whom I was arrested with who were raped by soldiers." 60:2. One Oromo woman shared with The Advocates the story of an Oromo woman who was raped and impregnated by a guard in 1993. She ended up committing suicide. 36:5.

---

[256] The use of dry-shave techniques was frequently mentioned. Amnesty International reported the cases of 60 Oromos, including a prominent Oromo folk singer, who were arrested on December 31, 1993 while peacefully demonstrating outside the High Court in Addis Ababa against the trial of two OLF officials who had returned to Ethiopia for a peace conference. They were held under military guard in Sendafa Police College, which is not an official prison, and they were ill-treated by soldiers. Their heads were dry-shaved without soap or water, which Amnesty International considers to be a form of cruel, inhuman and degrading treatment. They were also forced to do hard physical exercises, barefoot and on rough ground, and beaten if they failed to keep up. The only food provided was bread and water. They were brought to court in January 1994, charged with contempt of court and most were sentenced to a month's imprisonment. *See* Amnesty International, *Ethiopia—Accountability Past and Present: Human Rights in Transition*, AI Index AFR 25/6/95 (Apr. 18, 1995).

[257] *See* United Nations High Commissioner for Refugees, *Sexual Violence against Refugees: Guidelines on Prevention and Response* (Mar. 8, 1995).

[258] Libby Arcel, *Torture, Cruel, Inhuman and Degrading Treatment of Women: Psychological Consequences*, 12 TORTURE 5-16 (2002). The Rome Statute of the International Criminal Court, 2187 U.N.T.S. 90, art. 7(1)(g), recognizes rape as a crime against humanity.

Another Oromo who has worked in social services in Minnesota reported a story of an Oromo woman whose Amhara husband was killed in the early 1990s. The government "took her to prison. [They] tied her so she was hanging upside down, beating her. She still can't walk more than one block or stand for long. Five policemen raped her every night." 13:2. She explained to The Advocates that "rape is very disgraceful in Ethiopia. Women are blamed." 13:3. An Oromo elder who grew up in Arsi described these abuses as "very agonizing and terrorizing." 51:1. An Oromo man told The Advocates:

> *International criminal jurisprudence recognizes that rape constitutes a form of torture. Providing the other elements of torture are satisfied, rape constitutes "severe pain and suffering amounting to torture."*
>
> *Prosecutor v. Kvočka*, Case No. IT-98-30/1, ¶ 145, Judgment, Nov. 2, 2001 (*citing Celebici* Trial Chamber Judgement, ¶¶ 495-496 and 941-943, *Furundizija* Trial Chamber Judgement, ¶¶ 163, 171, *Akayesu* Trial Chamber Judgement, ¶¶ 597-598).

> I've heard of the things they do to women. They will come looking for a man if he is part of the OLF or a "trouble-making" Oromo. If he's not there, they will rape the wife. There are horrific stories. It is not well documented, especially stories about rape. Who do you turn to? There is no non-profit agency. Society is closed, and it is not easy to talk about. 44:5.

While few women interviewed by The Advocates shared their own experience, many had witnessed torture or had learned of others' experiences. A male medical care provider and torture researcher indicated, "I am sure that [rape] is underreported, and some women will share it with you after you have known them for a long time." 8:3.

Sexual violence against men was also reported. "As far as unique torture, there have been incidents of Oromo men having weights tied to their testicles." 8:2. One Oromo reported his father's experience while being interrogated by the current TPLF-led government. He was tied with electric wires and a bottle of water was attached to his testicles. 53:7. Oromos referred to this as virtual castration, 26:1, intended to make you infertile, 35:2, and not productive anymore, 54:6. One Oromo, whose brother was tortured in Mameria prison, stated "[he] was severely tortured, including his sexual organs, that he couldn't even walk." 52:1.

Few Oromos that The Advocates for Human Rights interviewed were unaffected by torture. The Advocates' results paralleled the findings of the five-year, multi-phased, community-based epidemiological study funded by the National Institute of Health ("NIH").[259] Setting out to interview a cross-section of Oromos in Minnesota who had and had not been tortured, one female researcher of the NIH study found "even those people who have not been tortured shared the pain of those that had because they usually have a family member or someone that they knew who had been tortured." 30:1. Another researcher of the Oromo and Somali torture study told The Advocates that 65 percent of the Oromos were tortured in prison or jail, and 60 percent reported seeing others being tortured. 9:2.

Both Oromo men and women were subjected to torture by the Ethiopian government. As one researcher of the NIH study of torture prevalence in Somali and Oromo refugees in Minnesota, indicated, "The literature suggests that men are tortured more than women, but this study showed that women were just as likely, if not more likely, to be tortured than men." 19:3. One of the researchers involved with the five-year NIH-funded study noted, "The

---

[259] Jaranson, *supra* note 239, at 591-98.

Oromo have been imprisoned longer than many groups that I have dealt with. I noticed before the data was gathered that they [Oromo] have been harshly treated and affected." 8:2.

It is believed that incidents of torture may be underreported out of shame or out of fear of reprisal against themselves or members of their families. Limitations of the interview setting may also have caused underreporting because there was not enough time to develop rapport necessary to share such intimate experiences. An Oromo woman who was imprisoned and tortured reported that if you talk, you "die or return to prison," 18:2, creating a chilling effect for the sharing of personal experience. An Oromo man told The Advocates that he was released under the condition not to talk about the torture or what had happened to him in prison. He was told not to tell human rights organizations or friends. "If I talk, I would be killed." 58:2. Family members would not always know all of the details or the full extent of their loved one's suffering. In addition, many of the interviewees feared surveillance or reprisal in the United States and did not want to risk the safety and security of friends and family still in Oromia.

Other human rights reports and the NIH study indicate that torture experiences among the Oromo are underreported. That which is reported provides staggering evidence of Ethiopia's violations, under the current regime and its predecessors, of its Constitution and of international human rights law prohibiting torture.

### 2. EXTRA-JUDICIAL EXECUTIONS AND DISAPPEARANCES

International law unambiguously protects persons from arbitrary deprivation of life.[260] Any sentence of death may only be executed "pursuant to a final judgement rendered by a competent court."[261] Reports from individuals that The Advocates for Human Rights interviewed demonstrate that Ethiopia's police and security forces systematically violate this right. This pattern is a long-standing one, spanning three successive regimes and affecting generations of

> *"Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life."*
>
> Art. 6(1), International Covenant on Civil and Political Rights.

Oromo. Many of the Oromos interviewed by The Advocates reported family members who had been killed or were missing or "disappeared" for many years under the current regime. Sometimes the family would later hear a rumor or receive proof that the missing person had been killed.

Another Oromo man witnessed the shooting and death of the son of a family friend by armed members of the OPDO:

> In my home area [of Wollega], there was a high school student aged 18 years that I saw OPDO running after. I knew his mother and father. I tried to observe. They had pistols and guns in hands. The boy fell down and was killed. The guys had pistols and they later shot and killed him. They alleged that he was OLF. The mother came out and asked, "Why did you kill this guy? Why didn't you just catch him and put him in prison?" He had already died. 16:4

---

[260] *See* ICCPR, *infra* note 377, art. 6(2).
[261] *Id.*

The same man also told the story of a close friend, a teacher in the Wollega region of Oromia, who was taken from a hospital by government agents in 1996. "They put him in a car, and he disappeared without a trace and has never been seen to date. His wife came to Addis Ababa to appeal. After a year, someone gave information to his wife not to look for [her husband] anymore." 16:3.

Another Oromo man, who was himself arrested and tortured under the *Derg*, reported that his older brother, who was active in the OLF, was detained for ten years under the *Derg* regime. The present government again detained his brother in 1992. Despite many efforts to discover his whereabouts, including an international letter-writing campaign on his behalf, his brother has been missing since his arrest in 1992. 22:1.

Oromo reported leaving Ethiopia under threats to their lives. An Oromo man from Arsi described his involvement in Oromo uprisings under the *Derg* regime, and how, after the TPLF came to power, he was forced to flee the country. "They [the TPLF] had given a death sentence to me. I heard that they wanted to kill me, and I was able to run away." 51:4.

Another Oromo man told The Advocates about the arrest and death of a friend and activist in the OLF in 1995. According to the witness, this very public act was intended to induce fear among the local Oromos:

> The killing of Mustapha created fear in us. The[y] tortured him first. They brought him to the city center where everybody could see his body. They nailed him on the ground. They removed his skin and took out his two eyes. They forced people from the region to come and watch. At first, I couldn't believe my eyes. I couldn't recognize him. I fainted when I saw him. We knew that we were the next target, which is why we decided to disappear. 48:1.

### 3.   ARBITRARY ARRESTS AND INCOMMUNICADO DETENTION

Arbitrary arrest or detention occurs when a government official detains an individual without due cause that the person has violated the law.[262] Although prohibited by international law and Ethiopia's own Constitution, interviewees reported that Ethiopia's police and military in Oromia commonly use arrest as a form of harassment against those the government wishes to intimidate or influence. For some, it was experienced for a relatively brief period of time. But detentions of three years were common and some interviewees experienced more than ten years in prison. In addition, many had experienced repeated arrests and detentions.

> *"Everyone has the right to liberty and security of the person. No one shall be subjected to arbitrary arrest or detention. No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law."*
>
> Art. 9(1), International Covenant on Civil and Political Rights.

One Oromo man recounted to The Advocates that his father was imprisoned for several years under the *Derg*, allegedly targeted because he was involved in an internationally-connected, non-governmental organization. At the same time, the *Derg* arbitrarily imprisoned, tortured, and interrogated his 14-year-old sister for almost a year. After her release, she was required to report periodically to the local government. 15:5.

---

[262] *See* ICCPR, *infra* note 377, art. 9.

Arbitrary arrest and detention of Oromos under the current TPLF regime have occurred since it came to power in the early 1990s, following the period of the transitional government. As reported in The Advocates' interviews, Oromos are targeted by this government, regardless of influence or wealth. There were, however, also several instances of wealthy, educated, or influential Oromos who were specifically selected for harassment. For example, an influential Oromo man, who was the head of a government office in Oromia during the former *Derg* regime and under the current TPLF government was imprisoned for three years in the late 1990s. The government never charged him with any violation of the law. He described his arrest:

> One employee told me that the military were surrounding the office. He asked me what the reason was. I said that I had no idea. The soldiers jumped the fence, but I told everyone to go ahead and do their work. We had no idea what was going on. One gentleman came to the office. He entered without asking my secretary. I said, "Can I help you, sir?" He said, "Shut up. I don't need your help." But I'm a civil servant and my job is to help others. Instead he told me to "[raise] up my hands." He also told me not to move or to touch anything. I asked him a couple of questions, [such as], "Where are you from?" He continued to tell me to raise my hands. I told him that I'm a civil servant and that I don't have weapons. He told me, "No. You don't have a right to ask a single question. You are arrested." 50:7.

The interviewee was eventually released. When he was finally taken to court, there was no evidence or case against him, and the court ordered his release.[263]

On other occasions, the TPLF military or police arbitrarily arrested family members of people they suspected were part of the OLF or part of an organization that they suspected sympathized or was allied with the OLF. An Oromo student, who was involved in the student protests of 2001, described the government's intimidation of his family members:

> The government attacks you and your family too. You have to obey what the government says unless you want to lose land or be imprisoned. My parents were arrested two to three times a year. They [were] detained, questioned. . . . My younger brothers were targeted in college. . . . They were detained two days and released but suspended from school. They were questioned, given a warning, and released. 35:4-5.

Another Oromo woman told the story of her relative who was involved in student protests in Addis Ababa in 2002. When the students were taken away by the military, the interviewee's relative was kept in detention for four months without any charge. "He was finally released but told that he has to come back every month. But they could not go back to school. They [the government] did not allow them to resume their studies. They are just sitting there doing nothing. . . . They are going back and forth to the prison camp every month." 54:6-7.

Additionally, two Oromo members of Parliament were reportedly harassed by government forces: "[T]he government intimidated them. When I say government, government security team would arrest them, question

---

[263] *See, e.g., Suppressing Dissent, supra* note 17, at 17 (reporting that eight members of the Human Rights League, which investigates human rights violations against the Oromo, were detained for three-and-a-half years on charges of terrorist activity where no evidence against them was ever found).

them for hours. Sometimes they would take them in the evening, in the night and take them around in car, blindfold them and ask them questions." 61:4. The two eventually fled Ethiopia. 61:4.

Many Oromos described to The Advocates their experiences of being held incommunicado, denied access to family or counsel. They related that either their family was unaware of where they were detained or they were denied visitors. One Oromo man was arrested at work in Adama, Oromia, and detained in a dark, underground room in Maikelawi, or Central Prison, in 1995. He stated, "For three months, nobody knew where I was. . . . My family was searching for me—asking the police, human rights organizations, and the International Red Cross for me." 50:4.

A *pro bono* lawyer for The Advocates reported that her Oromo client was held in Addis Ababa in the early 1990s. "She was not permitted contact with anyone, not even relatives. As to her father, who was imprisoned on two occasions, I know that the mom was able periodically to bring food. They knew where he was in one situation but not the other." 62:3. The brother of an Oromo who was detained in 2002 and held incommunicado in Mameria Prison outside Dire Dawa told The Advocates that he and his family were not allowed to visit him.[264] 52:1.

There is also widespread belief that many Oromos are being detained in secret facilities unknown to family, lawyers, medical professionals and the international human rights community. One Oromo woman told The Advocates, "People are beaten up, imprisoned in private houses, in toilets, even in the cities, and people would not know where those buildings are. There are people who know, but it is kept secret." 57:5 The Advocates heard from Oromos who were kept underground where there was no water, light, or sanitation. 26:2.

Many acknowledged that such secret facilities have likely been in existence since the time of Haile Selassie, but that the current government has been clever in its techniques and that much of the oppression and torture has moved "underground."[265] Interviewees mentioned arrests and detentions at private homes outside the watchful eye of the international community. The creation and maintenance of secret facilities allows for conditions where security guards violate prison rules and national and international law to engage in systematic acts of torture. One male Oromo stated, "Now prisons are like a laboratory of torture." 35:2.

### 4.  INADEQUATE PRISON CONDITIONS

International law requires that prisoners be held in conditions that respect their dignity and humanity.[266] Many interviewees were imprisoned in Ethiopia and recounted personal experiences or knew second-hand about detention conditions based on the experiences of friends and family.[267] Few people seemed unaffected by detention, prolonged incarceration, and torture.

---

[264] *See* Amnesty Int'l, *Urgent Action, Ethiopia: Torture/Fear for safety/Incommunicado detention*, AI Index: AFR 25/021/2002, Aug. 11, 2002, (noting that Ziad Hussein Abarusky had reportedly been subjected to severe torture, including to his sexual organs, leaving him unable to walk. He had been refused medical attention. The authorities had not allowed his family to visit him, but his family has been permitted to bring food for him to the prison).

[265] AMNESTY INT'L, REPORT 2004, *Ethiopia*.

[266] *See* ICCPR, *infra* note 377, art. 10(1).

[267] This is consistent with the findings of a National Institute of Health study, where one third of Oromo men were held in prison for more than one month and one third were held for more than one year. About 45% of the Oromo women that they interviewed were held for over one month. *See* Jaranson, *supra* note 239.

With little variation between facility or reported date of incarceration, military camps, prison camps, jails, and secret detention facilities throughout Oromia and all of Ethiopia were described as dark, overcrowded, and lacking adequate toilet and sleeping facilities. Interviewees also described to The Advocates meager food provisions, lack of water, rampant illness, and deprivation of medical care and contact with friends and family.

Interviewees reported extremely overcrowded detention conditions. An Oromo who was imprisoned in the mid-1990s indicated that the cells were so cramped that inmates alternated sleeping in beds and standing. 26:2. One Oromo man was confined in a cell designed for two people, but it was routinely packed with 10 or more persons. 59:3. Another Oromo man described his time in 2001 and 2002 at the Ambo Zonal detention center: "Here,

> *"All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person."*
>
> Art.10(1), International Covenant on Civil and Political Rights.

I was detained in a highly suffocated room about 9 meters squared in which we were 30 detainees altogether. Since the room was overcrowded, there was no space for any one of us to lie down. We had to lean against each other to sleep." 61: Supp. 6. Many interviewees noted that there was no bedding—just the cold cement floors— earning one facility the name "Siberia." 31:1. Another male Oromo, whose father was imprisoned in 1995, recounted his father's memory of the Oromo elders in his cell crying for the police to open the window so they could get air. 28:2. The Advocates interviewed several Oromos who indicated that political prisoners were put in jail with violent criminals and youth were intermixed with adults as a result of the overcrowding and inadequate facilities. 45:2.

Many Oromos interviewed reported conditions of inadequate food, lack of access to toilet facilities, and exposure to infection and illness. Interviewees reported that going without food for up to three days was not uncommon. More typically, there would be a daily provision of food, but it was wholly inadequate in nutritional and caloric value. It might be a piece of bread or leftovers from the prison guards' food, including the rinds from fruits. 31:1. There was no clean water to drink. 31:1.

Many of the interviewees who were imprisoned noted the lack of toilet facilities. A large camp or jail often would have one toilet to serve all inmates. Prisoners could access the toilet only twice a day. 50:5. Many prisoners were therefore forced to relieve themselves in shoes, on a bed, or on the cell floor.

Such conditions led to serious health problems and insufficient medical attention. There was a report of a cholera outbreak in a detention facility, 15:8, but more frequently mentioned was diarrhea and exposure to parasitic insects and worms. 58:2. An Oromo woman who works in social services told The Advocates of an Oromo friend whose brother is imprisoned in Ethiopia. He is diabetic and has high blood pressure, kidney problems, and other medical problems. He is sick and close to death, but the prison is denying him medicine.[268] 13:3.

---

[268] *See* Amnesty Int'l, *Urgent Action, Ethiopia: Further information on Medical concern / Torture / Detention Without Charge*, AI Index: AFR 25/009/2004, Aug. 11, 2004 (by Imiru Gurmessa Birru), *available at* http://web.amnesty.org/library/index/ENGAFR250092004 (publicizing the denial of medication to Imiru Gurmessa Birru, a middle-aged Oromo man reportedly removed from the hospital against the advice of medical doctors to a police investigation unit on a stretcher on August 6, 2004. They reported that he was extremely ill but denied the medication prescribed by hospital doctors for his diabetes).

### 5.   LACK OF CHARGES AND PROCESS

Ethiopia is a signatory to multiple international instruments that emphasize the need for governments to have a valid judicial process by which they can deliver justice to those accused of crimes.[269] Despite these constitutional and international guarantees, The Advocates' interviews revealed a high rate of occurrence of detentions—even those lasting many years, where no formal charges were ever made, let alone within the 48-hour period mandated in the Constitution.[270] Many Oromos reported to The Advocates that prisoners often never faced a judge, and no interviewee reported a case being brought before a court within 48 hours.

The lack of legal process and charges was common under the former regimes as well as under the current government. A man from the southern part of Oromia told The Advocates about the frequent detention of his father, who worked under Haile Selassie and was persecuted and eventually killed by the *Derg* when the interviewee was 13. When asked whether his father was charged with anything, the interviewee responded, "All I grew up knowing was that the regime would arrest you and not give any due process. Or they would just kill—there was no going to court." 33:1. The same sentiment and experience was shared by

> *"Anyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings before a court, in order that that court may decide without delay on the lawfulness of his detention and order his release if the detention is not lawful."*
>
> Art. 9(4), International Covenant on Civil and Political Rights.

another interviewee who was detained under the *Derg* in the early 1980s and under the current regime in the early 1990s while working with the Christian church in rural Oromia and in Addis Ababa:

> Finally when they let us go, they especially told me that I will be back in jail whenever they want me again. And I don't know why. This is common for any Oromo person. They tell you when you are released, well, they will call you back any time. It is always uncertain. Any reason can be created to put you back in jail. 47:2.

