# Exhibit D

Exhibit D



# Ethiopia

Bureau of Democracy, Human Rights, and Labor
2005
March 8, 2006

Ethiopia continued its transition from a unitary to a federal system of government, under the leadership of Prime Minister Meles Zenawi and the ruling Ethiopian People's Revolutionary Democratic Front (EPRDF) coalition. The country's population was approximately 74 million. On September 5, the government certified the results of the May 15 national parliamentary elections, in which the EPRDF won a third consecutive five-year term. Domestic and international observers reported that polling throughout the country was generally credible, although irregularities and intimidation of voters and election observers marred polling in many areas. Although political parties predominantly were ethnically based, opposition parties engaged in a steady process of consolidation. While civilian authorities generally maintained effective control of the security forces, there were instances in which elements within those forces acted independently of government authority.

After the May elections, serious human rights abuses occurred, when the opposition parties refused to accept the announced results, and in November after the Coalition for Unity and Democracy (CUD) called for civil disobedience, which resulted in widespread riots and excessive use of force by the police and military. Although there were some improvements, the government's human rights record remained poor and worsened in some areas. In the period leading up to the May national elections, campaigning was open and debates were televised. The Carter Center described this period as credible and commendable. However, in the period following the elections, authorities arbitrarily detained, beat, and killed opposition members, ethnic minorities, NGO workers, and members of the press. Authorities also imposed additional restrictions on civil liberties, including freedom of the press and freedom of assembly. The following human rights problems were reported:

- limitation on citizens' right to change their government
- unlawful killings, including alleged political killings, and beating, abuse, and mistreatment of detainees and opposition supporters by security forces
- poor prison conditions
- arbitrary arrest and detention of thousands of persons, particularly those suspected of sympathizing with or being members of the opposition
- detention of thousands without charge, and lengthy pretrial detention
- government infringement on citizens' privacy rights, and frequent refusal to follow the law regarding search warrants
- government restrictions on freedom of the press; arrest, detention, and harassment of journalists for publishing articles critical of the government; self-censorship by journalists
- government restrictions on freedom of assembly including denial of permits, burdensome preconditions or refusal to provide assembly halls to opposition political groups, and at times use of excessive force to disperse demonstrations
- government limitations on freedom of association
- violence and societal discrimination against women, and abuse of children
- female genital mutilation (FGM)
- exploitation of children for economic and sexual purposes
- trafficking in persons
- societal discrimination against persons with disabilities, and discrimination against religious and ethnic minorities
- government interference in union activities

**RESPECT FOR HUMAN RIGHTS**

Section 1 Respect for the Integrity of the Person, Including
Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

During the year paramilitary groups committed unlawful killings, including political killings. The Ethiopian Human Rights Council (EHRCO) reported that from January to March armed militia killed several members of the opposition All-Ethiopia Unity Party/Coalition for Unity and Democracy (AEUP/CUD) in the Amhara Region. For example, on January 19, militia killed AEUP member Anley Adis and local AEUP chairman Eyilegne Wendimneh, both of Debay Telat-gen District, Yebabat Kebele. On February 28, militia killed Tilahun Kerebe of Ankesha District, Sostu Shumata Zegsa Abo Kebele; and on March 21, Alamir Aemero of Shikudad District, Absela Kebele. By year's end, police had arrested two suspects in the killing of Tilahun Kerebe.

The Oromo National Congress (ONC) reported that, between March 19 and September 24, police, militia, and *kebele* (local administration) officials

shot and killed 24 members and supporters. For example, on March 28, police shot and killed Ahmed Adem of Chelia District, Ijai Town. On June 12, police shot and killed parliamentarian-elect Tesfaye Adane, representing Arsi Negeli Town, East Shoa Zone. Some of these killings were a result of confrontations in which both sides were armed. By year's end, three policemen suspected of being involved in the killing of parliamentarian-elect Tesfaye Adane were detained at Zway Prison and their case was under investigation.

EHRCO reported that on April 23, *kebele* officials shot and killed Hassan Endris, a coordinator for the CUD in South Wollo Zone, Were-Ilu District, Kebele 11, in the Amhara Region. On May 15, government security forces shot and killed Sheikh Osman Haji Abdella of Shashamane District, Hurso Sembo Kebele, Oromo Region.

The Ethiopian Social Democratic Federalist Party (ESDFP) reported that on August 18 army troops killed Bezela Lombiso of Gibe District in the Southern Nations, Nationalities, and Peoples Region, and raped his wife. Bezela faced charges of killing a policeman during the 2000 national and regional elections.

The CUD reported that on September 11 armed militia beat CUD member Asefa Getahun and that he died of his injuries the following day. On October 1, local militia shot and killed CUD member Girma Biru, of Sultulta Wereda, Mulo Town. The CUD stated that local administrators and armed militia were responsible for the October 11 extrajudicial killing of Mosse Wasse, in Shoga District, west Gojjam/Jiga, Amhara Region; and the October 16 extrajudicial killing of Tila Tsega, at Lay Gaynt/Nefas Mewucha, North Gonder.

In October 2004 EHRCO reported several alleged killings by police. For example, on October 18, police shot and killed Geletaw Mamo, of North Shoa Zone, Keya Gebriel Kebele, Amhara Region. A suspect in the killing was in police custody in the town of Jima. Authorities released a suspect in the November 2004 fatal police shooting of Nesredin Shehselo, a baker in Bole Subcity, Addis Ababa, on bail. Three suspects in the November 2004 fatal police shooting of Ashenafi Tabor, of Ilu District, Teji Town, were in custody at Sebeta police station. A suspect in the December 2004 fatal police shooting of Efrem Alemayehu, of Kirkos Subcity in Addis Ababa, was in police custody. A suspect in the January 3 fatal police shooting of Kebede Uzo, of Jijiga Town in the Somali Region, was in police custody in Jijiga.

There were no significant developments in the following cases of persons killed by security forces in 2004: the March killing of ninth-grade student Alemu Tesfaye in Oromiya Region; the killing of high school student Amelework Buli of Oromiya Region; the March to May killings of AEUP supporters; and the June incident of military personnel colliding with and then firing on a civilian vehicle in Gode town, killing 10 persons.

There were no developments in the case of district police responsible for the 2003 killing of opposition Southern Ethiopian People's Democratic Coalition (SEPDC) member Aeliso Tieliso.

The government reported that prosecutions had begun against several individuals suspected of the December 2003 to May 2004 extrajudicial killings of 13 Anuak civilians in the Gambella Region. In March Amnesty International reported that government soldiers had killed, raped, and tortured hundreds of Anuaks in the Gambella Region during that period.

During 2005 EHRCO reported that, from June 6 to 8, the police and army shot and killed 42 unarmed demonstrators in Addis Ababa. Between November 1 and 7, military and police forces opened fire on rioters who were throwing rocks, and in some cases were armed with machetes and grenades, killing at least 40 individuals in Addis Ababa (see section 2.b.). For example, on June 6, following unrest at Addis Ababa University, police shot and killed Shibre Desalegn of Yeka Subcity and Yesuf Abdela, a student at Kotebe Teacher's Training College. On June 8, police shot and killed 16-year-old student Nebiy Alemayehu of Kolfe Subcity, and Zulufa Surur (a mother of seven children), while security forces killed 16-year-old brothers Fekadu Negash and Abraham Yilma. Federal police acknowledged the death of 26 persons on June 8 following an unlawful demonstration. Several police were also killed during the November riots. On December 7, the government established an independent commission of inquiry to investigate circumstances surrounding the killings. The commission publicly issued a call for information and complaints.

EHRCO reported that on July 24 and 26 unidentified persons detonated hand grenades inside 4 hotels and a residence in the town of Jijiga, killing 5 persons and injuring 31. Police took suspects into custody and the case was under investigation.

Armed elements of the Oromo Liberation Front (OLF) and the Ogaden National Liberation Front (ONLF) continued to operate within the country. Clashes with government forces on numerous occasions resulted in the death of an unknown number of civilians, government security forces, and OLF and ONLF troops and members.

At year's end there were approximately two million landmines in the country, many dating from the 1998-2000 war with Eritrea. During the year landmines killed seven civilians, injured four, and destroyed seven vehicles in districts bordering Eritrea**.** The government demining unit continued to make limited progress in its survey and demining of border areas. United Nations Mission in Eritrea and Ethiopia (UNMEE) officials reported that new landmines were planted on both sides of the Ethiopian-Eritrean border during the year.The government and UNMEE engaged in demining activities in selected areas along the border and disseminatedinformation on the whereabouts of suspected mined areas to local residents.

In June, July, October, and November, suspects arrested for the April 2004 hand grenade attack on a television room at Addis Ababa University (AAU) during a Tigrigna language news program appeared in court; the trial was scheduled to resume in January 2006**.**

There were no developments in the May 2004 hand grenade attack on a Tigrayan-owned shop in Debre Zeit, Oromiya Region. Police blamed the OLF for the attack.

Ethnic clashes resulted in hundreds of deaths during the year (see section 5).

The federal high court in Addis Ababa continued to arraign and prosecute those formally charged with committing genocide and other war crimes, including extrajudicial killings, under the 1975-91 Derg regime (see section 1.e.).

b. Disappearance

There were reports of disappearances perpetrated by government forces during the year, some of which may have been politically motivated. In nearly all cases, security forces abducted persons and detained them in undisclosed locations for varying lengths of time ranging from weeks to months. Thousands of such cases occurred in response to calls for struggle against the government by the OLF in Oromiya and during post-election public demonstrations in November and December.

EHRCO reported the disappearance of 17 persons between June 8 and 10. On June 8 police abducted Ashenafi Berhanu, Tsegaye Neguse, Daniel Worku, and Adem Hussien, all working in Addis Ababa, and Jelalu Temam of Arada Subcity in Addis Ababa, and the brothers Girum Seifu and Mekonnen Seifu of Lideta Subcity; on June 9, security forces abducted Endeshaw Terefe of Addis Ketema Subcity in Addis Ababa, and federal police abducted Daniel Abera, Tesfaye Bacha, Tesfaye Jemena, Bonsa Beyene, and Getu Begi of Bole Subcity in Addis Ababa; and on June 10, Solomon Bekele of Lideta Subcity, and Amanuel Asrat, Mesfin Mergia, and Dawit Demerew of District 9, Kebele 7. The whereabouts of these individuals were not known.

