# Exhibit E

# Exhibit E



# Ethiopia

Bureau of Democracy, Human Rights, and Labor
2007
March 11, 2008

Ethiopia is a federal republic under the leadership of Prime Minister Meles Zenawi and the ruling Ethiopian People's Revolutionary Democratic Front (EPRDF) coalition. The population was approximately 77 million. In the May 2005 parliamentary elections, the EPRDF won a third consecutive five-year term. Domestic and international observers reported that polling throughout the country was generally credible, although irregularities and intimidation of voters and election observers marred polling in many areas. Political parties were predominantly ethnically based, but opposition parties engaged in a steady process of consolidation. During the year fighting between government forces and the Ogaden National Liberation Front (ONLF), an ethnically-based, nationalist insurgent movement operating in the Somali Region, resulted in widespread human rights abuses. While civilian authorities generally maintained effective control of the security forces, there were instances in which elements within those forces acted independently of government authority.

Human rights abuses reported during the year included: limitation on citizens' right to change their government during the most recent elections; unlawful killings, and beating, abuse, and mistreatment of detainees and opposition supporters by security forces; poor prison conditions; arbitrary arrest and detention, particularly of those suspected of sympathizing with or being members of the opposition or insurgent groups; detention of thousands without charge and lengthy pretrial detention; infringement on citizens' privacy rights and frequent refusal to follow the law regarding search warrants; use of excessive force by security services in an internal conflict and counter-insurgency operations; restrictions on freedom of the press; arrest, detention, and harassment of journalists for publishing articles critical of the government; restrictions on freedom of assembly; limitations on freedom of association; violence and societal discrimination against women and abuse of children; female genital mutilation (FGM); exploitation of children for economic and sexual purposes; trafficking in persons; societal discrimination against persons with disabilities and religious and ethnic minorities; and government interference in union activities, including killing and harassment of union leaders.

ONLF forces in the Somali region were responsible for widespread human rights abuses, including killings and the diversion of food supplies resulting in the displacement of thousands of persons.

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

Government forces and armed elements of the ONLF were responsible for numerous targeted killings in the Somali Region during the year (see section 1.g.)

Security forces committed politically motivated killings during the year. Security forces committed arbitrary killings during the year. For example, on January 16, two police officers beat, shot, and killed Tesfaye Taddese, who was an organizer for the opposition Coalition for Unity and Democracy (CUD) during the 2005 parliamentary elections. An autopsy later revealed that the victim had lost several teeth and one eye from the beating before being shot. The police officers were arrested and an investigation was ongoing at year's end.

On March 2, the opposition United Ethiopian Democratic Forces (UEDF) party reported that Degaga Gebissa, a party member from Meta-Robi District, Oromiya Region, was taken from his house by police and shot and killed. Police allegedly refused to allow an autopsy or to provide any information to UEDF party officials.

On March 5, Tsegaye Ayele Yigzaw of Debre Markos town, Gondar Region, died as a result of prolonged beatings and torture while in police custody. Tsegaye, a member of the opposition Ethiopian Democratic Party (EDP), was arrested and interrogated initially in late 2006. Reports indicate that he was kept in custody beyond the legal limit, denied food and water, and severely beaten to extract a confession. On March 5, the court ordered that Yigzaw be released for lack of evidence; however, he died before being set free. The victim's family was not given a copy of the autopsy report.

Local police or kebele militia reportedly killed activists working on a sugar cane project in the Afar regional government (see section 6.a.).

No investigation was conducted into the August 2006 political killing by army troops of Elias Molago, of Gibe District. After Molago was killed, his body was publicly displayed in the town of Hosana, the district capital. Molago, an election observer in the 2000 parliamentary elections, had disputed the official results that gave the ruling party victory in the area.

There were no developments in numerous other 2005 political killings.

For example, on January 3, police shot and killed two students during a raid on Gue Secondary School, Gue town, Oromiya Region. Police stormed the school in response to suspicions that supporters of the outlawed Oromo Liberation Front (OLF) were active in the school. Several other students were beaten and arrested. Some of the students were released, but others remained in detention at year's end.

On January 5, police shot and killed Belachew Endale Bitew of Arbaminch town, Southern Nations, Nationalities and Peoples' Region, according to reports from the Ethiopian Human Rights Council (EHRCO. A suspect was arrested and at year's end the case was being investigated.

On May 26, police fired on the vehicle of Manaye Alamrew of West Gojam Zone, Amhara Region; Alamrew died from his injuries. Police fired on the vehicle reportedly on suspicion that it was transporting weapons. No investigation had been initiated by year's end.

During the year Alemu Deriba, an off-duty federal police officer who in February 2006, shot and killed four youths in Gondar, was tried and sentenced to death.

There were no developments in the May 2006 shooting by police in Nazret, Oromiya Region of Alemu Tesfaye, Tariku Yakiso, and Mensur Musema.

Five persons were killed and two were injured from landmines during the year. The government demining unit continued to make limited progress in its survey and demining of border areas. United Nations Mission in Eritrea and Ethiopia (UNMEE) officials reported that new landmines were planted on both sides of the border with Eritrea during the year and disseminated information on the whereabouts of suspected mined areas to local residents.

At year's end there were approximately two million landmines in the country, many dating from the 1998–2000 war with Eritrea.

In 2006 several bomb explosions were reported in Addis Ababa and other parts of the country. During the year four supporters of the opposition Oromo National Congress (ONC) were arrested in relation to the April 2006 blast in the central market in the town of Gedo, Oromiya Region that killed 15 persons and injured 37 others. There were no developments in any of the other bombings that occurred in 2006.

Violent clashes between different ethnic clans during the year resulted in hundreds of deaths. There were no developments in the following 2006 attacks: the September bus attack by armed men; the hand grenade incident in the town of Jijiga; and the explosion in Addis Ababa.

There were no further developments in the 2005 hand grenade attacks on four hotels and a residence in Jijiga, which resulted in five deaths and 31 injuries.

The federal high court in Addis Ababa continued to arraign and prosecute those formally charged with committing genocide and other war crimes, including extrajudicial killings, under the 1975–91 Derg regime (see section 1.e.).

b. Disappearance

There were reports of politically motivated disappearances. On January 10, Yohannes Woldu, who was a CUD observer during the 2005 elections, disappeared, according to EHRCO. Following the elections, Yohannes had reported repeated harassment and threats from security services.

On July 11, small business owner Girma Tesfaye Ayana was arrested for allegedly possessing illegal weapons and has not been seen since. On July 18, Befekadu Bulti Merri, a professor at Jima University, Oromiya Region, was arrested on the same charge and his whereabouts also remained unknown.

A few of the thousands of civilian protestors who were detained and held incommunicado in 2005 remained in prison; however, most had been released by the end of 2006 (see section 1.d.).

On January 12, Mulatu Gebremichel, a UEDF member who ran for the federal parliament in 2005, was released after reportedly being held in solitary confinement for over three months. However, on January 21, Mulatu disappeared, and his whereabouts remained unknown at year's end.

On September 20, the UEDF reported that Ismail Blatta, another member who ran for federal parliament, disappeared. Prior to his disappearance he had reported repeated harassment and threats from security services. Blatta was arrested several times following the 2005 elections.

During the year Tadesse Zelelam, Ayana Chindessa, and Legesse Tolera were released, according to EHRCO. The three had disappeared in January 2006, along with Lt. Abebe Alemu, Heletework Zewdu, and Wondimagegene Gedefaw.

During the year EHRCO reported that Daniel Worku, who had been abducted in 2005, was killed while in police custody.

There were no developments in the 2005 abduction by security forces of Ashenafi Berhanu, Tsegaye Neguse, Adem Hussien, Jelalu Temam, Girum Seifu, Mekonnen Seifu, Endeshaw Terefe, Daniel Abera, Tesfaye Bacha, Tesfaye Jemena, Bonsa Beyene, Getu Begi, Solomon Bekele, Amanuel Asrat, Mesfin Mergia, or Dawit Demerew.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

Although the constitution and law prohibit the use of torture and mistreatment, there were numerous credible reports that security officials tortured, beat, or mistreated detainees. Opposition political parties reported frequent and systematic abuse of their supporters by police and regional militias. In Makelawi, the central police investigation headquarters in Addis Ababa, police investigators reportedly commonly used illegal interrogation methods to extract confessions.

For example, in May police arrested and reportedly tortured 37 CUD members suspected of having links with the outlawed Ethiopian Patriotic Front (EPF). Meqcha Mengistu, Anteneh Getnet, and Woldie Dana of the Ethiopian Teachers Association (ETA) were among the 37; the three had been repeatedly arrested beginning in late 2006. The trial of the 37 was ongoing at year's end.

On September 13, police beat regional parliamentarian Wegayehu Dejene of Me-ea District, Oromiya Region, and his family members. Police began harassing the parliamentarian after a February 2006 regional council meeting. Wegayehu filed several complaints with local authorities, but no action had been taken by year's end.

During the year two soldiers were arrested and convicted for the January 2006 rape of seven female residents of Guduru District, Oromiya Region. The two soldiers received sentences of seven and 14 years respectively.

There were no developments in the July 2006 incident in which security forces detained and beat one regional parliamentarian from the Oromo Federal Democratic Movement (OFDM) and five from the ONC after their attendance in a court case.

There were no developments in the 2005 beating and subsequent suicide of Abdeta Dita Entele, a member of the opposition coalition Oromo National Congress/United Ethiopian Democratic Forces of Siraro District in the Oromo Region.

There were no developments in the 2005 reported attack on Daniel Bekele, a policy advocate for the NGO ActionAid Ethiopia and a member of the executive committee of the Network of Ethiopian Nongovernmental Organizations and Civil Society Organizations, which monitored the May 2005 elections. At year's end Bekele remained in police detention on trial for "outrages against the constitution."

