# Exhibit F

# Exhibit F



# DISMANTLING DISSENT

INTENSIFIED CRACKDOWN
ON FREE SPEECH IN ETHIOPIA

**AMNESTY**
**INTERNATIONAL**

Amnesty International is a global movement of more than 3 million supporters, members and activists in more than 150 countries and territories who campaign to end grave abuses of human rights.

Our vision is for every person to enjoy all the rights enshrined in the Universal Declaration of Human Rights and other international human rights standards.

We are independent of any government, political ideology, economic interest or religion and are funded mainly by our membership and public donations.

# AMNESTY
## INTERNATIONAL



First published in 2011 by
Amnesty International Ltd
Peter Benenson House
1 Easton Street
London WC1X 0DW
United Kingdom

© Amnesty International 2011

Index: AFR 25/011/2011 English
Original language: English
Printed by Amnesty International,
International Secretariat, United Kingdom

All rights reserved. This publication is copyright, but may be reproduced by any method without fee for advocacy, campaigning and teaching purposes, but not for resale. The copyright holders request that all such use be registered with them for impact assessment purposes. For copying in any other circumstances, or for reuse in other publications, or for translation or adaptation, prior written permission must be obtained from the publishers, and a fee may be payable. To request permission, or for any other inquiries, please contact copyright@amnesty.org

*Cover photo*: The Federal High Court building in Addis Ababa, Ethiopia, where the trials of many opposition party members and journalists are being held.
© AP/PA Photo

**amnesty.org**

# CONTENTS

Summary ..................................................................................................5

PART I – Arrests and charges ....................................................................7

The Arrests..............................................................................................7

    Arrests of Oromo opposition members: March/April & August/September .........................7

    Arrests of other opposition party members and independent journalists: June – September9

The Charges ...........................................................................................10

    Charges against the Oromo political opposition members .............................................10

        The Federal Prosecutor vs Teshale Bekashi and others ................................................11

        The Federal Prosecutor vs Ghetnet Ghemechu Ghemta and others ............................11

        The Federal Prosecutor vs Bekele Gerba and others.....................................................11

    Charges against other opposition members and journalists ...........................................12

        The Federal Prosecutor vs Elias Kifle and others ........................................................12

        The Federal Prosecutor vs Abdiweli Mohammed Ismael and others ...........................12

        The Federal Prosecutor vs Andualem Arage and others ...............................................13

PART II – Targeting dissent....................................................................15

Profile of those arrested..........................................................................15

    The OPC and OFDM arrests ......................................................................................15

    The June & July arrests ..............................................................................................16

    The September arrests .................................................................................................16

    Those charged in absentia ..........................................................................................18

Examples of freedom of expression used as evidence ......................................................19

Overly broad definition of terrorism ............................................................................21

High-level political interest in the arrests and trials ........................................................... 22

PART III – Violations in pre-trial detention ..................................................................... 24

Restrictions on access to family members while in detention ........................................... 24

Restrictions on the right to access a lawyer ..................................................................... 26

Torture and other forms of ill-treatment .......................................................................... 27

    Evidence elicited by torture or other ill-treatment ....................................................... 29

    Inadmissibility of evidence elicited by torture or other ill-treatment ............................. 29

PART IV - Systematic trial monitoring essential .............................................................. 31

Conclusion: Ongoing crackdown and the wider impact on freedom of expression .............. 32

Recommendations ......................................................................................................... 33

Appendix: Defendants and charges in the six cases ........................................................ 35

    Defendants in the Federal Prosecutor vs Teshale Bekashi and others ........................... 35

    Defendants in the Federal Prosecutor vs Ghetnet Ghemechu Ghemta and others........... 38

    Defendants in the Federal Prosecutor vs Bekele Gerba and others ............................... 39

    Defendants in the Federal Prosecutor vs Elias Kifle and others.................................... 39

    Defendants in the Federal Prosecutor vs Abdiweli Mohammed Ismael and others........... 40

    Defendants in the Federal Prosecutor vs Andualem Arage and others.......................... 40

# SUMMARY

Since March 2011, at least 108 opposition party members and six journalists have been arrested in Ethiopia for alleged involvement with various proscribed terrorist groups. By November, 107 of the detainees had been charged with crimes under the Anti-Terrorism Proclamation and the Criminal Code. A further six journalists, two opposition party members and one human rights defender, all living in exile, were charged in absentia. Trials in all these cases have begun, and are ongoing at time of writing.

Amnesty International believes that the prolonged series of arrests and prosecutions indicates systematic use of the law and the pretext of counter-terrorism by the Ethiopian government to silence people who criticise or question their actions and policies, especially opposition politicians and the independent media. Whilst these groups have often been arrested and prosecuted in the past, the large numbers of arrests indicates an intensified crackdown on freedom of expression in 2011.

Many of those arrested during 2011 have been vocal in their commentary on national politics and in criticising government practise, in the course of their legitimate roles as journalists and opposition politicians. As a result, many had been harassed by state actors over a long period, and in some cases arrested and prosecuted. Many arrests in 2011 came in the days immediately after individuals publicly criticised the government, were involved in public calls for reform, applied for permission to hold demonstrations at a time when the government feared large-scale protests taking place, or attempted to conduct investigative journalism in a region of Ethiopia to which the government severely restricts access.

Much of the evidence against those charged, and listed in the charge sheets, involves items and activities which do not appear to amount to terrorism or criminal wrongdoing. Rather, many items of evidence cited appear to be illustrations of individuals exercising their right to freedom of expression, acting peacefully and legitimately as journalists or members of opposition parties, and which should not be the subject of criminal sanctions. Evidence cited includes articles written by the defendants criticising the government or journalistic reporting on calls for peaceful protest. In relation to some of the charges, it appears that the overly broad definitions of the Anti-Terrorism Proclamation are being used to prosecute individuals for any display of dissent. Calls for peaceful protest are being interpreted as acts of terrorism.

The trials of these individuals have become highly politicised due to the interest of, and statements made by, senior members of the government, including by the Prime Minister, who declared in the national parliament that all the defendants are guilty. Amnesty International is concerned that these comments could exert political pressure on the courts. These comments could also violate the right of the defendants to be presumed innocent until proven guilty.

All 114 opposition members and journalists arrested during 2011 were initially detained at Maikelawi detention centre, where they were denied the rights accorded to detainees under Ethiopian and international law. All were denied access to lawyers and family members during the initial stages of their detention, increasing their risk of being subjected to other

human rights violations. Many of the detainees complained, including in court, that they experienced torture and other ill-treatment during their detention and interrogation in Maikelawi. According to available information, the court has not ordered an investigation into any of the complaints of torture made by defendants, nor have the authorities indicated any intention of conducting investigations. Many of the detainees were reportedly forced to sign confessions or forced to acknowledge ownership or association by signing items of seemingly incriminating evidence.

Amnesty International believes that all the journalists and opposition members cited in this report were arrested primarily because of their legitimate and peaceful criticism of the government, and that the high level of political interest in the cases increases the risk that the independence of the judicial process will be subverted. The human rights violations widely reported to have taken place during pre-trial detention, and already raised in court several times with no result, raise further concerns that these individuals will not receive a fair trial and that they will be convicted for exercising their rights to freedom of expression and association. It is essential, therefore, that all six trials mentioned in this report are systematically monitored for their compliance with international fair trial standards. In the absence of a functioning civil society in a position to undertake trial monitoring, Amnesty International is calling on the representatives of the international community in Addis Ababa to take up the role of monitoring the trials.

The Prime Minister expressed an intention to arrest more members of the political opposition, indicating that the crackdown is not yet over and, indeed, the arrests continue. In the first week of December Amnesty International received reports that at least 135 people had been arrested across Oromia, including members and supporters of the Oromo People's Congress and Oromo Federalist Democratic Movement political parties.

These arrests, prosecutions and ongoing high level of government interest and involvement have had a wider impact on the exercise of freedom of expression in Ethiopia. They send a chilling message to other opposition politicians, journalists and anybody who has concerns about the policies and actions of their government to keep quiet, ask no questions or risk arrest. Several journalists and opposition members have already fled the country as a result.

It appears that the Ethiopian government is determined to destroy the few remaining traces of free expression in the country. There is increasingly no space in Ethiopia for individuals and publications who hold different opinions, represent different political parties or attempt to provide independent commentary on political developments.

# PART I – ARRESTS AND CHARGES

# THE ARRESTS

There has been a sustained crackdown on members of political opposition parties and journalists in 2011. At least 114 journalists and members of political opposition parties, including some high profile members of both groups, were arrested between March and September.

Those arrested included 98 members of the two main Oromo political opposition parties, who were arrested throughout the Oromia region and in Addis Ababa; and ten members of other political opposition parties and six independent journalists, most of whom were arrested in Addis Ababa.

## ARRESTS OF OROMO OPPOSITION MEMBERS: MARCH/APRIL & AUGUST/SEPTEMBER

Between 200 and 300 ethnic Oromos were arrested in March and April in widespread sweeps in the Oromia region and in Addis Ababa.[1] Arrests were reported from towns across the region, including Moyale, Jimma, Harar and Nekemte.