An Oromo man who had worked for the OLF when it was part of the transitional government was arrested during the night shortly after the OLF was expelled from the governing coalition in 1992. He no longer worked for the OLF at the time of his first arrest and detention. He explained:

> Men in uniform came up and took [me] to a police station. They asked "Are you in the OLF? Did you ever join the OLF?" [I] answered that [I] had been in the OLF. [I] thought that was fine as long as [I] was law-abiding. "It's a free country, I can be in whatever group I want." . . . The [TPLF] took [me] to a place in the city, but it was somewhere [I] didn't recognize. They kept [me] overnight and someone would come to interrogate [me] almost every hour. The next night they took [me] somewhere else to be held. [I] was beaten. [My] girlfriend found out where [I] was after searching and asking around. They had transferred [me] to a place for interrogation. [I] stayed there for four months. [I] was not charged with anything or given any chance to go to court. . . . One time [I] saw

---

[269] *See generally*, ICCPR *infra* note 377, at art. 9.
[270] CONST., art. 19 (Ethiopia).

people from the Red Cross coming to look at where [we] were staying. The [government] officials told the Red Cross people that all the prisoners were criminals. 40:2.

A former athlete who worked for the EPRDF following the OLF's expulsion from the governing coalition told The Advocates that he was imprisoned for six years before appearing in court. This Oromo man was taken in the middle of the night from his home after being beaten before his wife and children. When, years later, he was finally brought before a court, he was released. He stated: "They didn't have any evidence. The people who arrested me didn't come to the court on that day. They were transferred to other places. The judges asked if there is any proof that I'm guilty. They didn't have my case, only a list of my name." 49:2. These reports are consistent with Human Rights Watch reports which reported that, when visiting Oromia in spring 2005, none of the thirty-three interviewees who had been arrested because of alleged ties to the OLF had been brought before a court or confronted with any evidence that they had committed a crime.[271]

Many Oromos reported that in the absence of a clear and transparent legal process to contest charges against them, a payment of a fee or bribe enabled them to get out of jail. An Oromo professional reported that his cousin was detained eight years allegedly for being an OLF a supporter. He was eventually released on bail. "You could buy your way out of jail if your family raised enough money." 26:2. Another Oromo man reported that his brothers paid 5,000 Birr for his release after his first arrest in 1992. 27:1.

The State Department's 2006 Human Rights report corroborates this testimony, citing similar reports of long detentions without charge or access to any legal process.[272] The frequent imprisonment of Oromos with no knowledge of the charges against them and no ability to have their case reviewed by a court not only violates Ethiopia's Constitution but also basic international human rights standards to which the Ethiopian government is bound.

### 6.  LACK OF INDEPENDENCE OF THE JUDICIARY

The presence of a competent and independent judiciary is essential to a nation's ability to respect its people's human rights and to administer due process and justice. Several people reported to The Advocates that the government put pressure on judges to rule in its favor and refused to enforce judicial rulings with which it disagreed. A former Ethiopian judge reported that the judiciary "is not a place where you can make decisions on the basis of the law. There is tremendous political intervention by the political organs and the cadres, and you'll be threatened. As a judge in Ethiopia you are extremely powerless, actually." 63:3.

> *I was able to endure the intimidation, harassment, and interference of the government in the judicial process I was supposed to serve, until I was finally warned verbally by my immediate boss to refrain . . . from serving the public, but to implement "law and order" as the government wanted.*
>
> A former judge in Oromia, 23: Supp. 19.

When one of the interviewees, a well-educated and influential Oromo man, was arrested in southern Oromia, his family, friends, and colleagues were able to convince the government to take his case to court. "My main question

---

[271] *Suppressing Dissent, supra* note 17, at 16.
[272] U.S. DEP'T OF STATE, 2007 COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES, *Ethiopia* (Mar. 11, 2008), at Section 1(d) [hereinafter *2007 Ethiopia Report*] (noting that police in small towns reportedly detained members of opposition parties without access to a judge).

to the court was, 'Is this court free from any government influence? Are you working for all of us equally?' The judge reassured me, 'Don't worry. You can tell us any problems that you face.' I started talking." 50:5. After giving the government time to conduct an investigation, the court finally issued an order for release.[273] The interviewee showed The Advocates a certified copy of the final release order and translated it from Amharic.

> The order said that [the interviewee] is honest, he didn't commit any crime, and he should be released. As soon as the order came, my wife brought me food, and we thought I would be released in one to two days. But the investigator said that they will never accept an order from the court. Again I asked, "What did I do?" 50:6.

The case was appealed to the Supreme Court, which issued several orders that the police ignored until eventually the detainee was set free.[274]

Another interviewee, an Oromo woman who works with a non-governmental development organization in Oromia, described her brother-in-law's experience before a court:

> He was never charged. He once went before a court, and they let him go free. Then all three judges were arrested, and he went back to prison. . . . Now and then judges will act in that way, but with the risk of being arrested. I knew a judge in prison who didn't even have money to send his daughter to school. . . . They lose their job permanently. 57:2, 5.

An Oromo judge was threatened by the government to rule in the government's interests. He described his experience following the OLF's departure from the transitional government and mass arrests of OLF supporters as follows:

> Those who were illegally detained applied for habeas corpus rights to the court [over which] I was presiding. Since there is no law against political opinion, we gave an order [for them] to be released. Some officials ordered the court verbally by phone and sometimes by written order saying, "Do not see this file; don't release that person on bail since he is a member of opposition groups; this person must not be convicted by the court; he is our member . . . and so on." In spite of their threats, which were detrimental to my life, I used to tell them [about] the independence of the judiciary, [that] the court must not abide [by] any order except the law. . . . From then onward they threatened me saying, "If you did not accept our orders we would kill you in front of your home." 23: Supp. 10.

Later on, the interviewee received a visit from government officials in Addis Ababa who "warned me to accept officials' orders ignoring the written law of the land. After they got support from high officials, things turned worse." 23: Supp. 11. One Oromo district judge under the interviewee's supervision was killed after refusing a government order in the mid-1990s. 23:1. After being transferred to a remote region and suspended from his post, the

---

[273] Human Rights Watch reported cases in which the courts repeatedly gave in to government requests for more time to look for evidence on a case. *Suppressing Dissent*, *supra* note 17, at 15.

[274] *2007 Ethiopia Report*, *supra* note 272, at Section 1(d) (describing several instances where police did not respect court orders to release suspects on bail). *See also* Human Rights Watch, WORLD REPORT 2006, *Ethiopia*, at 107 (reporting that courts in Ethiopia often step in to order the release of government critics jailed on trumped-up charges of treason or armed insurrection and noting that judicial action often occurs only after unreasonably long delays, both because of the courts' enormous workload and excessive judicial deference to bad faith police requests for additional time to produce evidence).

interviewee hid in the capital city, fearing for his life. At that time, "While the security [forces] of the government [were] searching for me, they arrested my brother . . . to force him to tell them [my] whereabouts. But he himself at the time did not know [my] whereabouts. He [was put] in detention." 23: Supp. 13.

The coercion of judges and the strong government influence in their decision-making erodes the rights to a fair hearing and to due process of Oromos and all Ethiopian citizens. The lack of respect for judicial orders by the police and military in the course of their investigation and detention also weakens the rule of law in Ethiopia, without which the rights of its citizens cannot be protected.[275]

### B. THE STATE SURVEILLANCE APPARATUS: VIOLATIONS OF THE RIGHT TO FREEDOM OF SPEECH, ASSEMBLY, AND ASSOCIATION

The state surveillance apparatus erected under the *Derg* continues to restrict the rights of Ethiopians to freedom of association, privacy, movement, and property. Alleged ties to the OLF may serve as justification for arrest, detention, firing, expulsion, or confiscation of property. The government continues to monitor Ethiopians and conduct surveillance through the neighborhood associations, or *kebeles*, that were established by the *Derg* and served as the local apparatus of state security. Many interviewees reported a universal perception that all communications by phone, post, or e-mail are monitored by the government is nearly universal.

> *The situation is getting worse. While the TPLF started by focusing only on OLF members, now they are attacking sympathizers of the OLF, including students and farmers. The security forces are using scare tactics to warn farmers against harboring OLF guerrillas ... one farmer was arrested and hung in the marketplace. A soldier stood there and told others that their fate would be the same.*
>
> Male Oromo Professional, 2:3.

#### 1. RESTRICTIONS ON FREEDOM OF ASSOCIATION

Government efforts at limiting freedom of association largely fall into two categories: first, the government punishes Oromo citizens who associate peacefully in an attempt to limit potential political opposition; second, the government punishes those who associate with (or who are accused of associating with) the OLF. Often Oromo ethnicity is the sole basis of suspicion of OLF association. These activities violate international human rights law as well as specific rights enumerated in the Ethiopian Constitution.

> *"Everyone shall have the right to freedom of association with others…No restrictions may be placed on the exercise of this right other than those which are prescribed by law and which are necessary in a democratic society in the interests of national security or public safety…."*
>
> Art. 22(1)-(2), International Covenant on Civil and Political Rights.

---

[275] *2007 Ethiopia Report*, *supra* note 272, at Section 1(e) (describing the Ethiopian criminal courts as "weak, overburdened, and subject to significant political intervention").

### a.  GOVERNMENT RESTRICTIONS ON ASSOCIATIONS

Everyone shall have the right to freedom of association with others, including the right to form and join trade unions for the protection of his interests.[276] Ethiopia's parliament passed a Proclamation for the Registration and Regulation of Charities and Societies in January 2009, prohibiting foreign entities from working in the areas of human rights, equality, conflict resolution, and the rights of children.[277] Local civil society organizations that receive more than 10% of their funding from abroad, including contributions from the diaspora, are also banned from working in these areas.[278] Interviewees told The Advocates that no independent Oromo human rights organizations exist in Ethiopia. They described the hurdles organizations must overcome to get a license to operate, to maintain independence, and to continue to operate in the face of surveillance, harassment, and the incarceration of its leader and other members.

Oromos reported that human rights organizations cannot obtain licenses from the government. Many interviewees expressed concern regarding the banning and jailing of members of the prominent Oromo self-help organization, the Mecha Tulema Association. One of its founding members, an Oromo in Minnesota, told The Advocates:

Mecha Tulema Self-Help Association is an organization in Addis Ababa created in the 1960s. It was banned back then and some of its members were executed. It came back and reorganized in 1992 to build schools and roads and improve the socio-economic situation for the Oromo. The government shut down this organization a few months ago [in late 2004] and some members were imprisoned. Any organization with an Oromo name or purpose has been shut down by the government. 21:3.

According to the *Addis Tribune*, the Ethiopian government revoked the license of Mecha Tulema in July 2004 for purportedly carrying out political activities that were in violation of its charter.[279] Four of the organization's leaders were then arrested for providing support to the OLF. 7:3. An Oromo university student said, "The Oromo organization, Mecha Tulema, with more than a 30-year lifespan collapsed within one day when its leaders were arrested." 35:2. Another Oromo student who arrived in the United States as a refugee in 1999 reported, "Politically, Oromos can't form organizations. They shut down Mecha Tulema and confiscated its belongings. It was a self-help organization to advance Oromo culture. They tied it to the OLF just by virtue of it being Oromo." 46:7.

The charges levied against Mecha Tulema in denying its license and jailing its leaders were reported to be similar to the treatment of the Human Rights League, another Oromo-based human rights organization. In 2001, an Ethiopian court acquitted its eight founding members of unsubstantiated charges of involvement in terrorist activity after they had been detained for three-and-a-half years. The government has refused to issue a license to the League.[280] As Oromos reported to The Advocates, the only operating national human rights organization in

---

[276] ICCPR *infra* note 377, at art. 22.
[277] *Ethiopia Imposes Aid Agency Curbs*, Jan. 6, 2009, BBC, *available at* http://news.bbc.co.uk/2/hi/africa/7814145.stm
[278] *Id.*
[279] *Mecha Tulema Association Loses License to Operate*, ADDIS TRIB., July 23, 2004.
[280] Letter from Peter Takirambudde, Executive Director, Human Rights Watch's Africa Division, to Meles Zenawi, Prime Minister of Ethiopia (Sept. 8, 2004), *available at* http://hrw.org/english/docs/2004/09/07/ethiop9320.htm.

Ethiopia is EHRCO, the Ethiopia Human Rights Council, but limited resources and government restrictions keep many human rights abuses out of the international spotlight.

### b.   ALLEGED ASSOCIATION WITH OLF MEMBERS

The Advocates interviewed an Oromo man from Gimbi, a town in the western part of Ethiopia, who experienced the Ethiopian government's violation of rights to assembly and association. In the mid-1970s, the *Derg* nationalized his property, which included a coffee plantation and a pharmacy. He then moved to Addis Ababa where he opened another pharmacy, hoping to make a life for himself and his family. Soon thereafter, government officials began making visits to his pharmacy. One official later circulated a letter to local medicine distributors instructing them not to sell medicine to him or any other Oromos. Ethiopian officials claimed that the medicine he bought from his distributors was later sold to the OLF. Eventually, he was forced to close his drugstore. 25:1.

> *In July 2001, as the result of the [government's] political suspicions [of my involvement with the OLF], I was demoted and transferred . . . and put under daily surveillance of the government security agents. The security agents were strictly following my daily activities and interactions with people. I was practically on detention reporting many times to the security office.*
>
> Male Oromo Asylum Seeker, 61:5.

After not being able to reopen his pharmacy, the government began following him—waiting for him to return from his job, tracking his movements in town, and surrounding his home at night. On one occasion, an armed official opened his car door, at which point the interviewee told The Advocates that he expected to be killed. He was threatened with arrest, imprisonment, or death. He was then instructed to leave his home or be killed. 25:1. The government suspected him of harboring OLF members in his home, yet he claims he had no contact with the OLF or any idea where they were located.

This story is not unique. Oromos living in the United States reported to The Advocates widespread surveillance and collective punishment of those believed to be members or sympathizers of the OLF. An Oromo in Minnesota returned to Ethiopia in 2004. He told The Advocates that in December 2004, around Christmas, he was celebrating with friends, teachers, and doctors. All of the people who were with him were arrested the next day on allegations of supporting the OLF. 10:2.

Interviewees told The Advocates that local government units, including the *kebele* (neighborhood) and *woreda* (district), are used to suppress political dissent and the free association and assembly of Oromos. An Oromo from Arsi, who has been involved with Oromo political organizations, reported, "The government has an elaborate security structure. A village has 500-2000 people. There are 20 people in that group that, because of poverty and unemployment, will tell the OPDO at the village level of any suspicious activity." 28:5. Another Oromo woman recalled that when a female leader of the *kebele* where she grew up did not attend a meeting, the leader was later targeted by other members in the *kebele* who told her that if she did not participate, they would assume that she was working with the OLF. 30:4.

In addition, an Oromo educator reported that Oromos are forced to join peasant associations to show their allegiance to the government. He mentioned, "They have meetings, issue propaganda, charge taxes, brainwash the peasants, report on OLF activities, and so on. These organizations are put together to monitor and control the people. If a peasant doesn't join such an organization, they can lose their land." 22:6.

One local male Oromo community member and professional reported that the Ethiopian security forces use scare tactics to warn farmers against harboring OLF guerrillas. "The situation is getting worse," he said, "[w]hile the TPLF started by focusing only on OLF members, now they are attacking sympathizers of the OLF, including students and farmers." 2:3. He added  that "[o]ne farmer was arrested and [later] hung in the marketplace." 2:3. A soldier stationed there told other farmers that their fate would be the same if they chose to shelter anyone working with the OLF. 2:3.

## 2.   INTERFERENCE WITH PRIVACY, MOVEMENT, AND PROPERTY

International law prohibits arbitrary or unlawful interference with his privacy, family, or correspondence.[281] In addition, international law guarantees that everyone within the territory have the right to liberty of movement and freedom to choose his residence.[282] Oromos reported widespread belief and experiences of being followed and having correspondence or other communication monitored. Nearly every person interviewed reported a belief that all telephone calls to Ethiopia are monitored.

> *"No one shall be subjected to arbitrary or unlawful interference with his privacy, family, home or correspondence…."*
>
> Art. 17(1), International Covenant on Civil and Political Rights.

### a.   SURVEILLANCE AND MONITORING

An Oromo who now resides in Germany reported that families are spied on and no one is sure who is safe. He indicated "this has made the young especially scared." 6:1. An Oromo woman in Minnesota returned to Ethiopia to visit her father in April 2004. She experienced monitoring and surveillance while she was videotaping in the town in Western Wollega where she grew up:

> Two police followed me. They said, "We want to talk to you. We'll take you to the station." I asked, "Why are you taking me there?" They said that I needed permission to take the video. I told them that this is where I grew up and the pictures were memorable. I didn't know that we needed permission. They said that it was forbidden. I started to follow them. I took two steps, but something told me not to go. I told them, "Sorry, I'm not going with you." They said something like they were going to hold me responsible. It was a market day, and there were people standing by when I refused. Everybody was talking about it. I shamed the police. They were praising God.

---

[281] ICCPR *infra* note 377, at art. 17(1).
[282] *Id.* at art. 12.

They said that they wished they had the right to do that. The police "push us around and mistreat us." They were helpless. They came and told me that. 54:6.

While this Oromo woman reported that she was followed by the police, interviews revealed that civilian spies are widely thought to be the source of most surveillance. Some Oromos reported a belief that the Ethiopian government recruits vulnerable young people, such as students who have dropped out of school, unemployed youth, or impoverished Oromos to conduct such surveillance. Because of their economic disadvantage, it is believed that the Ethiopian government finds it easier to hire them for such purposes. 32:1. An Oromo man reported to The Advocates: "They live in small towns and are in charge of groups of houses, passing along information [through] a network of government agents." 21:5. He further reported, "These secret agents are often Oromo, but sometimes other [ethnic groups], too. They hand over lists of suspicious activities, and then people get arrested." 21:5. He also reported that people know who many of the "secret agents" are because they are not visibly employed or visibly working, but have inordinate amounts of money compared to their peers. 21:5. One Oromo man noted that the spies "could be beggars, shoe polishers, anyone." 15:9.

An Oromo woman who runs a non-profit noted that government observers constantly monitor and interfere with her organization. She reported that the undercover spies could be identified:

> They are not in uniforms; you know them by their questions. Sometimes they come officially. They are specially trained advocates, from perhaps one or the other department of the government, like the Education Ministry or the Agriculture Ministry. They come and talk, to ask political questions, who our funders are, and other threatening words. Most of the time they are Oromos who work for the government. 57:5.

> The Oromo woman who returned to Ethiopia in 2004 reported to The Advocates:
> What I saw in Wollega was a big change everywhere—in the countryside and the cities. Much of the oppression is going on under cover. People who watch you are everywhere. It was the same as during the Communist regime. There are more spies now, but you don't know who's who—Oromo, Amhara, or Tigray. 54:5.