There were no new developments in the May 2004 detention of Jigsa Soressa, a guard at the Mecha and Tulema Association (MTA), an Oromo nongovernmental organization (NGO), who reportedly continued to be detained at Addis Ababa prison.

The government and independent sources reported that Oromo singer Raya Abamecha, who disappeared in 2004, had returned to Addis Ababa. Details of Abamecha's disappearance were not known at year's end.

On June 9, three Ethiopian air force personnel landed a military helicopter at Ambouli, Djibouti; two of them reportedly requested asylum, but an Ethiopian military delegation reportedly convinced them to return to Ethiopia the next day. AI and UNHCR attempted to visit them in Djibouti but were refused. At year's end, family members told local press that the pilots were detained at an air force base and were restricted from seeing visitors.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

Although the law prohibits the use of torture and mistreatment, there were numerous credible reports that security officials often beat or mistreated detainees. Opposition political parties reported frequent and systematic abuse of their supporters by police and regional militias.

EHRCO reported that on May 14, Abdeta Dita Entele, a member of the opposition coalition Oromo National Congress/United Ethiopian Democratic Forces of Siraro District in the Oromo Region, committed suicide following the severe beatings he received from *kebele* officials.

On October 16, two men armed with pistols attacked Daniel Bekele, a policy advocate for the NGO ActionAid Ethiopia and a member of the executive committee of the Network of Ethiopian Nongovernmental Organizations and Civil Society Organizations, which monitored the May 15 elections. According to ActionAid, the armed men beat him in the eye. At year's end, Bekele was in police detention on charges of treason and genocide.

Authorities took no action against police responsible for the February and March 2004 police beatings of students, teachers, and parents at Oromiya Region high schools and universities; or against militia responsible for May 2004 attacks on its members reported by the opposition All-Ethiopia Unity Party.

Security forces beat persons during demonstrations (see section 2.b.).

In October 2004 an undisclosed number of the approximately 330 students expelled from Addis Ababa University following the January 2004 Oromo student protests, who had been ordered by police to kneel and run barefoot on sharp gravel for several hours, were readmitted to the university (see section 2.b.).

There were no significant developments in cases of beatings and torture committed by security forces in 2003.

Unlike in previous years, there were no reports that security forces beat journalists.

On August 11, local and international media reported that the federal high court sentenced to death two former senior government officials accused of torturing political opponents during the former Mengistu regime -- former National and Public Security Minister Tesfaye Woldeselase and Leggesse Belayneh, former head of criminal investigations.

During the year ethnic clashes resulted in hundreds of injuries and deaths (see section 5).

Prison and Detention Center Conditions

Prison and pretrial detention center conditions remained very poor, and overcrowding continued to be a serious problem. Prisoners often were allocated fewer than 21.5 square feet of sleeping space in a room that could contain up to 200 persons. The daily meal budget was approximately 25 cents (2 birr) per prisoner, and many prisoners had family members deliver food daily or used personal funds to purchase food from local vendors. Prison conditions were unsanitary, and access to medical care was unreliable. There was no budget for prison maintenance.

In detention centers police often physically abused detainees. Diplomatic observers reported firsthand accounts of such beatings from Addis Ababa University student detainees in Oromiya. Authorities generally permitted visitors, but sometimes denied them access to detainees.

While statistics were unavailable, there were some deaths in prison due to illness and poor health care. Prison officials were not forthcoming with reports of such deaths.

Authorities sometimes incarcerated juveniles with adults, if they could not be accommodated at the juvenile remand home. There was only one

juvenile remand home for children under age 15, with the capacity to hold 150 children.

Human rights organizations reported that the government had transported 10 to 18 thousand individuals (mostly youths aged 18-23 detained during the November mass house-to-house searches in Addis Ababa) to Dedessa, a military camp formerly used by the Derg regime located 375 kilometers west of the capital. Observers expressed concern that the camp's remote location and lack of facilities threatened the health of detainees. Human rights organizations reported on similar detention camps in and around Bahir Dar. Most of these detainees were released by year's end. The government transported an unknown number of other detainees to other detention facilities around the country during the same November period.By year's end the government publicly announced that it had released all but three thousand detainees, who would be charged with relatively minor crimes potentially carrying sentences of up to several months confinement. International observers were denied access to the detention facilities, but local NGO Prison Fellowship Association was permitted access.

During the year the International Committee of the Red Cross (ICRC) generally had access to federal and regional prisons, civilian detention facilities, and police stations throughout the country, and conducted hundreds of visits involving thousands of detainees. The government also granted diplomatic missions access, subject to advance notification, to prison officials. Authorities allowed the ICRC to meet regularly with prisoners without third parties being present. The ICRC received permission to visit military detention facilities where the government detained suspected OLF fighters. The ICRC also continued to visit civilian Eritrean nationals and local citizens of Eritrean origin detained on alleged national security grounds.

Government authorities continued to permit diplomats to visit prominent detainees held by the special prosecutor's office (SPO) for alleged involvement in war crimes and terrorist activities. However, the government denied representatives of the international community, including the ICRC, access to leaders of the CUD opposition party, members of civil society groups, and journalists detained in early November for alleged involvement in antigovernment demonstrations in Addis Ababa, who remained in federal police custody at Addis Ababa's Ma-Ekelawi detention facility at year's end. The government permitted Prison Fellowship Association and local religious leaders to visit these detainees.

d. Arbitrary Arrest or Detention

Although the law prohibits arbitrary arrest and detention, the government frequently did not observe these provisions in practice.

Role of the Police and Security Apparatus

The Federal Police Commission reports to the Ministry of Federal Affairs, which in turn is subordinate to the parliament. Local government militias also operated as local security forces largely independent of the police and the military. Petty corruption remained a problem in the police force, particularly among traffic policemen who solicited bribes from motorists. Impunity also remained a serious problem. The government rarely publicly disclosed the results of investigations into such types of abuses. The federal police acknowledged that many members of its police force as well as regional police lack professionalism.

The government continued its efforts to train police and army recruits in human rights. During the year the government continued to seek ICRC assistance to improve and professionalize its human rights training and curriculum to include more material on the constitution and international human rights treaties and conventions.

In late November parliament established a commission, whose members were appointed by the prime minister, to investigate the violent demonstrations of June and early November. The chair of the commission reported to a group of foreign ambassadors that it would begin in February 2006 to investigate alleged use of excessive force by security forces.

Arrest and Detention

Authorities regularly detained persons without warrants and denied access to counsel and family members, particularly in outlying regions, and for those thousands of young persons detained during and after the November riots. According to law, detainees must be informed of the charges against them within 48 hours, but this generally was not respected in practice. While there was a functioning bail system, it was not available for some offenses, including murder, treason, and corruption. In most cases authorities set bail between $115 and $1,150 (1 to 10 thousand birr), which was too costly for most citizens. In addition police officials did not always respect court orders to release suspects on bail. With court approval, persons suspected of serious offenses can be detained for 14 days while police conduct an investigation, and for additional 14-day periods while the investigation continues. The law prohibits detention in any facilities other than an official detention center; however, there were dozens of crude, unofficial local detention centers used by local government militia. In the Oromiya region, a police training facility was used as a makeshift prison during and after the November riots.

The government provided public defenders for detainees unable to afford private legal counsel, but only when their cases went to court. While in pretrialdetention, authorities allowed such detainees little or no contact with legal counsel.

There were many reports from opposition party members that in small towns authorities detained persons in police stations for long periods without access to a judge, and that sometimes these persons' whereabouts were unknown for several months. Opposition parties registered many complaints during the year that government militias beat and detained their supporters without charge for participating in opposition political rallies (see section 1.c.).

The government continued its harassment of teachers, particularly in Oromiya and Tigray. The independent Ethiopian Teachers Association (ETA) reported that authorities detained numerous teachers and accused them of being OLF sympathizers, many of whom remained in prison at year's end. Some of the teachers had been in detention for several years without charges. Human rights observers suspected several of the prolonged detentions were politically motivated.

Police continued to enter private residences and arrest individuals without warrants.

Police detained journalists during the year (see section 2.a.).

Authorities took no action against Amhara Region government militia, district officials, police who arbitrarilydetained AEUP members in April and May 2004, or against police who arbitrarily detained ONC member Olbana Lelisa from May to July 2004 without filing charges against him.

During the year police detained persons for holding meetings and demonstrations (see section 2.b.).

Opposition groups alleged that some of the persons detained by the SPO were held for political reasons, an allegation that the government denied (see section 1.e.).

Following the June 6 to 9 demonstrations protesting the announced outcome of the May 15 parliamentary elections, police detained thousands of opposition members and other residents of Addis Ababa. Government security forces took three to four thousand residents from their homes and detained them in Zway prison outside the capital. EHRCO reported the illegal detention between June 10 and 16 of 74 opposition political party activists, businessmen, and students. Security forces beat and detained an estimated five thousand individuals in various prisons around the country. On June 29, the federal police reported that it had detained 4,455 "suspects;" most were released after several days of detention. In mid-September, however, 40 percent of the prisoners at Shoa Robit prison (742 of 1,866 prisoners), north of Addis Ababa, were young men arrested around the time of the June demonstrations on charges of dangerous vagrancy.

In September the government arrested more than one thousand members of the CUD and UEDF opposition coalitions, following their announcement of plans to hold demonstrations on October 2.

In November, 30-200 motorists were arbitrarily detained for honking their horns during the African Union summit opening ceremony in response to an opposition call for civil disobedience.

In November military and police conducted door-to-door searches in Addis Ababa, often at night, and detained without warrant between 10 and 18 thousand youths, aged 18 to 23, believed to have been involved in violent antigovernment demonstrations.

In August and September police and local militia arrested six Oromo Federalist Democratic Movement (OFDM) members without warrant in the East and West Welega Zone of Oromiya Region: Shiferaw Fekadu, Fikru Benti, Mitiku Terfa, Abraham Jiregna, Abdeta Abraham, and Habte Tesema.