Security forces beat persons during demonstrations (see section 2.b.).

Prison and Detention Center Conditions

Prison and pretrial detention center conditions remained harsh and life threatening. Severe overcrowding was a problem, and prisoners were often allocated fewer than 21.5 square feet of sleeping space in a room that could contain up to 200 persons. The daily meal budget was approximately $0.50 (4.5 birr) per prisoner, and many prisoners had family members deliver food daily, or used personal funds to purchase food from local vendors. Prison conditions were unsanitary, and access to medical care was unreliable. There was no budget for prison maintenance.

In detention centers, police often physically abused detainees. Authorities generally permitted visitors but sometimes arbitrarily denied them access to detainees.

While statistics were unavailable, there were some deaths in prison due to illness and poor health care. Prison officials were not forthcoming with reports of such deaths.

Authorities sometimes incarcerated juveniles with adults if they could not be accommodated at the juvenile remand home.

A few of the 10,000 to 18,000 individuals (mostly youths) detained in Dedessa military camp since 2005 remained; almost all were released in 2006.

During the year the International Committee of the Red Cross (ICRC) visited regional prisons, civilian detention facilities, and police stations throughout the country and conducted hundreds of visits involving thousands of detainees. However, they were prevented from visiting federal prisons, including those where senior opposition, civil society, and media leaders were being held. Regional authorities allowed the ICRC to meet regularly with prisoners without third parties being present. The ICRC also received permission to visit military detention facilities where the government detained suspected OLF fighters. The ICRC also continued to visit civilian Eritrean nationals and local citizens of Eritrean origin detained on alleged national security grounds. The local NGO Prison Fellowship Ethiopia (JFA-PFE) was granted access to various prison and detention facilities, including federal prisons. The government also periodically granted diplomatic missions access to regional prisons and prison officials, subject to advanced notification.

The government limited access by representatives of the international community to leaders of the CUD opposition party, members of civil society groups, and journalists detained in 2005 for alleged involvement in antigovernment demonstrations in Addis Ababa, two of whom who remained in federal police custody at Addis Ababa's Kaliti prison at year's end. However, the government permitted JFA-PFE and local civic and religious leaders to visit these detainees.

d. Arbitrary Arrest or Detention

Although the constitution and law prohibit arbitrary arrest and detention, the government frequently did not observe these provisions in practice.

Role of the Police and Security Apparatus

The Federal Police Commission reports to the Ministry of Federal Affairs, which in turn is subordinate to the parliament. Local government militias also operated as local security forces largely independent of the police and the military. Corruption remained a problem, particularly among traffic policemen who solicited bribes. Impunity also remained a serious problem. The government rarely publicly disclosed the results of investigations into such types of abuses. The federal police acknowledged that many of its members as well as regional police lacked professionalism.

The government continued its efforts to train police and army recruits in human rights. During the year the government continued to seek assistance from the ICRC, JFA-PFE, and the Ethiopian Human Rights Commission (EHRC) to improve and professionalize its human rights training and curriculum by including more material on the constitution and international human rights treaties and conventions.

Arrest and Detention

Authorities regularly detained persons without warrants and denied access to counsel and family members, particularly in outlying regions. Although the law requires detainees to be informed of the charges against them within 48 hours, this generally was not respected in practice. While there was a functioning bail system, it was not available in murder, treason, and corruption cases. In most cases authorities set bail between $55 and $1,100 (500 to 10,000 birr), which was too costly for most citizens. Police officials did not always respect court orders to release suspects on bail. With

court approval persons suspected of serious offenses can be detained for 14 days while police investigate and for additional 14-day periods while the investigation continues. The law prohibits detention in any facilities other than an official detention center; however, there were dozens of unofficial local detention centers used by local government militia and other formal and informal law enforcement entities. The government provided public defenders for detainees unable to afford private legal counsel, but only when their cases went to court. While in pretrial detention, authorities allowed such detainees little or no contact with legal counsel.

Security forces arrested without warrant hundreds of persons during the year, particularly prior to the Ethiopian New Year on September 11. Security forces began arresting individuals throughout the Oromiya Region on the grounds that they were involved with the OLF and possibly planning terrorist activity. Many of those arrested were members of the opposition UEDF or OFDM parties. Approximately 450 cases of arrest were reported to opposition party offices in Addis Ababa. Three of these cases were executive committee members of EHRCO's Nekempt office. Nearly all those held were not charged with any crime or brought to court. At year's end 148 remained in jail.

There were many reports from opposition party members that in small towns, authorities detained persons in police stations for long periods without charges or access to a judge, and that sometimes these persons' whereabouts were unknown for several months. Opposition parties registered many complaints during the year that government militias beat and detained their supporters without charge for participating in opposition political rallies (see sections 1.c. and 1.e.).

Police continued to enter private residences and arrest individuals without warrants (see section 1.f.).

There were no developments in the 2006 arrest by security forces of 180 persons in the town of Nazret, Oromiya Region, following clashes between local police and store owners. Initial charges included inciting an uprising and destruction of property, but most of those arrested had charges dismissed and were released by the end of 2006. However, there was no information available on those still detained.

During the year the 250 persons arrested in 2006 in the town of Tikur Inchini, Oromiya Region, following an uprising by local ONC activists were released.

In January 2006 the international media reported that more than 11,000 persons detained in November 2005 following large-scale antigovernment demonstrations had been released. However, the commission of inquiry into post-election political violence found that over 30,000 individuals had been detained, while other reports placed the number at over 50,000. Most of the prisoners were released without charge. The exact number of persons who remained in custody at year's end was not known.

In February 2006 Amnesty International alleged that the government was still holding thousands of students under arrest in Oromiya Region. The government denied the accusation, and claimed that only 86 students were under arrest for offenses including violence, property destruction, and "disrupting the teaching and learning process." Most of the 86 had reportedly been released by year's end.

At year's end, most of the CUD leaders and independent journalists detained in 2005 were released from prison.

During and following the December 2006 fighting inside Somalia, authorities in Somalia arrested and detained numerous persons accused of terrorism and support for the former Islamic Courts. Authorities in Kenya subsequently arrested other suspected terrorists after they fled Somalia for Kenya. Some of those detained were released, while others were transferred without judicial process to Ethiopia. In May Ethiopian authorities acknowledged that 41 suspected international terrorists were being held and investigated. Most of the 41 detainees, including all women and children, were released during the year; some were sent back to their respective countries for possible prosecution. Those whose countries refused to take them back were sent to third countries and released.

Amnesty

On September 10, the government granted amnesty to 17,765 prisoners from throughout the country; this represented 22 percent of the prison population. All but 383 federal prisoners were from regional prisons. Convicted murderers, rapists, and those jailed for corruption were not included in the amnesty.

In July and August, 71 political detainees--the leadership of the CUD and several journalists--were pardoned for crimes for which they had been convicted and sentenced to punishments ranging from a few years to life in prison (see section 1.e.).

e. Denial of Fair Public Trial

The law provides for an independent judiciary. Although the civil courts operated with independence, the criminal courts remained weak, overburdened, and subject to significant political intervention.

The government continued to decentralize and restructure the judiciary along federal lines with the establishment of courts at the district, zonal, and regional levels. The federal high court and the Federal Supreme Court heard and adjudicated original and appeal cases involving federal law, transregional issues, and national security. The regional judiciary was increasingly autonomous and often heard regional cases.

Regional offices of the federal Ministry of Justice monitored local judicial developments. Some regional courts had jurisdiction over both local and federal matters, as the federal courts in those jurisdictions had not begun operation; overall, the federal judicial presence in the regions was limited. Anecdotal evidence suggested that some local officials believed they were not accountable to a higher authority.

To remedy the severe lack of experienced staff in the judicial system, the government continued to identify and train lower court judges and prosecutors, although officials acknowledged that salaries did not attract the desired number of competent professionals

Trial Procedures

According to the law, accused persons have the right to a fair public trial by a court of law within a "reasonable time," the right to a presumption of innocence, the right to be represented by legal counsel of their choice, and the right to appeal. Despite these protections, closed proceedings occurred, at times authorities allowed detainees little or no contact with their legal counsel, and detainees usually were not presumed innocent. Judicial inefficiency, lengthy trial delays, and lack of qualified staff often resulted in serious delays in trial proceedings.

The Public Defender's Office provides legal counsel to indigent defendants, although its scope remained severely limited. Although the law explicitly stipulates that persons charged with corruption are to be shown the body of evidence against them prior to their trials, authorities routinely denied defense counsel access to such evidence before trial.

In the country's federal system, federal and regional criminal courts worked side-by-side. There are federal first instance courts, high courts, and the Supreme Court. There are also regional first instance courts and high courts. The Supreme Court maintains appellate authority over all courts.

The law provides legal standing to some pre-existing religious and customary courts and allows federal and regional legislatures to recognize other courts. By law, all parties to a dispute must agree that a customary or religious court would be used before such a court may hear a case. Shari'a (Islamic) courts may hear religious and family cases involving Muslims. In addition other traditional systems of justice, such as councils of elders, continued to function. Although not sanctioned by law, these traditional courts resolved disputes for the majority of citizens who lived in rural areas and generally had little access to formal judicial systems.

The federal first instance court's seventh criminal branch handled cases of sexual abuse against women and children. Three federal judges sat on one bench to hear all cases involving juvenile offenses. There was a large backlog of juvenile cases, and accused children often remained in detention with adults until officials heard their cases.

Criminal matters related to the military are handled by military tribunals. Civilians are not permitted to be tried by military tribunals. The military justice system lacked adequately trained staff to handle a growing caseload.