At least 89 members of the two largest Oromo political parties – the Oromo Federalist Democratic Movement (OFDM) and Oromo People's Congress (OPC) were among those arrested. Many of them had been members of the national parliament or of the Oromia regional assembly from 2005 to 2010, and had also stood unsuccessfully for re-election in the 2010 general elections. For instance Berhanu Emiru, arrested in April, is a member of the Executive Committee of the OFDM, and a high school physics teacher. Berhanu campaigned in the 2010 elections and authored documents such as statements and media articles for the party. 32 of those arrested, including Asfaw Ngasso, Gutu Mulesa and Mengesha Tolesa, were OPC candidates in the 2010 elections. Asfaw Ngasso and Gutu Mulesa were also OPC members of parliament between 2005 and 2010.

A number of youth and student members of the two parties, including a 17 year old girl who was a supporter of the OFDM, were also arrested in the March and April sweeps.

---

[1] The government was not able to provide more specific information on numbers arrested, numbers charged or numbers released without charge. The two Oromo political parties have information on their own members who were affected, but comprehensive information on these arrests is not available.

A second round-up of Oromo opposition parties' members occurred in late August and early September with at least 20 people being arrested. Among those arrested were nine OFDM and OPC members including Bekele Gerba, an English teacher at Addis Ababa University and deputy chairman of the OFDM, and Olbana Lelisa, an OPC party official. Both men had met with Amnesty International delegates just days before their arrests.

All the OPC and OFDM members were arrested on suspicion that they were members of the Oromo Liberation Front (OLF), an armed insurgent group which was proscribed as a terrorist organisation by the Ethiopian parliament in June 2011. Members of the Oromo political opposition have been charged with OLF membership countless times in the past.

The OFDM and OPC told Amnesty International that a number of their members arrested in March and April have subsequently disappeared, leading to concerns that these individuals are being held in arbitrary detention. The families of these individuals have reported to OFDM and OPC that they have never been produced in court and that their current location is unknown. Amnesty International requested information about the details of all those arrested in Oromia and Addis Ababa in March and April, including names and locations of those arrested but not yet charged. However, the government responded that it was unable to provide such details, as collated information did not exist.[2]

According to OPC officials, arrests continued in the Oromia region between September and November, and in particular in the Wallega, Ambo and Harar areas of Oromia. Sometime in September, Bekele Argasa, a student at Adama University, was arrested and transferred to Maikelawi detention centre in Addis Ababa where he remains in detention without charge. Argasa was an OPC candidate for the Oromia regional council in the 2010 elections. It has been difficult for OPC officials to establish how many of their members have been arrested, or the details of any charges preferred, because of ever-increasing restrictions on communications and exchange of information.

Representatives of other groups critical of the government have also been arrested during 2011. Most notably large numbers of students were arrested across the Oromia region, including from the universities of Jimma, Haromaya and Nekemte. The authorities have not availed any official information on these arrests including names of those arrested, what they are charged with and where they are detained. In the absence of functioning civil society organisations[3] who could monitor and document large scale arrests and the fate of those arrested, these cases are severely under reported and are not subjected to independent monitoring or oversight. The students' cases are not covered in the focus of this report, but the outcome of those arrests requires scrutiny.

---

[2] Meeting between Amnesty International and Ministry of Justice, Addis Ababa, August 2011

[3] Repressive legislation introduced in 2009 massively impeded the ability of human rights organisations to function in Ethiopia. In 2011, those human rights organisations who survived the passing of the law and its re-registration process were struggling with severe capacity and funding shortfalls

## ARRESTS OF OTHER OPPOSITION PARTY MEMBERS AND INDEPENDENT JOURNALISTS: JUNE – SEPTEMBER

On 19 June, journalist Woubshet Taye, deputy editor of the weekly Awramba Times newspaper was arrested in Addis Ababa. Two days later, on 21 June, Reyot Alemu, an English teacher and regular contributor to the weekly Fitih newspaper was arrested. During the same week opposition politician Zerihun Gebre-Egziabher, the President of the Ethiopian National Democratic Party, and Dejene Tefera, a member of the party were also arrested. All four were detained on suspicion of terrorism offences.

Shortly afterwards, on 1 July, two more journalists, Swedish nationals, Martin Schibbye and Johan Persson, were arrested in the Somali region. The journalists were allegedly arrested with members of the rebel group the Ogaden National Liberation Front (ONLF).

In September several high profile opposition politicians and journalists were also arrested. On 8 September, well-known actor Debebe Eshetu, a founding member of the Unity for Democracy and Justice (UDJ) opposition party, and an official of the Coalition for Unity and Democracy in the 2005 election, was arrested in Addis Ababa. The following day, 9 September, Sileshi Hagos, a radio journalist with Addis Ababa-based radio station 96.3 FM, was arrested.

Five days later, prominent journalist Eskinder Nega, and opposition politicians Andualem Arage, Nathanial Mekonnen, Asaminew Berhanu and Zemene Molla were arrested in Addis Ababa. Andualem Arage is vice chairman of the UDJ party. Nathanial Mekonnen and Asaminew Berhanu are both members of the UDJ national council. Zemene Molla is the general secretary of the Ethiopian National Democratic Party.[4] All five were arrested on suspicion of involvement with the banned Ginbot 7 Movement for Justice, Freedom and Democracy (Ginbot 7).

Kinfemichael Debebe, a member of the opposition All Ethiopian Democratic Party, was arrested on 26 September. According to party officials, at least one other member of the UDJ, Gezahgn (family name unknown), was also arrested sometime in September.

---

[4] The same party as Zerihun Gebre-Egziabher and Dejene Tefera, who were arrested in June

# THE CHARGES

By November, 107 of the journalists and opposition party members arrested during 2011 had been charged. A further six journalists, two opposition members and one human rights defender, all of whom live in exile, were charged in absentia. All 116 were charged on the basis of alleged involvement with proscribed terrorist groups[5] and planned terrorist activities. The charges included a number of different offences under the Anti-Terrorism Proclamation and the Criminal Code.[6]

One journalist, Sileshi Hagos, and five opposition party members; Asaminew Berhanu, Zemene Molla, Debebe Eshetu, Dejene Tefera and Gezahgn, were released without charge.

The defendants have been charged in six different cases. In three of the cases, members of the OPC and OFDM political parties are defendants. The other three cases consist of journalists and members of other opposition political parties as the defendants. In the latter three cases the journalists and opposition members were charged alongside other individuals. In all six cases the defendants have reported that some or all of their co-defendants are unknown to them despite being charged together for alleged involvement in the same crimes.

## CHARGES AGAINST THE OROMO POLITICAL OPPOSITION MEMBERS

The 98 members of the OFDM and OPC parties were all charged on the basis of alleged involvement with the banned Oromo Liberation Front, which has been proscribed as a terrorist entity by the Ethiopian parliament. However, they were charged with crimes under the Criminal Code, rather than the Anti-Terrorism Proclamation.

The 98 were charged in three cases. 69 of those arrested in March and April are defendants in *the Federal Prosecutor vs. Teshale Bekashi and others.* The remaining 20 arrested in March and April are defendants in *the Federal Prosecutor vs. Ghetnet Ghemechu Ghemta and others.* Nine party members arrested in August and September are defendants in *the Federal Prosecutor vs. Bekele Gerba and others.* The names of the individuals charged in each of these cases are included in the appendix of this report.

---

[5] Five entities were proscribed as terrorist organisations by the Ethiopian parliament in June 2011: the Oromo Liberation Front and the Ogaden National Liberation Front – both armed groups which have waged long-term low-level insurgencies against the Ethiopian government; the Ginbot 7 Movement for Democracy and Justice – an opposition group in exile; al-Shabab (armed Islamist group in Somalia) and al-Qa'ida

[6] Criminal Code (2005)

THE FEDERAL PROSECUTOR VS TESHALE BEKASHI AND OTHERS

The 69 defendants[7] in the case *'the Federal Prosecutor vs Teshale Bekashi and others'* were charged on 8 May:

■ 1st charge: against all defendants: 'Attacking the Political or Territorial Integrity of the State' (Art. 241, Criminal Code);

■ 2nd charge: against 2nd, 14th, 40th, and 61st defendants: 'Material Preparation for Subversive Acts' (Art. 256, Criminal Code);

■ 3rd charge: against 8th, 10th, 14th, 36th, 57th, and 63rd defendants: 'Provocation and Preparation' (Art. 257, Criminal Code);[8]

THE FEDERAL PROSECUTOR VS GHETNET GHEMECHU GHEMTA AND OTHERS

The 20 defendants in the case *'the Federal Prosecutor vs Ghetnet Ghemechu Ghemta and others'* were charged in June. All defendants were charged with one offence:

■ 1st charge: against all defendants: 'Attacking the Political or Territorial Integrity of the State' (Art. 241, Criminal Code).

THE FEDERAL PROSECUTOR VS BEKELE GERBA AND OTHERS

The nine defendants in the case *'the Federal Prosecutor vs Bekele Gerba and others'* were charged on 12 October:

■ 1st charge: against all defendants: 'Attacking the Political or Territorial Integrity of the State' (Art. 241, Criminal Code);

■ 2nd charge: against the 9th defendant: 'Material Preparation for Subversive Acts' (Art. 256, Criminal Code);

■ 3rd charge: against the 2nd and 7th defendants: 'Provocation and Preparation' (Art. 257, Criminal Code[9]).