The presence of undercover civilian spies is so marked that many of the Oromos living in the Twin Cities reported their belief that people working for the Ethiopian government are living and operating in Minnesota. An Oromo student reported, "There are spies here in Minnesota that keep watch because [diaspora] Oromos are most populous in North America. I don't know what they do." 44:6. One Oromo, who has been in the United States since the early 1970s, told The Advocates that some Ethiopians came to his house in North Minneapolis in order to find out whether it was an "OLF office." Apparently there were rumors circulating in Ethiopia that he was involved with the OLF and provided shelter to its members. 10:2. As a result of that encounter, he has been cautious in his activities, especially during his limited travel to Ethiopia.

Many interviewees expressed fear when asked to provide identifying information in an interview. They believed that the safety and security of their friends and family still living in Ethiopia or neighboring countries would be compromised, should any of the information be shared with the Ethiopian government. According to one interviewee, the Ethiopian government would be able to find out the names of the people who participate in

interviews for this report, and as a result, spoke of conditions in Ethiopia in general terms so friends and family "back home" in Oromia would not be endangered. 15:1.

A private attorney in Minnesota, who represented an Oromo client *pro bono* in her application for asylum in 1993, told The Advocates that the fear of authority from her client's experiences in Ethiopia affected the attorney-client relationship and the development of their case.

> Fear ran through the interview process. I was, in her mind, an extension of the government and was helping with a government process. She came to trust me and could distinguish that I was not an arm of the government. She wanted it clear that her information would not get out anywhere. She was hyper-concerned and didn't want to hurt people back in the country. 62:3.

In reflecting on the case in mid-2005, the attorney told The Advocates, "It surfaced my own biases. My reaction was that this was extreme." 62:3. Her client was found to be credible and was granted asylum, and she noted that such a case so early in her legal career has stayed with her.

The Advocates interviewed many Oromos who spoke of being followed, spied on, and harassed while traveling and also commented on the onerous requirement to report all internal Ethiopian movements to the government. Such reports are corroborated by a 2005 Human Rights Watch report.[283]

### b.  MONITORING OF COMMUNICATION AND CORRESPONDENCE

Many Oromos reported to The Advocates that the government monitors their phone lines, e-mail, and other forms of communication. Nearly everyone interviewed spoke of phone lines being tapped, e-mail exchanges being delayed by several days and carefully monitored, the need to communicate in code with family members, and the general sense that conversations in Ethiopia are never private.

A young Oromo leader in Minnesota told The Advocates that she and her family find it difficult to talk with relatives in Addis Ababa and Oromia's countryside because of fear that the phones are tapped. 3:2. An Oromo scientist told The Advocates, "I usually keep in touch with my family in Ethiopia mainly by phone, but it's superficial because the phones are monitored by the government. Even e-mail and the post office are monitored, so any communication with my family is mainly casual." 12:2. Another Oromo scientist reported, "[s]ometimes it's hard to talk on the telephone because the government may monitor the conversation." 15:9. Another interviewee reported that the government started to block calls from the United States and Europe in early 2008. 63:15.

An Oromo professional keeps informed about the current human rights situation in Oromia with a contact there once a month. They do not exchange e-mail because it is monitored. Instead, they speak in code. 2:4. Another Oromo in Minnesota, whose father was killed under the *Derg* and whose two brothers have been imprisoned under the current regime, told The Advocates that he cannot discuss current conditions, including the safety and whereabouts of his siblings, with his mother "for fear of others having access to our conversations." 33:3. He added that "if I write a letter or send a document, I don't include anything political." 33:4.

---

[283] *Suppressing Dissent*, *supra* note 17.

A young Oromo woman keeps in touch with her mother in Kenya and relatives in Ethiopia by phone, "[b]ut I don't go into detail. I'm scared for them, not myself. I only ask, 'How are you?' I don't get into political particulars with them on the phone." 34:2. An Oromo man who settled in Norway as a refugee reported that he keeps in contact with his sister and friends in Oromia. "We don't talk about politics or the Oromo problem on the phone. We just talk about life and other problems, and I understand things indirectly." 59:4. An Oromo religious leader reported "[i]t is very difficult to get correct information when you are away because if we call, people say nothing about the situation of the country. We ask how the country is, and you can't get any hint." 47:6.

Another Oromo woman reported that her son was involved in the January 2004 protests at Addis Ababa University (AAU). She was cautious with what she discussed with him on the phone because of her belief that the phones are tapped. 18:2. Some Oromos have been asked about the particulars of their phone conversations while in prison. An Oromo woman reported the difficulty with communicating by e-mail. "I have a friend, and we e-mail. But you receive her e-mail from Ethiopia after four-to-five days. Especially if it's from a government office. Hotmail is better. But somebody reads the e-mail." 36:3. She reported that an Oromo student was scheduled to come to the United States on a diversity visa, but he was arrested by the Ethiopian government while boarding the plane. "I know because there was a person waiting for him here [in Minnesota.] They arrested him, and they read his e-mail and interpreted it how they wanted. They say, 'This means this.'" 36:3. In addition, some Oromos who have been imprisoned were given copies of their own e-mail correspondence. An Oromo woman reported that her nephew had e-mails from his family intercepted by the police and was shown copies of them while in jail. 18:2.

An Oromo man in Minnesota who helped found the Oromo-American Citizen Council (OACC) in 2002 reported that their agency's website, http://www.oromoamerican.org, had been blocked in Ethiopia. 4:2. The OACC, based in St. Paul, Minnesota, works to expose human rights abuses against Oromos and to mobilize and empower Oromos to represent their concerns in the American political system. 15:11. The OACC reported that in 2005, their website could be accessed in Ethiopia.

### c.   INFRINGEMENT OF FREEDOM OF MOVEMENT

Oromo community members reported the Ethiopian government's surveillance of movement within the country. One Oromo man, who left Ethiopia in the early 1970s before the Communist government came to power, reported to The Advocates that he was never harassed by the government or tortured. 10:1. Since he left and became a U.S. citizen, however, he has twice returned to Ethiopia. In 1993, he returned home to visit his mother. He indicated that he had been warned that he would be never harassed by the government or tortured. 10:1. Since he left and became a U.S. citizen, however, he has twice returned to Ethiopia. In 1993, he returned home to visit his mother. He indicated that he had been warned that he would be followed, and,

> *"Everyone lawfully within the territory of a State shall, within that territory, have the right to liberty of movement and freedom to choose his residence."*
>
> Art. 12(1), International Covenant on Civil and Political Rights.

indeed, he was. While in his mother's house in rural Oromia, a young man who he did not know requested that he take his photo while holding an Oromo flag. While his picture was being taken, he saw two young men outside the house watching, with a gun pointing directly at him. He suspected the government had sent them. He continued to see the same two people throughout the towns he visited during that trip. 10:2.

In 2004, while visiting his mother at the hospital, two men who he suspected of being government spies followed him and his wife. When his wife turned to take their picture, the two men fled. Nevertheless, he and his wife were so frightened for their own safety that they checked out of their hotel room that night. 10:2; 11:3.

An Oromo who worked for the Ministry of Finance during the transitional government would travel to his hometown in southern Oromia during the weekends. He reported to The Advocates that in 1992, "the Minister of Finance approached me and said, 'If you don't stop going to the south part of Oromo land every weekend, we will not be blamed if you are shot.'" 55:1. The interviewee explained that without another option, he kept working and stopped going home on the weekends. When he did go home, he would always bring someone along so he would not be traveling alone. 55:1.

> Interviewees also reported difficulty leaving Ethiopia, in violation of Article 12(2) of the International Covenant on Civil and Political Rights, which guarantees that "[e]veryone shall be free to leave any country, including his own. Ethiopians must obtain an exit visa prior to departing Ethiopia. Exit visas must be obtained from the local *kebele* office.

An Oromo man who was granted asylum in the early 2000s reported, "Traveling is easy, but it becomes tough once you mention you are Oromo." 16:3. He worked as an agronomist for an American-owned company and reported having to check in periodically at police stations. 16:3. An Oromo woman told The Advocates about her nephew, who is currently in hiding in Addis Ababa. If his mother and wife go to see him, they give a false reason to the *kebele*. 18:1. She informed The Advocates that they have to report their movement to government officials at the *kebele* level as Oromo face "more and more restrictions on travel." 18:1.

Oromos reported difficulty in travel not just to visit family, but to conduct business as well. An Oromo businessman reported that Oromos are "asked many detailed questions when traveling around Ethiopia. This is ordered by the government." 25:3. He attributed this to increased regulation at the local—*woreda* and *kebele*—level. 25:3.

An Oromo elder who came to the United States in 1998 reported, "[t]he situation is very bad right now. The countryside has markets on certain days in certain areas. The government has restricted people from moving around to different markets and villages. The people need permission from the local government to visit other local areas. This is something new." 21:3. He also reported that the government wants to restrict people's movement within Oromo areas because of "fear and suspicion by the government of the OLF." 21:3.

### d.   SEARCH AND SEIZURE OF PROPERTY

Several interviewees reported that personal property had been searched and seized, often including their homes. One Oromo professional noted that during the *Derg* regime, his house was searched and his property confiscated. 12:2. Another woman learned from her husband and children that the Ethiopian government searched her house and took her property after she left Ethiopia to seek asylum in the United States in 1990. 37:3.

Oromos have reported that such activity has continued during the current regime. An Oromo scientist who received asylum in the United States reported an incident that occurred in 1993:

46

> I heard a window crashing in my house. There was no light—sometimes the light goes out in our country—so it was pitch dark, and we heard this noise. We got up and there were people trying to get into the house. The room in which they entered was empty, it was quiet, and then we had to shout for help. Then we saw the glimpse of the Tigrayan soldiers running away. And since then I can't sleep. Even now [if] I hear anything in my house. Even though it is perfectly safe here [in Minnesota], I can't sleep. 20:8.

He reported that he is seeking treatment to deal with his post-traumatic stress.

The night seemed to be a common time for the government to come to one's home. An Oromo who was accused of supporting the OLF reported, "[t]he [TPLF] came in the middle of the night. They broke my door, and my wife and children started crying. They started searching the house and took whatever they thought was valuable. They opened my closet and took 7,000 Birr and my wife's jewelry." 49:1. The TPLF then asked if he had any weapons and arrested him.

An Oromo man reported that government security forces searched his house in 1993, accusing him of participating in OLF political activity. The government seized video tapes, manuscripts, and other articles from his home without a warrant. 39:1.

One Oromo woman in Minnesota described her family's experience in Ethiopia. When she was a child, the *Derg* regime arrested and imprisoned her mother for alleged participation and membership in the OLF. Her mother eventually escaped from prison and walked for 15 days to Djibouti. After her mother's escape, the Ethiopian government frequently searched and constantly surveilled her aunt's house, where the interviewee was staying. 36:1.

After the transitional government was established, the woman told The Advocates that everyone believed life would improve. Her mother returned to Ethiopia to participate in the government's formation. But she says that as the first election grew near, Oromos were suddenly being killed and imprisoned with an alarming frequency. In 1994, several government officials again searched their house in the middle of the night. "They took whatever they [saw] in Oromiffa. Now I don't have any documents. They took school documents, letters, my aunt's documents, my mom's." 36:2. The government asked the woman if she knew any of the OLF members who had fought with her mother. They asked her where those people were now and about who visited and contacted the home. She reported that the government tapped her phone and arrested her aunt, who was never a member of the OLF. Her aunt was imprisoned for three months, tortured, and then released without any legal process. She died within a year of her release.

Interviewees even reported to The Advocates that the Ethiopian government would instruct other cooperating governments to search Oromo property. For example, an Oromo student in Minnesota described his parents' involvement with Oromo political causes in Djibouti during the transitional government. He reported that the Ethiopian government would send Djibouti policemen to raid their house. 44:2.

### 3.   RESTRICTION OF FREEDOM OF THE PRESS

Despite the Ethiopian government's stated commitment to the principles of a free press and expression, the government generally restricts the flow of information and ideas within the nation.[284] The International Press Institute reports a number of restrictions on the press, and documents several instances of human rights violations involving journalists.[285] The press' access to the executive, legislative, and judicial branches of the government is severely restricted, and journalists who attempt to obtain such access are subject to intimidation and harassment by the government.[286] The government routinely refuses to respond to inquiries from the private press and generally only cooperates with the government-run Ethiopian news agency. Moreover, new legislation has expanded government control of the media.[287] In 2003, the Ethiopian government banned the only independent journalists' and editors' organization in the nation, the Ethiopian Free Press Journalists Association.[288]

> *How can I write? I won't write which supports the government. If you don't support the government, there is fear to [publish] any information against the government. There is no press freedom . . . That's part of the problem.*
>
> Oromo journalism student at AAU who came to the United States in 2003, 35:7.

While the Ethiopian government refuses to allow the press the access it needs to promote transparency, it is the government's actual persecution of press members which is most alarming. 36:5. One Oromo woman currently working in Oromia told The Advocates, "[a]s far as you report the truth, you will be in prison. If you are a journalist, that is your life, in and out of prison. Some disappear, and nobody knows where they are." 57:2-3. Another interviewee summarized the current situation: "There is no independent press in Ethiopia now. . . . [The Oromos] are totally denied their freedom of expression." 62:9.

One Oromo woman, who was granted asylum in the United States based on her persecution as an Oromo and a journalist, told The Advocates about her experiences. She worked for 11 years, covering women's issues for a government-owned radio program under the *Derg.* "They would tell the stories, and then they ma[d]e us translate from Amharic." 37:2. In discussing what she described as "the *Derg*'s propaganda," she disclosed, "[b]asically, I was just being a mouthpiece. I didn't have the right or flexibility to talk about what was going on. As a journalist, I didn't have that freedom. . . . It wasn't objective at all." 37:1. She and a group of journalists would keep various things to themselves, fearful that another journalist or government operative might report them.

> We don't trust each other, and so there isn't that freedom to [speak the truth]. It's just a given that you have to do what they tell you to do. . . . One time I was interrogated and actually I told them that I am an Oromo journalist, and the [government] even questioned how I got permission to come to that area, even though it [was] an Oromo-speaking area. 37:2.

---

[284] *See, e.g.*, Human Rights Watch, *Ethiopia: Stop Harassing Journalists' Group*, (Feb. 13, 2004) (noting "[t]he private press in Ethiopia leads a precarious existence. Reporters, editors and publishers are frequently arrested and convicted for criminal defamation and disseminating false information on the basis of articles they have written or published").

[285] Int'l Press Inst., *IPI Watch List*, www.freemedia.at/cms/ipi/watchlist.html, (reporting that Ethiopia is one of only six countries on the International Press Institute's Watch List).

[286] *2007 Ethiopia Report, supra* note 272, at § 2a.

[287] *Id.*

[288] Int'l Press Inst., *supra* note 285.

She experienced such treatment multiple times while on assignment. This journalist was able to leave the country just as the TPLF-led government was coming to power. She reported that many of her colleagues have since been fired and several imprisoned. A couple of them have died, while others were able to leave the country. 37:3.

Another female Oromo journalist reported experiencing government restrictions when she worked for Christian radio under the *Derg*. She told The Advocates, "[t]he program that we wrote started to be monitored, and then it was censored before we were allowed to put it on the radio. Then instead of writing our own program, we would translate the government's message into Oromo from Amharic. Everything was geared toward the Communist interests." 54:1. Unable to comply with the government's requirements to censor, she reported, "I actually left out everything against the Church. I omitted it. I just didn't translate it. Thank God nothing happened to me. Nobody found out." 54:1-2. After several altercations with the police and her growing concern of, "[h]ow am I going to survive before the police come and get me?" 54:1, she was able to leave Ethiopia in 1979 and secure asylum in the United States in 1992.

The overthrow of the *Derg* initially provided hope among the Oromos for a free and independent press, but such hope was frustrated by the actions of the present government. Interviewees expressed concern about the number of Oromo newspapers that the government has shut down. 23:3; 35:7. One interviewee reported that a newspaper, whose editor was charged by the government, has continued to operate underground, but those who attempt to procure the newspaper may face persecution. 40:3. An Oromo living in Germany told The Advocates that access to and control of information is the government's most powerful weapon. He reported that there are newspapers that are critical of the government, but they would never be available outside of Addis Ababa. If one were caught trying to smuggle the paper out, he or she would be imprisoned. 6:3.

One AAU student, who was studying journalism from 2000 to 2003, reported to The Advocates that he could not write freely and exercised self-censorship. 35:7. An American journalist who covered Oromo human rights issues complained about firsthand experiences with Ethiopia's repressive government and its limitations of the press while reporting in Kenya and Tanzania in the late 1990s and again in 2005 and 2006. 5:1. Along with this American journalist, a number of Oromos expressed frustration with the Ethiopian government's tight control over the media. Several individuals corroborate reports documenting harassment and persecution of journalists. These reports are further corroborated by the many Oromo journalists who have fled the country. 12:3; 21:6; 35:7; 53:8; 57:3. The journalists of *Urji*, a pro-Oromo weekly publication, were imprisoned after they contradicted an official statement that three men killed by security forces were connected to the OLF.[289] "The main victims," explained the Oromo journalism student, "are the journalists [and] intellectuals. They want to report fairly, but the government doesn't want that." 35:7.

One report found that the Ethiopian government "continued to prosecute journalists and editors" in clear violation of the free speech and free press guarantees set out in the Constitution and other prevailing law.[290] The report noted that police "harassed, beat and detained journalists during the year" and discussed several arrests of members of the Oromo press. Chief among these was the April 2004 arrest and detention of Debassa Wakjira

---

[289] Reporters Sans Frontières, Release of Two Journalists Detained Since 1997: Reporters Sans Frontières Calls for the Release of Three Journalists Still in Jail (May 23, 2001) (describing how the authorities claimed that the reporters, published in *Urji* had contradicted an official statement that three men killed by the security forces in October 1997 belonged to the OLF and were involved in attacks at this movement. *Urji* claimed that the three men were indeed Oromos but did not belong to the OLF).