The OFDM reported that ruling Oromo People's Democratic Organization (OPDO) cadres harassed, intimidated, and detained hundreds of OFDM members who served as observers during the May 15 parliamentary elections. For example, in Arsi Zone, Assassa District, cadres arrested and detained Sheikh Mahmud Tusuru for several days. Authorities interrogated Gebeyehu Hayato, the son of a newly elected member of parliament, over 10 times. OFDM member Hussein Adem faced 20 days imprisonment in Sodere District. At year's end, nine OFDM members who served as observers during the May election remained detained in Gachi district of Illubabor zone. The OFDM reported to the NEB that local officials arrested 10 OFDM members in Kokosa Constituency, Nansibo District, Bale Zone. OFDM also reported the detention of 13 of its members in Borena Zone, Bule Hora District.

In response to attacks by armed opposition groups operating out of Somalia and Kenya, the military continued to conduct operations, which included occasional arbitrary detentions, in the Gambella, Somali, and Oromiya regions.

In November authorities re-arrested CUD member and mayor of Addis Ababa Dr. Berhanu Nega and Professor Mesfin Woldemariam, two prominent academics and human rights activists, for participating in planning antigovernment protests aimed at the removal of the government. At year's end they remained in confinement on charges of treason and genocide, along with several members of NGOs active in civic education, and independent journalists. Other prominent CUD leaders arrested included: CUD president Hailu Shawel; Dr. Yacob Hailemariam, a former prosecutor for the UN International Criminal Tribunal for Rwanda; and CUD vice-president Ms. Birtukan Mideksa, a former judge. Their prison conditions were reported to be adequate, especially those of the CUD leaders, who had separate cells. However, access to legal counsel was sporadic, and there were serious concerns about access to adequate medical care.

Authorities took no action against Amhara Region government militia, district officials, and police who arbitrarily detained AEUP members in April and May 2004; or against police who arbitrarily detained ONC member Olbana Lelisa from May to July 2004 without filing charges against him.

Authorities took no action against police who detained hundreds of Oromo students and teachers for several weeks in detention centers on suspicion of being supporters of the OLF in 2004 (see section 1.c.).

Thousands of criminal suspects reportedly remained in pretrial detention, some for years. Some of the detainees were teachers and students from the Oromiya Region accused of involvement in OLF activities, or who were arrested after student unrest broke out in Oromiya in February and March 2004.

The government detained several persons without charge at the Gondar prison, some for years, while the police investigated their cases. In April, authorities sentenced Wondante Mesfin to life imprisonment following his conviction on murder charges; he had been in detention in Nefas Mewcha prison in South Gondar Zone since 1994.

e. Denial of Fair Public Trial

While the law provides for an independent judiciary, the judiciary remained weak and overburdened. Most perceived the judiciary to be subject to significant political intervention.

The government continued to decentralize and restructure the judiciary along federal lines with the establishment of courts at the district, zonal,

and regional levels. The federal high court and the federal Supreme Court heard and adjudicated original and appeal cases involving federal law, transregional issues, and national security. The regional judiciary was increasingly autonomous and often heard regional cases.

Regional offices of the federal Ministry of Justice monitored local judicial developments. Some regional courts had jurisdiction over both local and federal matters, as the federal courts in those jurisdictions had not begun operation; overall, the federal judicial presence in the regions was limited. Anecdotal evidence suggested that some local officials believed they were not accountable to a higher authority. Pending the passage of regional legislation, federal procedural and substantive codes guide all judges.

To remedy the severe lack of experienced staff in the judicial system, the government continued to identify and train lower court judges and prosecutors, although officials acknowledged salaries did not attract the desired number of competent professionals.

Trial Procedures

According to the law, accused persons have the right to a fair public trial by a court of law within a "reasonable time;" the right to a presumption of innocence; the right to be represented by legal counsel of their choice; and the right to appeal. Despite these protections, closed proceedings occurred, at times authorities allowed detainees little or no contact with their legal counsel (see section 1.d.), and detainees usually were not presumed innocent. The public defender's office provides legal counsel to indigent defendants, although its scope remained severely limited, particularly with respect to SPO trials. Although the law explicitly stipulates that persons charged with corruption are to be shown the body of evidence against them prior to their trials, authorities routinely denied defense counsel access to such evidence before trial.

The law provides legal standing to some pre-existing religious and customary courts and allows federal and regional legislatures to recognize other courts. By law, all parties to a dispute must agree that a customary or religious court will be used before it may hear a case. Shari'a (Islamic) courts may hear religious and family cases involving Muslims. In addition, other traditional systems of justice, such as councils of elders, continued to function. Although not sanctioned by law, these traditional courts resolved disputes for the majority of citizens who lived in rural areas, and who generally had little access to formal judicial systems.

The federal first instance court's seventh criminal branch handled cases of sexual abuse against women and children. By the end of the year the court had received 541 cases and had passed verdicts on 351 cases.

Three federal judges sat on one bench to hear all cases involving juvenile offenses. There was a large backlog of juvenile cases, and accused children often remained in detention with adults until officials heard their cases.

The military justice system lacked adequately trained staff to handle a growing caseload. Foreign assistance to train military justice officials resumed during the year.

There was no new information on the activities of the SPO, established in 1992 to create a historical record of the abuses committed during the Mengistu government (1975-91, also known as the Derg regime) and to bring to justice persons responsible for human rights violations. Approximately one thousand persons remained in detention charged with Derg-era offenses. Court-appointed attorneys, sometimes with inadequate skills and experience, represented many of the defendants.

Political Prisoners

The total number of political detainees during the year was estimated to be in the several thousands.

While the law stipulates that all suspects be arraigned before a court within 48 hours, the leaders of the CUD, civil society, and journalists were held without access to courts, counsel, and family for many days. Human rights groups and political parties (such as the CUD, UEDF, and OFDM) reported that police and local militia detained thousands of persons in police stations and detention camps for several days in order to conduct interrogations.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law requires authorities to obtain judicial search warrants to search private property; however, in practice, particularly outside Addis Ababa, police often searched property without obtaining warrants (see section 1.d.). Opposition party representatives claimed that police sometimes used fraudulent warrants to enter homes and commit criminal acts, including extorting money. There were reports that members of the federal police robbed persons during the year, including through the use of false warrants.

There continued to be reports of police forcibly entering civilian homes. During and following antigovernment demonstrations in June and early November, security forces entered homes and searched premises without warrants, took thousands of persons from their homes in the middle of the night without warrants, and often detained family members or other residents,

Some opposition party members reported that authorities burned down their homes and looted their offices (see section 3).

All electronic communications facilities were state-owned. Political party leaders and one foreign diplomat reported incidents of phone-tapping and other electronic eavesdropping.

The government used a system of paid informants to report on the activities of particular individuals.

There were reports during the year of the forced displacement of families in rural areas. The government stated that its resettlement program, which moved families from drought-prone areas to more fertile lands, was entirely voluntary, but opposition parties accused local authorities in some rural areas of targeting opposition supporters for resettlement by manipulating resettlement rosters. NGOs such as Doctors Without Borders reported

that, in several instances, the government resettled persons in areas with no existing infrastructure or clean water supply, resulting in unusually high rates of infant mortality.

During the year there continued to be credible reports from EHRCO and opposition parties that in certain rural areas in the Oromiya Region, Amhara Region, and the Southern Nations, Nationalities, and Peoples Region, local officials used threats of land redistribution and withholding of food aid and fertilizer to garner support for the ruling coalition. There were many reports of ruling party or government harassment intended to prevent individuals from joining opposition parties or from renting property to them. There were numerous reports of more serious forms of harassment and violence directed against members of opposition parties in many areas of the country, including beatings, house burnings, and killings (see sections 1.c., 1.d., 3, and 5).

There also were credible reports that teachers and other government workers had their employment terminated if they belonged to opposition political parties. According to the opposition SEPDC, the regional government continued to dismiss SEPDC members--particularly teachers--from their jobs.

The law imposes a six-month waiting period on anyone seeking to remarry following a divorce or the death of one's spouse (see section 5). The government maintained that this waiting period was necessary to determine whether a woman may still be carrying the child of her former spouse. In practice, this was not enforced, although the official overseeing such weddings may request a pregnancy test to show the woman was not pregnant from a previous marriage. Any interested party may request a written official explanation of why a wedding was allowed to occur within the waiting period.

Security forces continued to detain family members of persons sought for questioning by the government.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

While the law provides for freedom of speech and press, the government restricted these rights in practice. The government continued to harass and prosecute journalists, publishers, and editors for publishing allegedly fabricated information and for other violations of the press law. The government controlled all broadcast media. Private and government journalists routinely practiced self-censorship.

Prior to the May 15 national elections, government-controlled media provided unprecedented access to opposition views, but after the election they generally reflected only the views of the government and the ruling EPRDF coalition. Relations between the private press and the government were often strained.

Foreign journalists continued to operate freely and often wrote articles critical of government policies. Government officials often granted foreign journalists or local stringers greater access to government than local independent journalists received. However, prior to the May 15 national elections, some international correspondents reported strong government pressure to self-censor their coverage; they refused to do so, but suffered no immediate consequences.

Although the law allows for private radio stations, and the government said that it would license new stations, the government continued to control all radio and television broadcast media. The government operated the sole television station and tightly controlled news broadcasts. The broadcasting law prohibits political and religious organizations from owning broadcast stations. The law also prohibits foreign ownership.

State-run Radio Ethiopia sold broadcasting time to private groups and individuals who wanted to buy spots for programs and commercials. On April 1, the Southern Nations, Nationalities, and Peoples Region launched daily one-hour Amharic-language broadcasts on its regional FM radio station, Radio Voice of the South. On September 5, the Addis Ababa city administration started test transmissions for a daily five-hour FM broadcast.

There were some restrictions on access to international news broadcasts. Broadcasts of BBC and Deutsche Welle were listened to throughout the country. Opposition Web sites were also accessible by the Internet. At year's end, Voice of America broadcast signals remained subject to intentional jamming. The government permitted ownership of private satellite receiving dishes; however, high costs and the limited capacity of the sole telecommunications entity, the Ethiopian Telecommunications Corporation, effectively restricted access to this technology.

The government continued to use statutory provisions on the publication of false information, incitement of ethnic hatred, libel, and publication of articles offensive to public morality to justify the arrest and detention of journalists. Authorities also detained journalists to pressure them to identify sources of information. Independent journalists accused the government of selectively applying sections of the penal code to justify charges against them. The government charged, detained, and fined dozens of journalists during the year.