During the year Ethiopian forces serving in Somalia arrested and detained civilians suspected of being affiliated with foreign fighters in Somalia, including nine women and five children. Some of the civilians were released after questioning; however, two international NGOs reported that some were transferred from Somalia through Kenya to Ethiopia, where some were tried by military tribunal. Others were held without charge or due process. There were reports that some were held incommunicado and that others were tortured or sexually assaulted by Ethiopian security personnel. At year's end the status of many of those detained remained unknown.

In 2006 the 57 top officials from the former Derg (Mengistu) regime, including former communist dictator Colonel Mengistu Hailemariam, who were found guilty of genocide, treason, and murder for crimes committed during their 17 years of rule were sentenced. On January 11, they were given sentences ranging from 23 years to life in prison. Courts have convicted 1,018 persons involved with the Derg regime of crimes related to their role in atrocities, while 5,000 to 6,000 others remained on trial in other cases.

Political Prisoners and Detainees

The total number of political prisoners and detainees during the year was estimated to be in the hundreds.

In May police arrested and reportedly tortured 37 CUD members suspected of having links with EPF (see section 1.c.).

The trial of most of the CUD leadership, civil society members, human rights defenders, and journalists arrested following the demonstrations in November 2005 concluded after nearly two years of proceedings. In April 71 of the orginal 131 defendants were found guilty of "outrages against the constitution," "obstruction of the exercise of constitutional powers," and other crimes. Several of the defendants were sentenced to life in prison. The court ruled against the death penalty, noting that the crimes had been attempted, rather than actually carried out. One defendant was acquitted, and 25 were released for insufficient evidence.

Immediately following the court's finding of guilt in July and August, the government agreed to pardon the 71 after negotiations led by a group of prominent civic leaders. The pardon cleared all charges but was conditional on a pledge by the defendants to "abide by the constitutional order." The pardon also permitted the defendants' future political participation. Some of those pardoned had been held at Kerchele prison under harsh conditions. In 2006 CUD Secretary General Muluheh Eyoel and CUD member Andualem Arage, along with journalists Sisay Agena and Eskinder Nega, were placed in solitary confinement.

Two civil society leaders, Daniel Bekele and Netsanet Demissie, reportedly declined to sign an admission of guilt which would have made them eligible for pardon. They instead chose to present a full defense of their case. Following numerous delays on the part of the courts, their case concluded on December 26, when the federal High Court convicted them of incitement and sentenced both to 30 months' imprisonment. Since Bekele and Demissie had already served two-thirds of their sentences, they were eligible for parole; however, neither had been released by year's end.

At year's end, many other political detainees, including approximately 100 other CUD members, remained in prison on trial on charges related to activity in the November 2005 demonstrations.

Several of the pardoned detainees were journalists, some of whom fled following alleged threats from security officials (see section 2.a.). They later reported on detention conditions for political prisoners, noting that although they themselves had not been tortured, they had seen many others beaten and tortured. Family visits to political prisoners were restricted to a few a year in some cases, and the ICRC was not permitted access. Prisoners were frequently denied proper light, mattresses, and adequate bathroom facilities. Several of the pardoned political prisoners had serious health problems in detention, and some received no treatment.

Prominent ETA members Tilahun Ayalew, Anteneh Getnet and Meqcha Mengistu, arrested in 2006 for allegedly being members of the Ethiopian Patriotic Front, an outlawed, allegedly armed front operating in the Amhara Region, and rearrested in 2007 remained in jail awaiting trial, along with 52 other detainees charged similarly (see section 1.c.). Many observers maintained that the detentions were politically motivated.

Two NGO members active in civic education remained in prison.

The ONC reported that 138 of their members who were arrested in 2005, including three elected regional parliamentarians, remained in Kaliti Prison awaiting trial at year's end.

The three Ethiopian Air Force personnel who landed a military helicopter and requested asylum in Djibouti in 2005 remained incommunicado detention in the country. No further information was available.

Civil Judicial Procedures and Remedies

Civil courts, which provided judicial remedy for alleged wrongs, were generally viewed as independent and impartial. The law provides citizens the right to appeal human rights violations in civil court; however, no such cases were filed during the year.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law requires authorities to obtain judicial search warrants to search private property; however, in practice, particularly outside Addis Ababa, police often searched property without obtaining warrants. Opposition party representatives claimed that police sometimes used fraudulent warrants to enter homes and commit criminal acts, including extorting money. There were reports that members of the federal police robbed persons during the year, including through the use of false warrants.

There continued to be reports of police forcibly entering civilian homes. During and following antigovernment demonstrations in June and November 2005, security forces entered homes and searched premises without warrants, took thousands of persons from their homes in the middle of the night without warrants, and often detained family members or other residents.

All electronic communications facilities were stateowned. Political party leaders reported incidents of telephonetapping and other electronic eavesdropping.

The government used a widespread system of paid informants to report on the activities of particular individuals.

There were reports during the year of the forced displacement of families in the Somali Region (see section 1.g.); however, unlike in the previous year, no families were moved as a result of the government's resettlement program. In 2006 the government claimed its program to move families from drought-prone areas to more fertile lands was voluntary, but opposition parties accused local authorities of targeting opposition supporters for resettlement by manipulating resettlement rosters.

There were reports that local officials used threats of land redistribution and withholding of food aid and fertilizer to garner support for the ruling coalition. There were many reports of ruling party or government harassment intended to prevent individuals from joining opposition parties or from renting property to them. There were numerous reports of more serious forms of harassment and violence directed against members of opposition parties in many areas of the country, including beatings, arrests, and killings.

There were credible reports that teachers and other government workers had their employment terminated if they belonged to opposition political parties. According to opposition groups OFDM and ONC, the Oromiya Regional government continued to dismiss members--particularly teachers--from their jobs.

The law imposes a six-month waiting period on anyone seeking to remarry following a divorce or the death of one's spouse (see section 5).

Security forces continued to detain family members of persons sought for questioning by the government.

g. Use of Excessive Force and Other Abuses in Internal Conflicts

During the year fighting between government forces and the ONLF, an ethnically-based, nationalist insurgent movement operating in the Somali Region resulted in widespread human rights abuses, including targeted killings, torture, rape, abductions, arbitrary arrest, burning of villages, the displacement of thousands of civilians, and a restricted supply of food and medicine. Since it was outlawed in 1994, there have been numerous violent conflicts between the ONLF, which seeks greater autonomy for the Ogadeni people and the Somali Region, and the Ethiopian National Defense Forces (ENDF) and security services. The regional conflict in Somalia that began in late 2006 spread to the Somali Region and, fueled by support from the Eritrean government, resulted in greatly increased armed activity by the ONLF, whose members share ethnic ties with Somalis. International NGOs and other aid organizations operating in the region have reported that both the ENDF and the ONLF were responsible for abuses and harsh techniques to intimidate the civilian population. There have been no reports of authorities identifying or punishing the perpetrators of systematic human rights abuses in the Somali Region.

On April 24, in the largest offensive conducted in several years, the ONLF attacked a Chinese-run oil facility in the Degehabur zone of the Somali Region; 65 civilians and nine Chinese nationals were killed in the attack. Another seven Chinese were taken hostage by the ONLF, but later released. The ONLF acknowledged responsibility for the attack, which they said was in response to government-permitted exploration for resources in the Somali Region. The April 24 attack resulted in a dramatic increase in the conflict, which triggered widespread criticism of human rights abuses perpetrated by government forces.

On May 28, several individuals attacked a crowd with automatic weapons and hand grenades during an official public holiday celebration in Jijiga town, Somali Region; six persons were killed and several wounded, including the regional administrator, Abdullahi Hassan. The ONLF denied

responsibility for the attack, but coming on the heels of the April 24 attack, the ENDF responded with a massive counterinsurgency campaign.

The government and rebel forces restricted delivery of necessary food aid from donor organizations into the five zones in which military activity was the most intense. Flow of commercial traffic into these zones was also prevented, thereby creating food and supply shortages, a doubling of grain prices, and a 30 percent reduction in the price of livestock, a principal source of revenue. By year's end, the flow of humanitarian aid had resumed. Substantial improvements in food aid deliveries allowed relief to reach primary destination points, but distribution to secondary towns, rural areas, and to final beneficiaries remained limited.

The government restricted access by NGO workers and journalists to affected areas. International journalists who entered the Somali Region without permission of the government were arrested or asked to leave the country. The ICRC and Medecins Sans Frontieres (MSF) were expelled from the region for alleged cooperation with the ONLF; MSF had reported on alleged human rights violations and expressed concern about a possible looming humanitarian crisis.


Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

While the constitution and law provide for freedom of speech and press, the government did not respect these rights in practice. The government continued to arrest, harass, and prosecute journalists, publishers, and editors. The government continued to control all broadcast media. Private and government journalists routinely practiced self-censorship.

Government-controlled media reflected mostly the views of the government and the ruling EPRDF coalition. However, live radio and television broadcasts at times included televised parliamentary debates and broadcast the views of opposition parliamentarians, as did government newspapers.

Although some new, small circulation newspapers were published during the year, the number of private newspapers available in Addis Ababa remained small. Eight newspapers remained closed. Two were banned after their publishers and editors-in-chief were arrested in 2005, and six others that ceased publication as a result of the government's crackdown or government-owned printing presses' refusal to print newspapers. Three publishing houses owned by journalists who were detained and later released were ordered dissolved and fined during the year. Only 18 private Amharic-language and English-language newspapers with political and business focus were in publication with a combined weekly circulation of 100,000. The closed newspapers had a combined total weekly circulation of approximately 400,000.