---

[7] See Appendix for full list of defendants in all three of these cases

[8] This charge relates to the group of charges titled 'Crimes Against the Constitution or the State', Criminal Code, Part II, Book III, Crimes Against the State or Against National or International Interests, Sub-section I – Crimes Against the Constitution or the State

[9] As above

## CHARGES AGAINST OTHER OPPOSITION MEMBERS AND JOURNALISTS

### THE FEDERAL PROSECUTOR VS ELIAS KIFLE AND OTHERS

Journalists Woubshet Taye and Reyot Alemu, and opposition party leader Zerihun Gebre-Egziabher, were charged with terrorism offences on 5 September, alongside another individual, Hirut Kifle. Journalist Elias Kifle was also charged with the group, in absentia. They were charged under the Anti-Terrorism Proclamation (ATP) and the Criminal Code as follows:

- 1st charge: against all defendants: Articles "3(6) and/or 4" – 'Endangering, seizing or putting under control, causing serious interference or disruption of any public service' (Art. 3(6), ATP) and/or 'Planning, Preparation, Conspiracy, Incitement and Attempt of Terrorist Act' (Art. 4, ATP);

- 2nd charge: against all defendants: 'Participation in a Terrorist Organisation' (Art. 7, ATP);

- 3rd charge: against all defendants: 'Possessing and Dealing with the Proceeds of a Terrorist Act' (Art. 9, ATP);

- 4th charge: against all defendants: 'Money Laundering and Aiding'  (Art. 684, Criminal Code);

- 5th charge: against the 1st defendant (Elias Kifle): 'Rendering Support to Terrorism' – through providing or making available monetary, financial or other related services for terrorist acts or a terrorist organisation (Art. 5(1/d), ATP).

### THE FEDERAL PROSECUTOR VS ABDIWELI MOHAMMED ISMAEL AND OTHERS

On 5 September, the same day that Elias Kifle and others were charged in the above case, Swedish journalists, Martin Schibbye and Johan Persson, were charged with terrorism offences under the Anti-Terrorism Proclamation, and illegal entry into Ethiopia under the Criminal Code. Schibbye and Persson were charged alongside two alleged members of the ONLF, Abdiweli Mohamed Ismael and Kelif Ali Dahir, who were reportedly arrested alongside them, and who have since been convicted.[10] The charges listed below only relate to the two journalists:

_____

[10] The two alleged ONLF members pleaded guilty, offered no defence, and were promptly found guilty. In early November they were each sentenced to 17 years' imprisonment.

- 1st charge: against both defendants: 'Rendering Support to Terrorism', through providing 'a skill, expertise or moral support, or giving advice' (Art. 5(1/b) ATP);

- 2nd charge: against both defendants: 'Participation in a Terrorist Organisation' (Art. 7, ATP). This charge was dismissed by the judge on 3 November;

- 3rd charge: against both defendants: 'Violation of Political or Territorial Sovereignty, for the purpose of engaging in subversive activity, or to perform on behalf of a foreign power or organisation acts which are within the jurisdiction of the public authorities.' (Art. 242, Criminal Code).


## THE FEDERAL PROSECUTOR VS ANDUALEM ARAGE AND OTHERS

On 10 November Eskinder Nega, Andualem Arage, Nathaniel Mekonnen, Kinfemichael Debebe, Yohannes Terefe, Yeshewale Yehunalem, Mitiku Damte, and Andualem Ayalew Gelaw were charged with a number of crimes under the Anti-Terrorism Proclamation and the Criminal Code. A further 16 defendants were charged in absentia including five journalists (Fasil Yenealem, Abebe Belaw, Abebe Gelaw, Mesfin Negash and Abiye Teklemariam), one human rights defender (Obang Meto - Director of the Anuak Justice Council, a human rights organisation), the leader of a political opposition party (Zelelie Tsegaselassie), and a coordinator of Ethiopian opposition groups in exile and manager of Ethiopian Satellite Television (Neamen Zeleke).[11]

The 24 defendants were charged under various articles of the Anti-Terrorism Proclamation and the Criminal Code, as follows:

- 1st charge: against all defendants: 'Terrorist Acts' through 'causing a person's death or serious bodily injury; creating serious risk to the safety or health of the public or section of the public; committing kidnapping or hostage taking; causing serious damage to property; and endangering, seizing or putting under control, or causing serious interference or disruption of any public service' (Art. 3(1, 2, 3, 4 & 6), ATP);

- 2nd charge: against all defendants: 'Planning, Preparation, Conspiracy, Incitement and Attempt of Terrorist Act' (Art. 4, ATP);

- 3rd charge: against all defendants: 'Encouragement of Terrorism' (Art. 6, ATP).

- 4th charge: against all defendants: 'High Treason' through 'having dealings with or keeping up a secret correspondence with a power at war with Ethiopia,' (Art. 248(b), Criminal Code) [Note: the enemy cited in the charge sheet in relation to this charge is the government of Eritrea.]

---

[11] See Appendix for a full list of defendants in the order listed on the charge sheet

■   5th charge: against all defendants: 'Espionage' (Art. 252(1/a), Criminal Code);

■   6th charge: against defendants 1 to 18 (see appendix): 'Participation in a Terrorist Organisation' through 'serving as a leader or decision maker in a terrorist organisation,' (Art. 7(2) , ATP);

■   7th charge: against the 19th and 20th defendants (Elias Molla and Desalegn Arage Wale): 'Participation in a Terrorist Organisation' through 'recruiting another person, taking training, becoming a member or participating in any capacity,' (Art. 7(1), ATP);

■   8th charge: against 23rd and 24th defendants (Mesfin Negash and Abiye Teklemariam): 'Rendering Support to Terrorism' (Art. 5, ATP).

In late November, the prosecutor reportedly told the court that Mesfin Negash and Abiye Teklemariam (the 23rd and 24th defendants) were not charged with the first charge and had been included due to a typing error.

# PART II – TARGETING DISSENT

# PROFILE OF THOSE ARRESTED

Many of those arrested during 2011 have been vocal critics of government policy and practice and in calling for reform, including in the days immediately prior to their arrests, and in the course of their legitimate and peaceful activities as journalists and opposition politicians. Many had been harassed, arrested and prosecuted by the government over a long period.

In many cases the arrests came in the days immediately after the individuals publicly called for reform, or after they requested permission to hold demonstrations at a time when the government feared large-scale protests taking place, or in the case of the Swedish journalists, after attempting to report from a region of Ethiopia to which the government severely restricts access.

Amnesty International believes that the journalists and members of opposition parties listed in this report have been arrested and prosecuted solely because of these peaceful and legitimate activities as journalists and politicians.

## THE OPC AND OFDM ARRESTS

The accusation of supporting the OLF is frequently used to silence members of the Oromo political opposition. Countless members of Oromo opposition parties have been arrested and prosecuted on this basis in the past. For example, in February 2010, during the run-up to general elections, the OPC announced that more than 150 party officials had been arrested in less than five months, all for allegedly supporting the OLF.

Many of the members of the OPC and OFDM political parties arrested during 2011 reported a long history of harassment in the course of their political activities, particularly during election campaigning for the 2010 elections. Several members of both parties who were arrested in March and April reported that in the weeks before their arrests they had received phone calls warning them that they would be arrested if they did not join the ruling party.

Bekele Gerba and Olbana Lelisa, who were arrested in August, have both experienced repeated harassment, particularly during their campaigning for the 2010 elections. Both were under regular surveillance before their arrests and Bekele Gerba had previously been questioned about people he had met with. Bekele Gerba and Olbana Lelisa met with Amnesty International delegates in the days immediately before their arrests. The Amnesty International delegates were photographed by plain-clothed security agents as they were leaving Bekele Gerba's office in the Addis Ababa University campus. The security agents had

been waiting outside the office to photograph them on departure.


## THE JUNE & JULY ARRESTS


A few days before her arrest, Reyot Alemu had written an article for Fitih newspaper critical of Prime Minister Meles Zenawi. She was also a contributor to Ethiopian Review, a news website run from the USA, which is highly critical of the government. In the course of his activities for his political party Zerihun Gebre-Egziabher had written numerous statements critical of government policy and practice. Less than a month before his arrest, Zerihun Gebre-Egziabher had requested a permit to stage a rally on 28 May in central Addis Ababa. He had been refused permission on the basis that the authorities planned to hold a pro-government rally in the same location on the same day to mark the 20 year anniversary of the ruling party coming to power.

Swedish journalists Martin Schibbye and Johan Persson were arrested in the Somali region on 1 July. The rebel group, the Ogaden National Liberation Front (ONLF), has been waging an insurgency in the region against the government for over 18 years. The group was proscribed as a terrorist entity by the parliament in June 2011.[12] Reports continue to emerge from the region of serious crimes being committed by Ethiopian government troops and allied militia against the civilian population. The government severely restricts access to the region for journalists, human rights researchers and other monitors. A number of other foreign journalists have previously been arrested and deported from Ethiopia while trying to report from the region.[13] Schibbye and Persson had entered the region clandestinely with the ONLF, in an attempt to report on the situation in the region. The journalists report that they were pursuing a story linking Sweden to controversial oil exploration in the region.