[290] *2007 Ethiopia Report, supra* note 272, at § 2a.

and Shiferaw Ansermu, two journalists with the Oromo Service of Ethiopian Television. The arrests were allegedly based on the passing of information to rebels, although the journalists have denied such allegations.[291]

In addition, in March 2004, Ethiopian police beat and abused Atnafu Alemayehu, the Deputy Editor-in-Chief of Oromia's *Tobia* after Mr. Alemayehu made journalistic inquiries into the demolition of several Oromo citizens' houses. He was eventually released after posting bail, however, his later appeals concerning his physical mistreatment and the confiscation of his tape recorder were to no avail.[292] The Editor-in-Chief of *Seife Nebelbal*, the Amharic-language weekly on Oromo affairs, was charged at the Federal High Court for publishing a poem viewed by the prosecutor as "inciting violence among the public to secede from a region that is established by constitutional order" after publishing an editorial defending the rights of the Oromo ethnic group to self-determination.[293] In all, since the beginning of 2004, at least twelve Oromo journalists have fled Ethiopia to the safety of neighboring countries.[294] 12:3. Although 15 incarcerated journalists were released in 2007, journalists have been detained on false charges as recently as September 2009.[295] *Urji* and *Seife Nebelbal* were the only two Oromo independent newspapers that existed in the country. Both were banned. 67:01

In addition to its direct abuse and intimidation of journalists, the Ethiopian government has continued to strictly enforce the harsh measures set out in the Press Proclamation statute of 1992, which enabled the government to criminally punish journalists under the guise of preventing defamation.[296] Debate has raged over the "Draft Press Law," a series of proposed measures designed to further quell challenges from the press. As one Oromo religious leader reported to The Advocates, "the proposed Press Law gives the government more control." 6:3. The law provides for the outright "jailing of journalists who make reporting errors, allows the government to confiscate foreign newspapers entering the country and gives the authorities 30 days to answer journalists' questions."[297]

The law also sets out a number of bureaucratic "hoops" journalists must jump through before engaging in their profession, including onerous registration, certification, and licensing requirements. Media outlets that seek proper licensing must provide the government with extensive professional and personnel information concerning its journalists. These measures have inevitably led to a chilling effect in the media, and fearful journalists have routinely practiced self-censorship.[298] While the government defends the law,[299] director of the International Press Institute Johann P. Fritz stated, "the media law is trying to impose a statutory code on journalists and editors with threat of fines and imprisonment for those who fail to meet its requirements. In effect, the new law will allow the government to control the independent media in Ethiopia."[300]

The Ethiopian government controls all broadcast media and, most notably, all radio and television outlets. Although the law assumes the existence of private radio stations, in reality, none exist.[301] One interviewee

---

[291] *Id.*; Int'l Press Inst., Update, May 2005; Comm. to Protect Journalists, *Attacks on the Press 2004: Ethiopia.*
[292] *2007 Ethiopia Report, supra* note 272, at § 2a.
[293] *Id.*; Comm. to Protect Journalists, *Attacks on the Press 2004: Ethiopia,* 2004.
[294] Int'l Press Inst., Update, May 2005.
[295] *See* Reporters Sans Frontières, Ethiopia/Two journalists get one-year jail terms under obsolete law, Sept. 4, 2009, *available at* www.rsf.org/Two-journalists-get-one-year-jail.html. *See also* Int'l Press Institute, Update, June 2008; Int'l Press Inst., Update, Nov. 2007.
[296] Comm. To Protect Journalist, *Attacks on the Press 2003: Ethiopia.* Ethiopia Media Brief, http://www.stanhopecentre.org.
[297] *See* David Dadge, *Comments on the Ethiopian Draft Press Law,* INT'L PRESS INST., Dec. 2003.
[298] David Dodge, *The Road Not Taken,* Sept. 2004.
[299] *See, e.g., Ethiopia: Minister Defends New Press Law,* IRIN, Oct. 22, 2003.
[300] IFJ and IPI Condemn Suspension of Independent Journalists' Association EFJA, Int'l Freedom of Expression Exchange, Dec. 5, 2003.
[301] The Ethiopian Broadcasting Authority granted the first-ever licenses to two private commercial FM radio operators in February 2006. Zami Public Connections, Tinsae Fine Arts and Adei Promotions received licenses; bids submitted by other companies were rejected. *Broadcasting Authority Licenses First Private Radio Operators,* THE REPORTER (Addis Ababa, Ethiopia), Feb. 11, 2006.

explained that, in addition to the importance of a free press with available sources in written and spoken Oromiffa, "only 35 percent of the country can read. Therefore, access to radio in the Oromo language is important." 6:3. The interviewee voiced significant concern to The Advocates that Prime Minister Meles Zenawi accused Voice of America and the German Deutsche Welle radio stations of being "mouthpieces" of the opposition which were "destabilizing the peace and stability of the country."[302] Thus, no independent radio stations operated in Ethiopia from 2004 to 2007, and the government-run Radio Ethiopia served as the sole radio entity. In 2007, a private radio station, Sherger Radio, began broadcasting, but is reported to be under severe self-censorship.[303] With respect to television, the country's broadcasting law prohibits political, religious, and foreign organizations from owning broadcast stations.[304] The government operates the sole television station in the country and exercises tight control over news broadcasts.

### C.  REPRESSION IN THE SCHOOLS AND UNIVERSITIES

More than 80 percent of the Oromos interviewed by The Advocates discussed concerns about academic freedom issues. Those concerns included unequal access to education, and the civil and political rights implicated through government-sponsored violence against teachers and students as alleged OLF members or supporters. Given the numerous reports of arrest, torture, and killings in response to peaceful student protests and ongoing language and cultural repression, it is not surprising that Oromos widely perceive that, "the more [they] appear to be educated, the more they are targeted by the government." 12:2-3.

#### 1.  HUMAN RIGHTS VIOLATIONS AGAINST OROMO TEACHERS

Ethiopia has a history of widespread surveillance, harassment, firings, detention, beatings, torture, disappearances, and killings of students and teachers suspected of supporting the OLF.[305]  Arrests of students and teachers have continued, and freedoms of speech, expression, and assembly are frequently restricted on high school and university campuses.[306] The government does not permit teachers at any level to deviate from official lesson plans and discourages political activity and association of any kind on university campuses.[307] Several interviews conducted by The Advocates echo these findings, giving accounts of teacher termination (and often arrest) based on the government's suspicion of OLF involvement. 1:1; 20:15; 22:1; 33:3; 46:8.

Under the Derg, teachers were prohibited from teaching in the Oromo language. One Oromo in Minnesota, who was granted asylum in the U.S., reported that speaking Oromo, or any other language in school other than Amharic, was prohibited for students and teachers when he was in high school under the *Derg*. He described how, when he moved to Addis Ababa in 1982 for higher education, he "observed that the Oromo were laughed at and ridiculed either for speaking the Oromo language or for not fluently speaking Amharic, the language of the ruling Amhara nation." 61: Supp. 1.

---

[302] *IPI Worried by Ethiopian Prime Minister's Comments on Private Media,* INT'L PRESS INST., Nov. 8, 2005, *available at* http://www.freemedia.at/cms/ipi/statements_detail.html?ctxid=CH0055&docid=CMS1144234575647&year=2005.
[303] INT'L PRESS INST., Update, June 2008.
[304] *2007 Ethiopia Report, supra* note 272, at § 2a.
[305] *See* U.S. Dep't of State, 2004 Country Reports on Human Rights Practices, Ethiopia (Feb. 28, 2005) [hereinafter *2004 Ethiopia Report*].
[306] *See 2007 Ethiopia Report,* supra note 272, at § 2.
[307] *Id.* at § 2(a).

According to one university student who fled Ethiopia in May 2003, both his history and chemistry teachers were arrested, with one beaten for giving lectures in Oromiffa to students who did not understand English. 45:4-5. In addition, this student reported that these two teachers appeared to have good relationships with their students, which resulted in the government accusing them of influencing their students to follow the OLF. 45:4-5. The student also noted that, generally, the well-liked and "good teachers" were targeted. 45:4.

There have also been reports that teachers are being monitored by both government officials and students paid by the government to report on teachers who are diverging from government policy. One Oromo woman still living and teaching in Ethiopia, who was interviewed during a trip to Minnesota, reported to The Advocates that government officials come to the schools and hold meetings with students to find out what the teachers are teaching in the classroom. 57:2. They also reportedly inspect and survey teachers' e-mail, regular paper mail, and telephone calls. 57:2. This woman noted what several others have reported: to work in a government school a teacher must be a member of the OPDO. 57:2. Another interviewee, an American with a non-profit organization serving Ethiopia, reported that those teachers who are not OPDO members do not get raises or promotions, and that many teachers claim to be OPDO supporters to avoid discrimination. 11:2. One interviewee, whose brother is a coordinator of an Ethiopian school, reported that because his brother is not a member of the OPDO he has been interrogated through the night. This interviewee, who currently lives in Minnesota, encouraged his brother to join the OPDO just so that he would not be killed. 53:7. "I tell him, 'Be a member [of OPDO]. Just live.' We can do nothing from here [in the U.S.]." 53:7.

When the OPDO has "evaluations with Oromo employees, such as teachers and healthcare workers, they ask in the evaluation to tell about yourself. Then they decide if that person is with the OLF. They also ask whether the person supports the OLF. It becomes an interrogation at the job evaluation." 53:5.

One interviewee described the result of so many Oromo teachers being persecuted: "The teachers died first. There are not very many Oromo intellectuals left." 24:2. This interviewee reported he was only able to go to school through the eighth grade in Ethiopia before a government assassination attempt on his life forced him to Somalia in the early 1980s. Several interviewees relayed stories of teachers who were "disappeared" and ultimately killed by the government. For example, one interviewee, an Oromo graduate of an agricultural college in Oromia, related the story of his Oromo friend who was an elementary school teacher in Wollega. This friend was abducted from a hospital in 1996 by unknown persons and ultimately killed. Before his abduction, the friend said that the "government is going to kill me, I know, sooner or later. If I'm killed, tell people I'm killed because of the Oromo cause." 16:3.

Another interviewee spoke of his older brother, a teacher and active OLF member, who was detained by the EPRDF in 1992 and, despite a letter-writing campaign by Amnesty International, has been missing ever since. 22:1. This interviewee also described the killing of the ETA's leader, Assefa Maru, by government officials, who used a Land Rover donated by the British to accomplish the murder. 22:7. Another Oromo professional noted that an Oromo college president was kidnapped and detained for three to four years. 12:2-3.

Human Rights Watch also reported that teachers who joined student demonstrations were beaten by military and police personnel as the police attempted to rush demonstrations in Ambo, Nekemte, Jimma, Dembi Dolo, and other Ethiopian towns following the January 2004 dismissal of over 300 AAU students.[308] Amnesty International

---

[308] *Suppressing Dissent, supra* note 17.

reported the same events occurring between January and April 2004, noting that in some places police used live ammunition to disperse demonstrators, which included teachers. Some students were killed and others, including teachers, were detained for several months, beaten, and tortured.[309] The U.S. State Department reported similar incidents occurring in 2003, including the beating and detention of protesting students and teachers, specifically noting that no action against security forces occurred for the March 2003 beating of a teacher in Addis Ababa.[310]

## 2. SUPPRESSION OF ACADEMIC AND EMPLOYMENT OPPORTUNITIES

"The elite are no longer present in Oromia—they are either in jail, dead, or have fled." 22:6  Indeed, as one Oromo man with a Ph.D. noted, Ethiopia has lost a significant amount of its intellectual capital: "Over 100,000 have fled to other areas; they are from all walks of life. To South Africa, Australia, Minnesota, [and] Europe. They are among the best and brightest and examples of many who have done a lot for the country." 7:2. The end result of systematic repression is "a leadership vacuum. The [Oromos] need a leader with a vision, who is committed and convicted. It will be hard for the dynamic leader to come from within." 12:3.

One Oromo woman who fled to the U.S. in 1999 says that her family members in Ethiopia "are not able to get jobs . . . [they] face discrimination . . . [and] cannot speak their language and say anything about themselves. The government doesn't want them to be educated." 34:2. Using a variety of tactics, the Ethiopian government has imposed systematic repression of Oromo students both at the high school level and in the universities. This historic targeting of Oromo students, teachers, and academia has eliminated a large part Ethiopia's educated Oromo sector. An Oromo elder told The Advocates that under Haile Selassie the government did not want Oromos to go beyond fourth grade because "they would come back and fight for their land." 51:2. He was able to attend school through eighth grade and personally knew only one Oromo before the *Derg* came into power who had completed high school. According to an Oromo professional in Minnesota, "the government attempts to demoralize the Oromo by killing the elite, such as university students and professors. If the government prevents people from accessing education, they can rule . . . people without dissent." 2:2. He recalled seeing an Oromo man with a university diploma laid out in front of him on the ground begging for a job. 2:3.

Since 2000, students have been suspended, expelled, arrested, imprisoned, and tortured because of their attempts to exercise their rights of association, press, and speech. Although students of other ethnicities opposing government policies are also targeted, interviewees, NGOs, and the U.S. Department of State confirm that rights of Oromo students are particularly suppressed, in large part because of suspicions of OLF affiliation.[311] An Oromo religious leader told The Advocates that his older brother's son had his education interrupted and was given his final warning at AAU because of his involvement in student demonstrations. "He is a genius student, all As, in his fourth year in engineering, and he was chased away two times." 47:6. As one Oromo interviewee reported, "the government [is using] the OLF as an excuse in expelling students . . . who advocate for the cause and rights of the Oromo, which the government considers a crime." 21:3. One Oromo told The Advocates about the systematic nature of the government's persecution of Oromos:

> Oromo professionals have been leaving the country over the past ten years: many of its
> musicians are in Norway; lawyers are in Minneapolis. This is very costly to Ethiopia to lose all of

---

[309] Amnesty Int'l, ETHIOPIA REPORT, *Ethiopia* (2005).
[310] *2004 Ethiopia Report, supra* note 305.
[311] *Suppressing Dissent, supra* note 17.

its intellectuals. The Government has gotten rid of Oromo leaders by expelling them, torturing them, detaining them, or killing them. The majority of Oromos support the OLF, so all Oromos are suspected. Many Oromos sacrifice their own lives to uplift and support all of the people, but they are labeled as a terrorist organization, and they dehumanize them to get rid of them—which is equivalent to genocide. 22:2-3.

### 3.   Unequal Educational Opportunities

Interviewees displayed widespread concern for the right to practice their culture and to learn in their language on school campuses. At the same time, interviewees reported that the recent requirement that students in Oromia receive instruction in Oromiffa has led to fewer students gaining entrance to higher education, where fluency in

> *"There is a political-structural problem because the Oromo are marginalized; they have less opportunity for education and aren't allowed to serve their people." 22:6.*

Amharic is required. The Oromo diaspora reported a belief that the policy is part of the government's systematic goal to deny Oromos access to high school or college education.

While instruction throughout Oromia is now in Oromiffa, the governments of Haile Selassie and the *Derg* banned the Oromo language in schools. One Oromo who came to the U.S. in 2000, reported that when he was a child, he and other Oromo children were told to watch over each other, and "if anyone spoke Oromo, then he or she would be punished. Oromo language was banned in all the schools, and we were forced to speak Amharic, but this was very difficult for me because I felt that we should be allowed to practice our culture." 16:1. The Advocates frequently was told that the government has continued to use oppressive methods to target the use of Oromo culture and language as a sign of affiliation with the OLF.

The U.S. Department of State reported that in 1999, the Oromia regional government mandated "that all primary schools adopt Oromiffa as the language of instruction."[312] But, interviewees reported that teachers and students continued to face ongoing harassment for their use of Oromiffa. A student at AAU in 2001 reported that "if you speak the language, you are considered an enemy; they suspect you. They have their own spies who watch Oromo scholars' every step. In every region they collect information. If they catch you, they detain you." 35:6.

Students and teachers also appear to be facing harassment because of their use of the written language. Very young schoolchildren have been arrested for using an acronym for OLF, written in Afan Oromo or Oromiffa, on a school board or tattooed on their bodies. The Advocates interviewed many Oromos who were concerned about this issue. One man said he heard that the "government has been shooting high school students who wear tattoos about the OLF. They killed some and cut the breasts of others."[313] 22:3.

Language restrictions resulting in reduced access to education have been a primary concern for the Oromo who spoke with The Advocates. Several interviewees expressed frustration and alarm over unequal educational opportunities. One Oromo who came to Minnesota in 2002 stated:

---

[312] U.S. Dep't of State, 2001 Country Reports on Human Rights Practices, Ethiopia (Mar. 4, 2002) [hereinafter *2001 Ethiopia Report*].

[313] *Suppressing Dissent, supra* note 17 (reporting on the results of interviews with the parents of no less than 20 such children; each child had been under the age of 15 when imprisoned).

> [P]articular regions, like that of the Tigray, have the best teachers and materials. In Oromia, people are learning in their language, but there is no material supply. So we have the right to learn our language, but no access. As far as the future, there is not enough education and [Oromos] cannot compete. 53:2.

Several interviewees also reported the use of language in school entrance exams as a mode of restricting access to education for Oromos. One interviewee explained that "in Oromo areas, Oromo students must take a test in tenth grade which would allow them to finish high school and go to college" emphasizing that the "test is very difficult and few people pass it." 31:3. According to a report by Human Rights Watch, this test is part of a nationwide exam policy. The report states:

> Pursuant to national education policy, high school students must now take an examination in tenth grade to determine if they will continue on an academic track or shift to vocational schools. The majority of rural students fail the exam, effectively limiting their educational possibilities to vocational training.[314]

All students must take the exam in English, which often puts Oromo students at a significant disadvantage. An Oromo student who came to the U.S. in 2003 stated:

> Students are separated by language when they go to school. Oromo schools teach in Oromiffa, and [we] start learning English in ninth grade. Other schools start learning English when they are very young. The exam is in English, so the Oromo students have only had one year of English by the time they take the exam. They are at a disadvantage. All the test scores are compared to each other, so the Oromo students get lower scores. 45:3.

Many interviewees have noted that conditions for students are better in Addis Ababa than in rural regions of Ethiopia. Despite the fact that more than 85 percent of Ethiopia's population live in rural areas,[315] resources for education are directed to Addis Ababa and other large cities rather than to the rural areas. 31:3. Oromos account for an estimated 35-40 percent of the total population,[316] and since many Oromos live in rural areas, it is even more difficult for Oromos to access adequate education. According to the U.S. Department of State, there were "not enough schools to accommodate the country's youth, particularly in rural areas."[317] Despite obligations under regional and international treaties and the Constitution's requirement to provide education to all to the extent resources allow,[318] there were many reports of the lack of materials and resources for Oromo students. There were also reports on the perception of inadequate and unequal educational opportunities.

---

[314] Human Rights Watch, *Ethiopia: Lessons in Repression: Violations of Academic Freedom in Ethiopia*, Vol. 15, No. 2 (A) Jan. 2003 [hereinafter *Lessons in Repression*].
[315] *2004 Ethiopia Report, supra* note 305.
[316] *Id.*
[317] *Id.*
[318] *African [Banjul] Charter on Human & Peoples' Rights*, OAU Doc. CAB/LEG/67/3 rev. 5, art. 17, 21 I.L.M. 58 (1982); *African Charter on the Rights and Welfare of the Child*, OAU Doc. CAB/LEG/24.9/49, art. 11 (1990); ETH. CONST. ch. 10, art. 90.

### 4. OROMO STUDENT PROTESTS

The International Covenant on Civil and Political Rights provides that the right of peaceful assembly shall be recognized. No restrictions may be placed on the exercise of this right other than those imposed in conformity with the law and which are necessary in a democratic society in the interests of national security or public safety, public order, the protection of public health or morals or the protection of the rights and freedoms of others.[319] The Ethiopian government restricts the right of assembly and reacts harshly when protests erupt.

> *"The right of peaceful assembly shall be recognized. No restrictions may be placed on the exercise of this right other than those imposed in conformity with the law and which are necessary in a democratic society in the interests of national security or public safety, public order (ordre public), the protection of public health or morals or the protection of the rights and freedoms of others"*
>
> Art. 21, International Covenant on Civil and Political Rights.