On January 11, authorities arrested Shiferaw Insermu, a journalist with the Oromo-language service of the state-owned Ethiopian television (ETV), for the third time, at the central criminal investigation office prison in Addis Ababa.

Shiferaw and fellow ETV journalist Dhabassa Wakjira, who was arrested in April 2004, remained in detention on several charges, including passing government information to the OLF leadership. Prison authorities ignored various court orders to free them.

Police asked *Addis Zena* editor-in-chief Fassil Yenealem to disclose his sources for two stories, including a May 17 article reporting that the ruling EPRDF had established a special intelligence force to arrest and assassinate CUD leaders, and had recruited 11 Tigrayan women to poison CUD leaders**.** Yenealem did not reveal his sources and was subsequently arrested for publishing a story that could not be corroborated.

On June 7, the Ministry of Information revoked the accreditation of five local journalists working for foreign media, accusing them of writing "unbalanced reports" on the May 15 elections: Helen Mohammed, Temam Aman, Bereket Teklu, Tadesse Engidaw, and Assegedech Yiberta.

On June 8, government security forces detained Addis Ababa newspaper distributor Fikre Gudu and held him for one month. After his release on July 7, he gave an interview to the private Amharic-language weekly *Asqual* discussing his arrest and subsequent imprisonment in a detention center outside the capital. He described poor prison conditions and criticized the government for jailing him. Authorities detained him again on August 19; they released him on bail after four days in police detention. During his latest detention, police accused Gudu of using the interview to spread false information and to defame the police and prison system.

In November the government issued a list of 58 persons, including 12 journalists, wanted for alleged involvement in the violent antigovernment demonstrations that occurred in early November. During November police arrested six of the journalists. The imprisoned opposition members and journalists were charged with treason, genocide, and attempts to subvert the constitution, charges which carry prison terms and the possibility of a death penalty for those found guilty. By year's end the arrested journalists remained in detention awaiting arraignment. A byproduct of the arrests was the closure of more than a dozen Amharic-language newspapers, collectively representing more than 80 percent of the total circulation of Amharic newspapers.

At year's end, one journalist had been sentenced to one month in prison and released; more than 34 journalists had been summoned, questioned, arrested, detained on press charges, and made to pay bail ranging from $58 to $346 (500 to 3 thousand birr); approximately 54 journalists remained in self-imposed exile; and a number of journalists in the country faced criminal charges. In addition, two state-media journalists remained imprisoned on political rather than press-related charges.

All official media received government subsidies; however, the official media were legally autonomous and responsible for their own management and partial revenue generation. The minister of information was the government's official spokesperson and the ministry managed contacts between the government, the press, and the public; however, the government routinely refused to respond to queries from the private press and often limited its cooperation with the press to the government-run Ethiopian News Agency, the EPRDF-controlled Walta news agency, and correspondents of international news organizations. The prime minister's office continued to deny to the independent press all access for coverage of official events at the prime minister's office, limiting such coverage and access to government media representatives.

Reporters acknowledged that they routinely practiced self-censorship.

The Ministry of Information required that newspapers have a bank balance of $1,150 (10 thousand birr) when annually registering for a publishing license. This sum effectively precluded some smaller publications from registering. Authorities also required permanent residency for publishers to establish and operate a newspaper. The government did not require residency for other business owners, and some independent journalists maintained that the government used the residency requirement as a form of intimidation. The press law requires all publishers to provide free copies of their publications to the Ministry of Information on the day of publication.

The majority of private newspapers as well as government newspapers printed their publications on government-owned presses. Following the unrest in November, presses frequently refused to print some papers, citing Ministry of Justice statements indicating that presses would be held responsible for content they printed. Police had the authority to shut down any printing press without a court order, but during the year did not exercise that power.

The English-language press continued to publish articles critical of the government.

On March 3, the federal high court lifted a 17-month ban on the Ethiopian Free Press Journalists Association (EFPJA) and its leadership, by upholding a December 2004 decision by the court of first instance that the EFPJA was a legally recognized association, and rejecting the appeal of the Ministry of Justice. At year's end, the organization was inactive, as its president, journalist Kifle Mulat, was among journalists sought for arrest by the government. Mulat avoided detention, however, by not returning to the country at the time of the November unrest. A rival association with the same name as the EFPJA, sponsored by the government, was inactive during the year and its operating status was unknown.

At year's end the draft press law proposed in 2003 by the Ministry of Information had not been formally presented to parliament. However, on March 28, parliament included some of the most punitive provisions of the draft press law in the new penal code, which took effect in May. The articles include general provisions applicable to all offenses, and specific ones applicable to particular crimes. Among them are articles taken verbatim from the draft press law referring to liability for offenses committed by the press.

Journalists and international media organizations criticized the draft law, citing its ambiguity, restrictions, heavy penalties, and granting of excessive powers to the Ministry of Information. The government asked international donors to provide media experts to assist in redrafting and improving the press laws.

The government did not restrict Internet access. In the wake of the June 8 disturbances, however, the state telecommunications monopoly disabled mobile-phone text messaging, a block that remained largely in place at year's end, claiming that the CUD used text messaging to call for antigovernment actions.

The government restricted academic freedom during the year. The government maintained that professors could conduct research in their disciplines but that they could not espouse political sentiments. Authorities did not permit teachers at any level to deviate from official lesson plans and discouraged political activity on university campuses. Prior to the June disturbances, some of which occurred on and adjacent to Addis Ababa University's campus and on the premises of a state technical institute, there were reports that uniformed and plainclothes police officers were present on campuses. The government arrested students and teachers during the year (see section 1.d.).

b. Freedom of Peaceful Assembly and Association

Freedom of Assembly

The law provides for freedom of assembly. Prior to the May 15 national elections, there were numerous opposition rallies, including one that occurred in Addis Ababa attended by nearly one million persons the weekend prior to the elections. However, immediately following the elections, the government restricted this right in practice.

Organizers of large public meetings or demonstrations must notify the government 72 hours in advance and obtain a permit. There were several reports during the year that authorities denied permits sought by opposition political parties. Opposition parties also reported long, unexplained delays by the regional authorities in issuing permits, and last minute revocation of permits. The independent Ethiopian Teacher's Association (ETA) continued to encounter government restrictions when attempting to hold meetings or demonstrations.

On May 14, the eve of national elections, the prime minister announced a one-month ban on all demonstrations in Addis Ababa and the surrounding area. In a May 25 press statement, EHRCO condemned the ban as an infringement on the constitutional rights of citizens.

Despite the ban (which was extended to August 13), demonstrators protested against the government from June 6 to 8, leading to the killing of at least 42 unarmed demonstrators by security forces in Addis Ababa. On June 6, following unrest at Addis Ababa University, police shot and killed Shibre Desalegn of Yeka Subcity and Yesuf Abdela, a student at Kotebe Teacher's Training College. On June 8, police shot and killed 16-year-old student Nebiy Alemayehu of Kolfe Subcity, and Zulufa Surur (a mother of seven children), while security forces killed brothers Fekadu Negash and Abraham Yilma (age 16). Federal police acknowledged the death of 26 persons on June 8 following an "unlawful demonstration." The government established an independent commission of inquiry to investigate circumstances surrounding the killings.

Between November 1 and 7, military and police forces opened fire on rock-throwing demonstrators in Addis Ababa, killing at least 40 individuals (see section 2.b.).

The government claimed that some demonstrators were armed with machetes and hand grenades. Several regions throughout the country, including Amhara and Oromiya, reported numerous deaths resulting from confrontations between opposition protestors and the military or police.

The opposition CUD and UEDF parties reported that in September local officials prohibited public meetings the parties had organized in various towns. The UEDF reported that it had to cancel a general assembly of its members planned for September 29 because the government directed hotel proprietors in Addis Ababa not to rent their assembly halls to the UEDF or other opposition parties. The CUD reported that the Addis Ababa city administration imposed extraregulatory restrictions that prevented a mass rally planned for October 2. The government prevented the CUD from meeting after charges were brought on December 21.

Opposition political parties reported that during the year their supporters were targets of frequent and systematic violence by ruling party supporters, often after leaving meetings (see sections 1.c., 1.d., and 3). EHRCO reported that regional governments, including the Addis Ababa regional administration, infringed on the right of peaceful assembly and association. For example, authorities cancelled public meetings planned for September 4 by the CUD in Addis Ababa, Gondar, Bahir Dar, Awasa, and Dessie. Police arbitrarily arrested several CUD members in various towns where public meetings were scheduled to be held. Most obtained their release after several days of detention.

The OFDM reported that OPDO cadres seized and destroyed membership cards of OFDM supporters, disrupted OFDM political meetings, and detained OFDM members in police stations and army camps. Officials picked up Kebede Jato and several other OFDMmembersfrom Manasibu district and detained them for several days in an army camp. On September 8, following a quarrel in Dembidollo, an OPDO cadre shot and injured OFDM member Beyene Alemu.

No actions were taken against police who in January 2004 reportedly beat demonstrators protesting the government's decision to transfer the capital of Oromiya from Addis Ababa to Adama; police who forced hundreds of detained student protestors in January 2004 to kneel and run barefoot on gravel for hours (see section 1.c.); nor against security forces who forcibly dispersed demonstrations in 2003 or 2002. It was unknown at year's end whether any persons detained in previous years for holding illegal meetings remained in detention.

During the year attacks by police, the army, and militia against members of the opposition and the general public escalated, particularly for demonstrations against the results of the May national elections. EHRCO reported that after facing police and armed soldiers during June 6 to 9 demonstrations in Addis Ababa, 35 Addis Ababa residents were admitted to hospitals with serious gunshot wounds. The government had not investigated these cases by year's end.

The opposition CUD and UEDF parties reported that after the May 15 parliamentary elections, security forces continued to follow, harass, and arrest their leaders. For example, security forces placed opposition political party leaders, including CUD chairman Hailu Shawel and CUD spokesman Lidetu Ayalew, under house arrest for several days, and barred visitors from seeing them. On September 16, unidentified persons severely beat Debebe Eshetu, a senior official of CUD; police have not investigated the incident. Throughout October unidentified persons followed and harassed CUD Chairman Dr. Berhanu Nega, mayor-elect of Addis Ababa, and Dr. Merera Gudina, UEDF chairman.