The government operated the sole television station and tightly controlled news broadcasts. The broadcasting law prohibits political and religious organizations from owning broadcast stations. The law also prohibits foreign ownership.

Foreign journalists at times published articles critical of the government but were subjected to government pressure to self-censor their coverage. During the year some reporters were subjected to intimidation, harassment, and expulsion from the country for publishing articles critical of the government.

For example, on May 16, in the town of Degehabur, soldiers detained three *New York Times* journalists for five days. Nairobi Bureau Chief Jeffrey Gettleman, photographer Vanessa Vick, and videographer Courtenay Morris were reporting on the conflict between the government and separatist rebels in the Ogaden Region bordering Somalia. They had not received proper press credentials or formal approval from the government to travel to the region. Authorities repeatedly threatened the journalists, questioned them at gunpoint, refused to notify their embassy, confiscated their equipment, and, in one instance, kicked Vick in the back. The journalists were moved among three different jails before being released on May 21. Their embassy secured their release and departure from the country.

On July 18, Will Conners, a freelance writer in the country for over two years, was denied press accreditation by the Ministry of Information; Conners had been working with Jeffrey Gettleman and was investigating human rights abuses in the Ogaden area of Somali Region.

During the year the government convicted and sentenced journalists for articles or actions in 2005.

For example, on July 16, six journalists and three publishers received criminal penalties for "actions against the state" charges stemming from 2005. Editors Andualem Ayele of *Ethop*, Zelalem Gebre of *Menelik*, Mesfin Tesfaye of *Abay*, and Abiy Gizaw of *Netsanet* were sentenced to life in prison and stripped of all civic rights. The prosecution requested the death penalty for Mesfin Tesfaye and Andualem Ayele. Zelalem Gebre and Abiy Gizaw were sentenced in absentia. Wenakseged Zeleke of *Asqual* was sentenced to three years in prison, and deputy editor Dawit Fasil of *Satenaw* to 18 months in prison.

The government also pardoned and/or released other journalists who had been convicted of treason or "outrages against the constitutional order" stemming from the 2005 civil unrest.

For example, on April 9, the federal High Court acquitted and set free eight editors and publishers of Amharic-language newspapers who were arrested in 2005 along with opposition leaders and accused of treason and attempted genocide along with the top opposition leaders. Those released were Serkalem Fasil, co-owner and publisher of *The Asqual*, *Menelik*, and *Satenaw* newspapers (who gave birth while in custody); her husband, Eskinder Nega, columnist in the same newspaper; publisher Sisay Agena of *Ethop* and *Abay*; editor-in-chief Nardos Meaza of *Satenaw*; publisher Zekarias Tesfaye and deputy editor Dereje Habtewold of *Netsanet*; deputy editor Feleke Tibebu of *Hadar*; and publisher Fasil Yenealem of *Addis Zena*. They were acquitted of three criminal charges and were released from Kaliti prison. The publications have been banned since the crackdown. Eskinder Nega was also acquitted on three additional charges connected to his alleged political activism.

On May 17, the court fined and released two journalists, Abdissa Aberra Deressa, editor-in-chief of the defunct *Dagim Wonchif*, and Abraham Tezera Feleke, deputy editor-in-chief of the same newspaper. The two journalists were arrested in May and charged with spreading false information against the ENDF and inciting violence as a result of a 2005 report on the defection of Ethiopian Air Force officials who had criticized government officials.

On June 11, four editors and three publishers of now-defunct weeklies were convicted of anti-state charges linked to their coverage of the government's handling of disputed parliamentary elections in 2005. Two of the editors were convicted of charges carrying sentences of life imprisonment or death. Editors Andualem Ayele Legesse of *Ethop* and Mesfin Tesfaye Gobena of *Abay* were convicted along with 34 opposition activists of "outrages against the constitutional order," which can carry a sentence of life imprisonment or the death penalty. Editor Wenakseged Zeleke Tessema of *Asqual* was convicted of similar charges. Deputy editor Dawit Fassil Woldeselassie of *Satenaw,* who was released on bail in April after 16 months in prison, was returned to Kaliti prison on June 11 and charged with "inciting the public through false rumors."

On July 20, deputy editor Dawit Fasil of *Satenaw* and editors Andualem Ayele of *Ethop*, Mesfin Tesfaye of *Abay*, and Wenakseged Zeleke of *Asqual* were granted a conditional pardon and released from Kaliti prison after they accepted responsibility for postelection unrest in 2005. The four--who were among 71 opposition members and journalists pardoned--had requested clemency in a document in which they stated that they had attempted to change the constitution outside of the legal framework (see section 1.e.).

On August 18, another four imprisoned journalists of closed Amharic-language weeklies were pardoned and released along with 30 other opposition members; all were among the 71 opposition members and journalists pardoned during the year. Editors Wosonseged Gebrekidan of *Addis Zena*, Dawit Kebede of *Hadar*, Goshu Moges of *Lisane Hizb*, and freelance columnist Tadios Tantu had received prison terms ranging from four to 15 years after waiving their defense and pleading guilty in anticipation of a pardon. Wosonseged Gebrekidan and Dawit Kebede, who had been in prison since 2005, were convicted on July 30 of "conspiring to incite disruption of constitutional rule," while Goshu, who was arrested in February 2006, was convicted of belonging to an illegal political organization.

During the year publishers and publishing houses were charged and convicted of libel, sometimes for incidents dating back to 2005.

For example, on July 16, Serkalem Publishing House was fined $13,500 (120,000 birr) and Sisay Publishing and Advertising Enterprise was fined $11,000 (100,000 birr) for "committing or supporting outrages to the constitutional order" in 2005. Fasil Publishing and Advertising was fined $1,700 (15,000 birr). All three publishing companies were ordered dissolved.

On April 19, Tilahun Bekele, editor-in-chief of the defunct *Maebel* private newspaper, was fined $330 (3,000 birr) for libel; Bekele had published a report 10 years ago alleging corruption in the administration of the Addis Ababa Kirkos Church. Bekele, who had 17 press charges against him during his journalism career, has been acquitted of all the other 16 charges.

During the year Eyob Gebre Egziabher Bayissa, editor-in-chief of the defunct *Seife Nebelbal*, was released on bail after paying $110 (1,000 birr) for each of two charges. He was accused of reporting in a 2005 issue of *Seife Nebelbal* that the OLF destroyed a military vehicle and killed 18 soldiers "without verifying the story and in violation of the proclamation on upholding legality." Gebre Egziabher, who subsequently left the country, was charged with libel and publishing false information.

The case of Getachew Sime, former editor-in-chief of the defunct Amharic language weekly, *Agere*, whose appeal to the Federal Supreme Court against his 2005 defamation conviction and three-month prison sentence was rejected, remained pending.

Several journalists arrested in 2005 remained in prison. For example, Shiferaw Insermu, a journalist with Ethiopian Television (ETV), who was arrested in 2005, remained in detention on several charges, including passing government information to the OLF leadership.

During the year the government passed laws to expand government control of the media.

On June 7, the government passed a law that prohibits broadcast organizations that were established and have financial or management assistance from outside the country from owning broadcasting companies.

In June the government issued a proclamation that empowers the Ministry of Information to direct and coordinate government information and communication activities and also to serve as the main source of government information; formerly these functions were handled by the Ethiopian News Agency (ENA), which was accountable to parliament. The ministry is also empowered to "issue permits to noncommercial press and monitor their activities," giving further regulatory powers to the ministry. Under the new bill, media organizations that publish private newspapers are obliged to obtain a certificate of competence from the Ministry of Information.

The Ministry of Information requires that newspapers maintain a bank balance of $1,150 (10,000 birr) when annually registering for a publishing license. This sum effectively precluded some smaller publications from registering. Authorities also required permanent residency for publishers to establish and operate a newspaper. The government did not require residency for other business owners, and some independent journalists maintained that the government used the residency requirement as a form of intimidation. The press law requires all publishers to provide free copies of their publications to the Ministry of Information on the day of publication.

The Ethiopian Free Press Journalists Association (EFJA) remained in disarray following the 2005 crackdown on the private press. Several journalists remained in exile, including EFJA president Kifle Mulat, who was acquitted on April 9 of outrages against the constitution and constitutional order.

Internet Freedom

The government restricted access to the Internet and blocked opposition Web sites, including the site of the Oromo Liberation Front and several news blogs and sites run by opposition diaspora groups, such as the *Ethiopian Review*, *CyberEthiopia.com*, *Quatero Amharic Magazine*, *Tensae*

*Ethiopia*, and the *Ethiopian Media Forum.* On May 1, Reuters reported that an Internet watchdog accused the country of blocking "scores of anti-government websites and millions of weblogs."

The Ethiopian Telecommunication Corporation, which has 23,887 Internet subscribers, remained the only Internet provider. Citizens in urban areas had ready access to Internet cafes; however, rural access was still extremely limited.

Mobile telephone text messaging, which was blocked by the state telecommunications monopoly following claims that the CUD had used text messaging to coordinate antigovernment actions, restarted on September 12.

Academic Freedom and Cultural Events

The government restricted academic freedom during the year, maintaining that professors could not espouse political sentiments. Authorities did not permit teachers at any level to deviate from official lesson plans and discouraged political activity and association of any kind on university campuses. Reports continued throughout the year of both uniformed and plainclothes police officers being present on and around university and high school campuses. The government arrested students and teachers during the year. Professors and students were discouraged from taking positions not in accordance with government beliefs or practices. There was a lack of transparency in academic staffing decisions, with numerous complaints from individuals in the academic community of bias based on ethnicity and/or religion. The freedoms of speech, expression, and assembly were frequently restricted on university and high school campuses.