## THE SEPTEMBER ARRESTS


Eskinder Nega and Andualem Arage were arrested shortly after the Ethiopian New Year, which was on 12 September. Both had issued New Year messages calling for reform. Eskinder Nega gave a lecture on press freedom in Ethiopia, and published an article in which he stated '*Maybe 2004* [Ethiopian calendar] *could be the year when freedom of expression and association will be respected... maybe 2004 could be the year when Ethiopians will no*

---

[12] Along with the Oromo Liberation Front, whose proscription as a terrorist group is mentioned above

[13] In 2010 a journalist from Voice of America radio was expelled from Ethiopia after reporting on the conflict in the Somali region from the nearby city of Harar. In 2007 three New York Times journalists were expelled from the country after being caught in the Somali region, reportedly escorted by the ONLF, while attempting to report on the situation in the region.

*more be incarcerated for their political convictions.'* He was arrested five days later.

Andualem Arage is closely involved in the production of the UDJ party newspaper, which is regularly critical of government policy and practice. Andualem also issued a press statement with UDJ's New Year message that *'2004 … must be a year of legal and peaceful struggle … one that brings an all-round freedom to the Ethiopian people.'* He was arrested a few days later.

Shortly before his arrest in September, Zemene Molla, along with several small opposition parties applied for permission to hold a demonstration. He was arrested on 14 September, as they were awaiting their answer from Addis Ababa city council and preparing to hold a press conference the next day about the authorities' failure to grant their request.

Silehsi Hagos, a contributor to the Addis Ababa-based radio station 96.3 FM, was previously the director of a political monthly magazine *Change*, which reported on the activities of the opposition Ginbot 7 Movement for Justice, Freedom and Democracy before it was designated a terrorist entity by the Ethiopian government in June 2011. Silehsi Hagos is also the partner of journalist Reyot Alemu, who was arrested in June. Sileshi visited Reyot in Maikelawi on several occasions after her arrest. In July, shortly after Reyot's arrest, the authorities summoned Sileshi, interrogated him about his relationship with Reyot and confiscated his laptop.

Journalist Eskinder Nega has been previously harassed, arrested and prosecuted. His current prosecution on terrorism charges marks the eighth time that Eskinder has been arrested and prosecuted because of his activities as a journalist. Eskinder Nega, Andualem Arage and Debebe Eshetu were all tried on treason and other charges in the "CUD trial"[14] between 2005 and 2007, along with Eskinder Nega's wife, journalist Serkalem Fasil, and 127 other opposition politicians, journalists and civil society activists, following post-election protests in 2005.[15] All were found guilty, but subsequently released under presidential pardon. Eskinder, Andualem and Debebe have all been under close surveillance ever since their release in late 2007.

Yeshewale Yehunalam was a member of UDJ and a candidate for the Gojam constituency in the 2010 elections. His active participation in party activities reportedly ceased after the elections, because he experienced severe harassment during campaigning. The UDJ was not able to confirm whether Yehunalem was still a member. Andualem Ayalew Gelaw was a member of parliament for the Coalition for Unity and Democracy (CUD)[16] between 2005 and 2010, and a candidate for the UDJ party in 2010. However, after the elections he fled to

---

[14] Known as the 'CUD Trial' because the majority of defendants were members of the Coalition for Unity and Democracy, or were prosecuted on the basis of alleged affiliation with the Coalition

[15] The 131 defendants in this trial also included Fasil Yenealem and Berhanu Nega (present at the trial) and Elias Kifle and Andargachew Tsige (tried in absentia), all four of whom are listed in the charge sheet in absentia hin the case of 'Andualem Arage et al'

[16] He represented the Ethiopian Democratic Party within the Coalition

Sudan after he received a threatening letter, requiring him to report to the police to explain language he had used during election campaigning. He was subsequently granted refugee status in Sudan. However, in November it transpired that he had been kidnapped by Ethiopian agents in Khartoum and forcibly taken back to Ethiopia. Amnesty International received reports that some low-level members of the Sudanese security services were complicit in the kidnapping. The charge sheet stated that Ayalew had been in detention in Maikelawi, Addis Ababa since 25 October.

## THOSE CHARGED IN ABSENTIA

Media reports in March stated that Foreign Minister Hailemariam Desalegn asked the legal department of the Ministry of Foreign Affairs to prepare files against Ethiopians in exile in Europe, the United States and Canada, who were the most notable opponents of the government.

Elias Kifle, who was charged in absentia alongside Reyot Alemu and others in September, is the editor of the Ethiopian Review website which is frequently highly critical of government policy and practice and of specific individuals in the ruling party.

The 16 individuals charged in absentia alongside Andualem Arage and others, included five journalists, one human rights defender, the leader of a registered political opposition party, and a coordinator of Ethiopian opposition groups in exile, who is also the manager of Ethiopian Satellite Television.

Two of the journalists charged in absentia are Mesfin Negash and Abiye Teklemariam from the popular independent news website Addis Neger. In 2009, after experiencing sustained harassment and threats from the authorities, the management team of Addis Neger closed down the Ethiopia-based print version of the newspaper and a number of senior staff fled the country, including Negash and Tekelmariam. Once in exile, Addis Neger established an online version of the newspaper which continues to comment on current affairs in Ethiopia.

The other journalists charged in absentia were Fasil Yenealem of Ethiopian Satellite Television (ESAT), Abebe Gelaw of Addis Voice radio and Board member of ESAT TV, and Abebe Belaw of Addis Dimts radio, also a Board member of ESAT.

The Addis Neger and Ethiopian Review websites are blocked inside Ethiopia, as are Addis Voice and Addis Dimts radio stations. ESAT TV broadcasts into Ethiopia via satellite. The station reports that they repeatedly have to find different channels for their broadcast, as their transmission has been blocked seven times in last year alone.

Obang Meto, the Director of the Anuak Justice Council, was also charged in absentia in November. The Anuak Justice Council is a non-governmental organisation (based outside Ethiopia) which conducts research and advocacy on the rights of Anuak people, who predominantly live in the south-western region of Gambella. Recent work by the Anuak Justice Council included reports and advocacy on land-grabbing – currently reported to be

happening on a wide scale in Gambella. The practice of land-grabbing involves the leasing of huge tracts of land to foreign companies, followed by relocation, often by force, of large numbers of the local population residing on the leased land. Also charged in absentia were Zelelie Tsegeselassie, the leader of the opposition All Ethiopian Democratic Party who fled into exile after the 2010 elections, and Neamen Zeleke, reportedly a coordinator of Ethiopian opposition groups in exile and manager of ESAT.

The remaining eight charged in absentia include four members of Ginbot 7, Andargachew Tsige, Berhanu Nega, Efrem Madebo and Mesfin Aman; one member of the Amhara Democratic Force Movement (an armed opposition movement in exile, Colonel Alebel Amare); and three individuals whose political affiliation is not known, Desalegn Arage Wale, Wube Robe and Elias Molla.

Many of those charged in asbsentia have been arrested and prosecuted before. Fasil Yenealem and Berhanu Nega were both tried alongside Eskinder Nega and Andualem Arage during the 2005-2007 CUD trial, on treason and other charges.[17] Elias Kifle and Andargachew Tsige were also tried in absentia in the CUD trial. They were all were found guilty, but subsequently freed by presidential pardon. Fasil Yenalem and Berhanu Nega fled the country after their release. Berhanu Nega subsequently formed Ginbot 7 Movement for Justice, Freedom and Democracy.

# EXAMPLES OF FREEDOM OF EXPRESSION USED AS EVIDENCE

The evidence listed against the defendants in charge sheets of the six cases includes items and relates to activities that appear to be examples of individuals exercising their right to freedom of expression and association, therefore suggesting that acts of peaceful opposition to the government are being interpreted as unlawful activities. These include activities and incidents where those charged have demonstrated diverse political opinions, have criticized the government, and have acted peacefully and legitimately as journalists or members of legal opposition parties.

Evidence cited in the charge sheets includes newspaper and website articles critical of the government, communication with news outlets known to be critical of the government, writing poems calling for political change, writing articles about the uprisings in the Middle East and

---

[17] See above

North Africa and organising meetings to discuss reform.

Of the 51 pieces of evidence listed in the case of Reyot Alemu, Woubshet Taye, Zerihun Gebre-Egziabher, Hirut Kifle and Elias Kifle, 21 are articles from Elias Kifle's website Ethiopian Review. A number of the pieces of evidence listed relate to reports and photographs of the slogan Beka! in various locations in Addis Ababa. Beka means 'enough' in Amharic, Ethiopia's official language. The Beka! movement was a call for peaceful protests against the government to take place on 28 May 2011, which was the 20 year anniversary of the ruling party coming to power. The slogan Beka! began to appear in graffiti around the city and on pamphlets which were being anonymously distributed. There were reports that the government was undertaking a variety of activities to ensure that the Beka! protests did not happen, including threatening potential participants, monitoring internet cafes, and restricting news reports on the uprisings taking place across the Middle East and North Africa. Five pieces of evidence listed against Reyot Alemu and others in the charge sheet are explicitly referring to Beka! Some of the e-mails, telephone calls and photos listed as other pieces of documentary evidence are also believed to be related to the Beka! movement's call for peaceful protest. Article 30 of the Ethiopian Constitution protects the right of assembly, demonstration and petition stating "everyone has the right to assemble and to demonstrate together with others peaceably and unarmed, and to petition." Notwithstanding "appropriate regulations" which may be made in the interests of public convenience, such as the location and route of demonstrations, the right to call for peaceful protest is constitutionally guaranteed.