High school and university students have protested government policy. Growing tensions at AAU resulted in massive student strikes in April 2001, which then triggered protests of high school and university students around the country. The university administration had inadequately responded to students' demands for their rights to publish a student newspaper, to organize a student union, and for the armed police to be removed from campus.[320] Government forces violently repressed demonstrations over the course of the month, killing more than 40 demonstrators,[321] arresting more than 5,000 students,[322] and brutally dispersing the rest. The Advocates interviewed a young man who was a student at AAU and participated in a demonstration on April 11, 2001. He was so severely beaten on his head with a police stick that he could not hear or see normally for two weeks and believes the trauma he suffered has psychologically affected him. 35:2-3. Solidarity protests occurred at Mekele University in Tigray and at universities and colleges in Jimma, Bahir Dar, and Awassa in Oromia, as well as at high schools throughout the country. Credible accounts report that the police also responded with excessive brutality.[323] Many students involved in the demonstrations did not return to the university for one year. Although Oromo students were not the only students targeted by the government forces during these harsh attacks, "students of various ethnic groups agreed that Oromo students have been the primary targets of harassment on the AAU campus since the 2001 strike."[324]

In March 2002, police in the Oromia region opened fire on unarmed students and teachers protesting the government's policies on taxation, agriculture, and education in Nekemte, Shambu, Ambo, Gimbi, and other towns.[325] Widespread arrests and beatings and the killing of five students led to further protests around the region. The government detained hundreds of students throughout Oromia, and some students reported torture in prison.[326] In May 2002, over 200 AAU students were arrested after staging a peaceful demonstration protesting the government's refusal of their requests to hold a meeting to voice their concerns about other students in

---

[319] ICCPR *infra* note 377, at art. 21.
[320] *Lessons in Repression, supra* note 314.
[321] *Id.*
[322] *2001 Ethiopia Report, supra* note 312.
[323] *Lessons in Repression, supra* note 314.
[324] *Id.*
[325] *Id.*
[326] *Lessons in Repression, supra* note 314.

Oromia.[327] The students were detained for one day at the Kolfe Police Training College but never charged with any crime.[328]

Human Rights Watch reports that the federal police responded to a peaceful Oromo student demonstration at AAU in January 2004 by arresting between 330 and 350 students.[329] A female Oromo university student reported to The Advocates that the government believed the demonstration to be "an OLF mission." 38:2. The students were demonstrating for the release of eight Oromo students at AAU who had "criticized the Oromo regional government at a student cultural event" on January 18, 2004, and were subsequently arrested.[330] One interviewee in Minnesota was told by an AAU student who participated in the demonstration and escaped to Canada, that he and other Oromo students protested an OPDO cultural event that had a pro-government political message. 40:3. Those 350 arrested students were then taken to the Kolfe police training academy[331] for two days and were forced to "run and crawl barefoot, bare-kneed, and bare-armed over sharp gravel"[332] for several hours at a time. After their release two days later, the government then suspended or expelled most of these students, which resulted in high school and university student protests throughout Oromia.[333] 38:2.

The student protests in the capital spread throughout the Oromia countryside with violence following in their wake. Police beat many students, teachers, and parents and fired live ammunition to disperse protestors.[334]

> On March 1, [2004], district police shot and killed Alemu Tesfaye, a ninth-grade student in Tikur Inchine, Oromia Region, during a student protest. Amelework Buli, a female high-school student in Nekemte, Oromia Region, died from a police beating she sustained at her high school, although the government and police claimed she died from natural causes.[335]

The government accused the OLF of organizing these demonstrations throughout Oromia.[336] One Oromo university student in the Twin Cities told The Advocates that her relatives were suspended from AAU for one year, but eventually they were able to return to classes. 38:2. Another Oromo in Minnesota reported that his brother was arrested for the second time in 2004 as a university student; his earlier arrest was in 2001 while in high school. "It was a mass arrest. They were protesting against the government—wanting improvement for peasants and university administration. The government labeled them anti-government, and he was arrested. He is still in jail in Addis Ababa." 33:3.

The provisional results of the May 15, 2005, parliamentary elections, which maintained the EPRDF's overall majority, again resulted in student demonstrations throughout Oromia. Students at AAU demonstrated to show their support for opposition demands to investigate alleged voting irregularities. On June 6, 2005, during protests on two of AAU's main campuses, police beat hundreds of students with batons and rifle butts. Mass arrests of students also occurred on other AAU campuses, as well as at colleges and universities in Oromia and other regions. An estimated 500 students and other demonstrators were arrested and detained incommunicado in

---

[327] Human Rights Watch, *Ethiopia: Halt Crackdown on Oromo Students*, May 22, 2002.
[328] *Lessons in Repression, supra* note 314.
[329] *Suppressing Dissent, supra* note 17.
[330] *See generally* AMNESTY INT'L, REPORT 2004, *Human Rights in Federal Democratic Republic of Ethiopia*.
[331] *2004 Ethiopia Report, supra* note 305.
[332] *Suppressing Dissent, supra* note 17.
[333] *Id.*
[334] *See generally* AMNESTY INT'L, REPORT 2005, *Human Rights in Federal Democratic Republic of Ethiopia*.
[335] *2004 Ethiopia Report, supra* note 305.
[336] AMNESTY INT'L 2005, *supra* note 334.

Addis Ababa, and feared that these students were at risk of torture.[337] On July 28, 2005, all 190 AAU students were released.[338] While little information is available about whether the government is targeting Oromo students specifically, many of the protests and arrests have taken place in Oromia.

Although these student protests were not linked specifically to academic freedom issues, the mass arrests and unlawful detention of students resulting from these protests violate their freedoms of association and expression and restrict access to education. The presence of international NGOs, watch groups, and embassies in Addis Ababa puts pressure on the Ethiopian government to use some caution in reacting to student demonstrations given the likelihood of international exposure for severe repressions. For example, although students arrested in Addis Ababa during the January 2004 protests were severely beaten during their detention period and later expelled, it appears as though the repression of students in other towns in Oromia, such as Shambu, Nekemte, and Ambo, was even harsher. Police used live ammunition to disperse the protesters, which resulted in the killing of five students and injuries to many more.[339] While most students detained in Addis Ababa were released after a few days, many of the demonstrators in Oromia were detained for several months.[340] In addition, the government targeted AAU students who returned to their families in the countryside for visits in an effort to prevent these students from spreading their political ideas. A former AAU student reported that he was arrested several times, including one time for three months, when he went back to visit his family's home in Western Oromia. 35:3.

Minnesota's Oromo diaspora community expressed concern about the repressive tactics used in suppressing student protests at secondary schools and colleges throughout Oromia. Students, some of them under 18 years old, have been detained incommunicado and at different locations in response to student demonstrations since November 2005. Student demonstrators have repeated many of the demands from earlier protests for the release of political prisoners, including officials of the Mecha Tulema Association. The Advocates heard reports of police violence, including beatings and extrajudicial killings, from some of Minnesota's Oromo community who participated in these protests in Ethiopia.[341]

The Advocates' interviewees also expressed concerns that, not only do student expulsions eliminate their access to education, but they also lead to the growing poverty and marginalization of the Oromo community in Ethiopia. Expulsions and mass arrests of Oromo students are, according to one Oromo teacher interviewed by The Advocates, "the deprivation of Oromos, of intellectuals and academicians, people who are contributing to the development of our region." 20:14. Another Oromo educator attributes the poverty of the Oromo in part to the fact that "they have less opportunity for education." 22:6. A student reported to The Advocates that the government expelled and suspended Oromo students "to keep them poor." 38:2. Another interviewee reported that when students from rural areas are expelled from schools in Addis Ababa, they sometimes are not allowed to return to their villages. Instead, they become beggars in the streets because "the government is afraid that if they went home they would start movements or protests in their villages. They are very poor, and sometimes they don't have any food." 45:4. During her visit to Ethiopia in 2004, one Oromo woman remarked, "the life of young people is the saddest thing ever to experience. There is no work, and they don't go to school. . . . The young people are just sitting there—millions of them." 54:6-7. The long-term effects of expulsions reach even further because "in

---

[337] Press Release, Amnesty Int'l, June 9, 2005.
[338] Urgent Action, Amnesty Int'l, July 28, 2005.
[339] See AMNESTY INT'L 2004, *supra* note 330.
[340] *Id.*
[341] *See, e.g.*, Amnesty Int'l, *Urgent Action, Detention Without Charge/Fear of Torture or Ill-Treatment*, AFR 25/002/2005 Jan. 30, 2006; Human Rights Watch, *Ethiopia: Hidden Crackdown in Rural Areas*, Jan. 13, 2006.

Ethiopia, children are the social security for their parents, and without education they won't be able to provide for their parents. In Oromo culture, the first responsibility of [adult] children is to take care of their parents." 22:2.

Oromos interviewed by The Advocates expressed concern about the long-term marginalization of the Oromo population in Ethiopia and the already-low literacy and education rates. According to UNICEF, the youth literacy rates for males in Ethiopia is 62 percent and for females 39 percent. The primary school enrollment ratio for Ethiopian boys is 71 percent, higher than the 45 percent net attendance rate. For girls, the statistics are even starker with a 66 percent primary school enrollment ratio and a 45 percent net attendance ratio. Secondary school enrollment falls precipitously with a 38 percent net enrollment ratio for boys and 23 percent for girls.[342]

### a.  POLICE PRESENCE IN SCHOOLS

The government has monitored student activism and attempted to prevent further student actions by maintaining security forces at schools and universities. The role of campus security at AAU was transferred to private security guards in September 2001.[343] At AAU, however, the government granted the students' request that uniformed police be removed from the campus. A 22-year-old Oromo man relayed to The Advocates that the government sends spies to schools who "dress like students and sit in the classes. They always know what is happening. You could say something one day and be arrested the next." 45:4. This interviewee also stated that police would fire shots on school grounds to scare students.

Despite the change in control of campus security, students reported that "undercover security agents and students who double as informants continue to harass students, especially Oromos, on campus."[344] One Oromo reported that a school that principally educates Oromo girls almost closed down in 2004 after committee members told a non-governmental organization in Ethiopia that some students were recruited to report whatever they overhear. 37:8. This same individual reported that students are paid to report on teachers and what they are saying. "It's the same system that the *Derg* used when I was there, suspecting my coworkers. The same things [are happening] now. They don't trust each other. That's so sad." 37:8. In its Ethiopia reports, the U.S. Department of State reported that uniformed and plainclothes police officers were present on and around high school and university campuses.[345] One Oromo, who grew up in Gimbi and left college to come to the United States in 2003, reported one beating, "[a]t school, there were a bunch of students and they marched out in a parade. The government started shooting. We went out to see what was happening, and they started beating us as we went out of the school." 45:2.

---

[342] UNICEF, Ethiopia, Statistics (2000-06), *available at* http://www.unicef.org/infobycountry/ethiopia_statistics.html#15.
[343] *Lessons in Repression, supra* note 314.
[344] *Id.*
[345] *2007 Ethiopia Report, supra* note 272; *2004 Ethiopia Report, supra* note 305; U.S. Dep't of State, *Ethiopia*, 2003 Country Reports on Human Rights Practices, Feb. 25, 2004 [hereinafter *2003 Ethiopia Report*]; U.S. Dep't of State, *Ethiopia*, 2002 Country Reports on Human Rights Practices, Mar. 31, 2003 [hereinafter *2002 Ethiopia Report*].

### b.  TARGETING OF STUDENTS' FAMILIES

To quell further students' freedom, security forces have commonly targeted family members of Oromo students.[346] According to one interviewee, the government forces Oromo families to sign papers that require them to pay a fine if their children are discovered protesting the government. If the families do not pay the fine, they are arrested. 45:3. Another man reported to The Advocates in 2005 that, "two teachers just came to Minnesota from Oromia and told me that these students demonstrated on their own, and the parents were trying to bring them home to protect them. The parents were beaten because of this." 21:4. International NGOs and the U.S. Department of State have substantiated information learned by The Advocates that parents were beaten along with students and teachers during the January 2004 protests.[347]

### D.  ERODING THE OROMO CULTURE: VIOLATIONS OF THE FREEDOM OF EXPRESSION

"The major Oromo problem is loss of our culture, language, and country," as one male Oromo interviewee who was granted asylum in the United States summarized. 16:4. For example, there are reports that in recent celebrations, armed forces were deployed to deter Oromo from attending by searching cars and individuals as they entered the town, confiscating OLF flags and other cultural artifacts.[348] Likewise, while the EPRDF restored the Oromo's language rights in 1994, providing some autonomy to the Oromo, the restoration has had counterintuitive ramifications. For instance, speaking Oromiffa has been used to identify actual or suspected OLF members. It has also ironically

> *"In those States in which ethnic, religious or linguistic minorities exist, persons belonging to such minorities shall not be denied the right, in community with the other members of their group, to enjoy their own culture, to profess and practise their own religion, or to use their own language."*
>
> Art. 27, International Covenant on Civil and Political Rights.

disenfranchised Oromo speakers from educational and employment opportunities, which are limited to those who are fluent in Amharic or English. As one interviewee stated: The government is a contradiction; the Constitution provides for human rights protections, but the government takes them away. Ethiopia is supposed to be about assimilation of different cultures, but if you use the Oromo language or practice Oromo culture you are repressed. Oromo educator, 22:4

### 1.  LANGUAGE

Despite differences in religious beliefs and regional traditions within Oromia, the Oromo language serves as a shared and unifying bond. Throughout Ethiopian history, "rulers in Addis Ababa adopted a policy of forced cultural assimilation and they took steps to suppress Oromo culture, including restricting the use and development of *Afan*

> *Our language is our survival.*
>
> Oromo woman, 36:3.

---

[346] ICCPR, *infra* note 377, Art. 17(2) (stating that "[n]o one shall be subjected to arbitrary or unlawful interference with his privacy, family, home or correspondence, nor to unlawful attacks on his honour and reputation").

[347] *2004 Ethiopia Report*, *supra* note 305; Press Release, Amnesty Int'l *Ethiopia: Students at risk of torture as crisis deepens* (June 9, 2005).

[348] Qeerransoo Biyyaa, *Repression against Oromo in Ethiopia*, SUDAN TRIB., Oct. 6, 2006.

*Oromo.*[349] The language, referred to as *Afan Oromo* or *Oromiffa*, is the most widely-spoken language in the Horn of Africa and belongs to the eastern Cushitic group of languages.

The majority of interviewees identified speaking the Oromo language or practicing Oromo culture as a specific safety concern. They reported that the use of their language or cultural practice often results in persecution, repression, and, whether accurate or not, identification as members of the OLF.

Ethnic federalism, the governance system set in place by Ethiopia's adoption of its Constitution in 1994, allowed some space for the development of the Oromo language and its use in school, public proceedings, and private communication. The government-owned and operated Ethiopian Television offers news service in several languages, including Oromiffa. Official newspapers are offered in Oromiffa. A non-Oromo intellectual stated that Oromiffa:

> [I]s the legal language in the state of Oromia. It is used in school. There is discussion that Oromo should be a federal language. . . . [When I was in Bale] all signs and business signs were in Oromo. You can present your case to court in the Oromo language. Now there are translators into Oromo if you don't speak it . . . . In Oromia there are [Oromo language] dictionaries, books, and so on. Now, for the Oromos, they have a state now and a language now. So taking that perspective where it is not illegal to speak [Oromiffa, maybe it is better]. 41:5.

This interviewee's view, however, is not supported by all of those with whom The Advocates spoke. Despite the government's attempt to portray respect and encouragement for all cultures and languages in Ethiopia, The Advocates heard substantial evidence that Oromos are persecuted for the use of Oromiffa.

Most Oromos interviewed identified Oromiffa as the language they speak at home and with their families. But, a substantial number agreed that Oromos are not free to speak their language in all situations. For example, one Oromo student reported that while growing up in Wollega "[w]e couldn't even speak our language at a football [soccer] game." 53:2. Another example is a Oromo pastor preached in Amharic under the *Derg.* During the transitional government he started a service in Oromo. "This created very serious problems. The church where I was serving called me several times. They asked me, 'What are you doing?' They told me this was illegal." 47:3. He was told that Oromiffa was a politically-affiliated language. He continued to lead worship in Oromiffa "and some people associated all those worship services with the political situation of the country." 47:3. After learning that he was on a country-wide list of people the government believed to be politically affiliated, he left for the United States in 1995 and is now a naturalized citizen residing in Minnesota. 47:1, 3.

Many Oromos shared the view that "the past and current governments [are] forcing the Oromo to abandon their language, religion, and culture." 16:2. Others believe that the government understands that the language cannot be extinguished, but instead are trying to discourage its use to ensure that it will never become the official language. 67:01 One interviewee explained that Oromos are identified by other ethnic groups in Ethiopia mostly by the language that they speak. 23:2. This is seen as a cause for concern because of the persecution many Oromos face from mere suspicion of involvement with the OLF. One interviewee explained "even if someone is not an OLF representative, any Oromo who loves his country and language is suspect—even if [he is] working for the government, since the government doesn't trust any Oromo." 21:5.

---

[349] *Suppressing Dissent, supra* note 17.

The problem appears to be of greater concern within the capital, where some interviewees believe it is a crime to speak their language. 27:2. For example, one Oromo high school student who was raised in the United States visited Ethiopia with her family in 2002. While traveling through the streets of the capital in a public taxi, she noted that her parents switched from Oromiffa to Amharic after a local man started to insult them for speaking the Oromo language. 3:2. An Oromo man reported that his wife spoke in Amharic while in Ethiopia in December 2004. "She said that people are afraid to speak Oromo in the city." 40:3.

"After the capital moved [from Finfinne (Addis Ababa) to Adama (Nazret)]," one interviewee explained, "you were told not to speak Oromo on the street. 'This is not Oromia,' we were told." 57:2. The regional capital was moved in 2000. Although the government discussed the possibility of moving it back to Addis Ababa after the 2005 elections, the regional capital remains in Adama as of 2009. A former high-ranking government official, who is Oromo and seeking asylum in the United States, reported that "[o]n several meetings held in the year 2000 by the Oromia state Administrati[on] and Justice committee, to discuss the draft law endorsing Adama as [the] capital city of Oromia, I argued that it was against the interest of the Oromo people and that it would bring political unrest in the country." 61: Supp. 4. He reported to The Advocates that the government's decision to move the capital sought to dilute the power of the Oromo politically, economically, and culturally and to move its capital away from the international community's oversight. He noted that the decision led to violence when, in November 2000, the government police forces shot at and killed two Ambo High School students who were peacefully demonstrating against the capital's move. 61: Supp. 5.

Several interviewees described to The Advocates their fear of surveillance when using the Oromo language. "They know who they're targeting. If you have a chat in the coffee shop or on the street [and] you are Oromo and you speak your language. They see you on the street and they assign someone to [monitor/follow] you." 15:13. "If you speak Oromo and three-to-four people are together, they suspect you." 36:3.

The inability to freely use their own language and culture has restricted the Oromo's access to information, education, and employment. For those seeking job opportunities, language is a primary concern because Amharic is principally used and Oromiffa is discriminated against. 51:1; 53:2. One interviewee explained that if you speak "pure Oromo language, they suspect you of being in the OLF." 53:5. He told The Advocates that the OPDO uses a mix of Oromiffa and Amharic, and the Oromo have "to speak that word that the [OPDO] uses, rather than the pure Oromo one." 53:5.

## 2.   CULTURAL FIGURES

Oromo culture is being threatened by everyday, low-level repression as well as repression of individuals who are public cultural figures. Two interviewees specifically noted that being a "conscious Oromo," one who is educated and aware of her culture, is very dangerous in Ethiopia. 1:1; 22:2. One Oromo professor, who was arrested and tortured under the *Derg* government, said that Oromos who are currently detained "have not violated any laws— their only crime is being Oromo, especially if you are a 'conscious Oromo'" 22:2. He referred to the current persecution of Oromos as "ethnic cleansing." 22:2. Another Oromo professional told The Advocates that the Ethiopian government targets intellectuals and wants to eliminate the "conscious Oromo." 1:1. An Oromo student who had been involved in protests at AAU told The Advocates that rights to Oromo cultural expression were at the heart of the 2004 protests at AAU. 35:6. Those Oromos who are more "conscious" of their culture and background are targeted for harassment, arrest, and torture because they are seen as threats to the current government.