In September and October the UEDF, CUD, and ONC reported numerous arrests (see section 1.d.) and forced office closures throughout the country.

The CUD reported that on October 1, unidentified persons detained and assaulted Bertukan Mideksa, first vice president of the CUD, and Muluneh Eyoel, CUD secretary-general. The attackers also confiscated documents Muluneh was carrying in his briefcase.

There were no developments in the 2004 suspension of the MTA and arrests of its members. Some arrests appear to have been made without warrants, and some detentions continued despite court orders to release suspects (see section 1.d.).

Freedom of Association

Although the law provides for freedom of association and the right to engage in unrestricted peaceful political activity, the government in practice

limited this right. A number of policy issues regarding nongovernmental organizations (NGOs) remained unresolved, including the right of NGOs to enter into formal network arrangements that would enable them to pool funds. The Ministry of Justice registers and licenses NGOs, and there was some improvement in transparency of the NGO registration process. However, the government continued to deny registration to the Human Rights League (see section 4).

As provided by law, the government required political parties to register with the NEB. The NEB's independence was called into question when it made a series of decisions limiting the political activity of opposition parties, including the rejection of the CUD merger, unwillingness to recognize the CUD coalition after the elections, and the recognition of a disputed change in the ONC party leadership.

c. Freedom of Religion

The law provides for freedom of religion, and the government generally respected this right in practice; however, local authorities occasionally infringed on this right. The Ethiopian Orthodox Church (EOC) and Islam are the dominant religions; nearly 90 percent of the population adhered to one or the other faith.

While the government required that religious institutions annually register with the Ministry of Justice, there were no reports of government action against institutions that chose not to register. Under the law, a religious organization that undertakes development activities must register its development wing separately as an NGO. The government did not issue work visas to foreign religious workers unless they were associated with the development wing of a religious organization.

Some religious property confiscated under the Mengistu (Derg) regime had not been returned by year's end.

Societal Abuses and Discrimination

Minority religious groups reported discrimination in the allocation of government land for religious sites. Authorities banned a traditional animist Oromo religious group because it suspected that the group's leaders had close links to the OLF and Macha and Tulama Association (MTA). Protestant groups occasionally reported that local officials discriminated against them when they sought land for churches and cemeteries. Evangelical leaders stated that because authorities perceived them as "newcomers," they were at a disadvantage compared with the EOC and the EIASC in the allocation of land. The Ethiopian Islamic Affairs Supreme Council (EIASC) reported that it faced more difficulty obtaining land from the government than did the EOC, while others believed that the government favored the EIASC. Officials targeted for demolition many mosques that squatters had built without city government approval.

There were no reports of anti-Semitic acts.

For a more detailed discussion, see the 2005 *International Religious Freedom Report*.

d. Freedom of Movement Within the Country, Travel, Emigration, and Repatriation

Although the law provides for these rights, the government restricted some of these rights in practice.

Throughout the year in the Gambella Region, the government continued to monitor and sometimes control the passage of relief supplies and access by humanitarian organizations, explaining that it was doing so as a matter of security for those traveling in the region.

The law prohibits forced exile, and the government did not force any citizens into exile. A number of persons remained abroad in self-imposed exile, including 54 journalists (see section 2.a.).

During the year the ICRC repatriated 427 Ethiopians from Eritrea to Ethiopia and repatriated 192 Eritreans from Ethiopia to Eritrea. Most Eritreans and Ethiopians of Eritrean origin registered with the government and received identity cards and six-month renewable residence permits that allowed them to gain access to hospitals and other public services. However, there were anecdotal reports that local government officials denied indigent Eritreans the right to free medical services.

During the year the UNHCR processed 556 cases for resettlement in third countries and expected that number to exceed 600 by the end of the year.

Internally Displaced Persons

The 1998-2000 war with Eritrea produced approximately 350 thousand internally displaced persons (IDPs). Of these, humanitarian agencies resettled an estimated 225 thousand. In May the Norwegian Refugee Council's Global IDP Project estimated the number of IDPs at between 151 thousand and 167 thousand, including approximately 60 thousand in Tigray Region, 50 thousand in Gambella Region, 30 thousand in the Somali Region, and 10 thousand to 20 thousand in Oromiya Region.

Violent clashes between different ethnic groups during the year internally displaced thousands of persons, and resulted in deaths and injuries (see section 5).

Protection of Refugees

The law provides for the granting of asylum or refugee status in accordance with the 1951 UN Convention relating to the Status of Refugees and its 1967 protocol, and the government has established a system for providing protection to refugees. A national refugee law was passed in August 2004 and took effect in May. In practice the government provided protection against *refoulement*, the return of persons to a country where they feared persecution, and granted refugee status or asylum. The government generally cooperated with the United Nations High Commissioner for Refugees (UNHCR) and other humanitarian organizations in assisting refugees and returning citizens.

The government, in cooperation with UNHCR, also continued to provide temporary protection to individuals from Sudan, Eritrea, and Somalia who may not qualify as refugees under the 1951 convention and the 1967 protocol.

As of September the country hosted approximately 100,200 refugees, down from 121 thousand refugees at the end of 2004. Conditions at the 10 thousand-person capacity camp improved, and refugees subsequently had adequate health, education, water, and sanitation facilities. Throughout the year there was a steady influx of Eritrean refugees at a monthly rate of 200 to 450 persons. In response the government and UNHCR worked to find a site for a new camp.

In April the state-run Ethiopian News Agency reported that the federal high court sentenced three persons to up to 14 years' imprisonment for the 2002 ethnically motivated murder in the Gambella Region of 28 Nuer refugees from southern Sudan.

At year's end, approximately 32 thousand Nuer and Dinka refugees remained in Fugnido camp in the Gambella Region.

The conflict between ethnic groups in the Gambella Region complicated UNHCR refugee protection efforts (see section 5). Food deliveries to refugees continued in spite of the crisis in the West; however, humanitarian organizations at times were unable to adequately monitor deliveries due to travel restrictions.

Section 3 Respect for Political Rights: The Right of Citizens
to Change Their Government

The law provides citizens the right to change their government peacefully, and citizens exercised this right in practice through generally free and fair elections held on the basis of universal suffrage; however, irregularities and intimidation of voters and election observers marred polling in many areas. In practice the EPRDF ruling party dominated the government.

The government policy of ethnic federalism led to the creation of individual constituencies to ensure representation of all major ethnic groups in the House of Peoples' Representatives. Nevertheless, small ethnic groups lacked representation in the legislature. There were 23 nationality groups in 6 regional states that did not have a sufficient population to qualify for constituency seats; however, in the May elections, individuals from these nationality groups competed for 23 special seats in the 547-seat House of Peoples' Representatives.

Elections and Political Participation

According to domestic and international observers, the May national elections, in which the EPRDF coalition won 372 of 547 seats, were generally credible.Opposition parties made an unexpectedly strong showing, increasing their parliamentary representation from 12 seats to 172. Irregularities, including intimidation of voters and election observers, marred polling in many areas. The GOE/EPRDF also announced the "final" election results before the NEB released them. Some observers reported killings, disappearances, voter intimidation and harassment, and unlawful detentions of opposition party supporters, particularly in the Amhara, Oromiya, and Southern Nations, Nationalities, and Peoples regions (see section 1.a., b., and d.). Nevertheless, international observers, including the Carter Center, hailed the elections as an important development in the country's efforts at democratization.

Opposition parties accused the NEB of being an instrument of the ruling party and of failing to act when informed of electoral irregularities, including ballot stuffing, vote count fraud, bribery, killings, beatings, and widespread intimidation and harassment by ruling party supporters during the national elections.

In protest against national election results, the CUD opposed taking seats in the House of People's Representatives.

On May 20, the state-run Ethiopian News Agency announced that new parliamentary elections would be held May 22 at several polling stations where voting had not occurred properly; parliamentary elections were subsequently rerun at these locations August 21.

On May 31, in protest against the election results, the CUD announced that it had filed complaints against the NEB, and disputed the results in more than 150 constituencies.

The Carter Center issued a statement expressing concern about reports of improper vote counting and tabulation, stating that its observer teams had "found evidence that ballot boxes have been moved improperly, were improperly secured, or that party agents were barred from polling stations or were not allowed to watch the entire count." It also reported, "election day and postelection intimidation and harassment."

The head of the European Union's Electoral Observation Mission (EUEOM), parliamentarian Ana Gomes, issued a preliminary report stating that the May 15 elections "did not live up to international standards," citing irregularities in key areas. The Minister of Information and other government officials publicly criticized the EUEOM and charged that it illegally and secretly leaked unfounded information to the opposition.

The EU issued a statement noting "continuing issues of concern, including respect for human rights and balanced access to the media," but stating that "the EU regards the elections as an important step forward in the democratization process."

On June 10, negotiations between the ruling and major opposition parties resulted in an agreement to adopt an ad hoc complaints resolution process to deal with the large number of unresolved electoral complaints. According to the Carter Center, 44 different complaints investigation panels conducted formal investigations and hearings in 178 constituencies across the country, resulting in a decision by the NEB to hold new elections in 31 constituencies.

On August 16, international media reported that the primary opposition parties would boycott parliamentary elections scheduled for August 21 in the Somali Region. As a result the incumbent Somali People's Democratic Party won all 23 federal parliament seats. Opposition political parties reported that significant irregularities marred the regional election; however, the NEB reviewed the allegations and dismissed them.

In October the government and opposition leaders participated in discussions on the opposition's participation in the House of People's Representatives. While several UEDF members decided to take their seats in the house, some newly elected CUD members of parliament announced they would boycottthe opening of parliament, to protest the results of the May elections. By year's end, most of the CUD members had joined parliament. The CUD then called for civil disobedience measures, such as horn-honking, boycotting EPRDF-owned business and ostracizing alleged government supporters, which the government publicly declared illegal.