Unlike in the previous year, there were no reports that the Ministry of Culture and Tourism banned performances.

b. Freedom of Peaceful Assembly and Association

Freedom of Assembly

The constitution and law provide for freedom of assembly; however, the government restricted this right. Organizers of large public meetings or demonstrations must notify the government 72 hours in advance and obtain a permit; however, the government has issued no such permits since May 2005.

Opposition political parties reported that during the year their supporters were targets of frequent and systematic harassment and violence by government security forces, often after leaving meetings. EHRCO reported that regional governments, including the Addis Ababa regional administration, refused to grant permits or provide security for large meetings.

There were few attacks by police, the army, and militia against demonstrators, largely due to the fact that no public assembly permits were issued and illegal demonstrations were limited; however, police killed demonstrators during the year.

For example, on April 24, the police chief in Damot Weyde District shot and killed Meredo Mega and Alkal Dabso Dingo. The victims were part of a demonstration against the regional administration's decision to merge the victim's district with another district. At year's end there had been no investigation into the shootings. The victims' families reported continued harassment and threats from the police chief.

There was no investigation into the 2006 killing by federal police of 15 demonstrators in the East Wallega zone, Guduru District

There were no new developments reported in numerous 2005 police killings of demonstrators.

The Independent Inquiry Commission, established in late 2006 by the government to investigate the alleged use of excessive force by security forces in violent 2005 antigovernment demonstrations, found that security forces did not use excessive force, given demonstration violence. However, prior to the release of the report, the chairman and deputy chairman of the commission fled the country, allegedly in response to threats made against them by government forces. After fleeing, both stated publicly and showed video evidence that at an official meeting in 2006, the commission had originally decided, by a vote of eight to two, that excessive force was used and that the total number of killed and injured was the same as eventually reported. Following this vote, government officials allegedly urged commission members to change their votes to indicate that excessive force was not used.

The OFDM reported that ruling party cadres seized and destroyed membership cards of OFDM supporters, disrupted OFDM political meetings, and detained OFDM members in police stations and army camps.

Freedom of Association

Although the law provides for freedom of association and the right to engage in unrestricted peaceful political activity, the government in practice limited this right. The Ministry of Justice registers and licenses NGOs, and there was some improvement in transparency of the NGO registration process.

As provided by law, the government required political parties to register with the National Election Board (NEB), which continued to limit political activity by the ONC. For example, during the year the NEB forced the ONC to rename itself by granting the ONC name to a renegade ONC member.

During the year the UEDF, CUDP, OFDM, and ONC reported arrests of members and the forced closure of nearly all political party offices throughout the country (see section 1.d.) and intimidation of landlords to force their eviction. There were credible reports that the government used legal means to harass leadership from an influential opposition political party, utilizing government agencies to restrict party control and membership.

During the year some political leaders, including members of federal and regional parliaments, were prevented from traveling to their constituencies and meeting with supporters.

The ETA continued to encounter government restrictions when attempting to hold meetings. On August 2, police raided a meeting of the Addis Ababa chapter of the ETA without warrant on allegations that the meeting was being held illegally. The police arrested General Secretary Tesfaye Tirga after finding Education International postcards calling for the release of detained ETA members on trial (see section 1.e.). He was allegedly beaten and interrogated before being released.

The ETA has operated since 1967, but in 1993, after the EPRDF took power, an alternate, pro-EPRDF ETA was established. In 1993 the original ETA and the government-supported ETA began prolonged legal battles over the organization's name and property rights. Although the original ETA received favorable judgments in lower courts, the newly formed ETA appealed to the Supreme Court; the appeal remained pending at year's end.

c. Freedom of Religion

The constitution and law provide for freedom of religion, and the government generally respected this right in practice; however, local authorities occasionally infringed on this right. The Ethiopian Orthodox Church (EOC) and Sufi Islam are the dominant religions; nearly 90 percent of the population adhered to one or the other faith.

While the government required that religious institutions annually register with the Ministry of Justice, there were no reports of government action against institutions that chose not to register. Under the law, a religious organization that undertakes development activities must register its development wing separately as an NGO. The government did not issue work visas to foreign religious workers unless they were associated with the development wing of a religious organization.

Some religious property confiscated under the Mengistu (Derg) regime had not been returned by year's end.

Minority religious groups reported discrimination in the allocation of government land for religious sites. Authorities banned a traditional animist Oromo religious group because it suspected that the group's leaders had close links to the OLF. Protestant groups occasionally reported that local officials discriminated against them when they sought land for churches and cemeteries. Evangelical leaders stated that because authorities perceived them as "newcomers," they were at a disadvantage compared with the EOC and the Ethiopian Islamic Affairs Supreme Council (EIASC) in the allocation of land. The EIASC reported that it faced more difficulty obtaining land from the government than did the EOC, while others believed that the government favored the EIASC.

Societal Abuses and Discrimination

On March 26, an evangelist was killed by a group of Muslim youth near a mosque in the town of Jima, Oromiya Region. At year's end there were no arrests in the incident.

Unlike in the previous year, there were no reports of deaths resulting from clashes between Muslims and Ethiopian Orthodox Christians.

The Jewish community numbered approximately 2,000, and there were no reports of anti-Semitic acts.

For a more detailed discussion, see the *2007 International Religious Freedom Report.*

d. Freedom of Movement, Internally Displaced Persons, Protection or Refugees, and Stateless Persons

Although the law provides for freedom of movement within the country, foreign travel, emigration, and repatriation, the government restricted some of these rights in practice.

Throughout the year in the Gambella Region, the government continued to monitor and sometimes control the passage of relief supplies and access by humanitarian organizations, explaining that it was doing so as a matter of security for those traveling in the region. Between April and year's end, the government severely restricted the movement of persons into and within the Ogaden Region, arguing that the counterinsurgency operation against the ONLF posed a security threat. Travel by members of the press was particularly restricted (see section 1.g.).

The law prohibits forced exile; and the government did not force any citizens into exile. A number of persons remained abroad in self-imposed exile, including 54 journalists (see section 2.a.).

During the year the ICRC repatriated 1,379 Ethiopians from Eritrea and repatriated 62 Eritreans. Most Eritreans and Ethiopians of Eritrean origin registered with the government and received identity cards and six-month renewable residence permits that allowed them to gain access to hospitals and other public services. However, there were anecdotal reports that local government officials denied indigent Eritreans the right to free medical services.

During the year the UNHCR processed 97 cases for resettlement in foreign countries.

Internally Displaced Persons (IDPs)

The conflict between government and rebel forces in the Somali Region resulted in the displacement of thousands of persons (see section 1.g.). Violent clashes between different ethnic groups during the year displaced persons and resulted in deaths and injuries.

The 1998-2000 war with Eritrea produced approximately 350,000 IDPs. Of these, humanitarian agencies resettled an estimated 225,000. The UNHCR estimated there were approximately 200,000 IDPs in the country, including approximately 62,000 in Tigray Region, 44,700 in Gambella Region, 30,000 in the Borena area of the Oromiya Region, and 50,000 on the border of the Oromiya and Somali regions.

During the year the government cooperated with the government of Sudan in the forcible repatriation of Ethiopian refugees. The status of those repatriated in unknown.

Protection of Refugees

The law provides for the granting of asylum or refugee status in accordance with the 1951 UN Convention relating to the Status of Refugees and its 1967 protocol, and the government has established a system for providing protection to refugees. In practice the government provided protection against "refoulement," the return of persons to a country where there is reason to believe they feared persecution, and granted refugee status and asylum. The government generally cooperated with the UNHCR and other humanitarian organizations in assisting refugees and returning citizens.

The government, in cooperation with UNHCR, also continued to provide temporary protection to individuals from Sudan, Eritrea, and Somalia who may not qualify as refugees under the 1951 convention and the 1967 protocol.

During the year the government opened a new refugee camp at Teferi Ber, northeast of the town of Jijiga, to accommodate approximately 8,500 new Somali refugees.

The conflict between ethnic groups in the Gambella Region continued to complicate UNHCR refugee protection efforts (see section 1.g.). Food deliveries to refugees continued in spite of the crisis in the West; however, humanitarian organizations at times were unable to adequately monitor deliveries due to travel restrictions.

The government required that all refugees reside and remain in designated camps, most of which were located near the Eritrean, Somaliland, and Sudanese borders, unless granted permission to live elsewhere in the country. Such permission was given primarily to attend higher education institutions, undergo medical treatment, or avoid security threats at the camps.


Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The constitution and law provide citizens the right to change their government peacefully, and citizens exercised this right in practice through generally free and fair elections held on the basis of universal suffrage; however, violence and intimidation of voters and election observers marred polling in many areas in the 2005 election. In practice the EPRDF ruling party dominated the government.

The government policy of ethnic federalism led to the creation of individual constituencies to ensure representation of all major ethnic groups in the House of Peoples' Representatives. Nevertheless, small ethnic groups lacked representation in the legislature. There were 23 nationality groups in six regional states that did not have a sufficient population to qualify for constituency seats; however, in the May 2005 elections, individuals from these nationality groups competed for 23 special seats in the 547-seat House of Peoples' Representatives. Additionally, these 23 nationality groups have one seat each in the 112-seat House of Federation, the upper house of parliament.

Elections and Political Participation

According to domestic and international observers, the May 2005 national elections, in which the EPRDF coalition won 372 of 547 seats, generally reflected the will of the people. Opposition parties made an unexpectedly strong showing, increasing their parliamentary representation from 12 to 172 seats.