In the case of 69 members of the OFDM and OPC opposition parties, evidence cited in support of the charge of 'Provocation and Preparation' for Crimes against the Constitution or the state, includes poems, tracts and papers written by defendants, including one called 'What can we learn from the Egyptian civil disobedience?' and another called 'Oromo is a struggle against slavery'. Of 48 pieces of documentary evidence cited against the 69 individuals, 38 items are written confessions from defendants made in Maikelawi detention centre. As will be explained below, Amnesty International is concerned that a large proportion of these confessions may have been extracted under duress.

To date, Amnesty International has not been able to obtain the documentary evidence cited against the eight defendants present in the case of Andualem Arage, Eskinder Nega and others. The charge sheet states that evidence against the 16 charged in absentia will be produced when the defendants appear in court.

A number of those charged have reported that they were interrogated in detention about political opinions they had expressed or criticisms of the government they had made. For example, Zerihun Gebre-Egziabher reported that he was repeatedly questioned about statements his party issued about the Prime Minister, and asked why they were critical. Reyot Alemu reported that during interrogation she was asked repeatedly about her writings for the Ethiopian Review website, and why she had taken photographs of the Beka! slogan and distributed them to others. Bekele Gerba and Olbana Lelisa both reported that during interrogation they were questioned about their meetings with Amnesty International delegates. All of these acts which detainees were reportedly questioned about are examples of these individuals exercising their constitutionally and internationally protected rights to freedom of expression and association.

# OVERLY BROAD DEFINITION OF TERRORISM

Amnesty International is concerned that the Anti-Terrorism Proclamation is being applied to stifle legitimate exercise of the right of freedom of expression and association.

The definition of terrorist activities under the 2009 Anti-Terrorism Proclamation is broad and imprecise. The vagueness of certain provisions means that the law could be used to criminalise the legitimate exercise of human rights, particularly the rights to freedom of expression and association, and does not allow individuals to know how to regulate their conduct in order to avoid committing criminal acts.

Article 6 of the Anti-Terrorism Proclamation – 'Encouragement of Terrorism,' proscribes 'publishing or causing the publication of a statement that is likely to be understood by some or all of the members of the public… as a direct or indirect encouragement or other inducement to them to the commission or preparation or instigation of an act of terrorism.' This definition is overly broad and fails to distinguish acts of peaceful criticism from incitement to violence and/or violent opposition.[18] This provision enables the prosecution of journalists for reporting on the activities of proscribed groups or for simply referring in their articles to individuals or groups deemed to be terrorists. All 24 defendants in the case of *'Federal Prosecutor vs Andualem Arage and others'* are charged under this article of the Anti-Terrorism Proclamation.

Article 3 of the Anti-Terrorism Proclamation lists the proscribed activities constituting 'Terrorist Acts.' These include the "serious interference or disruption of public services." However, the provision does not define what constitutes 'serious disruption,' and nor does it distinguish between lawful and unlawful activities causing such a disruption, such as the legitimate exercise of freedom of association. For example, due to this lack of distinct definition, disruption to public transport services caused by a peaceful demonstration could be interpreted as a terrorist act. All five defendants in the case of *'Federal Prosecutor vs Elias Kifle and others'* and all 24 in the case of *'Federal Prosecutor vs Andualem Arage and others'* are charged under this article.

Article 5 on 'Rendering Support to Terrorism' prohibits the provision of "a skill, expertise or moral support" or "advice" to support a terrorist act or a terrorist organisation. The concept

---

[18] In previous trials of opposition members and journalists, Ethiopian courts failed to make the distinction between peaceful criticism and civil disobedience and incitement to violence, in relation to other provisions of Ethiopia law. See for example Amnesty International, 'Justice Under Fire: Trials of opposition leaders, journalists and human rights defenders in Ethiopia', 29 July 2011, http://www.amnesty.org/en/library/info/AFR25/002/2011/en

'moral support' is vague, contravening the principle of legal certainty which requires that the law is formulated with sufficient clarity and precision that the individual has a proper indication of how the law limits his or her conduct, in order that the individual can regulate his or her conduct accordingly.[19] Journalists Elias Kifle, Mesfin Negash and Abiye Teklemariam are charged under this article.

# HIGH-LEVEL POLITICAL INTEREST IN THE ARRESTS AND TRIALS

The government has shown a high level of interest in the trials, and senior members of the government have made public statements about the guilt of the defendants.

In October, Prime Minister Meles Zenawi reportedly assured the national parliament that the defendants were all guilty. The Prime Minister was questioned in parliament by the only independent opposition MP, Girma Seifu. Seifu asked about the detention of journalists and politicians on terrorism accusations. The Prime Minister reportedly responded by saying that the government had abundant evidence that could prove the detainees' involvement in terrorism. The Prime Minister told the parliament, *"We did not take actions before gathering enough evidence that can prove their guilt before the court of justice. We waited until we made sure we have everything we need to convince the court they are terrorists."*

Also in October, in an interview with Norwegian newspaper Aftenposten, the Prime Minister declared that Swedish journalists, Schibbye and Persson, were accomplices to terrorists, saying *"They are, at the very least, messenger boys of a terrorist organization. They are not journalists."*

Other members of the government have also made regular comments on the guilt of the defendants, including when questioned about the arrests by journalists and other observers. For example, in June, shortly after the arrests of Woubshet Taye, Reyot Alemu, Zerihun Gebre-Egziabher and Dejene Tefera, a government spokesperson told Amnesty International

---

[19] Any restrictions on freedom of expression "to be characterised as a "law", must be formulated with sufficient precision to enable an individual to regular his or her conduct accordingly." UN Human Rights Committee General Comment No. 34, para. 25. Article 15(1) of the International Covenant on Civil and Political Rights also imposes a more general requirement of legality for criminal offences, stating in part, "No one shall be held guilty of any criminal offence on account of any act or omission which did not constitute a criminal offence, under national or international law, at the time when it was committed"."

that the four had been arrested because they were found to be involved in terrorist acts. The spokesperson assured Amnesty International that the government would produce 'concrete evidence' of their guilt to the public and to a court of law.

Amnesty International is concerned that these comments could exert political pressure on the courts in a country where the judiciary lacks independence. The Ethiopian judicial system is heavily politicised; job security within the judiciary, including at the highest levels, are dependent upon membership of the ruling party. The comments of the Prime Minister, who has enormous individual influence, are particularly concerning.

Amnesty International is further concerned that some of these comments made by senior members of the government could violate the constitutional right of the defendants to be presumed innocent until proven guilty.[20] The UN Human Rights Committee has stated that all public authorities should "refrain from prejudging the outcome of a trial, e.g. by abstaining from making public statements affirming the guilt of the accused." [21]

In addition to the many comments made by senior officials on the guilt of the defendants, the government has indicated that the crackdown would continue. Prime Minister Meles Zenawi publically expressed an intention to arrest further members of the opposition, including senior figures. In October the Prime Minister told parliament that not only were all the journalists and opposition members arrested so far guilty of terrorism, but added that the government was collecting evidence against several other individuals in order to make another round of arrests. The Prime Minister reportedly stated *"There are people we are aware are involved in* [terrorism] *and have connections with terrorist groups. We only need more evidence before we take actions."* The Prime Minister announced that the list included some of the senior leadership of Medrek – the Ethiopian Federal Democratic Unity Forum – a coalition of eight of the leading opposition parties in the country. The Prime Minister admitted that inadequate evidence existed against these individuals, but nevertheless declared them to be guilty of terrorism, *"We know in our hearts that they are involved in terrorism acts. However, we are aware that this is not enough before a court of law."*

The high level political interest these cases strongly suggest that those arrested are political targets of the government, and that their arrests and prosecutions are based on their peaceful and legitimate expressions of dissent.

---

[20] Article 20, Ethiopian Constitution

[21] UN Human Rights Committee, General Comment 32, para. 32

# PART III – VIOLATIONS IN PRE-TRIAL DETENTION

# RESTRICTIONS ON ACCESS TO FAMILY MEMBERS WHILE IN DETENTION

All of the opposition members and journalists whose arrests are cited in this document were initially detained in Maikelawi, the Federal Police Crime Investigation and Forensic Department in Addis Ababa. Individuals arrested for serious crimes, including political dissidents, are usually detained at Maikelawi. Numerous opposition members and journalists have frequently been detained there in the past, including Andualem Arage and Eskinder Nega. There are frequent reports that the rights of detainees are not respected in Maikelawi, and that torture is regularly used.

The 107 opposition members and journalists in detention who have been charged to date were moved to Kaliti prison, on the outskirts of Addis Ababa, after being charged.

The rights of detainees to communicate with others and to receive visits are fundamental safeguards against human rights violations such as torture, ill-treatment and disappearances. Detainees must be allowed to communicate with the outside world, subject only to reasonable conditions and restrictions.[22]

At least 105[23] of the 114 journalists and opposition members arrested were denied access to family members for the first month of their detention in Maikelawi, and longer in some cases. Incommunicado detention – being held without access to family members and lawyers – significantly increases detainees' risk of being subjected to torture, other forms of ill-treatment or other violations of their rights.