Persecution of Oromo individuals, both in everyday society and in more public arenas, continues to threaten Oromo culture's survival and those who are a part of it.

Oromo artists, athletes, and other professionals have also been targeted for persecution by the government because of their public image and suspected links to the OLF. One Oromo professor reported that there was an "upsurge" in Oromo arts, literature, and drama during the transitional period in 1991, however, it is now decreasing because of oppression that the Oromo elite encounter. 22:2-4.

Similarly, an Oromo leader reported that Oromo literature "mushroomed overnight" when the OLF was part of the transitional government. After the TPLF-led coalition came to power, however, it "targeted Oromo businesses, teachers, professionals, community leaders, prominent farmers, artists, Oromo singers . . . Since 1996, Oromo cultural activity and literature and drama in theater have disappeared. There is fear and actual persecution. Singers are jailed, detained, and beaten." 28:4.

One Oromo in Minnesota reported that "you should not even listen to Oromo music." 20:16. Interviewees reported incidents of persecution of Oromo singers as a means to suppress Oromo culture and nationalism. 11:2; 22:4; 23:3. An Oromo woman interviewed by The Advocates in Norway was involved with a cultural group which "use[d] songs to create nostalgic feelings among Oromos, [and] create[d] a sense of solidarity." 60:1. She was part of a group of ten other Oromo singers who recorded a cassette about Oromo freedom. In 1996, while trying to make another music cassette with a singer in Dire Dawa, she was caught by soldiers who beat her and threatened her life. They demanded to know who she was working for and what OLF connections she had, and they forced her to reveal the whereabouts of the other singers. 60:2. She spent two-and-a-half years in prison. Another interviewee reported that this singer was tortured while imprisoned, including having her head shaved with glass. 11:2. She spoke about the Oromo woman's courage in continuing to sing Oromo songs to keep her spirits up during her difficult imprisonment.

A folk singer named Elfinesh Kano was arrested on December 31, 1993, with a group of Oromos who were protesting the trial of OLF leaders. All the prisoners were mistreated by guards and soldiers during their detention; they were sentenced to one month in jail after a trial. Ms. Kano, however, was held past her sentence because a court was examining the music that she had recorded to determine whether it was "seditious."[350]

A former, high-profile marathon runner and member of the Ethiopian national team told The Advocates that he worked for the sport commission under the *Derg*. After the TPLF-led coalition came to power, everything changed. He was without a government job in the capital and returned to his hometown of Dire Dawa to start a small business, however, he was arrested at his house and imprisoned for six years. 49:1. Relatives later sponsored him to come to Minnesota, but his family remains in Kenya. His story is similar to that of Mammo Wolde, an Oromo athlete, who won a gold medal for Ethiopia in the marathon in the 1968 Mexico Olympics and silver and bronze medals in the 1968 and 1972 Olympics. This made him a nationally and internationally-known athlete. In 1996, however, he was imprisoned and held for years without due process before access to a trial.[351] He passed away soon after his release from jail.

[350] Amnesty Int'l, *Ethiopia, Accountability Past & Present: Human Rights in Transition*, Apr. 1995.
[351] Amnesty Int'l, *Ethiopia: Human Rights Trials and Delayed Justice—The Case of Olympic Gold Medalist Mammo Wolde and Hundreds of Other Uncharged Detainees*, 1996.

### 3.   CULTURAL IDENTIFICATION

In addition to the targeting of elite Oromo artists and professionals, Oromos frequently reported being insulted and oppressed on a daily basis. The word "Galla" is used by other ethnic groups as a derogatory word for Oromo, and interviewees reported being called "Galla" as an insult.[352] Interviewees reported being referred to as "Galla" by strangers on the bus, 40:1; by classmates at school, 51:2; or that the word is used frequently by society in general. 10:1. One Oromo elder, recalling his childhood in Arsi, said that he was never referred to by his real name in school; everyone called him "Galla." He eventually learned to answer to "Galla" rather than his own name. 51:2.

Whatever the origin of the word "Galla," it has been used extensively to insult the Oromo, and most interviewees who cited the word reported that it meant "pagan" or "without religion or background." 16:1; 30:2; 40:2; 53:2. By using this word, other ethnic groups are insulting Oromos by insinuating that they have no culture of their own and that they have no religion or tradition linked to their ethnicity.

Oromos themselves reported their rich religious traditions to The Advocates. They spoke about large pockets of Muslims principally in the East, Protestant Christians of the Mekane Yesus Church in the West, members of the Ethiopian Orthodox church in the North, Seventh Day Adventists in the South, and followers of the traditional monotheistic religion known as Waaqa scattered throughout Oromia. Interviewees stressed that their Oromo ethnicity underscored their common and unifying identity and that religious distinctions were of secondary importance. 28:1,7. As one Christian Oromo woman told The Advocates while interviewed with her Muslim Oromo friend, "[w]e are Oromo from birth. Religion is [our] chosen identity." 18:4.

In their ongoing struggle against ethnic discrimination, personal names can cause Oromos to be marked as Oromo, and therefore subject to persecution and harassment. First and last names that are recognizably Oromo prevent people from getting jobs, especially in the capital. One interviewee said that many Oromos seeking employment in the capital adopt Amharic names in order not to stand out as Oromos. 16:1. One Oromo college student, who came to Minnesota in 2002, told The Advocates:

> My [first] name helped me not to be discriminated against. It is an Amharic name. We were in an Amharic-dominated [part of the] country, and the priest came to our house and gave me my Amharic-Orthodox name . . . I also don't look Oromo, so I could pass and speak Amharic. I didn't want to expose myself as an Oromo. 53:3.

One interviewee suggested that the Oromo elite who changed their names to Amharic ones had "drifted and become part of the system." 44:2. One younger interviewee who arrived in the United States in 2003 had a more positive outlook on the situation. He had been given an Amharic name at birth, but changed it to an Oromo name as he grew up and learned about his roots and the culture of his people. 45:1.

---

[352] The meaning of the word "Galla" is unclear, as different sources attribute different meanings to it. One Oromo man suggested that the word dates to the 1880s, as a phrase meaning for "come in, come home," used when farmers were coming in at the end of the day, part of which sounds like the word "Galla." It was then adopted by the oppressors as a derogatory term. 40:1-2. A folk etymology of the word claims that it comes from "kal la," meaning "he said no," which refers to refusing Mohamed's call to practice Islam. One interviewee said that using the word "Galla" suggests that the person came from the sea like a fish. 40:2. Similarly another Oromo said, "Galla means from water. Even though we are a majority of the people in Ethiopia, people referred to us as those who 'came from other parts' or were foreigners." 53:2.

### E. RELATIONSHIP TO LAND: ENVIRONMENT AND ECONOMY

As in most developing countries, land in Ethiopia is not only an economic resource, but is also strongly connected to culture and identity. Land is the primary means of production and the main asset that farmers have to accumulate and transfer wealth to future generations. Ethiopia's Constitution provides for public rather than private ownership of land, giving the government primary control of land administration while providing farmers with rights to use land. The Constitution provides that land belongs to the government.[353] At the same time, the government has specific duties under the Constitution to hold the land for the benefit of the people, protect the environment and ensure that all Ethiopians benefit from the country's resources.[354]

> *The trend in human rights violations changes from time to time. While the methods may change, the underlying reasons are the same—control of Oromo resources.*
>
> *Oromo professional, 12:3.*

Ethiopia maintains an economic policy based on government control and uses its bureaucracy rather than private investors to develop the agricultural sector. "The formal structure of local government in Ethiopia has remained largely unchanged since the overthrow of the *Derg* dictatorship in 1991."[355] The smallest unit of government is the *kebele* system, which organizes households or geographic areas. A group of *kebele*s forms a "district" or *woreda*.

Ethiopia's rural development policy relies on the government to distribute improved seeds, fertilizers, credit, and other technical assistance to peasants.[356] "In Oromia's rural areas, *kebele* officials wield a great deal of power over the populations they govern."[357] They distribute fertilizer to farmers on credit, collect debts when due, issue binding decisions in local disputes, and imprison those who fail to repay their fertilizer debt on time. "This authority gives *kebele* administrators an enormous power over their constituents, and many Oromo opposition politicians and civil society figures have long alleged that *kebele* officials employ that leverage to discourage and punish dissent."[358] The Advocates heard from many of its interviewees about the complex interrelationships between human rights and the land, environment, and economy and their effects on ethnic Oromos.

Under its Constitution, the state owns all land in Ethiopia.[359] Although the Constitution provides for the right of peasants to obtain land without payment, the right to be protected against eviction, and the right of pastoralists to have free land for grazing and cultivation,[360] the government nonetheless requires individuals to lease land from it.[361] Many interviewees told The Advocates about the relocation of ethnic groups into Oromo land, intra-ethnic fighting, and destruction of the Oromo land base.

> *Our enemy is our land. The country's resources come from Oromia. They want land but not the people. When Eritrea was part of Ethiopia, they needed the port, but they didn't like the people. It's the same thing for Oromia. They don't need us. Female Oromo who came to the U.S. in 2000 as a refugee, 36:5.*

---

[353] CONST., art. 40 ¶ 3 (Ethiopia).
[354] *Id.* at. art. 40 ¶¶ 4-5.
[355] *Suppressing Dissent, supra* note 17, at 27.
[356] Daniel Teferra, *U.S. Policy and Obstacles to Democratization & Development in Ethiopia,* 1999.
[357] *Suppressing Dissent, supra* note 17, at 28.
[358] *Id.*
[359] CONST., art. 40 ¶ 3 (Ethiopia).
[360] *Id.* at art. 40 ¶¶ 4-5.
[361] *2004 Ethiopia Report, supra* note 305; Daniel Teferra, *Globalization and Economic Development in Ethiopia.* (A paper presented at the International Roundtable on Globalization, Institute of Development Research, Addis Ababa University) Addis Ababa, Ethiopia, June 12, 2002.

### 1. RELOCATION AND ETHNIC FEDERALISM

The Advocates' interviews reflected a belief that government relocation of individuals by ethnic group is taking place within Ethiopia. Those interviewed varied in their beliefs as to the impetus and nature of the relocation program, variously termed "villagization," 23:2 and "resettlement," 25:2. The interviews revealed a pervasive belief that such relocation is occurring to the detriment of the Oromo people.

> *The people do not want to move, but they force them to move. They move them in a big truck, as though they were not human beings.*
>
> Oromo woman who runs development non-profit in Oromia, 57:6.

Interviewees frequently reported that the Ethiopian government is taking land away from Oromo farmers, particularly around urban areas such as Addis Ababa. 1:1. This practice displaces farmers, often leaving them on the streets in the cities. 25:2. According to one Oromo professional interviewed by The Advocates, government agents are sent to tell the Oromo farmers that they must leave. 23:2. Another interviewee stated that the government has taken rural Oromo farmland and given it to investors and real estate developers. 25:2. One Oromo woman working in Oromia told The Advocates that the government takes the Oromo land for government farms. 57:1.

In addition to moving Oromos off their land in Oromia, many individuals reported that other ethnic groups are being moved into the Oromo region. One interviewee told The Advocates that the Tigray from the north are being encouraged to move into the more fertile southern Oromo area. 23:2. Several interviewees indicated that Tigrayans and Amharas have moved into the southern lowlands where the Oromo have traditionally farmed. 21:5; 25:2; 30:6. Others indicated that the Ethiopian government is giving Oromo land to Somalis. 10:2; 25:2; 28:5. An Oromo man reported that more Oromos are moving from Eastern Ethiopia to the western part of Oromia. 21:5. One woman stated that the government has been moving the Wolita, Kambata, Amhara, and Arcopa into Eastern Oromia, and has moved Eastern Oromos into the western part of Oromia. 57:6. The relocation of Oromos from fertile to infertile areas creates instability. 10:2. The relocation of Oromos disrupts their traditional land base, creates real and perceived resource scarcity, and exacerbates environmental problems like drought. As one Oromo educator stated, "Oromia has famine, which it never had before. It ha[d] always been the 'breadbasket' of Ethiopia." 22:5.

Those interviewed cited various reasons for the government relocation programs. One man indicated that relocation occurs when there is drought and the land is not fertile. 44:5. Even though the majority of the Blue Nile is in Ethiopia, one Oromo student reported that Ethiopia has poor irrigation due, in part, to colonial era treaties between Egypt and Sudan that exclude Ethiopia from sharing the water evenly.[362] 44:5. Another Oromo student reported that non-Oromo have moved to farm the more fertile lands of rural Oromia. 46:9.

Ethiopian state ownership of land enables the government to relocate Ethiopians. 23:2. One interviewee stated that it is difficult to determine land ownership in Ethiopia because of its colonial history. Land may have an Oromo name or be located in a traditional Oromo area, but it is difficult to prove to whom it belongs. 44:3.

---

[362] *Water Plan Catches Nile River Flow for Ethiopia*, UNIVERSITY OF QUEENSLAND NEWS ONLINE, Feb. 28, 2005, *available at* http://www.uq.edu.au/news/index.html?article=6708 ("The majority of the Nile originates in Ethiopia but more than 97 percent of its annual flow of 84 million mega liters, is used by downstream countries such as Sudan and Egypt.")

Some interviewees believe that the government forces the Oromo to relocate in order to reduce their power by making them landless.[363] 2:2; 3:1; 4:1; 23:2. One Oromo interviewee reported that he believes that the Ethiopian government is trying to incite ethnic conflict between the Oromo and other groups by relocating populations. 44:3. A more pronounced version of this view included reports from Eastern Oromia in January 2005 that the Ethiopian government allegedly armed the Somali against the Oromo, leaving hundreds of Oromos displaced. 35:1. An Oromo man who left Ethiopia during the *Derg*, but who has since traveled to Ethiopia under the current government, stated, "[t]he government is pushing people to hate each other. For example, they supply arms to the Somali community to fight against Oromo and they are forcefully taking Oromo land and giving to the Somali. The government is generally diverting development money to buy weapons."[364] 10:2.

In addition to harming those who are forcibly moved, one woman who works for a non-profit organization in Ethiopia indicated that the relocation puts a strain on the people living in western Oromia where the Oromo are required to resettle. 57:6. This interviewee reported that Oromos are forcibly moved in large trucks over several days' journey to Wollega or Kambata. 57:6. She believes that it is the government's intention to create conflict among the Oromos themselves as they fight for scarce resources. 57:6. Another individual reported that the government is moving Oromos into camp-type areas guarded by soldiers 23:2. Others reported that the Oromos are purposely being moved into malaria-infested regions. 3:1.

Information reported to The Advocates regarding resettlement of Oromos in Ethiopia is consistent with the U.S. Department of State Country Report on Ethiopia, which documented forced displacement of families in rural areas.[365] The report further noted that the Ethiopian government has stated publicly that the relocation program is voluntary. Opposition parties accuse the government of targeting opposition supporters for resettlement.

Similarly, the aid agency Médecins San Frontières ("MSF") reported that the government resettled persons to areas with no existing infrastructure or clean water supply, resulting in high rates of infant mortality.[366] A group of Ethiopians from Harare province were moved to a former army base near Bale and from there were moved by the authorities to a location near Biddre, both in Oromia. MSF reported that the lack of preparation by the Ethiopian authorities for the resettlement of over 850 families on this occasion—including, insufficient shelter, a limited water supply, a lack of healthcare, and inadequate food distribution—resulted in respiratory infections and diarrhea.[367]

---

[363] In Ethiopia, almost 40 percent of farm households have less than 0.5 hectare of land, and more than 60 percent have less than 1 hectare from which to support a family of about six to eight people. Food and Agricultural Organization, *The Elimination of Food Insecurity in the Horn of Africa*, 2000, *available at* http://www.fao.org/documents/show_cdr.asp?url_file=/DOCREP/003/X8530E/x8530e03.htm.
[364] *See, e.g., Ethiopia: Rampant Inter-communal Clashes in the South and East*, IRIN, Aug. 26, 2005 ("The USAID-funded Famine Early Warning Systems Network (FEWS Net) recently reported that ethnic clashes in southern Oromia, Somali and Afar regions were exacerbating food insecurity."); USAID, *Ethiopia—Complex Health/Food Insecurity Emergency*, Sept. 8, 2005, http://ftp.info.usaid.gov/our_work/humanitarian_assistance/disaster_assistance/countries/ethiopia/dr_index.html ("The locally-based Ethiopian Human Rights Council (EHRCO) reported on August 23, that up to 73 people were killed, 45 others wounded, and 80,000 residents displaced in clashes so far this year between rival Oromo and Somali ethnic groups.").
[365] *2007 Ethiopia Report*, *supra* note 272.
[366] Médecins San Frontières, *Ethiopians Moved for the Third Time*, May 3, 2003, *available at* http://www.msf.org/msfinternational/invoke.cfm?component=article&objectid=B4DC4B61-35DF-4738-919B78EFB1F6A10B&method=full_html.
[367] *Id.*

### 2.   DISTRIBUTION OF RESOURCES

Many people interviewed expressed a belief that the Oromo are targeted economically by the Ethiopian government. Some stated that the Ethiopian government is removing resources from Oromia without compensation, 27:2, while others described a pattern of disproportionate levels of economic neglect in the Oromia region. 2:3. One Oromo professional explained that Oromia is vital to Ethiopia because of its fertile land, livestock, gold, aluminum, and coffee. 2:3. He believes that Ethiopia cannot afford for Oromia to gain more autonomy or to become independent, because the rest of Ethiopia is desert. Fearing an independent Oromia, the Ethiopian government oppresses the Oromos in order to ensure government control over the land and its essential resources. 2:3.

Specific examples of government confiscation of resources from Oromia include the claim that the Ethiopian government is removing fertile topsoil from Oromia and transferring it to make other regions more fertile. 3:1. Another interviewee reported that even though a hydro-electric dam is located in Oromia, the portion of Western Oromia where he lived and his family still resides has no electricity. 10:2. He indicated that the electricity is exported to the Tigray region.[368] 10:2.

As to disproportionate development, one Oromo engineer stated that the Ethiopian government only provides economic resources and development for the ethnic regions of the ruling party. 15:12. He stated that the Tigray region is developed at the same level as Europe, even though it is a dry area with few natural resources. He also indicated that the Ethiopian government places heavy industry in the Tigray region to create jobs, while the western Oromo region is neglected with no industry and no university. 15:12. An Oromo professional noted, "The cultural human rights abuses are also significant as are the economic human rights abuses: the Oromo are taxed more, not given permitting licenses for business, dominated by the TPLF, and neglected in terms of the construction of schools, hospitals, and roads." 2:3.

Reports that the Oromo are taxed at a higher rate than members of other ethnic groups were also common. 2:3. An Oromo pharmacist stated that he and other Oromo business owners were subjected to unnecessary taxes. At one point, in the mid-1970s, all of his business documents were confiscated by the government. Upon his attempt to retrieve the documents, he was told that he owed an additional 70,000 Birr in taxes, even though he had already paid his taxes in full. He was able to successfully challenge the tax in court over the course of the next five years. 31:1. He viewed this as a government attempt to exhaust him in time, resources, and effort so that he would have to close his business.

### 3.   AGRICULTURE

Because the Oromo traditionally are farmers, most of the complaints of the "economic domination" of the Oromo people by the individuals interviewed by The Advocates involve Ethiopia's agricultural policies. 22:5. Generally, those interviewed reported the overall poverty of Oromo farmers, blaming the condition on the government's agricultural policies, including the confiscation of land and cattle. 25:3; 28:1; 39:3.