Beginning on November 1, violent antigovernment protests called by the opposition occurred in Addis Ababa, and the government arrested several dozen opposition leaders, as well as members of the independent media and civil society groups, for alleged participation in unlawful activities. Security forces also detained over 14 thousand demonstrators without charge. Military intervention led to widespread abuses such as arbitrary detention and killings. Security forces arrested at least 12 of the 20 CUD party executive committee members, including party president Hailu Shawel, vice chairman Bertukan Mideksa, secretary-general Muluneh Eyoel, and Addis Ababa mayor-elect Dr. Berhanu Nega, on charges of treason and genocide, among others. At year's end, they remained in prison as their trial began.

The EPRDF, its affiliates, and EPRDF supporters controlled all seats in the 108-member House of Federation, whose members were appointed by regional governments and by the federal government. Membership in the EPRDF conferred advantages upon its members, and the party owned many businesses and awarded jobs to loyal supporters. In addition to the government, only members of the Tigrayan People's Liberation Front (TPLF) had received permission to operate radio stations (see section 2.a.).

During the year the major opposition parties negotiated significant mergers. The AEUP, Rainbow Ethiopia, Ethiopians Democratic Party-Medhin, and the Ethiopian Democratic League formed the CUD, making it the strongest opposition political coalition in the country. During the year other opposition members founded the OFDM, which secured 11 seats in the federal parliament and 10 seats in the Oromiya Regional Council during the May national elections.

Registered political parties must receive permission from regional governments to open local offices. Opposition parties, such as the CUD, the UEDF, and the OFDM, claimed that the pattern of widespread intimidation and violence directed against members of opposition political parties by local government officials continued throughout the year. Opposition parties and the press reported hundreds of such cases, including killings, beatings, arrests, house burnings, and property confiscation.

In many of the cases reported, authorities allegedly told opposition members that they had to renounce their party membership if they wanted access to fertilizer, other agricultural services, health care, or other benefits controlled by the government. Authorities often disrupted or unlawfully banned opposition party meetings.

There were no new developments in the EPRDF's dissolution in late 2003 and early 2004 of offices of the Konso People's Democratic Union (KPDU) and the KPDU-dominated Abaroba and Jarsso local councils, or in the arrest and beatings of KPDU members. Authorities took no actions against those responsible for the February 2004 stoning of AEUP member Bekele Tadesse, or for the March 7 bombing of the house of Zemedkun Gebre Kidane, chairman of the AEUP organizing committee in Ankober District.

Of the 19 members of the Council of Ministers, two were women, and a number of women held senior positions. There were 116 women in the 547-seat House of Peoples' Representatives, and 21 women in the 113-member House of Federation. Of the 14 members of the Supreme Court, 3 were women. During the May 15 national elections women constituted nearly half of the community observers, party workers, and election officials at polling stations.

Government Corruption and Transparency

The Ministry of Justice has primary responsibility for combatting corruption. A combination of social pressure, cultural norms, and legal restrictions limited corruption. Nevertheless, the lack of transparency in the cancellation of telecommunications, power, and other infrastructure tenders raised suspicions of corruption. In addition, government officials appeared to manipulate the privatization process, as state- and party-owned businesses received preferential access to land leases and credit.

The law provides for public access to government information, but access was largely restricted in practice.

The government publishes its laws and regulations in the national gazette prior to their taking effect. The Ministry of Information managed contacts between the government, the press, and the public; however, the government routinely refused to respond to queries from the private press (see section 2.a.).

Section 4 Governmental Attitude Regarding International and
Nongovernmental Investigation of Alleged Violations of Human Rights

A number of domestic and international human rights groups generally operated with limited government restriction, investigating and publishing their findings on human rights cases. The government generally was distrustful and wary of domestic human rights groups and some international observers. After the November protests the government restricted human rights groups from visiting or investigating detention camps. In April the government expelled representatives of several foreign-based NGOs conducting electoral work. Siegried Pausewang, a senior EU observer monitoring the May elections, resigned after government authorities accused him of bias.

Two of the most prominent domestic human rights organizations were EHRCO and the Ethiopian Women Lawyers Association (EWLA). The government routinely discounted EHRCO's reports and labeled it a political organization. On December 16, two of EHRCO's chief investigators, Cherinet Tadesse and Yared Hailemariam, were among 131 individuals the government charged with instigating violence in order to undermine the country.

The EWLA's primary function was to legally represent women. These and numerous other groups primarily engaged in civic and human rights education, legal assistance, and trial monitoring. However, the government neither shared information nor acknowledged the existence of human rights abuses with members of the domestic NGO community.

The government continued to investigate the Human Rights League for alleged ties to the OLF. The league's offices remained closed, and the government had not responded to its 1997 registration request by year's end, despite a court order to do so.

The government generally cooperated with international organizations like the UN and ICRC. ICRC access to prison and other detention facilities was restricted in the wake of election-related violence during the year.

While the government is required by law to establish a human rights commission and an office of the ombudsman with the authority to receive and investigate complaints with respect to misadministration by executive branch offices, neither entity was fully operational by year's end. The institutions had only limited resources. Neither organization had issued a report by year's end.

The Ministry of Justice continued to implement a three-year program of human rights training workshops for judges, prosecutors, and police, as well as community members around the country. Election-related violence, however, severely curtailed program activities.

A parliamentary commission investigated potential government human rights abuses in conjunction with ethnic violence in the Gambella Region in late 2003 and 2004 (see section 5). Human Rights Watch reported in March that the commission grossly underestimated the number of deaths associated with the ethnic violence and contended that neither the military or federal authorities took steps to bring the perpetrators to justice.

Section 5 Discrimination, Societal Abuses, and Trafficking in
Persons

The law prohibits discrimination based on race, color, gender, language, national origin, political or other opinion, or social status; however, in practice, the government did not effectively enforce these prohibitions.

Women

Domestic violence, including spousal abuse and rape, was a pervasive social problem. A July World Bank study concluded that 88 percent of rural women and 69 percent of urban women think their husbands have the right to beat them. While women had recourse to the police and the courts, societal norms and limited infrastructure prevented many women from seeking legal redress, particularly in rural areas. The government began to prosecute offenders on a limited scale.

In October the government announced the establishment of a women's affairs ministry.

The new June 2004 penal code criminalized rape, but did not specifically address spousal rape. The government does not fully enforce the code due to lack of awareness of the law, lack of training, and lack of funds. Social mores continue to be a key constraint, particularly in the rural areas. It is difficult to prove rape because the country does not have appropriate laboratory facilities and rape kits. The government has taken limited action based on the penal code.

Social mores obstructed investigations and prosecutions in rape cases, and many women were not aware of their rights under the law, which led to widespread underreporting. Observers estimated that at least one thousand rapes occurred annually in Addis Ababa, but data based on official police reports counted only approximately 400 cases per year. The press continued to report regularly on rape cases, particularly when injury to minors resulted. Courts sentenced convicted rapists to 10 to 15 years' imprisonment, as prescribed by law. In 2004 the EWLA conducted research on the number of rapes committed and the number of rape convictions handed down; however, the results had not been released by year's end.

Although illegal, the abduction of women and girls as a form of marriage continued to be a widespread practice in several regions, including the Amhara, Oromiya, and Southern Nations, Nationalities, and Peoples regions, despite the government's attempts to combat the practice. Forced sexual relationships accompanied most marriages by abduction, and women often experienced physical abuse during the abduction. Many abducted girls married as early as the age of 7, despite the legal minimum age for marriage of 18. Abductions led to conflicts among families, communities, and ethnic groups. In cases of marriage by abduction, the perpetrator did not face punishment if the victim agreed to marry him (unless authorities annulled the marriage); even after the conviction of a perpetrator, authorities often commuted the sentence if the victim married him. There were some signs of growing public awareness of the problems of attacks on women and early marriage.

The majority of girls undergo some form of female genital mutilation (FGM). Girls typically experienced clitoridectomies seven days after birth (consisting of an excision of the clitoris, often with partial labial excision, and faced infibulation (the most extreme and dangerous form of FGM) at the onset of puberty. According to a Ministry of Health Demographic and Health survey released during the year, the practice of FGM among all women had decreased from 80 to 74 percent, while support for the practice among women had dropped from 60 to 29 percent. In 2004 the new penal code criminalized the circumcision of any female by imprisonment of not less than 3 months or a fine of not less than $58 (500 birr). Likewise, infibulation of the genitals is punishable with imprisonment of 5 to 10 years.

The government took some measures to help eradicate FGM. It worked to discourage the practice through education in public schools and broader mass media campaigns. In July 2004 the Hamer District women's affairs bureau removed a district official from office for forcing his wife to undergo FGM. In 2004 the South Omo Zone Mobilization and Social Affairs Department Deputy Head reported that committees to eradicate harmful traditional practices were established in 197 localities through South Omo Zone. In 2004 Eastern Harerge Zone police arrested four women who had allegedly circumcised 62 girls in a single day; local residents allegedly tipped off the police following an intensive media campaign on the harmful effects of circumcision.

Prostitution was legal for persons over 18 but it remained a problem. Pimping and benefiting from prostitution were illegal. Persons exploited in prostitution routinely reported that poverty was the principal underlying cause.

The EWLA and the International Organization for Migration (IOM) reported that many female workers who traveled to the Middle East as industrial and domestic workers faced abuse (see section 5, Trafficking).

Sexual harassment was widespread. The penal code prescribes 1 and 1/2 to 2 years' imprisonment; however, sexual harassment-related laws were not fully enforced.

Although the law provides for equality of all persons, the government did not effectively enforce these protections. The law sets the legal marriage age for girls and boys at 18; elevates civil law above customary and religious law; allows for the legal sharing of property by unmarried couples who live together for at least five years; eliminates family arbitrators as a means of settling marital disputes in lieu of the court system; allows for the joint administration of common marital property; requires the courts to take into account the situation of children or the weakest member of the family in the event of divorce or separation; and imposes a six-month waiting period on women seeking to remarry following divorce or the death of a spouse. However, regional councils had authority to determine family law for their respective regions. Four regions have established their own family law: Amhara, Tigray, Oromiya, and Addis Ababa. Regional laws are more specific to the region than are federal laws. Regional laws are not uniformly enforced. By law, they cannot conflict with the national constitution.

In July 2004, at the urging of a group of activists on women's issues, the head of the NEB publicly endorsed the candidacies of women for parliament.