Irregularities, including intimidation of voters and election observers, marred polling in many areas. The government and EPRDF also announced the "final" election results before the NEB released them. Observers reported killings, disappearances, voter intimidation and harassment, and unlawful detentions of opposition party supporters, particularly in the Amhara, Oromiya, and Southern Nations, Nationalities, and Peoples regions. The Carter Center expressed concern over reports of improper vote counting and tabulation, stating that its observer teams had "found evidence that ballot boxes have been moved improperly, were improperly secured, or that party agents were barred from polling stations or were not allowed to observe the entire count." It also reported "election day and postelection intimidation and harassment." The head of the European Union's Electoral Observation Mission issued a preliminary report stating that the postelection complaint review process "did not live up to international standards," citing irregularities in key areas. In spite of these criticisms, international observers noted that the elections, and particularly the preelection campaign season, were an important step forward in the country's democratization efforts.

Following the election, opposition parties accused the NEB of being an instrument of the ruling party and of failing to act when informed of electoral irregularities, including ballot stuffing, vote count fraud, bribery, killings, beatings, and widespread intimidation and harassment by ruling party supporters during the national elections.

In June 2005, negotiations between the ruling and major opposition parties over election complaints resulted in an agreement to adopt an ad hoc complaints resolution process to deal with the large number of unresolved electoral complaints. According to the Carter Center, 44 different complaints investigation panels conducted formal investigations and hearings in 178 constituencies across the country, resulting in a decision by the NEB to hold new elections in 31 constituencies. New elections were held in those constituencies in August 2005, but were boycotted by opposition parties due to complaints regarding the election review process.

In 2005 the government and opposition leaders participated in discussions on the opposition's participation in the House of People's Representatives. While most UEDF members decided to take their seats in the house, some CUD leaders announced they would boycott the federal parliament, as well as regional parliaments and the Addis Ababa City Council. However, by year's end most elected CUD members had joined parliament. In 2005 the CUD called for civil disobedience measures, such as horn-honking, boycotting EPRDF-owned businesses, and ostracizing alleged government supporters, which the government publicly declared illegal.

Beginning on November 2005, violent antigovernment protests allegedly organized by the opposition were held in Addis Ababa, and the government arrested several dozen opposition leaders, as well as members of the independent media and civil society groups, for alleged participation in

unlawful activities. Security forces also detained between 30,000 and 50,000 demonstrators for up to three months without charge. Military intervention led to widespread abuses such as arbitrary detention and killings. Security forces arrested at least 12 of the 20 CUD party executive committee members, including party president Hailu Shawel, vice chairman Bertukan Mideksa, secretary-general Muluneh Eyoel, and Addis Ababa mayor-elect Dr. Berhanu Nega, on charges of treason and genocide, among others (see section 1.e.).

During the year a new NEB was elected and a new electoral law was passed by parliament. The law was drafted by a group of ruling and opposition party representatives after several rounds of interparty negotiations. These negotiations, which were also charged with selecting several nominees for the new NEB, initially included the EPRDF and all major opposition parties. However, when the EPRDF refused to consider many proposals from opposition members, several parties walked out of the talks, thereby giving the EPRDF control over drafting of the law and nomination of NEB members.

The EPRDF, its affiliates, and EPRDF supporters controlled all seats in the 112-member House of Federation, whose members were appointed by regional governments and by the federal government. Membership in the EPRDF conferred advantages upon its members, and the party owned many businesses and awarded jobs and business contracts to loyal supporters.

The largest opposition party in the House of Peoples' Representatives was the CUDP, composed of most of the former CUD coalition members, which held 61 seats.

Registered political parties must receive permission from regional governments to open local offices. Opposition parties, such as the CUDP, UEDF, and OFDM, claimed that the pattern of widespread intimidation and violence directed against members of opposition political parties by local government officials continued throughout the year. Opposition parties and the press reported hundreds of such cases, including killings, beatings, arrests, and property confiscation.

Authorities often disrupted or unlawfully banned opposition party meetings.

Unlike in the previous year, there were no reports that authorities told opposition members to renounce their party membership if they wanted access to fertilizer, agricultural services, health care, and other benefits controlled by the government.

Of the 19 members of the Council of Ministers, two were women, and a number of women held senior positions. There were 116 women in the 547-seat House of Peoples' Representatives, a gain from 14 in the previous parliament, and 21 women in the 112-member House of Federation. Of the 14 members of the Supreme Court, three were women. During the 2005 national elections women constituted nearly half of the community observers, party workers, and election officials at polling stations.

Parliamentarians in the House of Peoples' Representatives are elected from every "woreda" (county) in the country and thereby represent the various ethnic minorities present. The House of Federation is made up of one member per approximately one million population, one representative for each region, as well as 20 seats reserved for ethnic minorities that are underrepresented.

Government Corruption and Transparency

The law provides criminal penalties for official corruption; however, the government did not implement these laws effectively. The World Bank's worldwide governance indicators reflected that corruption was a serious problem.

The Ministry of Justice has primary responsibility for combating corruption. A combination of social pressure, cultural norms, and legal restrictions limited corruption. However, government officials appeared to manipulate the privatization process, as state and party-owned businesses received preferential access to land leases and credit. The government's decision to grant MIDROC, the country's largest foreign investor, an exclusive license to import cement was perceived as favoritism toward a government ally.

There were no arrests of high-level government officials, although numerous low-level officials were arrested for corruption during the year.

The law provides for public access to government information, but access was largely restricted in practice.

The government publishes its laws and regulations in the national gazette prior to their taking effect. The Ministry of Information managed contacts between the government, the press, and the public; however, the government routinely refused to respond to queries from the private press (see section 2.a.).

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

A number of domestic and international human rights groups generally operated with limited government restriction, investigating and publishing their findings on human rights cases. The government generally was distrustful and wary of domestic human rights groups and international observers.

Two of the most prominent domestic human rights organizations were EHRCO and the Ethiopian Women Lawyers Association (EWLA). The government routinely discounted EHRCO's reports and labeled it a political organization.

The EWLA's primary function was to legally represent women. These and numerous other groups primarily engaged in civic and human rights education, advocacy, legal assistance, and trial monitoring. However, the government neither shared information nor acknowledged the existence of human rights abuses with members of the domestic NGO community.

The government sometimes cooperated with international organizations such as the UN. However, in July the ICRC was ordered to cease its

operations in the Somali Region. In September the government restricted international workers for MSF from continuing work in the region. Both the ICRC and MSF had expressed concern about the government's counterinsurgency campaign against the ONLF (see section 1.g.)

Two NGO members active in civic education remained in prison (see section 1.e.).

The ICRC was denied access to federal prisons and to political prisoners.

In 2005 the government expelled representatives of several foreign-based NGOs conducting electoral work and by year's end had not allowed them to return.

Security officials continued to intimidate or detain local individuals to prevent them from meeting with NGOs and foreign government officials investigating abuse allegations.

The government is required by law to establish a human rights commission and an Office of the Ombudsman with the authority to receive and investigate complaints with respect to misadministration by executive branch offices. Both of these entities began work during the year. Each began accepting complaints and performed investigations during the year.

The Ministry of Justice continued to implement a three-year program of human rights training workshops for judges, prosecutors, police, and community members around the country.

Section 5 Discrimination, Societal Abuses, and Trafficking in Persons

The law prohibits discrimination based on race, color, gender, language, national origin, political or other opinion, or social status; however, in practice the government did not effectively enforce these prohibitions.

Women

The law criminalizes rape; however, the government did not fully enforce the law, in part due to widespread underreporting.Most women were unaware of the law, and social mores also discouraged women from reporting rape. Observers estimated that at least 1,000 rapes occurred annually in Addis Ababa, but data based on official police reports counted only approximately 400 cases per year. The press continued to report regularly on rape cases, particularly when injury to minors resulted. Courts sentenced convicted rapists to 10 to 15 years' imprisonment, as prescribed by law

Domestic violence, including spousal abuse and rape, was a pervasive social problem. A 2005 World Bank study concluded that 88 percent of rural women and 69 percent of urban women believed their husbands had the right to beat them. While women had recourse to the police and the courts, societal norms and limited infrastructure prevented many women from seeking legal redress, particularly in rural areas. The government prosecuted offenders on a limited scale.

The combination of pregnancy at an early age, limited birth space, chronic maternal malnutrition, and a lack of skilled care at delivery often led to obstetric fistulae and permanent incontinence. Approximately 8,700 women developed obstetric fistulae annually, and 27,000 women with untreated fistulae were estimated to be living in rural areas. Treatment for fistulae was available at only one hospital, the Addis Ababa Fistula Hospital, which annually performed over 1,000 fistula operations. It estimated that for every successful operation performed, 10 other young women needed the treatment but did not receive it. The maternal mortality rate was extremely high, partly due to food taboos for pregnant women, poverty, early marriage, and birth complications related to FGM, particularly infibulation.

Prostitution was legal for persons over age 18 and was commonly practiced around the country; however, the law prohibits pimping and benefiting from prostitution. Persons exploited in prostitution routinely reported that poverty was the principal underlying cause.

Sexual harassment was widespread. The penal code prescribes 18 to 24 months imprisonment; however, sexual harassment-related laws were not enforced.

The law sets the legal marriage age for girls and boys at 18, elevates civil law above customary and religious law; allows for the legal sharing of property by unmarried couples who live together for at least five years, eliminates family arbitrators as a means of settling marital disputes in lieu of the court system, allows for the joint administration of common marital property, requires the courts to take into account the situation of children or the weakest member of the family in the event of divorce or separation, and imposes a six-month waiting period on women seeking to remarry following divorce or the death of a spouse. However, the law was not always enforced, and regional councils had authority to determine family law for their respective regions. Four regions maintained their own family law: Amhara, Tigray, Oromiya, and Addis Ababa; however, regional laws were not uniformly enforced. By law, such regional regulations could not conflict with the national constitution.