Zerihun Gebre-Egziabher's family were not permitted to visit him for two months after his

---

[22] Principle 19 of the UN Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, (Adopted by consensus by t he UN General Assembly, 1988)

[23] Amnesty International was not able to obtain this information in the remaining nine of the 114 cases covered in this report

arrest. A family member of one of the Oromo detainees arrested in March also told Amnesty International that he was not permitted to see his brother for two months following his arrest.

The wife of one of the detainees reported that she had only been permitted to visit her husband on three occasions in five months. The wife of another detainee told Amnesty International that she was threatened with arrest when she requested to visit her husband in Maikelawi. In many cases, Amnesty International was told, families of the detainees were not informed of their relative's whereabouts for periods of up to two months after their initial arrest.

Many of the OFDM and OPC party members who were arrested were brought from across the Oromia region to Addis Ababa, which in some cases was 200 or 300 kilometers from their homes. This meant that it was impossible for their families to visit them in detention.

Some were initially detained in isolation from other prisoners as well as being denied access to visitors. For example, Zerihun Gebre-Egziabher, Woubshet Taye, Reyot Alemu and Eskinder Nega were all held in isolation cells during the initial stages of their detention.

Many relatives of those detained have complained to Amnesty International that even after access was granted it came with severe restrictions. In some instances family members have only been permitted less than five minutes visiting time with their relative. One or more police officers are present at all times during family visits, making private conversation impossible. In some cases police officers have intervened to disrupt conversations when family members tried to speak about sensitive issues such as torture. Some detainees say that the guards have given instructions on what subjects are permitted to be discussed during family visits. In October, Woubshet Taye and Zerihun Gebre-Egziabher were informed that their visiting arrangements had changed. Since then, visitors are only permitted to visit the two men for ten minutes per day. Visitors to some of the OFDM and OPC detainees have told Amnesty International that the same ten minute time restrictions are placed on their visits.

In some instances family members have been denied access to the pre-trial hearings of their relatives. One relative reported that the court officers told him that spectators were not permitted in terrorism cases. In several incidents wives and family members were denied entry to the court because, they were told, it was full. The wife of another detainee was simply denied access with no explanation. In several instances the time or date of the court hearing were changed at the last minute, causing family members to miss their relative's court appearance. One family member reported that she was slapped by a police officer when she tried to access her relatives' court hearing.

# RESTRICTIONS ON THE RIGHT TO ACCESS A LAWYER

Prompt and regular access to a lawyer for a detainee is an important safeguard against torture, other ill-treatment, coerced confessions and other violations.[24] The Committee Against Torture has recently recommended to Ethiopia that they "… should take prompt and effective measures to ensure that all detainees are, in practice, afforded all fundamental legal safeguards from the very outset of their detention. These include, in particular, the rights of detainees: […] to have prompt access to a lawyer […]"[25]

Prompt and regular access to a lawyer is also an "important element of the guarantee of a fair trial and an application of the principle of equality of arms."[26] The International Covenant on Civil and Political Rights provides that all accused persons have the right to "have adequate time and facilities for the preparation of his/her defence and to communicate with counsel of his/her own choosing."

In a small number of cases, legal representatives attempted to visit the detainees during the initial weeks of their detention, but were denied access in each instance. The significant majority of the 114 detainees listed in this report had no access to legal representatives during the first one to three months of their detention. In most cases this time period corresponded with the length of time the detainee spent in detention before they were charged and their trials subsequently began. Most detainees had access to a lawyer for the first time on the first day of their trials when they were allocated a state lawyer. In some cases of the OPC and OFDM detainees arrested in March and April this meant detainees spent four months in detention without access to a legal representative at any point.

Fear of punitive repercussions and harassment in cases of suspected political opponents deter private lawyers from representing the individuals. Lawyers representing defendants in similar previous cases have experienced significant harassment. Family members of the detainees have reported to Amnesty International that they have experienced difficulties in engaging legal representation for their relatives, due to lawyers' significant fears of repercussions.

---

[24] Human Rights Committee General Comment 20, para. 11; Committee Against Torture General Comment 2, para. 13; Report of the UN Special Rapporteur on torture, (E/CN.4/2003/68), 17 December 2002, para. 26(g); Report of the UN Special Rapporteur on torture, (A/56/156), 3 July 2001, para. 34; UN Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, Principles 17-18; UN Basic Principles on the Role of Lawyers, para.7.

[25] Concluding Observations of the CAT: Ethiopia, UN Doc.CAT/C/ETH/CO/1, 20 January 2011, para.12.

[26] UN Human Rights Committee, General Comment 32, para. 34

# TORTURE AND OTHER FORMS OF ILL-TREATMENT

The use of torture against detainees in Maikelawi, including against journalists and political opposition members has been frequently reported. In August Amnesty International delegates repeatedly requested access to visit detainees in Maikelawi, but these requests were rejected by the authorities.

As stated above, denial of access to lawyers and family members significantly increases detainees' risk of being subjected to torture or other forms of ill-treatment. The information and reports obtained by Amnesty International from opposition members and journalists cited in this report suggest that many of the detainees experienced torture or other forms of ill-treatment. In all cases the torture and ill-treatment reportedly took place during the period when the detainees were denied access to family members.

The detainees reported that they were interrogated during the first two to three weeks of their detention in Maikelawi. A significant number of the 114 opposition members and journalists detained complained of torture and other forms of ill-treatment during interrogation in Maikelawi. These complaints were particularly prevalent among the detainees from the OPC and OFDM political parties. Torture and other forms of ill-treatment reported to Amnesty International included beating, kicking and punching, beating with objects, including with a chair, and pieces of wire and metal, being tied and suspended by the wrists from the wall or ceiling, sleep deprivation, forced physical activity over a long period, being held in isolation and being held in complete darkness for prolonged periods.

Several detainees told Amnesty International that their hands were tied to the wall above their heads for periods of two or three days, while they were beaten. One former detainee showed Amnesty International deep scars around his wrists, reportedly resulting from this treatment. Several detainees have reported that during the initial stages of detention they were held in complete darkness for sustained periods, up to two weeks in some cases.

Several detainees reported that during interrogation in Maikelawi they were forced to reveal their e-mail passwords. Some were severely beaten to reveal their passwords, another was verbally harassed and threatened in order to obtain the password. In several cases the contents of individuals' e-mail accounts have been cited as evidence against them.[27]

---

[27] It was reported to Amnesty International that during the trial of Berhanu Emiru, e-mails were cited as evidence against him, which were later proven to have been fabricated. The e-mails were written from Berhanu's e-mail account after he had been arrested and was already detained in Maikelawi. The e-mails were withdrawn as evidence.

A number of detainees sustained injuries as a result of these acts. Those injured reported that they were subsequently denied access to medical care in Maikelawi.

Many of the members of Oromo political parties who were detained in March and April were arrested in various locations across the Oromia region and transferred to Addis Ababa, some from distances of 200 to 300 kilometers. A number of detainees now released, and family members of detainees still in custody, told Amnesty International that the detainees arrested in western Oromia were taken first to Ambo, a town on the way to Addis Ababa. The detainees were temporarily detained in Ambo in an unofficial place of detention, where they were badly beaten. Detention in un-gazetted places of detention puts detainees at greater risk of torture and other forms of ill-treatment.

Some further OPC and OFDM members were arbitrarily detained for varying lengths of time in other unofficial places of detention around the same period. One party member told Amnesty International that he had been held for three weeks in an unofficial place of detention, which he believed to be in Addis Ababa, where he was repeatedly beaten and whipped with metal wire. He showed Amnesty International deep scars in several places on his body which he said resulted from the beatings. He was hospitalised after his release due to the serious injuries he had sustained while in detention.

A number of the detainees complained in court during the pre-trial hearings that they had been subjected to torture or other forms of ill-treatment in Maikelawi. OFDM official Berhanu Emiru, arrested in April, complained in a pre-trial hearing that he had been repeatedly beaten and subject to inhuman and degrading treatment in Maikelawi. The court reportedly refused to consider his complaint.

In August, opposition politician Zerihun Gebre-Egziabher and journalist Woubshet Taye both complained during pre-trial hearings that they had experienced torture whilst detained in Maikelawi.[28] Zerihun reported that he had sustained injuries as a result of beating, including suspected broken ribs and pain in his ear, and told the court that he required medical attention. The court reportedly dismissed Woubshet's complaint with no further investigation. In response to Zerihun's complaint, the court instructed that any ill-treatment of Zerihun should cease, and ordered that Zerihun should be taken to a hospital for treatment. Although Zerihun experienced no further ill-treatment after this court appearance, he was not taken to a hospital nor allowed a doctor's visit. He says that the guards in Maikelawi told him that *"there are no health services for terrorists."* In November, after Zerihun had been moved to Kaliti prison, he was finally given permission to see a nurse and received medication for his injuries.

On 10 November, during the hearing at which he and his co-defendants were charged, Nathaniel Mekonnen complained to the court that he had been constantly subjected to torture and other forms of ill-treatment in detention. Nathaniel reported that he had been repeatedly beaten and deprived of sleep over a period of 23 days.