---

[368]The Ministry Public Relations Acting Head confirmed that the number of people in Ethiopia with access to a power supply currently stands at 17 percent while announcing a plan to provide 50 per cent of the population with electric power over the next five years. *Total Population 50 Percent to Benefit from Power Supply*, ETHIOPIAN HERALD (Addis Ababa), Sept. 11, 2005.

Ethiopia's economic system creates disproportionate problems for farmers. As one Oromo man explained, the Ethiopian government levies high import fees on items needed for farming, but then pays very little for agricultural products, leaving almost no profit to the farmers. 39:3. He reported that farmers who are unable to pay the taxes on their land are imprisoned until someone can pay for their release. 39:3. An Oromo scientist and scholar reported:

> The economy is controlled by the government. One of our main products is coffee, and the government is the purchaser of the coffee from the farmers. In Kenya, the farmers get 90 percent of the market value of the coffee. In Ethiopia, it's 40 percent. Most coffee farmers are Oromo and live in the South, in Oromia. They are required to sell their coffee to the government, in effect, because they are not allowed to transport it anywhere else in or out of the country. The West complains that the economy is not liberalized yet. 21:6.

Interviewees also reported to The Advocates that government security forces have specifically targeted farmers in an effort to prevent assistance to the OLF. One source described a situation in which a farmer who was accused of harboring OLF guerrillas was arrested and then hung in the marketplace. 2:3. A soldier told others that they would suffer the same fate if they harbored OLF guerrillas. 2:3.

Another Oromo farmer in Minnesota who was educated through the eighth grade spoke about the TPLF-led government, "[o]ne day they took 21 cattle of mine. There was no court, no judgment and no reason to take it. Instead, they say that you support OLF ideology and jail you. That's the problem we are facing today." 51:4.

The Advocates' interviews with Oromos in Minnesota also established two main areas of concern related to the government's distribution of fertilizer. The first relates to the unjust distribution of fertilizer. The second is the Ethiopian government's purposeful provision of "poison" fertilizer to the Oromo farmers in order to sabotage their crops.

### a.  DISTRIBUTION OF FERTILIZER

Some interviewees reported that the Oromo are starving because fertilizer is simply not available to them. 22:5. Other reports indicate that fertilizer is available, albeit through a system in which peasants are sold fertilizer by the government and then use their crops to repay the government. 21:6; 28:4; 57:3. Because the farmers do not reap enough from the land to repay the loans, they remain indebted and sometimes lose their farms as a result. 57:3. One interviewee indicated that an unjust system of government taxes discouraged private merchants from purchasing crops from farmers. 35:6. This results in low profit margins for the farmers, who cannot purchase or repay the fertilizer loans. 35:6.

Interviewees told The Advocates about the connection between access to fertilizer and politics, with implications for the outcome of democratic elections.[369] Other reports indicate that fertilizer may only be available to members of certain political parties. One Oromo man in Minnesota received a letter in early 2005 from his nephew in Ethiopia who had been imprisoned for joining student protests, stating that the government threatens farmers who

---

[369] *See, e.g.,* Chris Albin-Lackey, *The Dark Side of Ethiopia's "Green Revolution"* (Sept. 5, 2005), *available at* http://hrw.org/english/docs/2005/09/05/ethiop11727_txt.htm.

do not join the OPDO. 21:4. If the farmer does not join that party, he will not be extended credit for the fertilizer that he needs for farming. 21:4. Similarly, the Country Report on Ethiopia for 2004 cites credible reports of local officials in the Oromia Region threatening to withhold fertilizer from farmers to gain support for the ruling coalition.[370]

Another source indicated that the distribution of fertilizer is also used as a method of manipulating election outcomes. Rural farmers may not vote for an opposition candidate out of fear that that candidate will not be able to deliver fertilizer. 41:3. The government candidate tells people that if they do not vote for the government's candidate, the farmers will no longer receive fertilizer on credit, but will have to pay for it up front—something that most are unable to do. 41:3.

These reports are consistent with findings of Human Rights Watch, which reported that *kebele* officials in Oromia distribute fertilizer on credit and collect the acquired debt when due. Human Rights Watch also reported that *kebele* officials enforce the fertilizer-debt-repayment obligations unevenly. Individuals with good relations with the *kebele* officers were allowed to carry large debt loads, while others were imprisoned. One farmer told Human Rights Watch that, ironically, the individuals who come to imprison farmers for not repaying their debt themselves owe money for fertilizer.[371]

### b.  CORROSIVE FERTILIZER

In addition to complaints of the unequal distribution of fertilizer to farmers in Ethiopia, several individuals interviewed by The Advocates indicated a belief that the Ethiopian government was specifically targeting Oromo farmers by purposely providing them with ineffective or corrosive fertilizers. An American-born woman, who lived and worked in Ethiopia for many years and frequently returns, stated that the Ethiopian government forces Oromo farmers to use a certain kind of corrosive fertilizer in order to sabotage farming in the Oromo district. 11:2. An Oromo student who is in contact with extended family in Ethiopia told The Advocates that she had heard that the government is giving Oromo farmers "fake" fertilizers. 38:3. Another Oromo student talked about a condition called "green drought," in which the land appears fertile, but for one reason or another, there are drought-like conditions when it comes to crop growth. 44:3. He believes the "green drought" is caused by the government's provision of ineffective fertilizer to the farmers. 44:3. He also indicated that the fertilizer may allow the farmers to reap a productive crop harvest for one season, but after that the soil is "burned" and will no longer produce crops. 44:3.

An interviewee working in the Oromia region told The Advocates that the government changes the type of fertilizer that is provided every year. 57:3. This Oromo woman went on to explain that the government receives donations of fertilizer or looks for cheap fertilizer on the market. When the fertilizer is changed, the soil reacts negatively. Because of the changes in the fertilizer, the farmers do not produce as much as they expect and cannot repay the loans for the fertilizer. 57:3. The farmers then seek to move to the city to work as day laborers. She reported that some farmers lose everything and commit suicide because they know of no other way to earn a living and cannot support their families. 57:6. There is little secondary information available to corroborate these

---

[370] *2007 Ethiopia Report, supra* note 272 (noting reports that local officials used threats of land redistribution and withholding of food aid and fertilizer to garner support for the ruling coalition).
[371] *Suppressing Dissent, supra* note 17, at 29.

reports to The Advocates of corrosive fertilizer, but the situation underscores the alienation of the Oromos from their land and ability to earn a livelihood, and Ethiopia's noncompliance with national and international obligations.

### 4.  TARGETING OF OROMO BUSINESS LEADERS

Interviewees also described government forces targeting Oromo business leaders. An Oromo pharmacist told The Advocates that a government official under the *Derg* came to his pharmacy and later circulated a letter to pharmaceutical distributors instructing them not to sell drugs to Oromo pharmacists. 25:1. As a result, the pharmacist could not get medicines and was forced to close his pharmacy. Over the course of three months, the pharmacist appealed to the government to find out why he was being denied access to pharmaceuticals. 25:1. In response, the government accused him of providing drugs to the OLF, but the government never formally charged him with this. He told The Advocates that three or four months later, the government again granted him permission to run his pharmacy, which he did until he was accused of harboring the OLF and escaped to the United States in 1998 because he believed his life was in danger. Another Oromo pharmacist reported that the Ethiopian government confiscated his business located in Moyale while he was traveling in 1992. 31:2. His brother's business was also closed down by the government. 31:2.

Another Oromo man told of the discrimination he experienced in advancing within the government: "I was not given a position commensurate to my qualifications." 16:1. After he completed his studies at the university, he secured a position with the Ministry of State Farms and worked in various positions in Oromia. He reported to The Advocates, "I remember missing three scholarships for further studies due to my being Oromo [even] though I passed the interviews. Other communities were always awarded the scholarships. Even getting promotions took a very long time. I personally took eight years." 16:2. He eventually started to work for an American company as an agronomist and sales manager until the TPLF-led government accused him of being an OLF member and he sought asylum in the United States 16:2.

The government caused difficulties to those successfully self-employed. Oromos reported employment difficulty because of their ethnicity and alleged ties to the OLF. An Oromo man reported that after he was released from prison in 1992, "I didn't have a job. I thought to do some business to support my family. My friends and relatives helped me." He formed an exporting company in Eastern Oromia. "The business was good. At that time we made a lot of money. We bought 50 trucks from Italy to export the commodities. The [government] came and confiscated the trucks and took all the merchandise we had and gave it to a government-owned company." 56:1. He reported that the government took his property after accusing him of stealing from the government and working on behalf of the Islamic Front for the Liberation of Oromia (IFLO) and the OLF. 56:1.

One Oromo woman heard that a member of her family was harassed, items were taken from his store, and he was imprisoned. "They took money because the [government] claims that it goes to the OLF." 17:3. She reported that the government shut down her relative's store even though he had been in business for over 20 years.

Oromos in Minnesota reported that they had difficulty securing jobs in Ethiopia because they are Oromo and that friends and family continue to experience this difficulty. 34:2; 52:2. Another source reported to The Advocates that it is common for Oromos to be fired from employment without cause. 10:2. For example, one Oromo who has been in the United States for five years and communicates regularly with extended family in Ethiopia, reported that her uncle lost his job as a sales associate at a large department store without reason. 38:1 The department

store is under the joint ownership of a private company and the Ethiopian government. Her uncle believes that he lost his job because he is Oromo. 38:1. She also reported that a relative who is a pilot for Ethiopian Airlines has not been given choice flying assignments, whereas his non-Oromo classmates receive preferred assignments. 38:1. An American woman reported that an Oromo with expertise in satellite maintenance was fired and replaced with a Tigrayan without experience. 11:2. An Oromo woman reported that at least three Oromo medical doctors came to Minnesota after they lost their jobs. 13:5. At least one person reported that it was common to hear that Oromos had been denied business licenses. 2:3.

> An Oromo student shared with The Advocates how Oromos live on the "margins economically:" The Tigray control who gets a license and money from the bank. My aunt worked on a route to Jijiga [in Ogaden]. Before, under the *Derg*, she worked from Djibouti to Dire Dawa. Now the Tigray have access to rail licenses and check points. If they find contraband (e.g., cigarettes), they will put a levy on the post, and she doesn't make a profit. My aunt used to sell sugar and clothes. Her margin compared to the Tigray, who can trade as much as they wish, has changed. Now, my aunt claims that the items are for home use, and a group of Oromos puts the[ir] items together to sell. These are the tactics that they use. It is on a small-scale. They can be eliminated from business, but she has the attitude that tomorrow is a better day. They had to take out loans to keep in business. If the economy goes down, she won't be able to make a living. 46:7.

One Oromo woman in Minnesota reported that the government shot a prominent businessman while he was standing in the door of a restaurant. 13:2. Secondary sources report such incidents, including torture and disappearance of Oromo business leaders. The 2007 State Department Country Report on Ethiopia reported that a small business owner was arrested for allegedly possessing illegal weapons and had not been seen since.[372]

Similarly, Human Rights Watch reported on a middle-aged merchant who was arrested and tortured in Agaro in August 2004 because the Ethiopian National Defense Force (ENDF) believed his son was raising money for the OLF in London.[373] Human Rights Watch also reported that a thirty-five-year old businessman was arrested and tortured after being accused of providing financial support to the OLF.[374] Other Oromo business owners claim they are forced to close their businesses because of police harassment of their customers. The Ethiopian police reportedly create a climate in which customers, clients, and employees fear association with Oromo business owners. In order to avoid harassment, business owners are told they must "prove" they are not OLF by joining the ruling OPDO.

---

[372] *2007 Ethiopia Report, supra* note 272, at § 1B.
[373] *Suppressing Dissent, supra* note 17.
[374] *Id.*

## CONCLUSION

The human rights violations inflicted by three successive Ethiopian regimes upon the people of Ethiopia continue to affect the day-to-day lives of people in the diaspora. The particular experience of the Oromo people, victims of torture in extremely high numbers and of repressive practices designed to undermine their very culture, also continues to be felt by those in the diaspora. Traumatic experiences are relived over and over again by torture victims, and this trauma has lasting effects on even those not directly on the receiving end of the torturer's abuse. And of course, the diaspora remains connected with friends and family in Ethiopia, where human rights violations, repression of political opposition, and the undermining of civil society continue.

The Oromo diaspora plays a role in politics both in the United States and in Ethiopia. There is a constant flow of people, ideas, and money between the diaspora and those in Ethiopia reinforcing these connections. Members of the diaspora seek to raise awareness of the abuses they suffered and those that are ongoing to impact U.S. foreign policy, policies of donor organizations, and, hopefully, support respect for and promotion of human rights in Ethiopia. The Oromo diaspora also has an interest in the politics of Ethiopia, and its rhetoric and its money influences those politics. The near-instantaneous ability to know what is happening on the ground will only heighten as Ethiopia prepares for 2010 elections, and the possibility of a new prime minister and new government coalition for the first time in 15 years. The diaspora is watching. And their involvement allows them to be engaged and enfranchised.

This report outlines the sustained climate of disregard for basic human rights in Ethiopia. The task facing Ethiopia is daunting. Not only must the government commit to ending its reliance on abuses to maintain its power and commit instead to creating a climate of tolerance of dissent, it must work to undo the lack of trust, following decades of perceived injustice and outright persecution, of the Oromo people. As the 2010 elections draw near, the Government of Ethiopia has an opportunity to demonstrate whether it is up to this challenge.

## APPENDIX

## HUMAN RIGHTS STANDARDS IN ETHIOPIA

The Federal Democratic Republic of Ethiopia has ratified, adopted, or signed numerous international and regional treaties and adopted laws, including its Constitution, that guarantee to all citizens of Ethiopia the right to education, protection of civil and political rights, freedom of the press and cultural expression, rights to property and development, rights of association and assembly, and to privacy and bodily integrity. The observance of the following international agreements is provided for in Ethiopia's Constitution, which went into effect in 1994:[375]

- Universal Declaration of Human Rights (UDHR)

- International Covenant on Economic, Social and Cultural Rights (ICESCR)
    Acceded September 11, 1993

- International Covenant on Civil and Political Rights (ICCPR)
    Acceded September 11, 1993

- International Convention on the Elimination of All Forms of Racial Discrimination (CERD)
    Acceded July 23, 1976

- Convention on the Elimination of All Forms of Discrimination against Women (CEDAW)
    Ratified October 10, 1981
    Reservation to Article 29(1)

- Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT)
    Acceded April 13, 1994

- Convention on the Rights of the Child (CRC)
    Acceded June 13, 1991

- Convention relating to the Status of Refugees (1951)
    Acceded November 10, 1969

- Protocol relating to the Status of Refugees
    Acceded November 10, 1969

- Freedom of Association and Protection of the Right to Organize Convention (ILO No. 87) (1948)
    Ratification June 6, 1963

- The African Charter on Human and Peoples' Rights
    Ratified June 15, 1998

---

[375] ETH. CONST. art. 86 ¶ 4 (adopted Dec. 8, 1994).

- The African Charter on the Rights and Welfare of the Child
  Ratified October 2, 2002

- Convention Governing the Specific Aspects of Refugee Problems in Africa
  Ratified October 15, 1973

- OAU Convention on the Prevention and Combating of Terrorism
  Ratified February 24, 2003

These international laws, along with the Ethiopian Constitution, provide for, among others, civil and political rights, the right to assembly and freedom of association, the right to expression and freedom of the press, the right to academic freedom, and the right not to be arbitrarily deprived of property. These rights, set forth in greater detail below, provide the framework for the Report's findings.

## A. CIVIL AND POLITICAL RIGHTS

### 1. INTERNATIONAL DECLARATIONS AND TREATIES

Ethiopia has committed itself to protect against arbitrary arrest and detention, to provide due process, to ensure judicial independence, to guarantee adequate prison conditions, and to prohibit torture and extrajudicial execution. The UDHR declares, "No one shall be subjected to arbitrary arrest, detention or exile."[376] The ICCPR adds that "Anyone who is arrested shall be informed, at the time of arrest, of the reasons for his arrest and shall be promptly informed of any charges against him."[377] The African Charter reaffirms the right to liberty and security of persons and the freedom from arbitrary arrests and detention.[378]

The ICCPR requires that those arrested be brought promptly before a court and either tried or released.[379] Upon arrest, the individual is entitled to be informed promptly and in detail of the cause of the charge against him.[380] The ICCPR further states that anyone who is arrested is entitled to judicial proceedings to determine the lawfulness of the detention.[381] The African Charter affirms the right of an individual "to have his cause heard."[382] Fair treatment and judicial independence is required by the principles articulated in the UDHR, which states, "Everyone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations and of any criminal charge against him."[383] The ICCPR requires that

---

[376] United Nations Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810 at 71, art. 9 ¶ 2 (1948) (adopted by the U.N. General Assembly on Dec. 10, 1948) (Ethiopia agreed to abide by its terms in the 1991 Transitional Charter) [hereinafter UDHR or Universal Declaration].
[377] Int'l Covenant on Civil and Political Rights, G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, art. 9 ¶ 2, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, (acceded by Ethiopia on Sept. 11, 1993) [hereinafter ICCPR].
[378] African [Banjul] Charter on Human and Peoples' Rights, OAU Doc. CAB/LEG/67/3 rev. 5, at art. 6, 21 I.L.M. 58 (1982) (ratified by Ethiopia on June 15, 1998) [hereinafter African Charter].
[379] ICCPR, *supra* note 377, at art. 9 ¶ 3.
[380] *Id.* at art. 14 ¶ 3(a).
[381] *Id.* at art. 9 ¶ 4.
[382] African Charter, *supra* note 378, at art. 7 ¶ 1.
[383] UDHR, *supra* note 376, at art. 10.