Discrimination against women was most acute in rural areas, where 85 percent of the population lived. The law contains discriminatory regulations, such as the recognition of the husband as the legal head of the family and the sole guardian of children over five years old. Authorities did not consider domestic violence a serious justification for granting a divorce. There was only limited juridical recognition of common law marriage. Irrespective of the number of years the marriage existed, the number of children raised, and joint property, the law entitled women to only three months' financial support if the common law relationship ended. A husband had no obligation to provide financial assistance to his family and, as a result, women and children sometimes faced abandonment when there was a problem in the marriage. The law states that any property owned before marriage belongs to the spouse that had it. Any property gained during marriage is shared equally, although a wife does not have the right to inherit her deceased husband's share. Even with stronger formal laws, most rural residents continued to apply customary law in economic and social relationships.

All land belonged to the government. Although women could obtain government leases to land, and the government had an explicit policy to provide equal access for women to land, rural communities rarely enforced this policy. The EWLA reported that, in nearly all regions, women did not have access to land, except through marriage. However, when the husband dies, other family members often take the land from the wife.

In urban areas, women had fewer employment opportunities than men, and the jobs available did not provide equal pay for equal work.

Children

The government supported efforts by domestic and international NGOs that focused on children's social, health, and legal issues, despite its limited ability to provide improved health care, basic education, or child protection.

Education is compulsory and universal through grade six, though approximately 20 percent of school-age children do not attend school. By law, primary education is tuition-free. There were not enough schools to accommodate the country's youth, particularly in rural areas, and the cost of uniforms and school supplies was prohibitive for many families. Approximately 74 percent of male primary school-age children and 59 percent of female primary school-age children attended school; in Addis Ababa girls' attendance was slightly higher. Government reports showed that 29 percent of the children who attended school left the system before they reached the second grade, and only 22 percent of children who began first grade completed eighth grade.

Child abuse was a problem. Members of an NGO staffed 10 child protection units in Addis Ababa's police stations to protect the rights of juvenile delinquents and juvenile victims of crime. Some police officers completed training on procedures for handling cases of child abuse and juvenile delinquency.

Societal abuse of young girls continued to be a problem. FGM was performed on the majority of girls (see section 5, Women). Other harmful traditional practices included uvulectomy, milk-teeth extraction, early marriage, marriage by abduction, and food and work prohibitions.

In the Afar Region in the East, older men continued to marry young girls, but media accounts suggested that this traditional practice continued to face greater scrutiny and criticism. Local NGOs, such as the Kembatta Women's Self-Help Center and the Tigray Women's Association, also influenced societal attitudes toward harmful traditional practices and early marriage in their areas by raising awareness of the problems. During the year regional governments in Amhara and Tigray instituted programs to educate young women on the issues of early marriage.

Pregnancy at an early age often led to obstetric fistulae and permanent incontinence. Treatment for fistulae was available at only one hospital, the Addis Ababa Fistula Hospital, which annually performed more than one thousand fistula operations. It estimated that for every successful operation performed, 10 other young women needed the treatment but did not receive it. The maternal mortality rate was extremely high, partly due to food taboos for pregnant women, poverty, early marriage, and birth complications related to FGM, particularly infibulation.

According to international NGOs, child prostitution was a growing problem, particularly in urban areas. According to an NGO report, 60 percent of persons exploited in prostitution were between the ages of 16 and 25. Underage girls worked as hotel workers, barmaids, and prostitutes in resort towns and rural truck stops. Pervasive poverty, migration to urban centers, early marriage, HIV/AIDS and sexually transmitted diseases, and limited

educational and job opportunities aggravated the sexual exploitation of children. A few NGOs aided child victims, including the Forum on Street Children-Ethiopia, which provided children forced into prostitution or sexual exploitation with shelter, protection, and return to their families.

There were occasional reports that children were trafficked out of the country, including unconfirmed reports that children from the south were transported into Kenya by traffickers operating adoption rings, and adopted as other nationalities (see section 5, Trafficking).

Child labor remained a serious problem (see section 6.d.).

The government estimated the number of street children totaled 150 to 200 thousand, with approximately 50 to 60 thousand street children in Addis Ababa. The UN Children's Fund (UNICEF) estimated there were 600 thousand street children in the country and more than 100 thousand in the capital. UNICEF believed the problem was exacerbated because of families' inability to support children due to parental illness and decreased household income. These children begged, sometimes as part of a gang, or worked in the informal sector (see section 6.d.). Government and privately run orphanages were unable to handle the number of street children, and older children often abused younger ones. Due to severe resource constraints, hospitals and orphanages often overlooked or neglected abandoned infants. "Handlers" sometimes maimed or blinded children to raise their earnings from begging.

Trafficking in Persons

Ethiopia was a source country for men, women, and children trafficked for forced labor and sexual exploitation. Young Ethiopian women were trafficked to Djibouti and the Middle East, particularly Lebanon, the United Arab Emirates, Saudi Arabia, and Bahrain for involuntary domestic labor. A small percentage were trafficked for sexual exploitation to Europe via Lebanon. Small numbers of men were trafficked to Saudi Arabia and the Gulf states for exploitation as low-skilled laborers. Both children and adults were trafficked internally from rural to urban areas for domestic labor and, to a lesser extent, for commercial sexual exploitation and forced labor, such as street vending. NGOs estimated that international trafficking annually involved between 20 and 25 thousand victims.

The government does not fully comply with the minimum standards for the elimination of trafficking; however, it is making significant efforts to do so. The law provides penalties of up to 20 years imprisonment and a fine of $1,150 (10 thousand birr) for trafficking of women and children. Despite arrests of suspected traffickers in 2004, there were no successful prosecutions of traffickers by year's end.The Ministry of Labor and Social Affairs, in concert with local police, monitored trafficking in persons, while the Ministry of Justice enforced governmental law. The government assisted with international trafficking investigations.

Training programs for police officers on the criminal aspects of trafficking continued during the year. These institutions had limited resources and jurisdiction to protect or intervene in cases of prosecution of offending employers.

NGOs reported that houses of prostitution recruited impoverished girls as young as age 11 and kept them uninformed of the risks of HIV/AIDS infection and other sexually transmitted diseases. A 2003 Family Health International Report indicated that customers particularly sought younger girls because customers believed they were free of sexually transmitted diseases.

The International Organization for Migration (IOM) reported in 2004that trafficking was "increasing at an alarming rate." A 2003 study by a foreign government on the problem of internal trafficking of women and children confirmed that the problem was pervasive. The overwhelming majority of respondents confirmed that traffickers, typically unorganized petty criminals, lured women and children from rural areas to Addis Ababa and other urban centers with false promises of employment. Of the 459 respondents, 46 percent were illiterate and 49 percent had completed no more than an eighth-grade education. Upon arrival at their new destinations, 54 percent worked as domestic servants, but that number dropped to 9 percent as the trafficked women and children took jobs in bars, became prostitutes, or begged on the street.

There were no reports that government officials participated in, facilitated, or condoned trafficking.

Although illegal, the abduction of women and girls as a form of marriage was still a widespread practice in the Oromiya, Amhara, and Southern Nations, Nationalities, and Peoples regions (see section 5, Women).

Private entities arranged for overseas work and, as a result, traffickers sent women to Middle Eastern countries--particularly Lebanon, Saudi Arabia, Bahrain, and the United Arab Emirates--as domestic or industrial workers. These women typically were trafficked through Djibouti, Yemen, and Syria. The chief of the investigation and detention center in Lebanon reported in October that 30 thousand Ethiopian women worked in Beirut, the vast majority of whom were trafficked. The government also began registering persons seeking employment overseas. Approximately 50 percent of these women were not able to return legally to their home country.

The government provided little assistance to trafficked victims who returned to the country. EWLA provided limited legal assistance to such victims. The federal police's Women's Affairs Bureau, in collaboration with the media, continued to implement a public awareness program on the dangers of migrating to Middle Eastern countries. The Children, Youth, and Family Affairs Department of the Ministry of Labor and Social Affairs chaired the National Steering Committee Against Sexual Exploitation of Children. There were some government initiatives during the year to combat trafficking, including government consultation with IOM. In August IOM published a brochure for distribution to young women on the dangers of domestic service overseas. The Ministry of Labor and Social Affairs continued to review the contracts of prospective domestic workers planning to work overseas and rejected contracts that did not appear satisfactory. Immigration officials at the airport also inspected the employment contracts of prospective workers traveling to the Middle East. The Ministry of Labor and Social Affairs had limited success in regulating employment agencies that sent migrant workers to Middle Eastern countries. Some illegal employment agencies escaped government scrutiny and continued to operate. The country's consulates in Beirut and Dubai continued to assist Ethiopian women trafficked to Lebanon and the United Arab Emirates.

Persons with Disabilities

While the law mandates equal rights for persons with disabilities, the government had no established mechanisms to enforce these rights. Persons

with minor disabilities sometimes complained of job discrimination. The government did not mandate access to buildings or provide services for persons with disabilities. Although the law provides for rehabilitation and assistance to persons with physical and mental disabilities, the government devoted few resources to these purposes.

There were approximately six million persons with disabilities, according to local NGOs. Although there were an estimated 800 thousand persons with mental disabilities, there was only one mental hospital and only an estimated 10 psychiatrists in the country. The Ministry of Labor and Social Affairs was responsible for protecting the rights of the disabled.

National/Racial/Ethnic Minorities

There were more than 80 ethnic groups living in the country, of which the Oromo was the largest, at 40 percent of the population. Although many groups influenced the political and cultural life of the country, Amharas and Tigrayans from the northern highlands played a dominant role. The federal system drew boundaries roughly along major ethnic group lines, and regional states had much greater control over their affairs than previously. Most political parties remained primarily ethnically based.

The military remained an ethnically diverse organization; however, members of the Tigrayan ethnic group dominated the senior officer corps. During the May elections and subsequent demonstrations, there were many reports of Tigrayan or Gambellan troops being used in Addis Ababa and other urban centers where the opposition was strong, and where officials did not consider Amhara members of the armed forces sufficiently reliable.

There were occasional reports that officials terminated the employment of teachers and other government workers if they were not of the dominant ethnic group in the region.