Discrimination against women was most acute in rural areas, where 85 percent of the population was located. The law contains discriminatory regulations, such as the recognition of the husband as the legal head of the family and the sole guardian of children over five years old. Authorities did not consider domestic violence a serious justification for granting a divorce. There was limited legal recognition of common law marriage. Irrespective of the number of years the marriage existed, the number of children raised, and joint property, the law entitled women to only three months' financial support if the common law relationship ended. A husband had no obligation to provide financial assistance to his family and, as a result, women and children sometimes faced abandonment. The law states that any property owned before marriage belongs to the spouse that previously owned it. Any property gained during marriage is shared equally, although a wife does not have the right to inherit her deceased husband's share. Even with stronger formal laws, most rural residents continued to apply customary law in economic and social relationships.

All land belongs to the government. Although women could obtain government leases to land, and the government had an explicit policy to provide equal access for women to land, rural communities rarely enforced this policy. In nearly all regions women did not have access to land, except through marriage. In practice, when a husband died, other family members often took the land from his widow.

In urban areas, women had fewer employment opportunities than men, and the jobs available did not provide equal pay for equal work.

Children

The government supported efforts by domestic and international NGOs that focused on children's social, health, and legal issues, despite its limited ability to provide improved health care, basic education, or child protection.

As a policy, primary education was universal and tuition-free, but not compulsory; however, there were not enough schools to accommodate the country's youth, particularly in rural areas, and the cost of school supplies was prohibitive for many families. In 2005 73.2 percent of male primary-school-age children and 63.6 percent of female primary-school-age children attended school; in Addis Ababa girls' attendance was significantly higher. Government reports indicated that 22.4 percent of the children who attended school left the system before they reached the second grade, and only 34.9 percent of children who began first grade completed eighth grade.

Child abuse was widespread. Members of an NGO staffed 10 child protection units in Addis Ababa's police stations to protect the rights of juvenile delinquents and juvenile victims of crime. Some police officers received training during the year on procedures for handling cases of child abuse.

Societal abuse of young girls continued to be a problem. Harmful traditional practices included FGM, early marriage, marriage by abduction, and food and work prohibitions.

In the Afar Region older men continued to marry young girls, but media accounts suggested that this traditional practice continued to face greater scrutiny and criticism. Local NGOs, such as the Kembatta Women's Self-Help Center and the Tigray Women's Association, also influenced societal attitudes toward harmful traditional practices and early marriage in their areas. During the year regional governments in Amhara and Tigray instituted programs to educate young women on the issues of early marriage.

The majority of girls and women in the country had undergone some form of FGM. Girls typically experienced clitoridectomies seven days after birth (consisting of an excision of the clitoris, often with partial labial excision, and faced infibulation (the most extreme and dangerous form of FGM) at the onset of puberty. According to a Ministry of Health Demographic and Health survey released in 2005, the practice of FGM among all women had decreased from 80 to 74 percent, while support for the practice among women had dropped from 60 to 29 percent. The penal code criminalizes the circumcision of any female by imprisonment of not less than three months or a fine of not less than $58 (500 birr). Likewise, infibulation of the genitals is punishable with imprisonment of five to 10 years. However, no criminal prosecutions have ever been brought for FGM. The government discouraged the practice of FGM through education in public schools and broader mass media campaigns.

Although illegal, the abduction of women and girls as a form of marriage continued to be widespread in several regions, including the Amhara, Oromiya, and Southern Nations, Nationalities, and Peoples regions, despite the government's attempts to combat the practice. Forced sexual relationships accompanied most marriages by abduction, and women often experienced physical abuse during the abduction. Abductions led to conflicts among families, communities, and ethnic groups. In cases of marriage by abduction, the perpetrator did not face punishment if the victim agreed to marry him (unless authorities annulled the marriage); even after the conviction of a perpetrator, authorities often commuted the sentence if the victim married him. Child marriage was also a problem, particularly in Amhara and Tigray regions, where girls were routinely married as early as age seven, despite the legal minimum age of 18 for marriage. There were some signs of growing public awareness of the problem of abuse of women and girls, including early marriage.

The government estimated the number of street children totaled 150,000 to 200,000, with approximately 50,000 to 60,000 street children in Addis Ababa. The UN Children's Fund (UNICEF) estimated there were 600,000 street children in the country and more than 100,000 in the capital. UNICEF stated the problem was exacerbated because of families' inability to support children due to parental illness and decreased household income. These children begged, sometimes as part of a gang, or worked in the informal sector. Government and privately run orphanages were unable to handle the number of street children, and older children often abused younger ones. Due to severe resource constraints, hospitals and orphanages often overlooked or neglected abandoned infants. "Handlers" sometimes maimed or blinded children to raise their earnings from begging.

Trafficking in Persons

The law prohibits trafficking in persons; however, there were reports that persons were trafficked from and within the country. The country was a source country for men, women, and children trafficked for forced labor and sexual exploitation. NGOs estimated that international trafficking annually involved between 25,000 and 30,000 victims

According to the International Organization for Migration (IOM) there were a total of more than 130,000 Ethiopian migrant workers (legal and illegal) in the Middle East, predominantly women. NGOs and Ethiopia's Ministry of Labor and Social Affairs (MOLSA) estimated that the majority of illegal Ethiopian workers in Middle Eastern countries were trafficked rather than smuggled for employment purposes. According to data from MOLSA and IOM, 13,498 Ethiopian workers migrated to the Middle East between September 2005 and August 2006; and 12,016 Ethiopian workers migrated to the Middle East between September 2006 and January 2007.

Young women were trafficked to Djibouti and the Middle East, particularly Lebanon, the United Arab Emirates, Saudi Arabia, and Bahrain for involuntary domestic labor. Some women were trafficked for sexual exploitation to Europe (Specifically Turkey and Greece) via Lebanon.

Small numbers of men were trafficked to Saudi Arabia and the Gulf states for exploitation as low-skilled laborers. Both children and adults were trafficked internally from rural to urban areas for domestic labor and, to a lesser extent, for commercial sexual exploitation and forced labor, such as street vending and weaving.

Trafficked Ethiopians transited Egypt, Yemen, Djibouti, Kenya, and Tanzania to perform domestic labor in Lebanon and other Gulf states. They also transited Sudan and Libya as part of irregular migration to Europe and North America. Ethiopians were trafficked to Djibouti for domestic labor and

the sex industry, and to South Africa to perform labor associated with hosting the World Cup.

Local NGOs reported that internal trafficking of children and adults within the country continued to be a serious problem. Vulnerable individuals (such as young adults from rural areas and children) who transited the Addis Ababa bus terminal were sometimes identified and targeted by agents (or traffickers) who approached them offering jobs, food, guidance, or shelter. NGO representatives reported that some traffickers focused on rural villages to recruit specific types of laborers.

According to international NGOs, child prostitution was a growing problem, particularly in urban areas. Approximately 60 percent of persons exploited in prostitution were between the ages of 16 and 25, according to one NGO report. Underage girls worked as hotel workers, barmaids, and prostitutes in resort towns and at rural truck stops. Pervasive poverty, migration to urban centers, early marriage, HIV/AIDS and other sexually transmitted diseases, and limited educational and job opportunities aggravated the sexual exploitation of children.

NGOs reported that houses of prostitution recruited impoverished girls as young as age 11 and kept them uninformed of the risks of HIV/AIDS infection and other sexually transmitted diseases. IOM officials reported some linkages between internal and international trafficking, specifically noting that children internally trafficked from Dire Dawa, Bahir Dar, and Dessie, were frequently sent to the Middle East, transiting through Dire Dawa, Jijiga, Bosasso (in Somalia), and then Djibouti.

The law provides penalties from five to 20 years' imprisonment and a fine not to exceed $5,656 (50,000 birr) for trafficking women and children. For particularly egregious cases involving bodily harm, the penalty can be up to10 to 20 years of rigorous imprisonment. Organizations found in violation of Article 599 face a $11,312 (100,000 birr) fine and dissolution.

Approximately 925 cases of trafficked children were reported to police in 2006, and 67 of those cases were referred to the prosecutors office, according to an NGO. Of the 67, one resulted in a conviction in 2006, 23 were under investigation, and 43 had been closed due to lack of evidence or absconded defendants. Low conviction rates resulted from an understaffed and overburdened judiciary, lack of cooperation fromdestination country governments, and alleged corruption on the part of responsible local authorities. Traffickers often destroyed evidence, making convictions difficult.

In 2006 and 2007 the government closed illegal international employment agencies suspected of trafficking persons. The government also supervised the work of the legal international labor migration firms, which included antitrafficking training in their initial screening and predeparture counseling programs. Predeparture counseling was designed to inform potential migrants of the risk of being trafficked. During the year the government also provided antitrafficking training to police, judges, and prosecutors.

A few NGOs aided child victims, including the Forum on Street Children–Ethiopia, which provided children forced into prostitution or sexual exploitation with shelter, protection, and return to their families.

Persons with Disabilities

The law does not mandate equal rights for persons with disabilities, and the government devoted few resources to rehabilitate or assist persons with disabilities. Persons with disabilities sometimes complained of job discrimination. The government did not mandate access to buildings or provide services for persons with disabilities. There were approximately seven million persons with disabilities, according to the Ethiopian Federation of Persons with Disabilities. There was one mental hospital and an estimated 10 psychiatrists in the country. The Ministry of Labor and Social Affairs, which was responsible for protecting the rights of persons with disabilities, funded prosthetic and orthopedic centers in five of the nine regional states over the past three years as part of its "National Program of Action for Rehabilitation of Persons with Disabilities."