---

[28] The two men were detained in Maikelawi after their arrests in June until they were charged in September and moved to Kaliti prison

Amnesty International understands that there has been no further investigation into any of these complaints of the use of torture, or any attempt to identify the perpetrators. Amnesty International raised these reports of ill-treatment with various representatives of the Ethiopian government. On each occasion a variation of the same response was received – the government representatives all denied that torture takes place at Maikelawi, though they acknowledge that these and other allegations have not been investigated. In August an official from the Ministry of Justice told Amnesty International that investigations into allegations of torture at Maikelawi did not need to take place because he knew that such things did not happen.[29]

## EVIDENCE ELICITED BY TORTURE OR OTHER ILL-TREATMENT

Amnesty International has received reports that a large number of the defendants in the six trials of opposition members and journalists were forced, under duress, to sign confessions or to sign other documents that would be presented against them as evidence. In the case of the group of 69 members of the OFDM and OPC parties *'Teshale Bekashi et al'*, the charge sheet lists written confessions as evidence against 38 defendants. According to OPC party officials a large number of these detainees were coerced into signing the confessions.

A defendant in one of the other cases reported that during his interrogation attempts were repeatedly made to force him to sign various incriminating documents to acknowledge ownership of them. Two detainees have reported that they were tortured to force them to reveal their e-mail password. E-mails allegedly found in the accounts of both defendants have been listed as evidence against them in the charge sheets. Two other defendants reported that during interrogation they were heavily pressurised to testify against other members of the group with whom they were arrested.

## INADMISSIBILITY OF EVIDENCE ELICITED BY TORTURE OR OTHER ILL-TREATMENT

Article 15 of the UN Convention Against Torture makes clear that any statement obtained by torture must be declared inadmissible in any proceedings.[30] The Ethiopian Constitution states that "persons arrested shall not be compelled to make confessions or admissions which could be used in evidence against them. Any evidence obtained under coercion shall not be admissible."[31] Nevertheless, confessions and other information elicited by torture have

---

[29] Amnesty International meeting with Ministry of Justice, Addis Ababa, 19 August 2011

[30] See also, regarding article 7 ICCPR, Human Rights Committee General Comment 20, para. 12.

[31] Article 19(5), Ethiopian Constitution.

been admitted as evidence in previous trials in Ethiopia, including in high profile trials of opposition members and journalists.[32] Ethiopian law does not have specific, detailed provisions regulating the admissibility and exclusion of evidence, including the standards that such evidence needs to meet before being admissible in a criminal case.

Claims that evidence, including confessions and signatures on incriminating documents, were extracted under duress in these six cases should be immediately investigated, and if it is established that the evidence did arise as a result of torture or coercion, such evidence must be excluded by the court. Further, all allegations of torture must be thoroughly and impartially investigated, in order to hold possible perpetrators to account. However, according to the information received by Amnesty International, no moves have been made to initiate investigations in either area.

---

[32] See Amnesty International, 'Justice Under Fire: Trials of opposition leaders, journalists and human rights defenders in Ethiopia', 29 July 2011, http://www.amnesty.org/en/library/info/AFR25/002/2011/en

# PART IV – SYSTEMATIC TRIAL MONITORING ESSENTIAL

Based on the foregoing, Amnesty International believes that the individuals cited in this report have been arrested primarily because of their criticism of government policy and practice, and that the high level of political interest in the cases increases the possibility of influence in the outcomes of the trials. The human rights violations widely reported to have taken place while in pre-trial detention, and already raised in court several times with no result, raise further concerns that these individuals will not receive a fair trial and that they will be convicted for exercising their right to freedom of expression and association.

Amnesty International believes that it is essential that all six trials mentioned in this report are closely and systematically monitored for their compliance with international fair trial standards.

The role of monitoring the trials would normally be taken by a strong and independent civil society. However, no human rights organisations in Ethiopia are currently in a position to undertake trial monitoring. [33] Recently enforced civil society legislation has had a devastating impact on human rights organisations significantly limiting their ability to function.[34]

In the absence of a functioning civil society Amnesty International is calling on the representatives of the international community in Addis Ababa to take up the role of monitoring the trials. This is not without precedent. Ethiopia's foreign partners closely monitored the CUD trial of opposition members and journalists which took place between 2005-2007, in which Eskinder Nega, Andualem Arage and 129 other opposition members, journalists and human rights defenders were prosecuted. The Council of the European Union appointed a full-time trial observer, although the findings of the observer were never made public. EU embassy staff monitored these trials on a rotating basis, and a US embassy staff member was also present.

The six trials highlighted in this document must be afforded the same significance by the international community as the trial which took place between 2005 and 2007. Both series of trials – involving the large scale prosecution of opposition members and journalists – indicate a significant crackdown on free expression. It is essential that systematic monitoring be conducted on all six, to hold judicial authorities to account regarding their obligation to respect international standards of fair trial and their obligation to protect the rights of freedom of expression and association from criminalisation.

---

[33] International human rights organisations are severely constrained in their ability to access Ethiopia. Amnesty International delegates were expelled from Ethiopia in August 2011

[34] Charities and Societies Proclamation (No.621/2009)

# CONCLUSION: ONGOING CRACKDOWN AND THE WIDER IMPACT ON FREEDOM OF EXPRESSION

As the Prime Minister already intimated in October when he told parliament that further arrests would take place, the crackdown continues. In the first week of December Amnesty International received reports that at least 135 people had been arrested across Oromia, including members and supporters of the OPC and OFDM political parties. The Prime Minister's speech in parliament also indicated that figures among the senior leadership of Medrek – the Ethiopian Federal Democratic Unity Forum – a coalition of eight of the leading opposition parties in the country, are also at risk of arrest.

The arrests and prosecutions of 2011 have had a wider impact on freedom of expression in Ethiopia. They send a chilling message to others who dare to criticise or question the policies and actions of the government – to either self-censor or risk arrest. The threat of this message has caused at least three journalists and one opposition member to flee the country in late 2011.

In September journalist Argaw Ashine fled the country after he was mentioned in a Wikileaks cable and summoned by officials from the Government Communication Affairs Office and by the Federal Police for interrogation over his sources.

In September and October, the government-run publication Addis Zemen, heightened its campaign to discredit the Awramba Times newspaper, the publication which Woubshet Taye wrote for before his arrest. In 2009, the management team of the popular, independent Addis Neger newspaper shut down the print version of the newspaper and a number of senior editors and journalists fled the country after a smear campaign in the same government-run publication. Two of the journalists from Addis Neger were among the group charged in absentia on 10 November. In September and October Addis Zemen was particularly targeting Dawit Kebede, founder and managing editor of the Awramba Times, and calling for his arrest. In November, Kebede was informed by a reliable source that his arrest was imminent prompting him to flee the country. Journalist Abebe Tola, who wrote for Fitih newspaper, the same publication that Reyot Alemu wrote for, also fled the country in November after being threatened with arrest by the authorities. UDJ member Tesfaye Degu, who wrote for the party newspaper along with Andualem Arage, also fled in November after being threatened, he reported, for criticising the Prime Minister.

The ongoing events of 2011 suggest that the Ethiopian government is determined to destroy the few remaining traces of freedom of expression in the country. Individuals and publications who hold different opinions, represent different political parties or attempt to provide independent commentary on political developments, are no longer tolerated in Ethiopia.

# RECOMMENDATIONS

## TO THE GOVERNMENT OF ETHIOPIA

**Amnesty International calls on the government of Ethiopia to:**

### The right to fair trial

■   Take all appropriate steps to ensure that the opposition members and journalists on trial in Ethiopia receive trials that meet international standards of fairness;

■   Ensure that claims that evidence, including confessions and signatures on incriminating documents were extracted under duress in these six cases are immediately investigated, thoroughly and impartially, and if it is established that the evidence did arise as a result of torture or coercion, such evidence must be excluded by the court;

■   Immediately end any of the current trials of opposition members and journalists where the defendants are being prosecuted solely on account of their peaceful exercise of their rights to freedom of expression, association and assembly; and immediately and unconditionally release anyone detained on charges based on these activities;

■   Allow for systematic monitoring of the trials by the diplomatic community. Ensure that key information, including location and time of hearings, is available to the public on a timely basis;

### Torture and ill-treatment

■   Initiate prompt, thorough, effective and impartial investigations into all allegations of torture or other ill-treatment made by detainees in the six cases cited in this document, and ensure that, should there be enough admissible evidence, suspected perpetrators are prosecuted and tried in a fair trial in accordance with international standards, with no possibility of the death penalty.

### Arbitrary detentions and disappearances

■   Ensure that the Ministry of Justice and law enforcement bodies make available full details of all those arrested during 2011, including information on members of the OPC and OFDM parties, students from Jimma, Haromaya and Nekemte, and other individuals arrested in Oromia. Information must include the names, current location and detention status of all detainees;

■   Ensure that any of those detained who have not yet been charged are immediately brought before a judicial officer to challenge the legality of their detention;

■   Ensure that all detainees are promptly charged with a recognizable criminal offence, or are released immediately and unconditionally;

■   Immediately inform the families of anyone currently in detention of their whereabouts, and permit access to the detainee;

■   Guarantee that all detainees must be given prompt and full access to legal representatives;

■   Guarantee that arrested persons are never detained in un-gazetted places of detention. Immediately move any detainees currently held in an unofficial place of detention to a recognized detention centre;

### Treatment of detainees

■   Publically declare that no one, including detainees, should be tortured or subjected to other cruel, inhuman or degrading treatment or punishment, and ensure this is fully implemented by police and other law enforcement authorities;

■   Extend access to prisons and other places of detention and prisoners (and other persons deprived of their liberty), to independent non-governmental bodies such as the International Committee of the Red Cross (ICRC), which is not currently allowed access to prisons and detention centres in Ethiopia; allow such bodies to independently inspect and monitor prison conditions, and consider their recommendations on conditions and treatment in detention.