"[a]ll persons shall be equal before the courts and tribunals."[384] CERD declares that individuals have the "right to equal treatment before tribunals and all other organs administering justice."[385]

The African Charter states, "Every individual shall have the right to the respect of the dignity inherent in a human being . . . . All forms of exploitation and degradation of man particularly slavery, slave trade, torture, cruel, inhuman or degrading punishment and treatment shall be prohibited."[386] Ethiopia guarantees, "All persons under any form of detention or imprisonment shall be treated in a humane manner and with respect for the inherent dignity of the human person."[387]

The Standard Minimum Rules for the Treatment of Prisoners outline specific standards of care. These include that sanitary installations be adequate to enable every prisoner "to comply with the needs of nature when necessary and in a clean and decent manner."[388] Every prisoner should be provided a separate bed and sufficient bedding.[389] Every prisoner shall be provided "at the usual hours" with "food of nutritional value adequate for health and strength, of wholesome quality and well prepared and served,"[390] and with drinking water "available to every prisoner whenever he needs it."[391] Communication with family and friends shall be allowed under appropriate supervision at regular intervals, both by correspondence and visit.[392]

The UDHR provides, "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."[393] This human right is codified in the ICCPR.[394] Under the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, each party shall take effective legislative, administrative, judicial or other measures to prevent acts of torture in any territory under its jurisdiction.[395] No exceptional circumstances—a state of war or a threat of war, internal political instability, or any other public emergency—may be invoked as a justification of torture.[396] In addition, each party shall prevent other acts of cruel, inhuman, or degrading treatment or punishment which do not amount to torture.[397] Ethiopia also is prohibited from committing torture or other cruel, inhuman, or degrading treatment or punishment against children under the CRC[398] and the African Charter on the Rights and Welfare of the Child.[399]

---

[384] ICCPR, *supra* note 377, at art. 9 ¶ 2.
[385] Int'l Convention on the Elimination of All Forms of Racial Discrimination, G.A. res. 2106 (XX), Annex, 20 U.N. GAOR Supp. (No. 14) at 47, art. 5(a), U.N. Doc. A/6014 (1966) (ratified by Ethiopia on June 23, 1976) [hereinafter CERD].
[386] African Charter, *supra* note 378, at art. 5.
[387] ETH. CONST. art. 21(1) ("Any person in custody or a convicted prisoner shall have the right to humane treatment which accords with his human dignity."); *see also* Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, G.A. res. 43/173, annex, 43 U.N. GAOR Supp. (No. 49) at 298, U.N. Doc. A/43/49 (1988), Principle 1.
[388] Standard Minimum Rules for the Treatment of Prisoners, adopted Aug. 30, 1955 by the First United Nations Congress on the Prevention of Crime and the Treatment of Offenders, U.N. Doc. A/CONF/611, annex I, E.S.C. res. 663C, 24 U.N. ESCOR Supp. (No. 1) at 11, U.N. Doc. E/3048 (1957), amended E.S.C. res. 2076, 62 U.N. ESCOR Supp. (No. 1) at 35, U.N. Doc. E/5988 (1977), at art. 12.
[389] *Id.* at art. 19.
[390] *Id.* at art. 20 ¶ 1.
[391] *Id.* at art. 20 ¶ 2.
[392] *Id.* at art. 37.
[393] UDHR, *supra* note 376, at art. 5.
[394] ICCPR, *supra* note 377, at art. 7 ("No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment.").
[395] Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, at art. 2 ¶ 1 [annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984)] (Ethiopia acceded to the Convention on Apr. 13, 1994) [hereinafter CAT].
[396] *Id.* at art. 2 ¶ 2.
[397] *Id.* at art. 16.
[398] Convention on the Rights of the Child, G.A. res. 44/25, annex, 44 U.N. GAOR Supp. (No. 49) at art 37(a), U.N. Doc. A/44/49 (1989) (acceded by Ethiopia on May 14, 1991) [hereinafter CRC].
[399] African Charter on the Rights and Welfare of the Child, OAU Doc. CAB/LEG/24.9/49, art. 16 ¶ 1 (1990) (ratified by Ethiopia on Oct. 2, 2002) [hereinafter ACRWC].

Arbitrary executions are those committed by the government without a proper trial or process or simply apart from any judicial involvement. The ICCPR affirms the right to be protected from extra-judicial executions: "Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life."[400] A nation that imposes the death penalty is required to ensure that it is only instituted as punishment for the severest crimes and is executed following a valid, final judgment of a competent court.[401]

### 2. ETHIOPIAN CONSTITUTION

The Ethiopian Constitution provides that no one shall be deprived of his or her liberty except on such grounds and in accordance with such procedures as are established by law.[402] No person may be subjected to arbitrary arrest, and no person may be detained without a charge or conviction against him.[403]

The Constitution dictates that not only must people who are arrested "be informed promptly, in a language they understand, of the reasons for their arrest and of any charge against them,"[404] but they also have "the right to be brought before a court within 48 hours of their arrest."[405] Further, "[o]n appearing before a court, they have the right to be given prompt and specific explanation of the reasons for their arrest due to the alleged crime committed."[406] If the arresting law enforcer fails to give reasons for the arrest, the detained person has a right to petition for release, although a court may give the arresting officers some time to conduct further investigation.[407] Ethiopian law establishes an independent judiciary. According to the Constitution, "Courts of any level shall be free from any interference or influence of any governmental body, government official or from any other source."[408] Judges have "full independence and shall be directed solely by the law."[409]

Everyone has the right to protection against cruel, inhuman or degrading treatment or punishment.[410] Further, the Constitution mandates minimal standards of treatment and conditions for those detained or imprisoned. All persons held in custody have the right to treatments respecting their human dignity.[411] All persons shall have the opportunity to communicate with, and to be visited by, their spouses or partners, close relatives, friends, religious counselors, medical doctors, and their legal counsel.[412]

---

[400] ICCPR, *supra* note 377, at art. 6 ¶ 1.
[401] *Id.* at art. 6 ¶ 2.
[402] ETH. CONST. art. 17 ¶ 1.
[403] *Id.* at art. 17 ¶ 2.
[404] *Id.* at art. 19 ¶ 1.
[405] *Id.* at art. 19 ¶ 2.
[406] *Id.*
[407] *Id.* at art. 19 ¶ 4.
[408] *Id.* at art. 79 ¶ 2.
[409] *Id.* at art. 79 ¶ 3.
[410] *Id.* at art. 18.
[411] *Id.* at art. 21 ¶ 1.
[412] *Id.* at art. 21 ¶ 2.

## B.  SURVEILLANCE: RIGHTS TO ASSEMBLY AND ASSOCIATION

### 1.  INTERNATIONAL DECLARATIONS AND TREATIES

The UDHR states, "[e]veryone has the right to freedom of peaceful assembly and association."[413] The CERD requires signatories to "undertake to prohibit and to eliminate racial discrimination . . . and to guarantee the right of everyone, without distinction as to race, color, or national or ethnic origin," to a variety of civil rights, including "[t]he right to freedom of peaceful assembly and association."[414] The African Charter guarantees that "[e]very individual shall have the right to free association provided that he abides by the law."[415] The rights of children to associate freely and to assemble peacefully are also protected.[416]

The UDHR provides that no person "shall be subjected to arbitrary interference with his privacy, family, home or correspondence, nor attacks upon his honor and reputation. Everyone has the right to the protection of the law against such interference or attacks."[417] The ICCPR parallels the individual privacy rights in the UDHR,[418] and international law also protects children's privacy rights.[419]

The UDHR states, "[e]veryone has the right to life, liberty and security of person."[420] As a party to CERD, Ethiopia provides the "right to security of person and protection of the State against violence or bodily harm, whether inflicted by government officials or by any individual group or institution," without distinction as to race, color, or national or ethnic origin.[421] The African Charter indicates that human beings are inviolable and "[e]very human being shall be entitled to respect for his life and the integrity of his person."[422] No one may be arbitrarily deprived of this right. The ICCPR mandates, "no one shall be subjected without his [or her] free consent to medical or scientific experimentation."[423]

### 2.  ETHIOPIAN CONSTITUTION

The Constitution protects Ethiopian citizens' rights "to assemble and to demonstrate together with others peaceably and unarmed, and to petition."[424] Every person has the right to freedom of association "for any cause or purpose."[425] Freedom of association may be restricted only under narrow circumstances.[426]

---

[413] UDHR, *supra* note 376, at art. 20.
[414] CERD, *supra* note 385, at art. 5.
[415] African Charter, *supra* note 378, at art. 10.
[416] The Convention on the Rights of the Child recognizes "the rights of the child to freedom of association and to freedom of peaceful assembly." CRC, *supra* note 398, at art. 15. The African Charter on the Rights and Welfare of the Child guarantees similar rights: "Every child shall have the right to free association and freedom of peaceful assembly in conformity with the law." ACRWC, *supra* note 399, at art. 8.
[417] UDHR, *supra* note 376, at art. 12.
[418] ICCPR, *supra* note 377, at art. 17.
[419] CRC, *supra* note 398, at art. 16; ACRWC, *supra* note 399, at art. 10.
[420] UDHR, *supra* note 376, at art. 3.
[421] CERD, *supra* note 385, at art. 5(a).
[422] African Charter, *supra* note 378, at art. 4.
[423] ICCPR, *supra* note 377, at art. 7.
[424] ETH. CONST. art. 30.
[425] *Id.* at art. 31.
[426] *Id.* ("Associations formed in violation of the appropriate laws or associations formed with the objective of overthrowing the constitutional order or associations carrying out these activities shall be prohibited.")

The Constitution guarantees a right of privacy to each citizen, which "shall include the right not to be subjected to searches of his personal possession."[427] Further, citizens have a "right to the inviolability of his notes and correspondence including postal letters, and communications made by means of telephone, telecommunications and electronic devices."[428]

## C.   RIGHT TO EDUCATION

### 1.   INTERNATIONAL DECLARATIONS AND TREATIES

By adopting the UDHR, Ethiopia has declared that "Everyone has the right to education."[429] Specifically, Article 26 requires that education be free and compulsory at the elementary levels and that higher education be generally available and "equally accessible to all on the basis of merit."[430] Education must promote "understanding, tolerance and friendship among all nations, racial or religious groups."[431] The ICESCR uses similar language in recognizing the right to education for "everyone."[432]

Ethiopia is signatory to international treaties specific to women, such as CEDAW,[433] and children, such as the CRC, that guarantee a right to education.[434] In 1976, Ethiopia ratified CERD, which prohibited discrimination based on, among other things, "descent, or national or ethnic origin" in the exercise "of human rights and fundamental freedoms" in public life[435] which, under the UDHR, includes a right to education.

Ethiopia has also ratified instruments that protect and enforce the right to education within the African continent. The African [Banjul] Charter on Human and Peoples' Rights guarantees the right to education for every individual.[436] In addition, the African Charter on the Rights and Welfare of the Child guarantees every child a right to education, including "free and compulsory basic education" and access to higher education to all.[437]

### 2.   ETHIOPIAN CONSTITUTION

The Constitution of the Federal Democratic Republic of Ethiopia guarantees access to education for all. Although the constitution limits this access "[t]o the extent the country's resources permit," it specifically requires that education be provided "in a manner that is free from any religious influence, political partisanship or cultural prejudices."[438]

---

[427] *Id.* at art. 26.
[428] *Id.*
[429] UDHR, *supra* note 376, at art. 26 ¶ 1.
[430] *Id.* at art. 26, ¶ 1.
[431] *Id.* at art. 26, ¶¶ 2-3.
[432] Int'l Covenant on Economic, Social and Cultural Rights, G.A. rest. 2200A (XXI), U.S. GAOR Supp. (No. 16) at 49, art. 13, U.S. doc. A/6316 (1966) (ratified by Ethiopia on June 11, 1993) [hereinafter ICESCR].
[433] Convention on the Elimination of All Forms of Discrimination against Women, G.A. res. 34/180, 34 U.N. GAOR Supp. (No. 46) at 193, art. 10, U.N. Doc. A/34/46 (1981) (ratified by Ethiopia on Dec. 10, 1981) [hereinafter CEDAW].
[434] *See* CRC, *supra* note 398, at art. 28-29.
[435] CERD, *supra* note 385, at art. 1, ¶ 1
[436] African Charter, *supra* note 378, at art. 17.
[437] ACRWC, *supra* note 399, at art. 11.
[438] ETH. CONST. art. 90.

### D.  EXPRESSION

#### 1.  INTERNATIONAL DECLARATIONS AND TREATIES

Guarantees of expression are found in a number of international covenants and conventions recognized by Ethiopia. The Universal Declaration of Human Rights ("UDHR") provides that "everyone has the right to freedom of opinion and expression [and that] this right includes freedom to hold opinions without interference and to seek, receive and impart information and ideas through any media and regardless of frontiers."[439] In addition, the UDHR provides that "everyone has the right freely to participate in the cultural life of the community, to enjoy the arts and to share in scientific advancement and its benefits."[440]

The International Convention on Economic, Social and Cultural Rights ("ICESCR") ensures "the equal right of men and women to the enjoyment of all economic, social and cultural rights."[441] Specifically, parties to the ICESCR recognize everyone's right "to take part in cultural life" and to the productive "diffusion of science and culture."[442] The International Covenant on Civil and Political Rights ("ICCPR") ensures that "everyone shall have the right to freedom of thought, conscience and religion," as well as "the right to hold opinions without interference."[443] Furthermore, "in those states in which ethnic, religious or linguistic minorities exist," the ICCPR provides that persons "belonging to such minorities shall not be denied the right, in community with the other members of their group, to enjoy their own culture, to profess and practice their own religion or to use their own language."[444]

The African Charter provides for "freedom of conscience, the profession and the free practice of religion."[445] The Charter further provides that "every individual shall have the right to receive information" and "every individual shall have the right to express and disseminate his opinions within the law."[446] An individual may "freely, take part in the cultural life of his community," and "all peoples shall have the right to their economic, social and cultural development with due regard to their freedom and identity."[447] Such cultural rights of children are also protected.[448] In addition, "every child shall have the right to freedom of thought, conscience and religion."[449]

#### 2.  ETHIOPIAN CONSTITUTION

The Constitution safeguards rights to political, personal, and cultural expression. The Preamble expressly provides for the protection of "people's fundamental freedoms and rights" and states that "cultural discrimination"

---

[439] UDHR, *supra* note 376, at art. 19. The ICCPR provides the same right to everyone. ICCPR, *supra* note 377, at art. 19. The CRC provides this same right to children. *See* CRC, *supra* note 398, at art. 13.
[440] *Id.*
[441] ICESCR, *supra* note 432, at art. 3.
[442] *Id.* at arts. 3 & 15.
[443] ICCPR, *supra* note 377, at arts. 18-19.
[444] *Id.* at art. 27.
[445] African Charter, *supra* note 378, at art. 8.
[446] *Id.* at art. 9.
[447] *Id.*
[448] The African Charter on the Rights and Welfare of the Child provides that "every child who is capable of communicating his or her own views shall be assured the rights to express his opinions freely in all matters and to disseminate his opinions subject to such restrictions as are prescribed by laws." ACRWC, *supra* note 399, at art. 7.
[449] *Id.* at art. 9.

will not be tolerated.[450] It also pays heed to Ethiopia's "rich and proud cultural legacies in territories" in referencing the various, diverse nationalities' "common interest."[451] The Preamble leaves no doubt that the rights in the Constitution are intended to foster a culturally diverse nation.

The right to freely express ideas and opinions is central to a democratic society's success, which the Ethiopian government has recognized in its Constitution. Everyone has the right to freedom of thought, conscience, and religion,[452] to hold opinions without interference,[453] and to freedom of expression without any interference.[454] Freedom of the press and other mass media and freedom of artistic creativity are also guaranteed.[455] In addition to protecting general rights of expression, the Constitution also explicitly protects the cultural rights of Ethiopian citizens, permitting them to freely express and celebrate their cultural identity and heritage. All Ethiopian languages shall enjoy equal state recognition.[456] Uniquely, all sovereign power resides in the nations, nationalities, and peoples of Ethiopia.[457] "Nation, Nationality and People" is defined as a "group of people who have or share a large measure of a common culture or similar customs, mutual intelligibility of language, belief in common or related identities, a common psychological make-up, and who inhabit an identifiable, predominantly contiguous territory."[458]

> Every Nation, Nationality and People in Ethiopia has an unconditional right to self-determination, including the right to secession . . . [and] every Nation, Nationality and People in Ethiopia has the right to speak, to write and to develop its own language; to express, to develop and to promote its culture; and to preserve its history . . . [and] every Nation, Nationality and People in Ethiopia has the right to a full measure of self-government that includes the right to establish institutions of government in that territory it inhabits . . ."[459]

The state of Oromia is one of the member states of the Federal Democratic Republic of Ethiopia.[460] The Constitution equally protects the various nationalities' rights to express their cultural viewpoints, and it specifically respects and recognizes Oromia's relationship to the capital city "regarding the provision of social services or the utilization of natural resources and other similar matters, as well as joint administrative matters arising from the location of Addis Ababa within the State of Oromia."[461]

---

[450] ETH. CONST. Preamble.
[451] Id.
[452] Id. at art. 27 ¶ 1.
[453] Id. at art. 29 ¶ 1.
[454] Id. at art. 29 ¶ 2.
[455] Id. at art. 29 ¶ 3.
[456] Id. at art. 5.
[457] Id. at art. 8 ¶ 1.
[458] Id. at art. 39.
[459] Id. at art. 39 ¶¶ 1-3.
[460] Id. at art. 47. Other members states are Tigray, Afar, Amhara, Somalia, Benshengul (Gumez), Southern Nations, Gambela Peoples, and Harare Peoples.
[461] Id. at art. 49 ¶ 5.

### E.   RELATIONSHIP TO LAND: ENVIRONMENT AND ECONOMY

#### 1.   INTERNATIONAL DECLARATIONS AND TREATIES

Under the UDHR, Ethiopia recognizes the right to own and not to be arbitrarily deprived of property,[462] and the right to the realization of economic, social, and cultural rights indispensable for individual dignity and personal development. As a signatory to the ICESCR, Ethiopia pledges to "improve methods of production, conservation, and distribution of food by making full use of technical and scientific knowledge."[463]

#### 2.   ETHIOPIAN CONSTITUTION

The preamble to Ethiopia's Constitution recognizes the need to build a political community for the "Nations, Nationalities, and Peoples of Ethiopia" founded on the rule of law and capable of advancing their economic development, respecting individual freedoms, rectifying historically unjust relationships, and creating sustainable conditions to live as one economic community.

The Constitution's provisions concerning property rights have particular significance considering that more than 85 percent of Oromia's population lives in the countryside.[464] The right to ownership of rural and urban land, as well as of all natural resources, is exclusively vested in the state and in the people of Ethiopia.[465] "Land is a common property of the Nations, Nationalities, and Peoples of Ethiopia and shall not be subject to sale or to other means of exchange."[466] Within this framework of state ownership, the Constitution also provides for certain possession rights, which are vital for a rural population dependent on land for its livelihood:

> Any Ethiopian who wants to earn a living by farming has a right, which shall not be alienated, to obtain, without payment, the use of land.

> Ethiopian pastoralists have a right to free land for grazing and cultivation as well as a right not to be displaced from their own lands.

> Every Ethiopian shall have the full right to immovable property he builds on the land and to the permanent improvements he brings about on the land by his labor or capital. This right shall include the right to alienate, to bequeath, and where right of use expires, to remove his property, transfer his title, or claim compensation for it . . .[467]

Other provisions of the Constitution directly address the environment and the economy: "All persons have the right to a clean and healthy environment."[468] Along with this right, "[g]overnment and citizens have a duty to

---

[462] UDHR, *supra* note 376, at art. 17. This right is also recognized by Ethiopia in the ICESCR, *supra* note 432, at art. 1, and the African Charter, *supra* note 378, at art. 14.
[463] ICESCR, *supra* note 432, at art. 11.
[464] *Suppressing Dissent, supra* note 17, at 9.
[465] ETH. CONST. art. 40.
[466] *Id.*
[467] *Id.*
[468] *Id.* at art. 44 ¶ 1.

protect the environment."[469] Ethiopian farmers and pastoralists have the right to receive a fair price for their products, which would lead to improvement in their conditions of life and to enable them to obtain an equitable share in the national wealth commensurate with their contribution.[470]

The Constitution contains provisions that direct the government to share resources and ensure a basic living standard for all citizens. The government shall formulate policies that ensure that all Ethiopians can benefit from the country's legacy of intellectual and material resources[471] and deploy land and other natural resources for the common benefit and development of the people.[472]

---

[469] *Id.* at art. 92 ¶ 4.
[470] *Id.* at art. 41 ¶ 8.
[471] *Id.* at art. 89 ¶ 1.
[472] *Id.* at art. 89 ¶ 5.

Human Rights in Ethiopia: Through the Eyes of the Oromo Diaspora

ISBN 0-929293-64-9

© 2009 The Advocates for Human Rights



Saving Lives. Fighting Injustice. Restoring Peace. Building the Human Rights Movement.