There were continued incidents of ethnic conflict during the year, particularly in the western, southern, and eastern areas. The OLF and the government engaged in many clashes. There were also clashes among ethnic groups in the Gambella, Somali, and Southern Nations, Nationalities, and Peoples regions.

Interethnic clashes resulted in hundreds of deaths during the year. EHRCO reported ethnic conflicts between Somalis and Oromos in East and West Hararghe Zones, and ethnic clashes between Gabras and Gujis in Borena Zone of the Oromiya Region. On February 22, armed ethnic Somali Ethiopian groups raided several Oromo villages and killed 18 persons, injured 31, burnt 103 huts, looted cattle, and destroyed property. Following the administrative transfer of several villages between the Oromiya and Somali regions after a December 2004 referendum, harassment and intimidation by Somalis of Oromos residing in Erer District caused the displacement of 760 persons.

EHRCO reported that on April 2, armed Somali tribesmen raided an Oromo village in Kurkur Kebele, Golo Oda District, and killed 14 persons, injured 10, and displaced 1,358 Oromos. An April 3 clash between Gabras and Gujis in Yabelo District, Borana Zone, Oromo Region, killed 24 persons. Intervention by the army stopped the clash from escalating, but fighting resumed on April 29, killing 19 individuals and displacing 30 thousand persons; 1,378 huts were also burned. On June 27, clashes between ethnic Somali and Oromo in Mieso and Doba districts of West Hararghe Zone resulted in 16 Oromos killed, 25 Oromos injured, and an unknown number of persons displaced.

EHRCO reported that on July 24 and 26, unidentified persons detonated hand grenades inside four hotels and a residence in the town of Jijiga, killing 5 persons and injuring 31. Police took suspects into custody and the case was under investigation at year's end. The federal high court in Addis Ababa continued to arraign and prosecute those formally charged with committing genocide and other war crimes, including extrajudicial killings, under the 1975-91 Derg regime (see section 1.e.).

On October 20, local media reported that two thousand farmers abandoned their homes in Gida-Kiramu village, East Wellega Zone, Oromiya Region and moved to nearby towns following beatings, arrests, and intimidation by local officials, reportedly for supporting the opposition CUD party. The population of Gida-Kiramu is primarily Amhara, while local officials are primarily Oromo, and the village had been the site of ethnic clashes in previous years. Following intervention by the regional government, most farmers returned to their homes.

Other Societal Abuses and Discrimination

Homosexuality is illegal and punishable by imprisonment. Instances determined to be cruel, involving coercion, or involving a minor (age 13 to 16) are punishable by not less than 3 months or more than 5 years of incarceration. Where children under 13 years of age are involved, the law provides for imprisonment of 5 to 25 years. While society did not widely accept homosexuality, there were no reports of violence against homosexuals.

Societal discrimination against persons with HIV/AIDS continued during the year.

Section 6 Worker Rights

a. The Right of Association

The law provides most workers with the right to form and join unions, and the government allowed this in practice. However, the law specifically excludes teachers and civil servants (including judges, prosecutors, and security service workers) from organizing unions. There was government interference in trade union activities during the year. According to the International Confederation of Free Trade Unions, many trade union leaders have been removed from their posts and/or forced to leave the country, while others have been sent to prison.

The minimum number of workers required to form a union was 20. While all unions had to be registered, the government retained the authority to cancel union registration. There were no reports that the government used this authority during the year. The law stipulates that a trade organization may not act in an overtly political manner. Approximately 300 thousand workers were union members.

Seasonal and part-time agricultural workers did not organize into labor unions. Compensation, benefits, and working conditions of seasonal workers

were far below those of unionized permanent plantation employees.

Despite government recognition of the independent Ethiopian Teachers Association (ETA), authorities required all public school teachers to subsidize a separate government-created and controlled teacher's union (also called ETA) through mandatory withholding of $0.23 (2 birr) from their monthly salaries.

In late 2003 the federal high court ruled that the government's ETA had no legal standing or claim on the property of the independent ETA, and that authorities should return the assets of the independent ETA and allow its offices to reopen. The government-controlled ETA appealed to the Supreme Court, which instructed the federal high court to reinvestigate the case. That investigation continued at year's end, and the high court's decision to recognize the independent ETA had not been implemented.

Complete government control of the government-sponsored Confederation of Ethiopian Trade Unions (CETU) executive committee continued throughout the year, as it had since its inception.

Although the law prohibits antiunion discrimination by employers against union members and organizers, unions reported that employers frequently fired union activists. Lawsuits alleging unlawful dismissal often took years to resolve because of case backlogs in the labor courts. According to labor leaders, a number of court cases in which workers were terminated for union activities were pending after four or five years. Employers found guilty of antiunion discrimination were required to reinstate workers fired for union activities and generally did so in practice.

b. The Right to Organize and Bargain Collectively

The law protects the right of collective bargaining for most workers, and in practice the government allowed citizens to exercise this right freely. Labor experts estimated that collective bargaining agreements covered more than 90 percent of unionized workers. Representatives negotiated wages at the plant level. Unions in the formal industrial sector made some efforts to enforce labor regulations.

There are no export processing zones.

Although the law provides workers with the right to strike to protect their interests, it contains detailed provisions that make legal strike actions difficult to carry out, such as a minimum of 130 days advance notice before striking. There was one strike during the year, involving Dragados, a European road construction company. Striking workers returned to work, while the case remains pending in court. The law requires aggrieved workers to attempt reconciliation with employers before striking, and includes a lengthy dispute settlement process. These applied equally to an employer's right to lock out workers. A majority of the workers involved must support a strike for it to occur.

Workers nonetheless retain the right to strike without resorting to either of these options, provided they give at least 10 days notice to the other party and to the Ministry of Labor and Social Affairs, make efforts at reconciliation, and provide at least a 30-day warning in cases already before a court or labor relations board.

The law also prohibits strikes by workers who provide essential services, including air transport and urban bus service workers, electric power suppliers, gas station personnel, hospital and pharmacy personnel, firefighters, telecommunications personnel, and urban sanitary workers. Amendments to the 2003 Labor Proclamation narrowed the definition of essential services, giving workers in railways, the inter-urban transport services, banks, and postal services the right to strike.

The International Labor Organization (ILO) noted that labor disputes lasted for months or years.

The law prohibits retribution against strikers, but labor leaders stated that most workers were not convinced that the government would enforce this protection. Labor officials reported that, due to high unemployment and long delays in the hearing of labor cases, some workers were afraid to participate in strikes or other labor actions.

In June the government further amended the labor law, allowing one or more permanent labor relations boards in the regional states to decide on cases involving enterprises owned by the federal government. The amendment also allows ad hoc labor relations boards in the regions to fulfill the same purpose.

c. Prohibition of Forced or Compulsory Labor

While the law prohibits forced or compulsory labor, including by children, there were reports such practices occurred (see sections 5 and 6.d.) Courts could order forced labor as a punitive measure.

d. Prohibition of Child Labor and Minimum Age for Employment

There were laws against child labor; however, the government did not effectively implement these laws in practice and child labor remained a serious problem, both in urban and rural areas. Under the law, the minimum age for wage or salary employment is 14 years, which was consistent with the age for completing primary school; the minimum age for employment was not effectively enforced, however. Special provisions cover children between the ages of 14 and 18, including the prohibition of hazardous or night work. By law, children between the ages of 14 and 18 were not permitted to work more than 7 hours per day, work between the hours of 10 pm and 6 am, work on public holidays or rest days, or perform overtime work. The government defined hazardous work as work in factories or involving machinery with moving parts, or any work that could jeopardize a child's health.

The Ministry of Labor and Social Affairs is responsible for enforcing child labor laws, but it did not provide adequate resources and oversight. While the government made some effort to enforce these regulations within the formal industrial sector, social welfare activists, civic organizers, government officials, and employers agreed that child labor was pervasive throughout the country, particularly in agrarian areas and in the informal

sector. In urban areas, many children worked in a variety of jobs, including shining shoes, sewing clothes, hustling passengers into cabs, working as porters, selling lottery tickets and other small items, and herding animals. In rural areas, children worked on family and commercial farms and as domestic laborers.

A 2001 ILO-funded survey on child labor found that 40 percent of children began working before the age of 6. It also found the average number of hours worked in a week by children ages 5 to 17 was 32.8 hours. Approximately 13 percent of boys and girls between the ages of 5 and 9 worked from 58 to 74 hours a week. More than two-thirds of all children surveyed were giving either all or part of their earnings to their parents or guardians. Reduced household income from poor crop harvests and children dropping out of school were two factors contributing to the increased incidence of child labor.

Child laborers often faced abuse. A 1999 studyconcluded that compared to non-working children, child workers faced twice as much physical and emotional abuse, five times as much sexual abuse, and eight times as much neglect. Among child workers surveyed, rapes occurred exclusively among child domestic laborers.

The government's definition of worst forms of child labor included prostitution and bonded labor. During the year there were reports of forced or bonded labor of children who had been trafficked from the Oromiya Region and the Southern Nations, Nationalities, and Peoples Region to other regions of the country to work as domestic servants (see section 5). Family members reportedly forced young girls into prostitution (see section 5).

e. Acceptable Conditions of Work

There is no national minimum wage. However, some government institutions and public enterprises have set their own minimum wages. For example, public sector employees, the largest group of wage earners, earned a monthly minimum wage of approximately $23 (200 birr); employees in the banking and insurance sector had a minimum monthly wage of $27 (230 birr). According to the Office of the Study of Wages and Other Remuneration, these wages did not provide a decent standard of living for a worker and family. Consequently, most families in the wage sector required at least two wage earners to survive, which forced many children to leave school early. Only a small percentage of the population was involved in wage labor employment, which was concentrated largely in urban areas.

The law provides for a 48-hour legal workweek (with a 24-hour rest period), premium pay for overtime, and prohibition of excessive, compulsory overtime. Although the government did little to enforce the law, in practice most employees in the formal sector worked a 40-hour workweek**.**

The government, industry, and unions negotiated to set occupational health and safety standards; however, the inspection department of the Ministry of Labor and Social Affairs did not effectively enforce these standards, due to a lack of resources. A lack of detailed, sector-specific health and safety guidelines also inhibited enforcement. Workers had the right to remove themselves from dangerous situations without jeopardizing their employment; however, most workers feared losing their jobs if they were to do so.