National/Racial/Ethnic Minorities

There were more than 80 ethnic groups living in the country, of which the Oromo, at 40 percent of the population, was the largest. Although many groups influenced the political and cultural life of the country, Amharas and Tigrayans from the northern highlands played a dominant role. The federal system drew boundaries roughly along major ethnic group lines, and regional states had much greater control over their affairs than previously. Most political parties remained primarily ethnically based.

The military remained an ethnically diverse organization; however, Tigrayans increasingly dominated the senior officer corps. During the May 2005 elections and subsequent demonstrations, there were many reports of Tigrayan or Gambellan troops being used in Addis Ababa and other urban centers where the opposition was strong and where officials did not consider Amhara members of the armed forces sufficiently reliable.

There were occasional reports that officials terminated the employment of teachers and other government workers if they were not of the dominant ethnic group in the region.

Government and ONLF forces were responsible for widespread human rights abuses in the Somali Region (see section 1.g.).

Ethnic conflict in the western, southern, and eastern areas resulted in killings and injuries; however, there were far fewer such cases than in 2006, when hundreds of persons were killed and tens of thousands were displaced. There also were clashes among ethnic groups in the Oromiya, Benishangul-Gumuz, and Southern Nations, Nationalities, and Peoples regions.

On February 27, an ethnic conflict between the Guji and Burji groups in the Arero district of Oromiya Region resulted in two deaths and several injuries.

On May 19, a conflict over land rights between the Oromo and Gumuz ethnic groups in the Haro Limu district of Oromiya Region resulted in five deaths and an unknown number of injuries.

Other Societal Abuses and Discrimination

Homosexuality is illegal and punishable by imprisonment. Instances of homosexual activity determined to be cruel, involving coercion, or involving a minor (age 13 to 16) are punishable by not less than three months or more than five years in prison. Where children under 13 years of age are involved, the law provides for imprisonment of five to 25 years. While society did not widely accept homosexuality, there were no reports of violence against homosexuals.

Societal discrimination against persons with HIV/AIDS continued during the year.

Section 6 Worker Rights

a. The Right of Association

The law provides most workers with the right to form and join unions, and the government allowed this in practice. However, the law specifically excludes teachers and civil servants (including judges, prosecutors, and security service workers) from organizing unions. There was government interference in trade union activities during the year.

A minimum of 10 workers were required to form a union. While the law provides all unions with the right to register, the government may refuse to register trade unions that do not meet its registration requirements. The government retained the authority to cancel the registration of a union after consulting the appropriate courts. There were no reports that the government used this authority during the year. The law stipulates that a trade organization may not act in an overtly political manner. Approximately 300,000 workers were union members.

Seasonal and part-time agricultural workers did not organize into labor unions. Compensation, benefits, and working conditions of seasonal workers were far below those of unionized permanent plantation employees.

Despite government recognition of the independent ETA, authorities required all public school teachers to subsidize a separate government-created and controlled teacher's union (also called ETA) through mandatory withholding of $0.23 (2 birr) from their monthly salaries. A 2003 ruling by the federal high court that authorities should return the assets of the independent ETA and allow its offices to reopen was appealed to the Supreme Court by the government-controlled ETA; the appeal continued at year's end, and the high court's decision to recognize the independent ETA had not been implemented.

During the year the National Workers Federation for Crops, Fishery and Agro Industry reported that union leaders in the Oromiya Region were harassed, intimidated, and imprisoned by regional police in collaboration with employers. The federation also reported that kebele militia or local police killed activists working in a sugar cane project in the Afar Regional government, in Sabure Woreda, Awara Melka. The federation has submitted a formal letter requesting the government to investigate, but no investigation had been conducted by year's end.

Although the law prohibits antiunion discrimination by employers against union members and organizers, unions reported that employers frequently fired union activists. Lawsuits alleging unlawful dismissal often took years to resolve because of case backlogs in the labor courts. According to labor leaders, a number of court cases in which workers were terminated for union activities were pending after four or five years. Employers found guilty of antiunion discrimination were required to reinstate workers fired for union activities and generally did so in practice.

b. The Right to Organize and Bargain Collectively

The law protects the right of collective bargaining for most workers, and in practice the government allowed citizens to exercise this right freely. Labor experts estimated that collective bargaining agreements covered more than 90 percent of unionized workers. Representatives negotiated wages at the plant level. Unions in the formal industrial sector made some efforts to enforce labor regulations. There are no export processing zones.

Although the constitution and law provide workers with the right to strike to protect their interests, it contains detailed provisions that make legal strike actions difficult to carry out, such as a minimum of 30 days' advance notice before striking. The law requires aggrieved workers to attempt reconciliation with employers before striking and includes a lengthy dispute settlement process. These applied equally to an employer's right to lock out workers. A majority of the workers involved must support a strike for it to occur.

Workers nonetheless retained the right to strike without resorting to either of these options, provided they give at least 10 days' notice to the other party and to the Ministry of Labor and Social Affairs, make efforts at reconciliation, and provide at least a 30-day warning in cases already before a court or labor relations board.

The law also prohibits strikes by workers who provide essential services, including air transport and urban bus service workers, electric power suppliers, gas station personnel, hospital and pharmacy personnel, firefighters, telecommunications personnel, and urban sanitary workers.

The law prohibits retribution against strikers, but labor leaders stated that most workers were not convinced that the government would enforce this protection. Labor officials reported that, due to high unemployment and long delays in the hearing of labor cases, some workers were afraid to participate in strikes or other labor actions.

The labor law allows one or more permanent labor relations boards in the regional states to decide on cases involving enterprises owned by the federal government. The amendment also allows ad hoc labor relations boards in the regions to fulfill the same purpose.

In June 2006 the government further amended the labor law to provide severance pay for workers on additional grounds that were not previously provided for, such as discrimination against persons with HIV/AIDS and payment of severance to those without a pension plan.

c. Prohibition of Forced or Compulsory Labor

While the law prohibits forced or compulsory labor, including by children, such practices occurred (see sections 5 and 6.d.). Courts could order forced labor as a punitive measure.

d. Prohibition of Child Labor and Minimum Age for Employment

There were laws against child labor; however, the government did not effectively implement these laws in practice, and child labor remained a serious problem, both in urban and rural areas. Under the law, the minimum age for wage or salary employment is 14 years; however, the minimum age for employment was not effectively enforced. Special provisions cover children between the ages of 14 and 18, including the prohibition of hazardous or night work. By law, children between the ages of 14 and 18 were not permitted to work more than seven hours per day, work between the hours of 10 p.m. and 6 a.m., work on public holidays or rest days, or perform overtime work. The government defined hazardous work as work in factories or involving machinery with moving parts, or any work that could jeopardize a child's health.

In 2005 approximately 58 percent of boys and 42 percent of girls ages 5 to 14 were working. The majority of working children were found in the agricultural sector, followed by services, manufacturing, and other sectors. According to the Ministry of Social and Labor Affairs (MOLSA), many children work for their families without pay. In both rural and urban areas, children often begin working at young ages, with many starting work at age five. In rural areas, children work in agriculture on commercial and family farms, and in domestic service. Children in rural areas, especially boys, engage in activities such as cattle herding, petty trading, plowing, harvesting and weeding, while other children, mostly girls, collect firewood and water. In urban areas, many children, including orphans, work in domestic service, often working long hours which may prevent them from attending school regularly. Many believe they were unable to quit their jobs and fear physical, verbal, and sexual abuse from their employers while performing their work. Children in urban areas also work in construction, manufacturing, shining shoes, making clothes, portering, directing customers into taxis, petty trading, and herding animals. Estimates of the population of street children vary, with the government estimating it to be between 150,000 and 200,000 for the whole country, and UNICEF estimating it to be 600,000 children. In the capital city of Addis Ababa alone, there are an estimated 50,000 to 60,000 street children according to the government, and 100,000 according to UNICEF.

The commercial sexual exploitation of children increased during the year, particularly in urban areas. Girls as young as 11 reportedly were recruited to work in brothels, they often were sought by customers who believed them to be free of sexually transmitted infections. Girls are also exploited as prostitutes in hotels, bars, resort towns, and rural truck stops. Reports indicate that some young girls have been forced into prostitution by their family members. The government's definition of worst forms of child labor included prostitution and bonded labor. During the year there were reports of forced or bonded labor of children who had been trafficked from the Oromiya Region and the Southern Nations, Nationalities, and Peoples Region to other regions of the country to work as domestic servants. Family members reportedly forced young girls into prostitution.

e. Acceptable Conditions of Work

There is no national minimum wage. However, some government institutions and public enterprises set their own minimum wages. Public sector employees, the largest group of wage earners, earned a monthly minimum wage of approximately $35 (320 birr); employees in the banking and insurance sector had a minimum monthly wage of $37 (336 birr). According to the Office for the Study of Wages and Other Remuneration, these wages did not provide a decent standard of living for a worker and family. Consequently, most families in the wage sector required at least two wage earners to survive, which forced many children to leave school early. Only a small percentage of the population was involved in wage labor employment, which was concentrated largely in urban areas.

The law provides for a 48-hour legal workweek (with a 24-hour rest period), premium pay for overtime, and prohibition of excessive, compulsory overtime. Although the government did little to enforce the law, in practice most employees in the formal sector worked a 40-hour workweek.

The government, industry, and unions negotiated occupational health and safety standards; however, the inspection department of the Ministry of Labor and Social Affairs did not effectively enforce these standards, due to a lack of resources. A lack of detailed, sector-specific health and safety guidelines also inhibited enforcement. Workers had the right to remove themselves from dangerous situations without jeopardizing their employment; however, most workers feared losing their jobs if they were to do so.