### TO THE INTERNATIONAL COMMUNITY

**Amnesty International calls on the United Nations, European Union, African Union, and governments having close political and economic relations with Ethiopia, all of which have made commitments and developed policies including respect for human rights in their aid and political relations, to:**

■   Conduct systematic monitoring of the ongoing terrorism trials and the trials of members of the Oromo political opposition arrested during 2011, through representatives of the international community based in Addis Ababa. Make findings of the monitoring publically available and share with relevant stakeholders;

# APPENDIX: DEFENDANTS AND CHARGES IN THE SIX CASES

## DEFENDANTS IN THE FEDERAL PROSECUTOR VS TESHALE BEKASHI AND OTHERS

1. Teshale Bekashi Ayana

2. Tirfessa Megerssa Hundie

3. Alemayehu Garansso Chimssa

4. Mulatu Abdissa Gobana

5. Lijalem Taddesse Gudina

6. Hassen Mohammed Amin

7. Adugna Begna

8. Milkessa Waqjirra Gemeda

9. Samson Alemu Kitessa

10. Gemechu Amisho Gelgelo

11. Usman Umar Tesogillo

12. Jarsso Borru Raro

13. Ismael Keliffa Muzein

14. Kefale Fetenne Gebeyehu

15. Gutu Mulissa Gedeffa

16. Hussein Bersso Godana

17. Tolessa Becho

18. Kanu Gunos Demissie

19. Gizachew Abdissa Baissa

20. Etana Senbetto Tucho

21. Lemessa Dessissa Genete

22. Abera Biqilla Tolessa

23. Tukie Tibisso

24. Belay Kormie Baissa

25. Hassen Aman Sege

26. Mezgebu Debella Waqjira

27. Asfaw Angessu Benti

28. Bontu Wdai Bulla (Female)

29. Beshir Dadi Fufa

30. Alemayehu Tolessa Liban

31. Hawi Gonfa Debella (Female)

32. Taddesse Gelalicha

33. Teferi Kenanissa Gemechu

34. Bulcha Soressa

35. Mohammed Seliho Waqo

36. Sorssa Debella Gelalicha

37. Teshale Edossa Diriba

38. Erpa Dube Dikamo

39. Muktar Usman

40. Umar Bassa

41. Mohammed Hussein

42. Chali Tolessa Nika

43. Diriba Negessa Muleta

44. Mengesha Tolessa Dessie

45. Amentie Solomon Bekele

46. Nure Haji Kemal

47. Wegayehu

48. Taddesse Moti Tura

49. Adurazaq Ababiyya

50. Mengistu Wordefa

51. Efferem Geleta

52. Mohammed Tukie

53. Tolessa Beddada

54. Mengistu Girma

55. Rashid Jamal

56. Takale Abdeta

57. Kalil Jamal

58. Melesse Chala

59. Hussein Abdala

60. Wassie Gaddissa

61. Solomon Temesgen Belay

62. Getachew Edossa

63. Tariku Debissa

64. Wagari Lachissa

65. Erpassa Drirssa

66. Chaluma Likessa

67. Gurmessa Tuffa

68. Chimdessa Mintas Gutata

69. Dawit Abdissa

## DEFENDANTS IN THE FEDERAL PROSECUTOR VS GHETNET GHEMECHU GHEMTA AND OTHERS

1. Ghetnet Ghemechu Ghemta

2. Tekalign Abera Gemeda

3. Miteku Ghetachow Ejeta

4. Aobsa Alemu Foghe Dano

5. Ghetu Assefa Irisa

6. Dodola Bunna Finquile

7. Rabira Aderi Buzu

8. Muhdin Ababulegu Abaghero

9. Khalid Mohamed Abdellah

10. Tesfu Motora Woyessa

11. Megehrsa Kuma Diririsa

12. Demise Dabessa Insa

13. Wagari Dribisa Witu

14. Desalegn Debol Hora

15. Ghetachow Buru Gurmessa

16. Chale Abdisa Bulgu

17. Hamza Abdu Ibrahim

18. Col. Fekade Regasa Jollu

19. Deribachow Amente Buli

20. Letchesa Idosa Deriba


## DEFENDANTS IN THE FEDERAL PROSECUTOR VS BEKELE GERBA AND OTHERS

1. Bekele Gerba Dako

2. Olbana Lelisa Oljra

3. Welbeka Iemi Dedefi

4. Adem Busa Kabeto

5. Hawa Wako Boru

6. Mohamed Melu Sori

7. Dereje Ketema Motuma

8. Addisu Mokre Gebregiorgie

9. Gelgelo Gufa Abyo


## DEFENDANTS IN THE FEDERAL PROSECUTOR VS ELIAS KIFLE AND OTHERS

1. Elias Kifle

2. Zerihun Gebre-Egziabher

3. Woubshet Taye Abebe

4. Hirut Kifle Woldeyesus

5. Reyot Alemu Zebebo

## DEFENDANTS IN THE FEDERAL PROSECUTOR VS ABDIWELI MOHAMMED ISMAEL AND OTHERS

1. Abdiweli Mohammed Ismael

2. Kelif Ali Dahir

3. Martin Schibbye

4. Johan Persson

## DEFENDANTS IN THE FEDERAL PROSECUTOR VS ANDUALEM ARAGE AND OTHERS

1. Andualem Arage Wale

2. Nathnael Mekonnen GebreKidan

3. Yohannes Terefe Kebede

4. Yeshewale Yehunalem

5. Kinfemichael Debebe Bereded

6. Mitiku Damte Weraku

7. Eskinder Nega Fenta

8. Andualem Ayalew Gelaw

9. Andargachew Tsege

10. Berhanu Nega Bongar, Dr.

11. Wube Robe

12. Ephrem Madebo

13. Mesfin Aman

14. Zelelie Tsegaselassie

15. Fasil Yenealem

41 Dismantling Dissent: Intensified Crackdown on Free Speech in Ethiopia

16. Abebe Belew

17. Abebe Gelaw

18. Neamen Zeleke

19. Elias Molla

20. Desalegn Arage Wale

21. Colonel Alebel Amare

22. Obang Meto

23. Mesfin Negash

24. AbiyeTekleMariam



# WHETHER IN A HIGH-PROFILE CONFLICT OR A FORGOTTEN CORNER OF THE GLOBE, **AMNESTY INTERNATIONAL** CAMPAIGNS FOR JUSTICE, FREEDOM AND DIGNITY FOR ALL AND SEEKS TO GALVANIZE PUBLIC SUPPORT TO BUILD A BETTER WORLD

### WHAT CAN YOU DO?

Activists around the world have shown that it is possible to resist the dangerous forces that are undermining human rights. Be part of this movement. Combat those who peddle fear and hate.

- Join Amnesty International and become part of a worldwide movement campaigning for an end to human rights violations. Help us make a difference.

- Make a donation to support Amnesty International's work.

**Together we can make our voices heard.**

☐ I am interested in receiving further information on becoming a member of Amnesty International

name

address

country

email

☐ I wish to make a donation to Amnesty International (donations will be taken in UK£, US$ or €)

amount

please debit my        Visa ☐        Mastercard ☐

number

expiry date

signature

Please return this form to the Amnesty International office in your country.

For Amnesty International offices worldwide: www.amnesty.org/en/worldwide-sites
If there is not an Amnesty International office in your country, please return this form to:

**Amnesty International**, International Secretariat, Peter Benenson House,
1 Easton Street, London WC1X 0DW, United Kingdom

amnesty.org

## I WANT TO HELP



# DISMANTLING DISSENT
## INTENSIFIED CRACKDOWN ON FREE SPEECH IN ETHIOPIA

Scores of opposition party members and journalists were arrested and detained in Ethiopia during 2011 because of their legitimate and peaceful criticism of the government.

Amnesty International believes that the pretext of counter-terrorism is being used by the government to silence dissent. The arrest and prosecution of government critics is not a new phenomenon in Ethiopia, but the significant increase in arrests represents an intensified crackdown on freedom of expression in 2011.

Calls by the defendants for peaceful protest, as well as articles and poems, have been presented as evidence of terrorism and treason, suggesting that freedom of expression is being criminalized in these cases.

Detainees awaiting trial were subjected to human rights violations including torture and other ill-treatment, exertion of pressure to sign confessions, and denial of access to lawyers and family members. There are a number of fair trial concerns and Amnesty International is calling for systematic monitoring of the trials by the international community.

These events send a chilling message that those who hold different opinions, or attempt to provide independent political commentary, should remain silent or risk arrest. The government has indicated that the crackdown is not over, and arrests continue.

The authorities in Ethiopia appear determined to destroy the few remaining traces of free expression in the country. Amnesty International is urging the Ethiopian government to uphold the rights of those who peacefully express dissent and to immediately release anyone detained on this basis.

**amnesty.org**

Index: AFR 25/011/2011
December 2011

