IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| John Doe, | ) | Civil Action |
| | ) | No. 14-cv-372 |
| Plaintiff, | ) | |
| | ) | MOTION HEARING |
| vs. | ) | |
| | ) | Washington, DC |
| Federal Democratic Republic | ) | July 14, 2015 |
| of Ethiopia, | ) | Time:  2:00 p.m. |
| | ) | |
| Defendant. | ) | |

_____

TRANSCRIPT OF MOTION HEARING
HELD BEFORE
THE HONORABLE JUDGE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

_____

A P P E A R A N C E S

For the Plaintiff:          **Nathan Daniel Cardozo**
                            **Cindy Cohn**
                            ELECTRONIC FRONTIER FOUNDATION
                            815 Eddy Street
                            San Francisco, CA 94109
                            **Scott A. Gilmore**
                            CENTER FOR JUSTICE & ACCOUNTABILITY
                            One Hallidie Plaza
                            Suite 406
                            San Francisco, CA 94102

For the Defendant:          **Robert Phillip Charrow**
                            **Melissa Prusock**
                            GREENBERG, TRAURIG, LLP
                            2101 L Street, NW
                            Suite 1000
                            Washington, DC 20037

_____

Court Reporter:             Janice E. Dickman,  RMR, CRR
                            Official Court Reporter
                            United States Courthouse, Room 6523
                            333 Constitution Avenue, NW
                            Washington, DC  20001
                            202-354-3267

1          THE COURTROOM DEPUTY:  Civil action 14-372, John

2    Doe versus the Federal Democratic Republic of Ethiopia.

3          Counsel, will you please approach the podium and

4    identify yourselves for the record.

5          MR. CARDOZO:  Good afternoon, Your Honor.  Nathan

6    Cardozo for the plaintiff John Doe, A/K/A Mr. Kidane.  And

7    with me I have my colleague Cindy Cohn and Scott Gilmore.

8          THE COURT:  Good afternoon.

9          MR. CHARROW:  Robert P. Charrow for the defendant

10   Federal Republic.  And with me is Miss Prusock, you just

11   admitted.

12         THE COURT:  Thank you again.  Welcome.  Just

13   before getting going, one thing that I just wanted to put on

14   the record, I don't think is an issue, but I always prefer

15   full disclosure on these things, and if anyone sees an

16   issue, please let me know.  But when I was in private

17   practice, not all that long ago, one of the opposing counsel

18   in at least one of my cases was EFF.

19         And in addition, I think that Mr. Snider, who is

20   one of the counsel representing the Federal Republic was at

21   Wilmer, Cutler, Pickering, Hale and Dorr when I was there,

22   as well.  So, if anyone has any issue, please let know.  But

23   I'm not aware of any.

24         So, we're here for argument today on defendant's

25   motion to dismiss.  I think that given the number of issues

1    that are involved, that if the parties don't mind doing it

2    this way, it would probably be most helpful for the court to

3    proceed, at least, on an issue-by-issue basis with respect

4    to the major issues.  I think we could probably clump some

5    of the issues together.

6         But I think that rather than having defendants go

7    first and go through all the issues and then having the

8    plaintiff then have to go back and respond to things that I

9    may have heard oral argument about some time earlier, it may

10   be easier to do it one issue at a time.

11        And I guess the issue where I would like to start

12   would be with the discretionary function exception to the

13   Foreign Sovereign Immunities Act.  And, obviously, if there

14   are any overview points that you want to make, you should

15   feel free to make those at this time as well.

16        MR. CHARROW:  Thank you very much, Your Honor.  I

17   would like to begin with one overview point.  There is

18   apparently some disagreement about the burden of proof that

19   pertains in a case involving a section 1330 case, and I

20   would like to address that to start with because I believe

21   that is an overarching consideration.  And obviously, the

22   burden of proof only relates to questions of fact.

23        And in the context of the Foreign Sovereign

24   Immunities Act, when we're dealing with an exception, it

25   really relates to those facts that are jurisdictional in

1    nature, that are independent of the facts necessary to

2    establish the textbook version of the cause of action at

3    issue.  And in this case there are two such facts.

4         And also, as an overarching consideration, there

5    are really two burdens of proof.  And part of the confusion

6    comes from that.  There is the burden of producing evidence.

7    And the burden of producing evidence at this stage of the

8    proceeding rests with the plaintiff.  And there is the

9    burden of proof to establish by proof at some point later in

10   the case that the exception to the Sovereign Immunities Act

11   applies, and that would be the defendant's burden.

12        And the two factual predicates that are

13   independent of the cause of action but are jurisdictional in

14   this case would be, number one, whether the entire tort

15   occurred in the United States, and, number two, was there a

16   personal injury.  Those are the two factual predicates that

17   stand as jurisdictional predicates, that are independent of

18   the two causes of action.  In other words, these are unusual

19   torts.  Both torts can be maintained in textbook format

20   without allegation of proof of personal injury.

21        THE COURT:  My understanding, and I think this is

22   just a version of what you've said, is that the defendant in

23   a Foreign Sovereign Immunities Act case where it is

24   asserting immunity carries the ultimate burden throughout

25   the process.

1          MR. CHARROW:  That's correct.

2          THE COURT:  And that the plaintiff has some burden

3     of coming forward and placing the issue in contest, but that

4     it remains the defendant's burden of ultimate persuasion.

5          MR. CHARROW:  Correct.  The ultimate burden of

6     proof rests with the defendant.  However, the burden of

7     producing evidence shifts back and forth.  And with respect

8     to the burden of producing evidence -- it's a 12(b)(1).

9     Once a plaintiff -- or, once a defendant calls into question

10    the fullness of the pleadings, whether they're adequate, it

11    is then the plaintiff's burden in this context to produce

12    evidence to demonstrate the underlying jurisdictional fact,

13    provided that fact is independent of the textbook version of

14    the cause of action.

15         THE COURT:  This is something perhaps we'll

16    explore more as the arguments proceed, but one question that

17    I'll have -- I can ask you now, but I probably should ask it

18    again when we're closer to the end of the argument -- is

19    whether there is a factual dispute between the parties, or

20    whether it is a legal dispute on these issues.  And related

21    to that, if there is a factual dispute, is there any need

22    for jurisdictional discovery in order to decide the pending

23    motion?

24         MR. CHARROW:  It is a dispute based on the

25    pleadings.  So it is an 8(a) dispute.

1            THE COURT:  If that's the case, then doesn't the

2      court take the plaintiff's pleadings as true for purposes of

3      resolving the motion?

4            MR. CHARROW:  No, the court does not.  Only

5      factual assertions are taken as true.

6            THE COURT:  Fair enough.  That's what I meant.

7      But the factual assertions that are in the complaint.

8            MR. CHARROW:  The factual assertions that are in

9      the complaint can be taken as true, if they are in fact

10     factual assertions, as opposed to legal conclusions.

11           THE COURT:  If they are legal conclusions, we

12     don't need facts, the court will decide the law.  And if

13     it's a factual dispute, then the court, absent someone

14     putting other evidence before the court, which could occur,

15     that the court would take the pleadings or the plaintiff's

16     complaint as true and any reasonable inferences that can be

17     drawn from the complaint for purposes of deciding the

18     present motion, is that right?

19           MR. CHARROW:  That is partially true, correct.

20           THE COURT:  Tell me where I'm not true.

21           MR. CHARROW:  I think that with respect to the

22     facts as pled, there is a subtle difference between what is

23     sufficient in a normal case and what is sufficient in a 1330

24     case.

25           THE COURT:  Okay.

1          MR. CHARROW:  And I think there's a heightened

2     standard of pleading in a 1330 case because, unlike in a

3     normal case, you don't have a moving burden of producing

4     evidence at the pleading stage, at the 12(b)(1) stage, and

5     you do in a 1330 case.  And that's what's unusual about

6     these cases.

7          THE COURT:  So is there any case that you can

8     point me to saying there's a heightened standard that

9     applies in a 1330 case?

10          MR. CHARROW:  I think any of the Supreme Court

11     cases deal with the fact there's a significant presumption

12     against bringing a foreign country into court in the United

13     States.  And it's that underlying presumption that drives

14     the shifting burden of producing evidence.  If you look at

15     the, *Chabad* case, for example, it deals with the shifting

16     burden of producing evidence and the fact the pleadings

17     themselves --

18          THE COURT:  I don't understand, though, your

19     emphasis on the shifting burden of producing evidence in a

20     context in which neither you nor the plaintiff is putting

21     any evidence before the court and the court is relying on

22     the complaint.  I would understand that if you had come

23     forward with some evidence that might then shift the burden

24     in some way back to the plaintiff to contest that evidence.

25     But in a case in which there's no evidence in front of the

1    court and there's just a complaint in which the court

2    accepts the allegations, the factual allegations as true,

3    I'm not quite sure I follow the shift.

4            MR. CHARROW:  Let me provide you the context in

5    this case, I think, that makes it clear.  I think the one

6    factual allegation that is subject to the moving burden, the

7    shifting burden of producing evidence, is the allegation of

8    mental distress.  That is not an allegation that is

9    necessary to establish either cause of action.  It is an

10   allegation, however, that is essential to establishing this

11   court's jurisdiction.  Without it there is no jurisdiction.

12           THE COURT:  But it's alleged in the complaint.

13           MR. CHARROW:  It is alleged in the complaint, but

14   there are no facts to support it.  At the point that we

15   place that at issue, it was the plaintiff's burden to come

16   forward with some evidence or some additional pleading

17   demonstrating that, in fact, an emotional distress in the

18   form of an injury was in fact suffered.

19           THE COURT:  How did you place that issue, that

20   question at issue, other than simply saying we doubt it?

21           MR. CHARROW:  We doubt it -- well, we doubt it in

22   more ways than one.  Obviously, it was not in the initial

23   complaint.  We pointed that out in our first motion to

24   dismiss.  It suddenly appeared as a conclusion in the second

25   complaint, i.e., the first amended complaint.

1           THE COURT:  But not a surprising allegation, given

2      the nature of the underlying allegations in this case.

3           MR. CHARROW:  Not surprising, but when dealing

4      with shifting burdens under the context of 1330 it's

5      incumbent upon the plaintiff to at least present some

6      factual support for the assertion that there is emotional

7      distress.  Because, remember, both of these causes of

8      action, when private parties are involved, can survive

9      without a demonstration of personal injury.

10           THE COURT:  Okay.

11           MR. CHARROW:  That's what makes it unusual.  Okay?

12           Discretionary function?

13           THE COURT:  Please.

14           MR. CHARROW:  Okay.  Assuming -- assuming that the

15      torts exception were to be satisfied with respect to where

16      the tort occurred, the discretionary function exemption

17      obviously must be satisfied in this case.  And it obviously

18      exempts from review by a court any activity which is a

19      discretionary function of a foreign nation.  And the

20      plaintiff argues that the courts have used, by analogy, the

21      Federal Tort Claims Act.  We don't dispute that.  We think

22      it provides some analogy.  Obviously it provides an

23      analytical basis for which a court can analyze the extent to

24      which a foreign can exercise its discretionary function.

25           The allegations in the complaint are that there

1    was spying done.  It's not quite clear where the spying was

2    done.  It's not quite clear whether the defendant was aware

3    that it was spying on the plaintiff.  And I'll get to that

4    shortly.  This is all from the pleadings.  This is not

5    something I'm making up.

6            The central point, though, is that a nation, even

7    the United States, has a discretionary function of deciding

8    whether it will spy abroad and on whom it will spy on.  And

9    I think we've seen a number of cases where that issue has

10   arisen and the courts have said discretionary function

11   exemption applies here because it's inherent in the

12   decision.

13           THE COURT:  What cases are you referring to?

14           MR. CHARROW:  I think the case involving China,

15   which was, I think, the *Jin* case, State Security.  *Jin*

16   versus State Security.

17           THE COURT:  That was a case in which someone was

18   killed, correct?

19           MR. CHARROW:  No, that was not a case in which

20   someone was killed.  That's *Liu*.  *Liu* was a case where

21   someone was killed.  *Liu*, I believe, was out of the Ninth

22   Circuit.  *Jin* was, I believe, out of this circuit.  And in

23   *Jin* -- that's my recollection.  And in *Jin* there was an

24   allegation that Chinese citizens who were adverse to the

25   government were being harassed in the United States by

1    agents of the Chinese government, and the court said that

2    that's a discretionary function.

3        Correspondingly, when the head of security of

4    Saudi Arabia was sued for funding, as part of the spying

5    efforts, entities that ultimately were responsible,

6    according to the complaint, in the 911 terrorist attack.

7    Again, the court said that is a discretionary function, who

8    they fund, how they go about their intelligence operations.

9    And, obviously, the plaintiff argues that that type of

10   conduct is not subject to a discretionary function because

11   it's illegal in the United States.  Well, obviously, all

12   torts are civil wrongs and the discretionary function

13   exception, obviously, does not apply to all torts.

14       Let's go back a minute, however.  The real

15   question, though, in assessing the discretionary function is

16   whether it is legal or illegal in the country that's

17   performing the actions.  And here it's Ethiopia.  And under

18   Ethiopia law, it's not illegal to engage in spying overseas.

19   Just as in the United States, it's not illegal for the U.S.

20   government to engage in spying overseas.

21       THE COURT:  That was one of the questions I had,

22   actually.  No one actually cites to Ethiopian law in any of

23   the briefing on this issue.  What is, in fact, the Ethiopian

24   law with respect to alleged computer intrusions?  And, you

25   know, I think you need to be somewhat specific about this

1     and not simply, you know, simply say, you know, spying, but

2     the question is, is it in fact lawful?  And I should say, by

3     the way, I'm taking, for purposes of this entire hearing,

4     the allegations of the complaint as true.  I have no idea

5     whether they're true or not.

6               MR. CHARROW:  So are we.

7               THE COURT:  Everything I say, take that, too.

8               MR. CHARROW:  Obviously the defendants disagree

9     with the underlying allegation, but we are accepting as true

10    for the purposes of this hearing only.

11              THE COURT:  Accepting the allegations as true, is

12    there, in fact, Ethiopian law that says that there are

13    individuals in Ethiopia who are authorized, or where it is

14    lawful for people in Ethiopia to reach out through the

15    internet and to intrude into the computers of people in

16    other parts of the world for purposes of eavesdropping on

17    their telephone conversations, their Skype conversations,

18    eavesdropping on what may be going on in their home, reading

19    their text messages?  I don't know the answer to know

20    whether that's lawful or not under Ethiopia law.

21              MR. CHARROW:  I believe it is.  And I believe it's

22    the same in most nations.  Clearly, in the United States the

23    law establishing the CIA gives the CIA the authority to do

24    precisely what Ethiopia is alleged to have done here

25    overseas.

1          THE COURT:  I do think there's sort of an

2     interesting and difficult question I want to spend some time

3     talking about:  Illegal in what sense?  And you're the one

4     who has said illegal under Ethiopian law.  And I think that,

5     you know, under those circumstances, particularly where

6     you're representing the government of Ethiopia, it may your

7     obligation to come forward, if that's what your argument is

8     here, and point me to, hopefully, a translated Ethiopian

9     statute, code, provision, something that says that we are

10    authorized to do this.

11         I do think that, even putting that aside, that

12    there are some difficult questions about whether that's the

13    right standard of thinking about illegality here.  I think

14    you, in your own brief, say that, you know, if an act -- I

15    don't have the language in front of me, but if an act is

16    sufficiently outrageous, that it could rise to the level

17    of -- even if it were not a violation of Ethiopian law, that

18    it is so fundamental it violates international law, that you

19    would say, you know, they're not authorized to do this.

20         MR. CHARROW:  Obviously I don't want to get into a

21    discussion of natural law with the court, but if we're

22    thinking about natural law versus positive law, obviously

23    the cases involving murder would trigger natural law.

24    Fairly uniform recognition that murder is illegal.

25         THE COURT:  One hint of what standard might be

1    used is in the D.C. circuits opinion in the -- which case

2    was this one?  Oh, I guess it was in the *MacArthur Area*

3    *Citizens Association* case, where the court, in a footnote,

4    says, Well, there may be a difference between crimes that

5    are malium prohibitum and those that are malium in se.

6              And I guess one question I would have is, is

7    whether, in fact, you know, does one look to U.S. law, does

8    one look to international law, does one look to foreign law

9    for purposes of making this determination?  I have some

10   concerns -- I take your point about the analogy to the

11   Foreign Sovereign Immunities -- to the Federal Tort Claims

12   Act, and you might ask whether the Ethiopian official had

13   authority to act as an Ethiopian official, analogous to the

14   U.S. official having authority to act.

15             I have to say, I think that raises some

16   significant issues about whether it's appropriate and

17   whether Congress would have intended for a U.S. court to be

18   making judgments of that type, which seems to me to perhaps

19   raise even greater comity concerns of reaching into the

20   domestic law of Ethiopia and deciding whether, for example,

21   a particular official in Ethiopia was acting within his or

22   her authority in doing something, at least raises some

23   issues that I think ought to make a U.S. court a little bit

24   uncomfortable and question whether that's the right standard.

25             Similarly, one might say that as a U.S. court, you

```
1    know, I ought not say someone has discretion to violate the

2    law in this country.  And I take your point about negligence

3    and things like that, but maybe that's where you get into

4    the malium prohibitum and malium in se or, as the

5    Restatement does, the difference between serious crimes and

6    nonserious crimes.

7         But there is something -- and the cases don't

8    speak terribly directly to any of this, but there's

9    something a little bit troubling about a U.S. court saying,

10   Oh, yeah, someone was acting within their discretion when

11   they came into the United States and committed a clear

12   violation, and I'm not saying that's this case, but a clear

13   violation of U.S. law in some way.

14        In the Letelier case -- I mean, you know, I'm not

15   sure you need to turn to international law or the law of

16   humanity to simply say that it's troublesome for a U.S.

17   court to say that someone was acting within their discretion

18   to come into the United States and in the United States

19   assassinate somebody.

20        MR. CHARROW:  Correct.  And that's why, I think, I

21   was talking about natural law and the concept of those types

22   of actions that are universally viewed as reprehensible.

23        THE COURT:  So let me get at that.  How would you

24   articulate that standard?  If the standard is not just the

25   law of Ethiopia, but there's, you know, a second prong to
```

1     it, it's -- you know, even if they had authority under

2     Ethiopian law, if they did something that was X --

3          MR. CHARROW:  I think most courts that have

4     addressed this issue have either overtly or subconsciously

5     reverted to U.S. law.  And they have said, okay, make

6     believe this were the U.S. government acting overseas.

7     Would this be legal or illegal under U.S. law?  Would this

8     be viewed as a discretionary function of U.S. law if it were

9     done overseas?  And this type of conduct here, as alleged in

10    the complaint, clearly would be within the scope of what the

11    CIA is expressly authorized to do by statute.

12         So if you use the U.S. law as a gloss, if you

13    will, as a template for what is proper and what is not

14    proper in terms of discretionary function, I think you come

15    away with the understanding that this would be a valid

16    exercise of a nation's discretionary function.

17         THE COURT:  How would you articulate the standard

18    though?

19         MR. CHARROW:  I think I would look at it as a

20    two-prong standard.  First of all, I would ask myself, Is

21    this something that is so inconsistent with universal norms

22    as to be condemned by all nations?  A standard very similar

23    to that which would be used in the international legal area.

24         The next question would be if it isn't, then is

25    this a type of activity which, if done by the United States

1    abroad, would in fact be viewed as something subject to

2    governmental discretion?  And I think in both cases we find

3    that this is not something that would be viewed as

4    reprehensible internationally and, number two, it is

5    something that is done by the United States abroad and

6    pursuant to its discretion.  And if you apply that to this

7    case, I think it would be -- I think it would be

8    inappropriate for a court to say, well, the United States

9    can do it overseas, but another nation can't do it here, in

10   terms of exercising its discretion in its homeland, making a

11   decision what to do.

12            THE COURT:  Well, that actually raises another

13   question which has been on my mind, which is has anyone

14   actually asked the United States what their position is with

15   respect to this case?  Has anyone raised the question with

16   the United States as to whether the United States should

17   file a statement of interest?

18            MR. CHARROW:  Normally the State Department, in my

19   experience, does not file statements of interest, normally,

20   in District Court proceedings.  They wait until a matter

21   pops up to Court of Appeals.

22            THE COURT:  Do you know whether it's been raised

23   with the State Department at this point?

24            MR. CHARROW:  I can't say one way or another.

25            THE COURT:  Any views on whether the court should

1    ask for the State Department's views?  Frankly, as a

2    District Court Judge I don't -- it's not the best --

3              MR. CHARROW:  I guess the issue is this:  The

4    issue is -- there are a lot of issues in this case, for

5    example, that arguably raise potential Constitutional

6    issues.  This court can dispose of this case without getting

7    to those issues.

8              THE COURT:  So there's another line of defenses in

9    this case, I take it, that if these defenses fail, is there

10   an active state defense?

11             MR. CHARROW:  We haven't raised an active state

12   defense, Your Honor.  I think that the Federal Tort Claims

13   Act, tortious exception 1605(a)(5) in this Circuit and in

14   the Ninth Circuit and in the Second Circuit and in the Sixth

15   Circuit require that the entire tort be committed in this

16   country.

17             THE COURT:  That will be our next segment.

18             MR. CHARROW:  And that hasn't occurred here.  And

19   that, to me, is the cleanest and easiest way to resolve this

20   case.

21             THE COURT:  Is the reason you raise that point now

22   is because the Active State Doctrine usually applies to

23   conduct that occurs outside the United States?

24             MR. CHARROW:  Correct.

25             THE COURT:  Are there other Constitutional

1    defenses?

2          MR. CHARROW:  There are Constitutional issues.

3    There is one lurking that's very subtle, that we did not

4    raise in our briefs, but it is there nonetheless, and that's

5    the definition of person.

6          THE COURT:  You did raise that in your briefs.

7          MR. CHARROW:  We did, but I don't believe we

8    raised the Constitutional issue in the brief, to alert the

9    court that if it were to hold that the word "person"

10   included a foreign entity, then one has to look back and

11   question whether the in persona jurisdictional provisions

12   are Constitutional of 1330.

13          Because, remember, in this Circuit a foreign state

14   is not a person for due process clause protections.  That

15   permits service of a foreign state in the United States,

16   even though it doesn't satisfy minimum contacts.  If a

17   foreign state is a person, then we have a Constitutional

18   issue of due process.

19          THE COURT:  I see your point.  Did service occur

20   through the State Department in this case?

21          MR. CHARROW:  I don't know how service was

22   perfected in this case.  We received it after the fact and --

23          THE COURT:  Would you have any objection to the

24   court asking if the United States cared to express its views?

25          MR. CHARROW:  We do not.  We would not object to

 1    that, Your Honor.

 2              THE COURT:  Okay.  Another question with respect

 3    to the discretionary function exception is -- there's no

 4    briefing on international law.  And I guess I had a question

 5    about whether you have a view as to the type of conduct that

 6    is alleged here, whether it's consistent with international

 7    law, whether it's consistent with the international covenant

 8    on privacy and civil rights to which, I believe, Ethiopia is

 9    a signatory -- or, not a signatory, it's a party.

10              MR. CHARROW:  I believe it's consistent with

11    international mores, which I think is more important in that

12    respect.

13              THE COURT:  Well, but is it consistent with

14    international law or not?

15              MR. CHARROW:  I believe the actions are consistent

16    with international law.

17              THE COURT:  What about the international covenant

18    on privacy and civil rights?

19              MR. CHARROW:  I believe that the actions here

20    would be consistent with that.

21              THE COURT:  Any view about whether the conduct at

22    issue that is alleged here is malium in se or malium

23    prohibitum?

24              MR. CHARROW:  Haven't thought about it long enough

25    to give you an answer.  I just view it very simply as

1   something that falls well outside the area that would not be

2   subject to a discretionary function exemption.

3              THE COURT:  All right.  Anything further on

4   discretionary function?

5              MR. CHARROW:  I think not.

6              THE COURT:  Let me hear from the plaintiffs then.

7              MR. CARDOZO:  Good afternoon, Your Honor.  Thank

8   you.

9              THE COURT:  Good afternoon.

10             MR. CARDOZO:  As my opposing counsel did, I'll

11  start with just a very brief introduction about why we're

12  here.

13             Congress has, of course, given foreign governments

14  wide berth and immunized them against civil actions for many

15  torts.  But, the question before this Court is whether a

16  foreign sovereign has discretion to commit a violation of

17  the Wiretap Act, which is a tort as well as a serious

18  felony, discretion that not even the U.S. government claims

19  for itself.  So -- and I will, if Your Honor will allow it,

20  switch to burden very briefly.  Or would Your Honor prefer I

21  go to straight to discretionary function?

22             THE COURT:  I was thinking about what you said in

23  your opening.  Let me get that up a second.

24             MR. CARDOZO:  Yeah, I will.

25             THE COURT:  Feel free to go to burden.

1          MR. CARDOZO:  I'll continue on discretionary

2     function, actually.  As a court in this District ruled in

3     *Orlikow* versus United States, that court found that CIA

4     agents have no discretion to commit intelligence operations

5     that are lacking in statutory authority.  That's the case

6     that controls here.  You know, if a CIA agent was caught

7     here in the United States and violated the FTCA.  Same thing

8     would apply to an Ethiopian agent if they were caught here.

9          CIA agents, when they conduct intelligence

10    operations undercover abroad, if they get caught, they go to

11    jail.  It's not something that is legal for CIA agents to

12    do.  That's essentially what the government in Ethiopia is

13    claiming here, that what CIA agents can't do, or if they did

14    do they would get sent to jail, that Ethiopia can.

15          The question that this Court asks in determining

16    whether the spying alleged here was a discretionary function

17    is whether this is the type of judgment that Congress meant

18    to immunize.  And the Foreign Tort Claims Act case law cited

19    in *Letelier* shows that this is not the type of judgment that

20    Congress meant to immunize.  This court, in *Letelier*, stated

21    that foreign states have no discretion to have their

22    officers commit an illegal act.  Of course, illegal acts

23    must be sufficiently grave to fall outside the discretionary

24    act exception.

25          And *Orlikow* shows us that violating a federal

1     criminal statute for which, here, a Wiretap Act violation,

2     carries a five years prison sentence.  There's no discretion.

3               THE COURT:  Is that true for the Federal Tort

4     Claims Act as well?  If there's some level of seriousness --

5     seriousness threshold that has to be met before an act is

6     deemed to be nondiscretionary?

7               MR. CARDOZO:  So in the Federal Tort Claims Act,

8     as in the Federal Sovereign Immunities Act, there's a two-

9     step process.  The first is, is there an element of choice?

10    And that's where defendant fails.  If U.S. criminal law

11    prohibits one of your options, with a serious enough -- and

12    there is no bright line, there's no -- "serious enough" is

13    not a bright line distinction.  But if U.S. criminal law

14    prohibits one of the options but offers a regulated lawful

15    pathway to go about accomplishing the same end, then there's

16    no discretion to go about the illegal channel.

17              And here there is a mandatory channel.  Ethiopia

18    could have accomplished this act of spying in the United

19    States legally if it had wanted to.  We have a mutual legal

20    assistance treaty framework.  Ethiopia is not a signatory to

21    an MLAT with the United States.  But even if it's not a

22    signatory to an MLAT, it still may request State Department

23    or Justice Department assistance collecting evidence.  And

24    that happens all the time, Your Honor.

25              THE COURT:  Is the allegation here that Ethiopia

1    was engaged in a criminal enterprise or an intelligence

2    enterprise?  And if it was intelligence versus criminal, is

3    there any authority or basis for seeking mutual assistance

4    in an intelligence activity?

5              MR. CARDOZO:  Your Honor, the plaintiff is not

6    aware whether this was considered a criminal or an

7    intelligence operation.  And there's no distinction, Your

8    Honor.  At the MLAT framework there is no distinction

9    whatsoever.  And at least in this Circuit the defendant is

10   simply wrong.  This court, in *Letelier*, said that we look to

11   U.S. law to determine whether a discretionary function is

12   being exercised.

13             THE COURT:  It went a little bit beyond the U.S.

14   law and talked about crimes against humanity or something to

15   that effect.  There was some language in there which was

16   stronger than just this was a violation of U.S. law.  And I

17   assume it was also a violation of Chilean law as well, I

18   would assume.

19             MR. CARDOZO:  That is certainly possible, Your

20   Honor.  And notably, the defendant hasn't alleged that they,

21   for instance, got a warrant to serve on Mr. Kidane.  But in

22   any case, the conduct that happened here was not consistent

23   with the international covenant on civil and political

24   rights.  The -- that covenant requires that intelligence

25   activities or surveillance be necessary and proportionate.

1    And defendant has not made even an argument, much less a

2    showing, that the -- this surveillance was necessary and

3    proportionate.

4              THE COURT:  Can I ask you another question about

5    the International Covenant, which is, based on my reading of

6    it, it -- let's see if I have it here.  It's Article 17

7    says, "No one shall be subjected to arbitrary or unlawful

8    interference with his privacy, family, home or

9    correspondence."  Is that the provision you're relying on,

10   as well?

11             MR. CARDOZO:  Yes, Your Honor.

12             THE COURT:  When it refers to unlawful

13   interference, this gets us back to the same question again:

14   Unlawful under international law, unlawful under the law,

15   the domestic law of the target nation, or unlawful under the

16   domestic law of the targeting nation?

17             MR. CARDOZO:  I think in the covenant, Your Honor,

18   that it's referring to international law.  But here we can

19   look to U.S. domestic law and international norms, as did

20   the court in *Letelier*, as do courts in this Circuit

21   generally.

22             THE COURT:  But the International Covenant, in

23   particular Article 17, is not self-executing in the United

24   States.

25             MR. CARDOZO:  That's correct, Your Honor.  And we

1    have the Wiretap Act to do that work for us here.

2            THE COURT:  So what work does the International

3    Covenant do for you?

4            MR. CARDOZO:  It's just simply another indication

5    that the conduct that Ethiopia subjected Mr. Kidane to is

6    simply not accepted at international law or at U.S. law.

7            The other case, which is a Foreign Tort Claims

8    Act, which I think speaks directly to this, is from the

9    district of Hawaii, which is *Cruikshank versus United*

10   *States*.  And in that case CIA agents were found to not have

11   the discretion to break the law in the course of an

12   intelligence operation.  *Cruikshank* is also important

13   because it shows that privacy torts are not barred by the --

14   in that case the FTCA, and this is, of course, a privacy

15   court.

16           And then --

17           THE COURT:  How would you articulate the test, the

18   test for unlawfulness?

19           MR. CARDOZO:  The test for unlawfulness, Your

20   Honor, is was there an element of choice?  Here a federal

21   felony criminal statute takes away the element of choice.

22   And second, was there a mandatory pathway?  And again, the

23   answer is yes.

24           THE COURT:  On prong one, how do you distinguish

25   the *MacArthur Area* case then?

1      MR. CARDOZO:  Your Honor --

2      THE COURT:  We know there isn't a choice to

3  violate the zoning laws.

4      MR. CARDOZO:  Indeed, Your Honor.  But it wasn't a

5  felony.  No one was going to jail for five years for

6  violating a zoning law.  Similarly, in the consular

7  assistance cases, no one is going to jail for those.  In a

8  grant recommendation, no one is going to jail.

9      THE COURT:  So it turns on the seriousness of the

10  crime?

11      MR. CARDOZO:  Indeed, Your Honor.

12      THE COURT:  Here you said that it's a felony.  And

13  it struck me, on reading the briefs, that you have an

14  argument, and a substantial argument, that a foreign entity

15  may be subject to civil suit under 2520.

16      MR. CARDOZO:  Yes, Your Honor.

17      THE COURT:  Because that statute refers to person

18  or entity.  But the criminal provisions of the statute refer

19  to just persons.  And so do you actually have an argument

20  here that anything Ethiopia would have done would have been

21  criminal?

22      MR. CARDOZO:  Your Honor, if I was a U.S. attorney

23  standing up here with the Ethiopian intelligence agent who

24  directed this operation in the witness box, perhaps I would.

25      THE COURT:  But with the individual, not the

1  nation then?

2          MR. CARDOZO:  Correct.  But, obviously, I'm not a

3  U.S. attorney.

4          THE COURT:  Right.

5          MR. CARDOZO:  Turning to the issue of burden here,

6  the motion to dismiss --

7          THE COURT:  To be clear, I don't mean to be

8  suggesting that there -- you know, that I have reason to

9  conclude there's anything criminal here.  As I said, I'm

10 just taking the allegations as started in your arguments as

11 stated.

12         MR. CARDOZO:  Yes, Your Honor.  Turning to the

13 issue of burden.  As opposing counsel noted, it is -- it's

14 not particularly straightforward, but it's not as complex as

15 opposing counsel suggests.  At the motion to dismiss phase,

16 Ethiopia has its initial burden to show that it is in fact a

17 foreign sovereign and entitled to immunity.  And, of course,

18 it has met that burden.  The burden then shifts to the

19 plaintiff.  And at this stage, at the motion to dismiss

20 stage, all that's required is that the plaintiff assert

21 allegations sufficient to bring this claim within the

22 exception.  And that comes directly from *O'Bryan versus Holy*

23 *See* out of the Sixth Circuit.

24         And our evidence here is that there's been an

25 interception; that Mr. Kidane's Skype calls, his web search

1    history, possibly his e-mail as well, and that of his

2    family, were all monitored by the government in Ethiopia.

3    And that's all that's required to get past a motion to

4    dismiss.

5              THE COURT:  Let me ask you another question about

6    the discretionary function exception here.  I take your

7    point, there certainly is lots and lots of support in the

8    case law for modeling the discretionary exception, kind of

9    discretionary function exception under the Foreign Sovereign

10   Immunities Act and the Federal Torts Claims Act, it was

11   modeled on it in the cases cited.  But they don't apply in

12   exactly analogous circumstances.  And the purposes of the

13   Federal Tort Claims Act and the Foreign Sovereign Immunities

14   Act are not the same.

15             And going back to John Marshall, one of the

16   principal reasons for having foreign sovereign immunity is

17   comity between nations.  And if I were to rule your way on

18   this case, does that open the door to a situation that, not

19   necessarily in this case or just in this case, but more

20   broadly gives rise to pretty serious foreign policy issues

21   where -- and, again, let me not use this case because I

22   don't want to comment, necessarily, on this case in any way,

23   but imagine a case in which someone has a grudge with a

24   nation that they've left and they left on bad terms, there's

25   some hostility between somebody who's moved to the United

1    States from that nation.  The person comes into court and

2    says, You know what? I think I've got a good enough basis to

3    believe, you know what? there's guys back in my old country,

4    I think they're spying on me.

5           You come in, maybe there's a little bit of

6    evidence on that, and someone comes in and says, Okay, now I

7    want to subpoena the head of intelligence, you know, the

8    prime minister, I want to find out if it was authorized.

9    You know, I got to ask the prime minister if the prime

10   minister authorized this.  I have to delve into, you know,

11   highly confidential either law enforcement or intelligence

12   activities of a foreign nation and have this federal court

13   doing that.  Doesn't that raise the sort of comity concerns

14   that animated the Foreign Sovereign Immunities Act and

15   foreign sovereign immunity going back to the beginning of

16   the nation?

17          MR. CARDOZO:  It might, Your Honor, but, luckily,

18   that's not the case we have in front of us and that's not

19   the case that this Court is going to face going forward.  In

20   FSIA context, discovery -- factual discovery is not

21   permitted until after a motion to dismiss.  And just

22   stepping back a little bit further, the Mutual Legal

23   Assistance Treaty framework, which the U.S. is a vibrant

24   participant in, would be rendered superfluous if the

25   Ethiopia government's argument was correct.  What Ethiopia

1    has argued to Your Honor today is that their failure to sign

2    a Mutual Legal Assistance Treaty with the United States

3    gives them more power than if they had.

4            THE COURT:  My point, though, is the legal

5    principle that you're arguing for here -- again, putting the

6    facts of this case aside, or the allegations in this case

7    aside, but the legal principle is that if someone from

8    outside the United States, a foreign state reaches into the

9    United States in a way in which someone can make an

10   allegation that they've committed a felony, that that then

11   allows a federal court to take jurisdiction over that matter

12   in a way that could, at least in some cases, really upset a

13   fairly delicate set of issues of foreign relations.

14           You could imagine a case in which a judge --

15   again, not this case, but you can imagine a judge, based on

16   that type of policy, the use of the subpoena power and so

17   forth, could strain, if not worsen relations with a foreign

18   power.  Could, where you -- could have had, you know, the

19   United States government could have been working very

20   carefully -- again, not this case, but could have been

21   working very carefully to establish some sort of

22   relationship with a country, could have gotten very close

23   to, you know, a treaty of some type with the country, could

24   have been huge U.S. interests in this issue, and all of a

25   sudden you've got a judge who's dragging in the head of

1    intelligence saying, you know, I need to know what happened

2    here and let's do some depositions.  And the foreign

3    government starts saying, you know, this is out of control

4    and, you know, is calling up and yelling at the president

5    about this crazy judge.

6         And I'm really more getting at the principle here

7    than the particular facts of this case.  And how do you draw

8    the line in a way to make sure that that purpose of the

9    Foreign Sovereign Immunities Act isn't overridden by

10   whatever rule you're asking me to adopt?

11        MR. CARDOZO:  Two points in response, Your Honor.

12   First, federal discovery does not extend, I think, to the

13   extent that Your Honor is worried about.  If a U.S. litigant

14   attempted to haul the chancellor of Germany into a

15   deposition, a federal court should and would grant a

16   protective order to stop that.  So that's not what's going

17   to happen.

18        The second thing is the diplomatic harm or the

19   nation-to-nation harm that occurs is simply the harm that

20   occurs when spies get caught.  That's just when spies --

21   when a spy of a friendly nation or of a not-so-friendly

22   nation gets caught, diplomatic harm occurs.

23        THE COURT:  There may be a difference in whether

24   the authorities in one of those nations is making a decision

25   about whether to prosecute that person versus, you know,

1    allowing a civil litigant and a nonelected judge to make the

2    decisions about whether to create what could become an

3    international crisis.

4          MR. CARDOZO:  Perhaps, Your Honor.  But Congress

5    gave this court, with the Discretionary Act exception, gave

6    this Court the power to decide whether this is the sort of

7    tort that was intended to come within this Court's power.

8    And here the answer is yes.

9          THE COURT:  Is there some other doctrine that

10   would address the types of concerns that I'm raising, so

11   that even if the court were to conclude that it had

12   jurisdiction over the matter, that there might be, if not

13   active state, which I guess is also in the form of immunity,

14   but, you know, they're -- for example, there are cases that

15   preclude state courts, like the *Garamendi* case and those

16   lines of cases, from adjudicating matters where doing so

17   could interfere with foreign relations?  Is there some other

18   doctrine that would provide a safety valve for the types of

19   concerns I'm talking about?

20         MR. CARDOZO:  First of all, the Active State

21   Doctrine can't apply because it only applies to conduct

22   within the territory of the foreign state.  So that's not at

23   issue here.  The Political Question Doctrine might apply,

24   but no court has ever applied it in the Foreign Sovereign

25   Immunities Act context.

1          THE COURT:  What about the assertion of the

2     foreign relations powers, the separation of powers issue?

3          MR. CARDOZO:  There is no such doctrine, at least

4     not to dismiss an FSIA case.  No federal court, to my

5     knowledge at least, has applied such a doctrine in the FSIA

6     context.  And Congress didn't intend that.  Congress

7     intended that for nondiscretionary acts that create personal

8     injury here in the United States, and acts that occurred

9     here in the United States, that this court should exercise

10    its jurisdiction.  This court has jurisdiction to hold the

11    foreign sovereign accountable to that.

12          Something my opposing counsel said, the privacy

13    torts that we've alleged here are per se personal injury and

14    nothing further is required.  And that comes -- that comes

15    from *Pearce versus E.F. Hutton* out of this District.  Both

16    intrusion upon seclusion and the sort of interception that

17    we've alleged that's a violation of the Wiretap Act are

18    per se a personal injury.  And in terms of the burden of

19    producing evidence, that's all that's necessary at the

20    motion to dismiss phase.

21          Opposing counsel has cited no authority to say

22    that the plaintiff needs to produce anything other than an

23    allegation that what has happened is, by definition,

24    personal injury.

25          THE COURT:  The hypotheticals that I was throwing

1    at you a minute ago, which admittedly, you know, are not

2    this case, but go to the question of how to articulate a

3    rule here, involve the equities of the executive branch and

4    perhaps the legislative branch.  Do you have a view on

5    whether this court should at least provide the government

6    with an opportunity to be heard on these issues?  Do you

7    know whether anyone has explored that issue with the

8    government thus far in the litigation?

9            MR. CARDOZO:  We have not, Your Honor.  And while

10   we have no objection to the Court reaching out to the

11   Department of State to get its views, we don't think it's

12   necessary.  Certainly the motion to dismiss phase it's not

13   necessary.

14           And then if Your Honor has no further questions on

15   the burden or on discretionary functioning.

16           THE COURT:  Why don't we move on to the entire

17   tort.  Okay.  I'll hear from the defendant.

18           MR. CHARROW:  Thank you, Your Honor.  Since 1984

19   the law in this Circuit has been fairly straightforward.

20   The entire tort has to occur in the United States in order

21   for the exception to be triggered.  And that's largely an

22   outgrowth of the legislative history, the language of the

23   provision, Supreme Court opinions prior to 1984 and

24   thereafter, and a string of cases that has consistently held

25   that the entire tort must occur in the United States.  And

1    there's good reason for that.  And there are a lot of policy

2    reasons why we would want the entire tort to occur in the

3    United States, as opposed to piecemeal, some here, some

4    there.  And I can go through those one by one with the

5    court, if the court would like.

6              THE COURT:  Sure.  Whatever you think is helpful.

7              MR. CHARROW:  I think some of these would be

8    helpful.  I think, first of all, we have a general

9    presumption against extraterritoriality.  And if we look,

10   for example, at -- if we compare, for example, 1605(a)(2),

11   which is the commercial exception to the Federal Tort Claims

12   Act, with 1605(a)(5), which is the tort exception, which is

13   the one before the court today, you'll note that (a)(2) does

14   permit activity to occur overseas.  It expressly so permits.

15   Those express terms are not present in 1605(a)(5).

16             So quite aside from the law of the circuit, we

17   have general notions of statutory interpretation, coupled

18   with the concept of a presumption against

19   extraterritoriality.  The statute itself was primarily

20   designed to enable citizens in the United States to sue for

21   auto accidents.  And auto accidents, by definition, occur

22   entirely in the United States.

23             If we look at a number of the cases that were

24   cited -- now, plaintiff argues that a lot of the cases that

25   were cited are cases where things occurred overseas.  Well,

1     that's the point.  When things occur overseas, people

2     frequently attempt to sue in the United States.  And a

3     number of cases, though, involve what I call split torts,

4     where some of it occurred there and some of it occurred

5     here.  And the courts have consistently held in those cases

6     that there's no cause of action.

7              I think the Colorado aircraft case, *Four Corners*,

8     was a products liability suit against the French engine

9     manufacturer that was owned by the French government.  The

10    crash occurred in Colorado.  A portion of the tort occurred

11    in the state of Colorado.  And the Court said 1605(a)(5) did

12    not trigger because the entire tort did not occur in the

13    United States.

14             THE COURT:  My recollection was it was actually

15    something -- was it in Mexico that it actually occurred,

16    where it was some sort of -- I can't remember if it was a

17    supervision or some negligence that actually occurred in

18    Mexico, as well.

19             MR. CHARROW:  Could be.  And I think the courts

20    have consistently so held.  I don't know of any court that

21    has held that a tort that is committed overseas can give

22    rise to a federal -- to an exception provision, trigger the

23    exception provision of 1605(a)(5).

24             THE COURT:  So you were certainly right, that

25    there is precedent from the Circuit here that says that the

1    entire tort has to occur in the United States.  I guess the

2    question for me is what that means.  And most recently, the

3    Court of Appeals in a case called *Jerez versus Cuba*,

4    described it this way, they said, "The law is clear that the

5    entire tort, including not only the injury, but also the act

6    precipitating that injury, must occur in the United States."

7            And then it went on and distinguished the

8    situation and said, "Jerez seeks to reinforce the parties'

9    redeployment analysis by analogizing the defendant's actions

10   to a foreign agency's delivery into the United States of an

11   anthrax package or a bomb.  But here the defendant's

12   infliction of an injury on Jerez occurred entirely in Cuba."

13   He was, I believe, infected with hepatitis C.  "Whereas, the

14   infliction of the injury by the hypothetical anthrax package

15   or bomb would occur entirely in the United States."

16           And it sounds to me like what the court is saying

17   there is that when it refers to the entire tort occurring in

18   the United States, it requires two things:  One is that the

19   injury be in the United States and, two, that the act that

20   precipitated that injury occur in the United States.  But I

21   take it that that's what the plaintiffs are alleging here,

22   at least, it did in fact take place.

23           MR. CHARROW:  I think you have to step back.  What

24   does the tort consist of?  These are both intentional torts.

25   They require the marriage of mens rea, or whatever the state

1    of mind necessary for an intentional tort is, and the act

2    itself.  The two have to coexist.  Here there is no doubt

3    and no dispute that all human behavior occurred in Ethiopia.

4    There is no allegation that any Ethiopian agent of the

5    government of Ethiopia was present in the United States.

6              What is surprising is that if we step back a

7    moment and look at the original infection, the original

8    computer virus -- remember, the plaintiff here was not the

9    target of that virus.  The plaintiff's friend was.  Where

10   did that occur?  That occurred, finally I figured it out,

11   occurred in London.  If you look at the translated version

12   of Exhibit C, it appears that the individual who was

13   originally infected was residing in London.  And there's no

14   allegation that that person was present in the United States

15   in this complaint.

16             So the actual act did not even occur here.  So I

17   find it very difficult to understand how any part of the

18   tort occurred in the United States.  Certainly all of the

19   acts occurred overseas.  The actual reading of the

20   documents, to the extent they occurred overseas, the intent

21   was developed overseas, the service was located overseas,

22   all of the individuals were overseas.  Nothing occurred

23   here.

24             THE COURT:  I will, obviously, let the plaintiffs

25   address that.  But let me at least try what I think they

1       might say, just to get your response to it while you're

2       standing here, which is -- I take it from reading their

3       papers what they would say is that when the invasive code

4       ended up on someone's computer in the state of Maryland,

5       that someone then still had to activate that in some way.

6       They may have activated it from Ethiopia, but the result of

7       what they did was to turn on, in essence, a tape recorder on

8       someone's computer sitting in Maryland.

9               And by, sort of, by analogy, maybe a circumstance

10      in which, you know, I'm on vacation in Canada and I pick up

11      the telephone and I call a friend of mine and I say, hey,

12      there's a tape recorder under the desk in someone's office,

13      can you do me a favor and go and flip it on?  That person

14      has no mens rea because they -- they don't know what they're

15      doing, they're just staff and they turn on a tape recorder.

16      But, in fact, that is -- was an illegal recording that was

17      taking place purely in the United States and that was the

18      act that precipitated the injury, was that recording.  And

19      so I'll hear from the plaintiffs, but I take it that's what

20      their theory is in response to it.

21              MR. CHARROW:  Right.  They're arguing, basically,

22      that a robot can commit a tort.  The Restatement Third has

23      not reached that point yet.  The Restatement Third --

24              THE COURT:  We live in a word in which the

25      internet is pretty expansive.

1          MR. CHARROW:  I recognize that.  And as courts

2     have recognized frequently, the law does not keep up with

3     the internet.  But in this case we are requiring the entire

4     tort, including the intent, to be developed in the United

5     States.  That is the law of this Circuit.

6          THE COURT:  And is there any case that actually

7     says you need the intent in the United States?  That's where

8     I'm pausing a little bit, particularly this case that I just

9     mentioned to you, because it doesn't say anything about the

10    intent.  It suggests that if someone were to mail a package

11    into the United States that contained a bomb or anthrax,

12    that that might be sufficient.  It's dicta in the decision.

13    But it's dicta from the Court of Appeals here.  It seems

14    that might be sufficient.

15         MR. CHARROW:  The cases that we've seen do in fact

16    have intents developed overseas with effects in the United

17    States and the courts have held that's just insufficient.

18         THE COURT:  Well, but there's usually something

19    else that's taking place overseas in the cases that I've

20    read.  If there are cases where the only thing that occurs

21    overseas is the intent, you ought to point me to them.

22         MR. CHARROW:  I think the closest is the Mexican

23    case from 1984.

24         THE COURT:  The case we were talking about before?

25         MR. CHARROW:  Correct.

1          THE COURT:  I believe, and I need to go back and

2    look at that myself, my belief is that the court held that

3    the problem was that there was either some negligent

4    supervision or some negligence that occurred.

5          MR. CHARROW:  We're talking about a different

6    case.  We're talking about the 1984 case.  My pronunciation

7    is abysmal, it's --

8          THE COURT:  You can spell it.

9          MR. CHARROW:  It's *Asociacion de Reclamantes*.

10          THE COURT:  Oh, yes.

11          MR. CHARROW:  Scalia decision.

12          THE COURT:  Okay.

13          MR. CHARROW:  From '94.

14          THE COURT:  *Reclamantes*, I believe.

15          MR. CHARROW:  Right.  And in that case the court

16    was having difficulty figuring out precisely what the tort

17    was.  Because it was unclear whether the tort was the

18    original taking of the property or was it the subsequent

19    refusal of the state of Mexico to recompense the family for

20    the taking of the property.

21          THE COURT:  Right.  But what the court actually

22    held in *Reclamantes* was the tort occurred exclusively in

23    Mexico.

24          MR. CHARROW:  No, it didn't.

25          THE COURT:  I believe it did.

1          MR. CHARROW:  It did not hold that.  It stated the

2     entire tort has to occur in the United States.  But a

3     portion of the tort, to the extent that there was an injury,

4     that occurred in the United States because --

5          THE COURT:  Maybe -- the injury may have occurred

6     in the United States, but my recollection of what the court

7     held was is that by that point in the litigation, it was a

8     complicated history, but what happened was that there was a

9     dispute with respect to land, it was settled between the

10    United States and Mexico.

11         MR. CHARROW:  Correct.

12         THE COURT:  Individuals in the United States

13    originally had claims against the U.S. government for taking

14    their land.  The Mexican government agreed to take on that

15    responsibility and said we will pay them for the land.  Took

16    on that responsibility pursuant to a treaty or agreement

17    with the United States, and then didn't pay.

18         MR. CHARROW:  Exactly.

19         THE COURT:  And what the Court held in

20    *Reclamantes*, I believe, was that the tort that occurred was

21    the omission by the government of Mexico, city in Mexico to

22    pay the amount that they were required to pay.

23         MR. CHARROW:  Arguably, with the failure to send a

24    check in to the United States.

25         THE COURT:  Well --

1          MR. CHARROW:  It can be viewed either way.  It was

2     cross-border activity, is the bottom line.

3          THE COURT:  Right.  But what I was asking you,

4     though, is whether -- was there any case that says that

5     where the only element of the tort that did not occur in the

6     United States --

7          MR. CHARROW:  Was the injury?

8          THE COURT:  No, with the formation of the required

9     mental state, the intent.

10          MR. CHARROW:  I can't think -- I can think of

11     none.  But, of course, here none of the human acts occurred

12     in the United States.  So it was not just the intent, we're

13     talking about the human acts.

14          THE COURT:  But what about this hypothetical,

15     thought, from the *Jerez* case where the court says, you

16     know -- suggests, at least, that it might well be sufficient

17     if someone were to mail a package into the United States

18     that contains anthrax or a bomb.  There, you know, no tort

19     feasor is in the United States, but the tort is taking place

20     in the United States and the injury is occurring in the

21     United States.

22          MR. CHARROW:  It's like throwing a bomb, if you

23     will, from the Canadian border into the United States.  Part

24     of the act occurred in Mexico -- in Canada, part in the

25     United States.  That's the hypothetical.

1          THE COURT:  Yeah.  I mean, you know, as I say, I

2     don't think it's a holding, I think it's dicta from the

3     court.

4          MR. CHARROW:  But I don't think that any court has

5     ever addressed -- has retreated from the entire tort view

6     when faced with the actual set of facts.

7          THE COURT:  But let me put it this way:  You, a

8     minute ago, said that one of the rationales for the entire

9     tort doctrine was that there's a general presumption against

10     extraterritoriality.  I would have assumed that the

11     presumption against extraterritoriality would not apply

12     where, in fact, the action that gives rise to the injury

13     occurs in the United States, even if the intent was formed

14     outside the United States.

15          So you have, for example, you know, in an

16     antitrust case, you've got people outside the United States --

17     and I can't, frankly, remember off the top of my head,

18     remember if the Sherman Act applies extraterritorially or

19     not, but assume it doesn't for purposes of this.  You have

20     people outside the United States who decide where to engage

21     in price fixing in the United States, they get on the

22     telephone and call all of their vendors in the United States

23     and say set the price at X dollars and, as a result of it,

24     every vendor selling a particular good in the United States

25     is selling it at a particular price.  Maybe the people with

1      the specific intent are outside the United States, but the

2      tort is arguably -- I wouldn't think the ban on

3      extraterritoriality would apply.

4              MR. CHARROW:  Let's look at OPEC, it's a good

5      example.  The antitrust example you gave is a great example.

6      If the tort exemption did not apply, citizens of California

7      could sue under 17200, the Business and Professions Code.

8              THE COURT:  I don't know the story with respect to

9      OPEC.  I assume someone might assert the commercial

10     exception, which does apply outside --

11             MR. CHARROW:  Let's make believe that I allege a

12     tort, and I certainly can construct a tort out of price

13     fixing and market shares, can I not, and of allocation of

14     markets.

15             THE COURT:  Okay.

16             MR. CHARROW:  Okay.  And if I can do that, I can

17     sue under California's Cartwright Act, I can sue under

18     California 17200.

19             THE COURT:  Are there any cases that deal with

20     this issue?

21             MR. CHARROW:  The point is there are none, and

22     there are none for a reason.  Because what occurs outside

23     the United States, is not subject to 1605(a)(5).  That's why

24     no one has sued, even though there's a pot of money there.

25             THE COURT:  That may be a circumstance -- I'm not

1    familiar enough with it, though.  May be a circumstance in

2    which the injury is just occurring in the United States, but

3    where the actual sale is taking place outside of the United

4    States.  I don't know the answer to that question.

5            MR. CHARROW:  The sales are occurring here,

6    actually.  When you stop and think about it, you're buying

7    the gasoline, the crude oil is coming into the United States.

8            THE COURT:  I meant the sale from the --

9            MR. CHARROW:  Sales come directly from those

10   nations to the United States.  So part of the tort occurs

11   here, the injury occurs here, the mens rea occurs there, the

12   conspiracy occurs there.

13           THE COURT:  Are there cases that hold that the

14   entire tort rule bars an action against OPEC?

15           MR. CHARROW:  There was a case that did not get

16   resolved, in 1982, that I was involved in, which was the

17   Westinghouse antitrust litigation, where this issue was

18   raised but the case was settled before court was involved.

19   But it certainly involved price fixing of uranium by foreign

20   nations.

21           THE COURT:  Anything more on the entire tort

22   issue?

23           MR. CHARROW:  I think we've exhausted it.  I think

24   it's well briefed by both parties.

25           THE COURT:  Let me ask you, our conversation was

1    proceeding on the assumption that the only element from

2    outside the United States was the specific intent.  Is that

3    your position or --

4            MR. CHARROW:  No, no.

5            THE COURT:  Part of it, I think, is the question

6    of how you define the tort.  I want to give you a chance to

7    do that.

8            MR. CHARROW:  Here all of the acts occurred, all

9    the human acts occurred outside the United States.  No human

10   act occurred in the United States.

11           THE COURT:  Where do you think the interception

12   occurred?

13           MR. CHARROW:  There was no interception under the

14   Wiretap Act.  Zero.

15           THE COURT:  Was there any interception anywhere?

16           MR. CHARROW:  There was no interception.  But

17   they're relying on the Wiretap Act.  There was no

18   interception under the Wiretap Act.

19           THE COURT:  Would the Stored Communications Act

20   provide a cause of action then?

21           MR. CHARROW:  No, it would not.

22           THE COURT:  The Computer Fraud and Abuse Act?

23           MR. CHARROW:  Don't know.  But I certainly know

24   that the Act that they're relying on, which is 2511 and

25   2520, provides no cause of action here.

 1          THE COURT:  What about their argument that the

 2     interception was, in essence, turning the plaintiff's

 3     computer into their own tape recorder?

 4          MR. CHARROW:  I think they recognize that the

 5     Wiretap Act, as have a number of cases, that the Wiretap Act

 6     was passed many, many years before the internet.  And if

 7     they want to use the Wiretap Act to address this case when

 8     it doesn't, Congress is going to have to amend the Wiretap

 9     Act accordingly.

10          THE COURT:  It was amended in 1986.

11          MR. CHARROW:  I'm talking about post internet.

12     The internet as we know it really didn't come into existence

13     until the '90s.  It was crude e-mail before.

14          THE COURT:  Okay.  Anything further on this issue?

15          MR. CHARROW:  I assume I'll come back to the

16     Wiretap Act.

17          THE COURT:  Yes, yes.

18          MR. CHARROW:  Okay.

19          THE COURT:  All right.  Let me just pause for a

20     second here, ask the court reporter when you would like to

21     take a break.

22          You're okay?  After this.  Why don't we go through

23     this segment and then we'll take a break.

24          MR. CARDOZO:  Thank you, Your Honor.  And I

25     appreciate your patience with what is turning out to be a

1    long argument.

2          Before I start on location of the tort, let me

3    clarify two points that I made earlier.  The first is that

4    entities, in fact, can commit crimes through their agents

5    under 2511; it's just that the entities can't be prosecuted,

6    only their agents can.

7          And then second, we haven't asked the State

8    Department specifically for their views.  I wanted to just

9    be clear that it was the State Department that we did not

10   ask.

11         THE COURT:  Okay.

12         MR. CARDOZO:  The invasion of Mr. Kidane's privacy

13   occurred in his home in Silver Spring, Maryland, and not

14   anywhere else.  And *United States versus Rodriguez* out of

15   the Second Circuit tells us that the interception occurs

16   where the conversation was happening.  In *Rodriguez* it was a

17   telephone.  In *Rodriguez* the court said the interception

18   occurred at or very close to the telephone itself.  And

19   that's what we have here.  The interception at or very close

20   to Mr. Kidane's home.

21         THE COURT:  I thought that the relevant law on

22   this was the interception occurs in two places, at least

23   with respect to the Wiretap Act more generally.  It occurs,

24   you know, using old style versions of -- thinking about

25   this, where the alligator clips go on the line and where the

1    listening post is.  Is that not --

2            MR. CARDOZO:  That's actually not the law, Your

3    Honor.  The interception occurs when the acquisition is

4    made.  And where, or even if it was listened to is

5    irrelevant for that purpose.

6            THE COURT:  Right.  But the cases I'm referring to

7    are the older cases that dealt with the court's jurisdiction

8    to enter -- or, to authorize an interception.  I thought

9    that's what they said.  But the point is where the clips go

10   on the line, the alligator clips in the old technology, is

11   where the interception would occur.

12           MR. CARDOZO:  Exactly, Your Honor.

13           THE COURT:  And here, I take it, your position is

14   that, as I was saying to your colleague, that the

15   interception, in essence, was the commandeering of the

16   plaintiff's computer and using the plaintiff's computer to

17   make a recording for the defendant.  Is that your position?

18           MR. CARDOZO:  It is, Your Honor.  And more

19   specifically, it's the creation of the additional files on

20   Mr. Kidane's computer.  So it's not just the commandeering

21   of the computer, it's not just the potential to listen to,

22   it's the fact that his Skype calls were actually copied by

23   the FinFisher software and saved on his computer in Maryland.

24           THE COURT:  I understand that point conceptually.

25   Are there any cases that have ever embraced that theory?

1           MR. CARDOZO:  You know, this is the first case

2     where we've seen a -- this particular type of malware under

3     the Wiretap Act.  It almost certainly won't be the last.

4           Something that opposing counsel said was that he

5     was aware of no cases where the intent was formed, the

6     tortious intent was formed abroad, but yet courts found.

7     *O'Bryan versus Holy See* is that case, Your Honor, out of the

8     Sixth Circuit.  There there were several causes of action.

9     The Sixth Circuit dismissed some but allowed others to

10    proceed.  The ones they dismissed were the ones that

11    occurred entirely outside of the United States; namely, the

12    negligent training and supervision of the priests.  But the

13    cause of action that *O'Bryan* allowed to proceed was the

14    application of policies that were formed in the Vatican in

15    the United States.

16          And that's what we have here.  We have the

17    application of policy formed in Ethiopia, the intent to

18    wiretap Mr. Kidane, its application in the United States,

19    the actual wiretapping of Mr. Kidane succeeds, and that's

20    where the tort happened.

21          Just like in *Jerez versus Cuba*, this is the

22    digital equivalent of the anthrax packet mailed into the

23    United States.  There's no conceptual difference here.  It's

24    just one happens on the internet and the other happened --

25          THE COURT:  Do you agree that that language in

1        *Jerez* is dicta though?

2               MR. CARDOZO:  It is, Your Honor.  But it's

3        instructive and it should guide this court's reasoning.  And

4        the logic is, frankly, persuasive.

5               In the Computer Fraud and Abuse Act context courts

6        apply this quite regularly.  In the *United States versus*

7        *Ivanov*, for instance, there was a Russian hacker hacking

8        entirely from Russia, compromising computers in the United

9        States, and that posed no bar whatsoever.  The crime was

10       committed here, where the computers were, not where the

11       criminal happened to be.  And that's noted right here.

12              What matters is where the relevant conduct

13       occurred.  Here the relevant conduct is the interception,

14       the acquisition of Mr. Kidane's phone calls.  And for the

15       intrusion upon seclusion tort, the monitoring of his web

16       searches and e-mail.  All of that happened at his home in

17       Maryland.

18              THE COURT:  One question about the Maryland state

19       common law claim, if the court finds that there's a waiver

20       of immunity under the Foreign Sovereign Immunities Act with

21       respect to the wiretap claim, is that sufficient then to

22       bring in the Maryland claim without also having to then

23       decide whether the violation of Maryland law itself would

24       have constituted a crime or a serious crime?

25              MR. CARDOZO:  Yes, Your Honor.  But, of course,

1    the violation of Maryland common law is a personal injury

2    tort of the type that is permitted to continue under FSIA.

3    But even if it wasn't --

4         THE COURT:  I'm jumping back there to the

5    discretionary function exception.  And if the test there is

6    a serious crime has been committed, and if the serious crime

7    is the allegation that there was a violation of the Wiretap

8    Act, is that sufficient to pull in a Maryland common law claim?

9         MR. CARDOZO:  Yes, Your Honor.  And we see that in

10   *Letelier*.  In *Letelier* there was the wrongful death claim,

11   the assassination itself, and then there was assault and

12   battery.  Assault and battery may not have been sufficient

13   to pass the discretionary function, but the court allowed it

14   to continue because of the more serious tort that occurred

15   as well.

16        THE COURT:  Can you respond to the defendant's

17   argument about his inference that the original recipient of

18   the e-mail was located in London and that there's not any

19   allegation that the Ethiopian government was in any way

20   involved in transferring that e-mail in London to the United

21   States?

22        MR. CARDOZO:  First of all, that's not what the

23   e-mail says.  It does not identify Mr. Kidane's

24   acquaintances as being in London.  And I'm not aware that

25   that person was in London, frankly.

1          THE COURT:  Do we know if the person was in the

2     United States?

3          MR. CARDOZO:  We do not.  That's not alleged in

4     the complaint, Your Honor, his location.  And it's

5     irrelevant because that's not the tort.  The tort wasn't the

6     sending of the e-mail, the tort wasn't even the opening of

7     the e-mail, the tort wasn't even when Mr. Kidane opened the

8     e-mail.  The tort occurred after.  The tort occurred after

9     Mr. Kidane opened the Word attachment, his computer was

10    infected, then Ethiopia forwarded the actual spyware to Mr.

11    Kidane's computer, activated the infection, and began to

12    wiretap his Skype calls.  Each call that was intercepted was

13    an individual tort.  And the Wiretap Act recognizes this.

14         THE COURT:  Was each call separately authorized

15    under your view of the facts?  And was there some

16    affirmative action that was taken?  Or once the malware was

17    installed, was it just automatic at that point?

18         MR. CARDOZO:  For each call, no, they were not

19    individually authorized, it was automatic.  However, because

20    of the way that the licensing -- that the pricing schedule

21    for FinFisher works, Ethiopia began to pay for that seat,

22    that target seat of the spyware only when the -- Mr.

23    Kidane's infection became active, and paid for it

24    continuously until March of 2013 when they were caught red

25    handed by Citizen Lab.  Five days after that Citizen Lab

1    report Ethiopia pulled the plug on Mr. Kidane's infection

2    and stopped paying.  And that's when the tortious activity

3    stopped.

4         THE COURT:  Under your view of the facts, did the

5    Ethiopian government need to engage in some affirmative act

6    to turn on the spyware on the plaintiff's machine?

7         MR. CARDOZO:  Yes, Your Honor.  And that's what we

8    allege in the complaint and that's what the brochures that

9    we have attached from FinFisher support.

10        THE COURT:  Would they have known and do the

11   allegations support whether they would have known that they

12   were turning it on on the plaintiff's machine, versus the

13   person's machine who may have forwarded the e-mail to the

14   plaintiff?

15        MR. CARDOZO:  They certainly knew it was in the

16   United States.  Mr. Kidane's IP address would have made that

17   abundantly clear.  Whether they knew who it was immediately,

18   that's something only Ethiopia can answer.  However, the

19   infection stayed live for four and a half months.  They must

20   have -- and we allege this in the complaint, they must have

21   figured it out and they didn't turn it off until they were

22   caught.

23        THE COURT:  This question goes both to the entire

24   tort, but also, I think, goes back somewhat to the

25   discretionary function.  The legislative history on the

1     discretionary function exception is quite limited and refers

2     to a concern about traffic accidents in the United States.

3     How do you reconcile that with the theory that does involve

4     actions that, you know, span the globe at some level, as

5     well as with -- let me ask you that first, then I'll ask you

6     the follow-up.

7             MR. CARDOZO:  That's *O'Bryan versus Holy See*, Your

8     Honor.  A policy that's formulated in the Vatican can be

9     actionable under the Discretionary Act exception if it's

10    applied in the United States.  Globe-spanning suits are par

11    for the course in Foreign Sovereign Immunities Act.

12            THE COURT:  The second part of my question goes

13    back to the concern I was expressing before about the

14    discretionary function exception and potential for policy

15    implications of a very narrow reading of the discretionary

16    function exception.  It is the fact that Congress was

17    principally concerned with car accidents, some indication

18    that Congress wasn't contemplating that they were

19    authorizing actions against foreign states that could give

20    rise to the type of potential foreign affairs concerns that

21    I was raising before?

22            MR. CARDOZO:  No, Your Honor, I don't believe so.

23    And the courts have not -- you know, the court in *Letelier*,

24    the court in *O'Bryan* recognized that there were potential

25    diplomatic consequences.

1          THE COURT:  Was that from *Letelier*?  There had

2     already been a prosecution in *Letelier*.

3          MR. CARDOZO:  Indeed, Your Honor.  But *Letelier*

4     wasn't just between Cuba -- Chile and the U.S., but Cuba was

5     involved as well.  So this -- in *Letelier* it was even more

6     of a globe-spanning situation than we have here.

7          THE COURT:  What was the other case that you

8     raised?

9          MR. CARDOZO:  *O'Bryan versus Holy See*, it's --

10    *O'Bryan versus Holy See* is potentially the closest analogy

11    we have in terms of the intent being formulated abroad and

12    the application of that intent being actionable here.

13         Thank you.

14         THE COURT:  I don't know if you had anything else.

15    I was just looking down at my notes.

16         MR. CARDOZO:  On location of the tort, Your Honor?

17    No, only to reiterate that the tort -- both the Wiretap Act

18    and the intrusion upon seclusion were -- began and ended

19    here.  And the fact that they were directed from abroad is

20    irrelevant.

21         THE COURT:  Is that true with respect to all of

22    the intrusions you're alleging?  I understand the point with

23    respect to the Skype calls where, I take it, your argument

24    is that someone remotely turned on the plaintiff's machine

25    to store, to create, to make copies of those calls in a

1    portion of the computer files that were hidden from his

2    views.

3              MR. CARDOZO:  Yes.  And the same thing happened

4    with the web searches and e-mails.

5              THE COURT:  That was my question.

6              MR. CARDOZO:  Yeah.  During -- while Mr. Kidane

7    and, indeed, his family, including his children, were using

8    the computer, the FinFisher software automatically

9    activated, created copies of what they were doing, just like

10   it did for the Skype calls, stored them on his computer and

11   then, in the ordinary course of operation, would have sent

12   them back to Ethiopia.

13             And to be -- so, in our papers -- defendant

14   confuses this a little bit, so I want to make it quite

15   clear.  We're alleging a wiretap violation for the Skype

16   calls and an intrusion upon seclusion action for the web

17   searches and e-mails.  So it's separate interceptions give

18   rise to separate causes of action.  The Skype calls might

19   also gives rise to an intrusion upon seclusion case -- or,

20   clause.  But what we've claimed is that the Skype calls give

21   rise to the Wiretap Act.  And all of the conduct, including

22   the Skype calls and the web search and e-mails give rise to

23   intrusion upon seclusion.

24             THE COURT:  Is there some reason you've pled this

25   under the Wiretap Act instead of the Stored Communications

1    Act or the Computer Fraud and Abuse Act?

2            MR. CARDOZO:  Your Honor, the plaintiff has chosen

3    his causes of action quite carefully, and the reasons why we

4    chose what we did is not something that I'm prepared to get

5    into.

6            THE COURT:  I'm not asking to get into your

7    strategy.  I was really more wondering whether there was

8    something that went to the issues that we're talking about

9    here.  But I'm not asking for your strategy.

10           MR. CARDOZO:  It's not having to do with the

11   issues that we're talking about today.

12           THE COURT:  Okay.  That's fine.  Okay.

13           Mr. Charrow, I think we've touched briefly on some

14   of the other issues.  But I want to make sure I've given you

15   a chance to address everything you want to address.  The

16   issues that I still have left on my list that I will now put

17   into a combined --

18           MR. CHARROW:  I will try my best.  A couple of

19   points of clarification, if you don't mind.

20           THE COURT:  Actually, just before you do that, I

21   want the plaintiff to hear this as well, just the remaining

22   issues that I have, which are damages for injury to a

23   person, whether Title III applies to a foreign sovereign,

24   question of whether there's an allegation of an intercept.

25   As I said, I think we've touched on a number of these

1     points.  Preemption.  And the elements of the Maryland tort

2     law in particular, whether the tort has to be directed at

3     the plaintiff or whether there's some form of transferred

4     intent.

5               MR. CHARROW:  Let me start with that one, because

6     I remembered, in May the --

7               THE COURT:  I'm sorry.  I forgot our break.  We

8     were to take a break.  And I apologize, I was so engaged.

9               MR. CHARROW:  No problem.  How long?

10              THE COURT:  Ten minutes.

11              (Pause.)

12              THE COURT:  Mr. Charrow.

13              MR. CHARROW:  Thank you, Your Honor.  I would like

14    to come back to one point that the court raised concerning

15    place of injury.

16              THE COURT:  Yes.

17              MR. CHARROW:  If the court doesn't mind.

18              THE COURT:  Not at all.

19              MR. CHARROW:  And I would like to start with two

20    things.  First of all, I would like to look at the *O'Bryan*

21    case which the plaintiff discussed.  The *O'Bryan* case

22    consisted of two genre of torts.  There was the tort

23    committed by the Holy See directly, in negligently training

24    and negligently supervising priests that were sent from the

25    Vatican to the United States.  Very much like -- very much

1  like the virus being sent by someone from country A into the

2  United States.  The court held that the acts in Rome did not

3  take place in the United States.  Now, what about -- and,

4  therefore, there was no waiver of sovereign immunity under

5  1605(a)(5).

6         What about the contention that the case against

7  the Holy See was permitted to proceed with respect to other

8  grounds?  And that is true.  But it was *respondient*

9  *superior*, it had nothing to do with what the Holy See did or

10  not do.  It was purely vicarious liability.  That was the

11  basis of those claims that were permitted to go forward, and

12  those with respect to the bishops in the United States who,

13  indeed, were in a hierarchical religion, employees, if you

14  will, of the Vatican.

15         The other case I would like to come back to just

16  to discuss with the court is the *Four Corners* case.  Let's

17  change the facts somewhat to make it simpler.  Let's make

18  believe that the plane flew from Paris to Colorado, or a

19  scheduled flight from Paris to Los Angeles, and let's make

20  believe that the engines fail in Colorado.  Okay?  It's not

21  a tort that necessarily involves state of mind, it's a

22  defective engine.  The defect occurred in France.  No waiver

23  of -- or, no waiver of immunity under 1605(a)(5) because the

24  entire tort did not occur in the United States, even though

25  the infliction of the injury did occur in the United States.

1    And I think that phrase was precisely the phrase used by the

2    *Jerez* court.

3            What if, rather than having a defectively designed

4    engine, we have a worker who is dissatisfied with his lot in

5    life and decides to attach a bomb to the engine.  And he did

6    that while the engine is being -- while maintenance is being

7    conducted on the engine.  And now the plane takes off, bound

8    for the United States, bound for Los Angeles, explodes over

9    Colorado.  Different result?  I think not.

10           I don't think the intent would make any difference

11   one way or the other.  The acts of setting the plane in

12   motion occurred overseas, that's where the tort occurred,

13   that's where the *Four Corners* held the tort occurred.  And

14   indeed, arguably, that's dicta of what the *Perez* court held.

15   The infliction of the injury occurred here, but that's not

16   enough.

17           THE COURT:  I take it then you would reject the

18   examples given in the dicta that we're talking about from

19   the D.C. Circuit from a year or so ago?

20           MR. CHARROW:  No, I'm reading from that.  That's

21   exactly what I'm reading from.  I think that dicta is

22   consistent with what I'm talking about.

23           THE COURT:  It was *Jerez*, and they -- the court

24   there, I thought, suggested that there would be a claim for

25   someone mailing anthrax or a bomb to the United States.

1          MR. CHARROW:  The infliction of the injury would

2     occur in the United States.  They didn't say one way or

3     another, they just said it was different than -- or,

4     different from, to be grammatically correct.

5          THE COURT:  Which is the reason I think it's

6     dicta.  But I think the implication of what they're

7     saying --

8          MR. CHARROW:  I think it's less than dicta.  I

9     think the court wasn't grappling one way or another, but was

10    contrasting it to what did or didn't occur in the case.

11         If you look at the Colorado case, if you look at

12    the *O'Bryan*, all of these cases point to the very simple

13    proposition that if you start something in the foreign

14    country and it ends up in the United States, but the acts

15    itself started in a foreign country, that is not enough to

16    trigger the exemption under 1605.  Which makes sense, given

17    the original nature of 1605(a), what it was designed to

18    accomplish and what it was designed not to accomplish.

19         THE COURT:  You mean car accidents?

20         MR. CHARROW:  Yeah, rudimentary torts.  There are

21    a couple of other points that I think are worth mentioning,

22    and I'll forget if I don't address them in this order.  So

23    if the court has an objection, please let me know.

24         There was some -- the court questioned the

25    plaintiff concerning whether they would have -- whether the

1    defendant would have known that it, in fact, was in the

2    plaintiff's computer.  And the response was they must have

3    figured it out.  That's a quote from the plaintiff during

4    oral argument.  And they pay for licenses and, therefore, as

5    they pay more, they must have known.

6         In fact, according to the complaint, at paragraph

7    45, they paid for a fixed number of licenses.  So as long as

8    you aren't above your threshold, the payment rate -- the

9    amount you pay does not increase.

10        THE COURT:  I thought what Mr. Cardozo indicated

11   to me was that as alleged, the Ethiopia government would

12   have actually had to affirmatively turn on their

13   surveillance and that they would have known that it was in

14   the United States because they would have recognized it as a

15   US IP address, even if they weren't sure, didn't know that

16   the -- it was the particular plaintiff whose machine they

17   were turning on.

18        MR. CHARROW:  I'm sorry.  I didn't see that in the

19   complaint.

20        THE COURT:  Well, I'll have to take a look and see

21   if that's there.

22        MR. CHARROW:  I did not see either allegation in

23   the complaint.  I may have missed it, but I don't remember

24   seeing either of those allegations in the complaint.  What I

25   do remember, however, are the actions of the plaintiff

1    prior, long before this hearing, that would be inconsistent

2    with knowledge on the part of Ethiopia.

3            For example, the plaintiff is proceeding under a

4    pseudo name.  Now, if Ethiopia knew that it was monitoring

5    the plaintiff's computer, they would know who the plaintiff

6    was.  But the plaintiff is proceeding under a pseudonym, so

7    clearly the plaintiff assumes that the government doesn't

8    know who he is.  That would be inconsistent with the

9    statements made during the oral argument today.  And there

10   are no statements that I've been able to find in the

11   complaint that would be inconsistent with the petition filed

12   to proceed under a pseudo name.

13           THE COURT:  Okay.

14           MR. CHARROW:  Okay.  Now, you have a list of order

15   you would like me to go through.  You want to talk about

16   transferred intent?

17           THE COURT:  Sure.

18           MR. CHARROW:  Transferred intent is real simple.

19   Restatement Second discusses, in the comments to the intent

20   sections, which would be the single digit sections, and

21   Restatement Third, tentative draft one was just voted on by

22   ALI in May, and under section 110 it discusses transferred

23   intent.  Makes no change to transferred intent under

24   Restatement Two.  But let me talk about Restatement Three

25   because I'm more comfortable with it.  It would be section

1    110.  It would be section 110 of the tentative draft.  That

2    was, in fact, passed by ALI in May.

3            Transferred intent only applies to assault, to a

4    battery, to false imprisonment.  It does not apply beyond

5    those three torts.  It does not apply to invasion of

6    privacy.  End of story.  So, if the plaintiff is relying on

7    transferred intent, it's inapplicable.

8            THE COURT:  What about plaintiff's analogy that if

9    you have somebody who's peeking in somebody's window and

10   they think they're peeking in somebody else's window,

11   doesn't really matter, they're still engaged in an invasion

12   of privacy.

13           MR. CHARROW:  But that's not the way the tort

14   reads.  652B does not read that way.  And 652B is what is

15   being relied upon by the plaintiff in this case.  And 652B

16   deals with an intent to intrude upon the seclusion of a

17   person and injury to that person.  It is the same person.

18   Transferred intent has no place in intrusion upon seclusion,

19   at least under the Restatement view.  And, of course, the

20   plaintiff is relying on the Restatement for the underlying

21   tort.  So all the baggage of the Restatement necessarily

22   comes along with it, including the limitation on transferred

23   intent under 110.

24           THE COURT:  Okay.

25           MR. CHARROW:  The Wiretap Act, I mentioned to the

1    court that in my view there was no violation of the Wiretap

2    Act as pled.  And I base this on two reasons.  First of all,

3    as the Court alluded to earlier in the day, section 2520,

4    which provides the private right of action in this case,

5    deals with persons and entities.  But 2520 gives the private

6    right of action for a violation of the provisions of the

7    Wiretap Act.  And the provision of the Wiretap Act relied

8    upon by the plaintiff in this case is 2511.  2511 deals with

9    person, not persons or entity.  And persons are

10   traditionally viewed as nongovernmental entities.

11          Now, here the Wiretap Act defines a person to

12   include federal government and local and state governments,

13   but it does not define -- does not define it to include a

14   foreign nation.  And foreign nations are referred to

15   throughout the Wiretap Act under other provisions.  So the

16   fact that foreign nations were mentioned by Congress is

17   strong evidence that person is intended to exclude foreign

18   nations, at least in 2511.

19          THE COURT:  So what is that -- what work does the

20   word entity do in 25 --

21          MR. CHARROW:  There are other provisions of the

22   Wiretap Act that do deal with entities.  And 2511(a) and

23   similar sections do not; they are limited to persons.  So

24   the Wiretap Act does not apply to foreign governments.

25          THE COURT:  So what are the provisions that deal

 1    with entities?  Like the provision that deals with

 2    manufacturing devices?

 3              MR. CHARROW:  Let me see if I can find it.  There

 4    is a provision (3)(b) which would be -- yeah, I'm sorry,

 5    2511(3)(b), a person or entity providing electronic

 6    communication services.  (3)(a), except as provided in

 7    paragraph (b) of this section, a person or entity providing

 8    electronic communication service.

 9              So the word entity is used -- and these

10    provisions, obviously, aren't applicable here, but these

11    provisions are used -- person or entity is used in 2511.  It

12    is not used in the provision of 2511 on which this complaint

13    is based, though.

14              THE COURT:  Are the provisions that you just read

15    to me actually ones that give rise to liability?  I think

16    it's (3)(a), looks like it is.

17              MR. CHARROW:  Um-hum.  Yes.

18              THE COURT:  Okay.  So, the definition of person

19    actually doesn't include the United States, it includes an

20    agent, an employee or agent of the United States.  And

21    section 2712 creates a cause of action against the United

22    States for violation of section 119 -- or, Chapter 119,

23    which is the Wiretap Act.

24              So, under your theory, if entity -- under your

25    theory, if a violation of section 2511 is limited to a

1    person, and the United States is not a person in the same

2    way that a foreign government is not a person --

3            MR. CHARROW:  I don't follow that, Your Honor.

4    2511 deals with local and state governments, it deals with

5    agents of the United States, does it not?

6            THE COURT:  Right.  But is there anywhere in 2511

7    where it actually suggests that the United States itself

8    would be subject to suit?

9            MR. CHARROW:  No.  I misspoke then.

10           THE COURT:  It doesn't impose -- I mean, the same

11   way 2511 doesn't, on it's face, impose any duty on a foreign

12   sovereign, it doesn't impose any duty on the United States.

13           MR. CHARROW:  The basic rule, obviously, if you go

14   back to the Dictionary Act, and even this law is that a

15   person does not include sovereigns.  Here there's a

16   peel-back of that for states and local governments, and

17   later on for the U.S. government.

18           THE COURT:  But it's not a peel-back for states.

19           MR. CHARROW:  It is a peel-back for states.

20           THE COURT:  I'm sorry.  It's not a peel-back for

21   states or the federal government.  It's a peel-back for an

22   agent -- in fact, it's a peel-back not for the state, it's

23   for their -- a person is an employee or agent of the United

24   States or any state.  So it's not a peel-back for,

25   literally, for the states themselves.

1          MR. CHARROW:  But their employees.

2          THE COURT:  But their employees.

3          MR. CHARROW:  Correct.

4          THE COURT:  So, is it your position then that an

5     employee of a foreign government isn't subject to the

6     Wiretap Act, the individual, him or herself, if they're

7     acting, you know, as an employee of their foreign

8     government?

9          MR. CHARROW:  They probably would not be subject

10    to the Wiretap Act, but that's not before the court.

11         THE COURT:  I think maybe it is before the court

12    because the question is whether, as I take it from what the

13    parties were discussing, is whether a serious crime has been

14    committed and if there was some agent -- obviously, no

15    government acts without agents.  And so the question is

16    whether there's some person who committed a crime in some

17    way, right?

18         MR. CHARROW:  You would be reading out of the

19    fundamental definition of person, the concept that it does

20    not apply to governments presumptively, by having it apply

21    to their employees.  Indeed, if you sue someone under the

22    Federal Tort Claims Act as an employee, what happens?  The

23    federal government intervenes.

24         THE COURT:  That's true.  But that's under --

25         MR. CHARROW:  You cannot sue, quote, an employee

1    of the United States as an employee.

2            THE COURT:  You can, but the United States is then

3    substituted in under the statute.

4            MR. CHARROW:  Correct.  That's correct.

5            THE COURT:  If the United States concludes that

6    they were acting within the scope of their duties.  Okay.

7    Well, I understand your argument.  Thank you.

8            MR. CHARROW:  Okay.  We don't believe there was an

9    interception either, because an interception, in our view,

10   requires contemporaneous interception.  And I think there

11   are a number of courts that have so held.  And there's a

12   split among the circuits.  And the D.C. Circuit has not

13   opined on this, to my knowledge.

14           THE COURT:  But even taking the view that an

15   interception is contemporaneous, I thought that the

16   plaintiff's allegation is that in fact what was occurring

17   here is the computer is being highjacked and is creating an

18   instantaneous or simultaneous copy in an area of the files

19   which is not generally perceptible to the user of the

20   computer.

21           MR. CHARROW:  That's exactly what happened in the

22   *Bunnell* case.

23           THE COURT:  In which case?  *Bunnell*?

24           MR. CHARROW:  Precisely what happened in *Bunnell*.

25   And there the court held that there are two laws, there is

1    Title I and Title II.  Title I is the Wiretap Act, and

2    that's the one before the Court.  And Title II is the

3    Storage Act, and that is not before the court.  And the

4    court said the two are mutually exclusive.  And it held

5    there that the fact that something is -- there I believe the

6    hacker programmed the computer to make a copy of all of the

7    computer's e-mail and then sent those e-mails on to the

8    hacker.

9           THE COURT:  That's a different circumstance

10   because the e-mails already reside on the computer and

11   e-mails typically are treated as stored communications and,

12   therefore, subject to the Stored Communications Act.

13   Whereas, a Skyped call is not stored on the computer in the

14   same way that an e-mail is stored and that it -- the

15   allegation is that the call -- that a copy of the call was

16   made in real time on the computer.  With respect to an

17   e-mail, the e-mail is residing on a server somewhere, it's

18   residing on the computer somewhere.  You're making a copy of

19   the stored communication.  But with a Skype call, I take it

20   the allegation is that as the call is occurring, it's being

21   recorded.

22          MR. CHARROW:  But there really is no difference

23   technologically between a Skype call when seen by a computer

24   and an e-mail when seen by a computer.  They're both subject

25   to protocols for reassemblage and they're identical.

1          THE COURT:  I would have to get back and look at

2     the -- technologically, the case that you looked at.  But

3     technologically I don't think that they are identical

4     because I think that the e-mail resides on your computer.

5     And maybe -- there might be a period of time, I guess, if

6     you intercepted the e-mail precisely as it was arriving,

7     which it might be treated as an interception.

8          But if I've got 100 e-mails on my computer and

9     someone comes in and copies those e-mails off my computer,

10    they're copying a stored communication because they're on my

11    computer.  That's different than if I'm using my computer

12    for a Skype call, where it's in real time, there's nothing

13    that's stored on my computer, but they are making a copy of

14    it where it's not stored on the computer, that actually

15    would be occurring in real time in a way that an e-mail

16    already resides there and is already sitting on the computer

17    and is then copied.

18          MR. CHARROW:  From a technological point of view I

19    see no distinction between Skype and e-mail, number one.

20    But more critically from a legal perspective, I don't see a

21    distinction between whether a person goes in through hacking

22    and forces another copy to be made and then redirected

23    versus coping something that may not otherwise be copied

24    onto the computer and then redirecting it.  There is no

25    difference between the two.  There are no devices being

1    planted in the machine, there's just a virus, which is

2    software.

3              THE COURT:  I'm not aware of any case that has

4    ever held that you could do this before.  But I understand

5    their theory, which is that allegedly the defendant was

6    using the plaintiff's computer as a recording device and was

7    intercepting the communication as it was occurring and

8    recording it on the plaintiff's own device, unbeknownst to

9    the plaintiff.

10             MR. CHARROW:  From a technological point of view,

11   as far as -- you know, as far as I understand e-mail and

12   Skype, they're subject to protocols that break down the

13   message, whether it's an e-mail message or Skype message,

14   into packets and are reassembled at the other end.

15             THE COURT:  That's when they're being transmitted.

16             MR. CHARROW:  Correct.

17             THE COURT:  But here the e-mails, as I might

18   have -- based on your description of the case you're

19   describing, is e-mails are actually sitting on the computer.

20   And that's why it's a stored communication, it's actually

21   sitting there on your computer and someone has to go in and

22   copy it off of the computer where it's already stored,

23   versus a Skype call is not stored on the computer unless

24   someone actually creates a copy of it.  If they're creating

25   a copy, which they're saying constitutes a violation --

1          MR. CHARROW:  Their allegation is transforming

2     Skype into an e-mail is an element that creates a violation

3     of the Act.

4          THE COURT:  Making a real time copy of Skype is

5     what constitutes --

6          MR. CHARROW:  Onto the very computer owned by the

7     plaintiff.

8          THE COURT:  That's my understanding, that's their

9     allegation.  As I said, I'm not aware of a case that says

10    that, but I conceptually understand the point.

11         MR. CHARROW:  Nor am I.

12         THE COURT:  Did you have more?

13         MR. CHARROW:  Third aspect --

14         THE COURT:  Yes.

15         MR. CHARROW:  -- of the Wiretap Act are two forms

16    of preemption.  I'm only going to discuss one here because

17    the other is discussed thoroughly in the brief we discuss.

18    Express preemption.  But merely because something expressly

19    preempts does not preclude it from also impliedly

20    preempting, as the court held in *Buckley*.  And

21    telecommunications, especially these laws, we view as field

22    preempting.  They would preclude the states from entering

23    into similar laws because they, in fact, field preempting,

24    states do not have the traditional type of law making

25    responsibility in this area as the federal government has.

1      THE COURT:  Doesn't virtually every state have its

2  own Wiretap Act?

3      MR. CHARROW:  Every state has its own Wiretap

4  Act -- most states do, I wouldn't say every one.

5      THE COURT:  I don't know.  I don't mean to suggest

6  every one, but many states do.

7      MR. CHARROW:  Many states do and most of those

8  states are -- most of those laws are criminal.

9      THE COURT:  Okay.

10      MR. CHARROW:  And when we're talking about civil

11  remedies, that's when we're talking about preemption.

12      THE COURT:  Why would that be different?

13      MR. CHARROW:  Because there's nothing that

14  precludes the federal government -- because normally when

15  you're talking about preemption, you're talking about civil

16  actions that affect conduct in the civil arena.  Which

17  sounds circular, I know, but I've never seen preemption in

18  the criminal arena, per se; doesn't mean it doesn't exist.

19  But, as a general rule, we're talking about in the civil

20  arena, and here we're talking about in the civil arena.

21      And the general rule is that, okay, we're looking

22  at telecommunications.  Telecommunications have been within

23  the purview of the federal government since the original act

24  was passed in what? 1934?  Communications Act.

25      THE COURT:  Yes.

1          MR. CHARROW:  Okay.  States have only been able to

2     deal with communications, telecommunications on an

3     intrastate basis.  They have only been able to deal with it

4     beyond an intrastate basis when they're permitted to do so

5     by the federal government.  So unlike normal cases of

6     preemption, here the default is not state law governs unless

7     the federal government says to the contrary, the verse is

8     true; federal law pertains to interstate and foreign

9     communications unless -- federal law governs unless the

10    federal government gives the state the ability to something.

11         THE COURT:  The plaintiff cites three or four

12    District Court decisions in their brief saying there's no

13    preemption, and I don't recall your citing any authority.

14         MR. CHARROW:  We did.  The *Bunnell* case discusses it.

15         THE COURT:  It says that there is field preemption.

16         MR. CHARROW:  Both field preemption and express

17    preemption.  Both.

18         THE COURT:  Okay.  You know, I mean, for example,

19    there are a number of states that have two-party consent

20    requirements.  Whereas, the Wiretap is a one-party consent

21    requirement.  Is it your view that all those laws are

22    preempted and that you only need one party consent to

23    intercept a telephone call in all those jurisdictions, to

24    tape a call?

25         MR. CHARROW:  I guess the question remains, does

1    the state have the permission of the FCC to do it?  And my

2    bet is they do.

3                THE COURT:  Okay.

4                MR. CHARROW:  It's very much like the Food, Drug,

5    and Cosmetic Act, there's a broad preemption provision in

6    section 521 of the FTCA --

7                THE COURT:  Implied preemption requires that the

8    state laws frustrate the purpose, at a minimum, of the

9    federal law.  How would any of these state laws frustrate

10   the purpose of the federal law here by being more

11   restrictive?

12               MR. CHARROW:  Let's go back a moment.  That's only

13   one aspect of it.  There's different types of implied

14   preemption.  In field preemption the government occupies the

15   entire field.

16               THE COURT:  Field preemption, there are maybe four

17   areas that the Supreme Court has ever recognized for field

18   preemption.  This is not one of them.

19               MR. CHARROW:  I beg to differ with you.  It is, in

20   fact, because we're dealing with foreign commerce.

21               THE COURT:  So you're making a different argument.

22   So you're arguing more commerce preemption.

23               MR. CHARROW:  Well, you asked me about preemption,

24   and I was relying on Article 1, Section 8, Clause 3.  The

25   only reason that states have authority to act in this area

1    is if it's given to them by the federal government.

2              THE COURT:  I thought you were relying on the

3    supremacy clause.

4              MR. CHARROW:  I am relying on the supremacy

5    clause, but it's the supremacy clause vis-à-vis the commerce

6    clause.

7              THE COURT:  But it's not based on the Wiretap Act,

8    it's based on Congress's exclusive power to regulate foreign

9    commerce?

10             MR. CHARROW:  Correct.  That's the field preemption.

11             THE COURT:  That's not in the briefs.

12             MR. CARROW:  I know that.

13             THE COURT:  Okay.

14             MR. CHARROW:  I'm aware of that.

15             THE COURT:  Okay.

16             MR. CHARROW:  Anything else?

17             THE COURT:  Let me see.

18             No.  I think that covers the questions I had.

19             MR. CHARROW:  Okay.

20             THE COURT:  Thank you.

21             MR. CARDOZO:  Your Honor, to return for a moment

22    back to comity.  The FSIA was designed to remove foreign

23    sovereign decisions from the executive branch.  And just a

24    couple of years ago, in 2012, the Supreme Court, in *Samantar*

25    *v. Yousuf*, told us that pre-FSIA common law tradition was

1     based on the executive suggesting in individual cases

2     whether to apply comity and to dismiss the case as a Foreign

3     Sovereign Act, or to allow the case to go forward.

4          The FSIA, according the Supreme Court in 2012,

5     was designed to supplant the executive acts -- or, the

6     executive branch's judgment in that case and give the

7     judgment to this Court, to courts in the FSIA.

8          THE COURT:  That's true, but a little bit circular

9     in that the Court has to then figure out what the scope of

10    that authority is that Congress has given to the Court.  And

11    the question is would Congress have intended to give the

12    Court the authority to do something that would have,

13    potentially, significant foreign policy consequences, where

14    the legislative history suggests that Congress was

15    principally concerned -- or, at least first concerned with

16    auto accidents.

17         MR. CARDOZO:  True, Your Honor.  However, the

18    courts certainly have not limited FSIA to auto accidents.

19    Second -- actually, two other points.  Plaintiff is unaware

20    of any case where any federal court has dismissed for

21    comity.  Hasn't happened, to our knowledge.  And second, if

22    it did become a problem and we saw plaintiffs subpoenaing

23    foreign ministers, then either Congress or the executive

24    could step in.  And if our discovery requests went out of

25    order, the State Department might well do so in this case.

1          THE COURT:  What way would they be able to step in?

2          MR. CARDOZO:  To file a statement of interest or

3     to intervene to protect the U.S.'s foreign diplomacy powers.

4          THE COURT:  But what --

5          MR. CARDOZO:  We haven't seen it.  It's never

6     happened.

7          THE COURT:  So we don't know what theory they

8     would assert.  They would intervene or file a statement of

9     interest, but we don't know what they would be able to point

10    to as their basis for telling the court please don't do that.

11         MR. CARDOZO:  Comity would be the --

12         THE COURT:  That's what I was wondering, whether

13    there's some Constitutional comity principle that might

14    govern these cases at some level.

15         MR. CARDOZO:  In a sense, that's a Constitutional

16    principle.  But comity is a pre-Constitutional common law

17    principle.

18         THE COURT:  Okay.

19         MR. CARDOZO:  So to turn to the Wiretap Act issue,

20    which my opposing counsel talked about at length.

21         From the statute, any person whose communication

22    is intercepted may recover from any entity that engaged in

23    the interception.  Here, there was an interception.  I think

24    Your Honor quite succinctly described our theory of the case

25    here, about how the software residing on Mr. Kidane's

1     computer, copied in real time, which is something very

2     different than what happened in the *SCA* case.  So there was

3     an interception.

4              THE COURT:  Is that all in the complaint, by the

5     way?  I think your colleague indicated -- he wasn't sure

6     whether it was.

7              MR. CARDOZO:  Yes, Your Honor, it is in the

8     complaint.  And I think it shows most strongly in the

9     summary of allegations, toward the end, and then in the

10    first cause of action --

11             THE COURT:  Okay.

12             MR. CARDOZO:  -- we describe what happened.

13             THE COURT:  Okay.

14             MR. CARDOZO:  And we talk about it, as well, in

15    the opposition to the motion to dismiss.

16             But, the Second Circuit, in *Organización JD Ltda.*

17    *versus DOJ*, told us that entities, as in 2520, must mean

18    governmental entities.  And as Your Honor pointed out,

19    entities are not liable under 2511(a).  The only entity that

20    is directly liable under 2511 is a service provider.  If

21    Congress had meant to limit entity in 2520 to service

22    providers, they would have done so.  Instead, they excepted

23    the U.S. government from 2520.

24             So 2520 has both *Organización* and *Adams versus*

25    *City of Battle Creek* in the Sixth Circuit, held the 1986

1   amendment adding the word entity must mean that governmental

2   entities are liable under the act.

3           THE COURT:  I suppose, given the definition of

4   person, even a service provider?

5           MR. CARDOZO:  A service provider is definitely a

6   person, Your Honor.

7           THE COURT:  So what, then, does the word -- adding

8   entity add, if a service provider is already a person?

9           MR. CARDOZO:  So there are also governmental

10  service providers, I think that's the issue.  There are

11  service providers that are persons and there are service

12  providers that are nonpersons service -- you know, the

13  internet is a weird place and there are service providers

14  that fill both those roles.

15          But 2520 creates the cause of action to recompense

16  plaintiffs who have suffered an interception.  And that's

17  what happened here.  And it's almost that simple.  And

18  adding the word "or entity," as courts in civil circuits

19  have held, meant that Congress intended governmental

20  entities to be liable.

21          THE COURT:  What about the preceding question

22  though, of whether an agent of a foreign government would

23  actually be subject to criminal liability under 2511?

24          MR. CARDOZO:  I see absolutely no reason why that

25  wouldn't be true.

1          THE COURT:  But 2511 only applies to a person, and

2     a person is defined as an employee or agent of the United

3     States or any state or political subdivision thereof,

4     doesn't say --

5          MR. CARDOZO:  Or a natural person, an individual.

6     When individuals are prosecuted by the United States they're

7     not prosecuted as -- under a theory of *respondient superior*,

8     they're prosecuted as themselves, as individuals.  And

9     there's no reason to think that whichever agent of the

10    Ethiopia government actually supervised the surveillance on

11    Mr. Kidane would not be subject to prosecution.

12          Congress knew how to exempt the U.S. government

13    from 2520 and they could have exempted foreign sovereigns as

14    well.  They didn't.  They chose not to.  In *Bunnell*, the

15    case that opposing counsel cites, I think opposing counsel

16    may misapprehend the technology at issue in *Bunnell*.  The

17    access was to files, was to already stored communications.

18    And that's not what happened here.

19          I think Your Honor -- I think Your Honor

20    apprehends plaintiff's argument in this case.

21          Shall I turn to preemption, or do you have any --

22          THE COURT:  That would be fine.

23          MR. CARDOZO:  Okay.  In preemption -- *Leong versus

24    Carrier IQ* out of the Central District of California shows

25    that 2518 doesn't impact preemption.  It only discusses what

1    federal remedies are available.  And the two sets of facts

2    that we're talking about are distinct.  So our Wiretap Act

3    claim is limited to the Skype calls.  Our intrusion upon

4    seclusion claim encompasses the Skype calls, but focuses on

5    the web search and e-mail monitoring.  We have a little bit

6    less technical information about how exactly that happened,

7    but we do know it happened and we've alleged it quite

8    clearly in the complaint.

9            So even if there is preemption, which there isn't,

10   and *Leong* teaches us that there isn't, the preemption would

11   only be regarding the Skype calls and it would not preempt

12   the entirety of our claim because we're talking about

13   different courses of action and different modules, actually,

14   of FinFisher that did the recording.

15           THE COURT:  But if -- never mind.  I follow.

16           MR. CARDOZO:  Your Honor indicated --

17           THE COURT:  I guess, let me break this down.  This

18   goes back to the question I think I was asking earlier,

19   which is whether a criminal violation -- or, an alleged

20   criminal violation of the Wiretap Act is enough to get your

21   foot in the door to then assert, notwithstanding Foreign

22   Sovereign Immunities, your intrusion upon seclusion claims,

23   if you're breaking those claims down in a way in which they

24   actually are focused on something different than what you're

25   focusing on in the Wiretap Act claims, does that mean that

1    the Court has to find some other basis of not applying the

2    discretionary function exception as to that portion of the

3    claim because it's not -- there's no allegation of

4    criminality there?

5              MR. CARDOZO:  No, Your Honor.  The FSIA gives this

6    court jurisdiction not over individual claims, but if you

7    look at the language, it gives this court jurisdiction over

8    the case, and the case is composed of all of its claims.

9    And defendant has cited no authority, at least not that I

10   was able to grasp, that would require this Court to dismiss

11   the intrusion upon seclusion claim --

12             THE COURT:  Okay.

13             MR. CARDOZO:  -- if the entire case goes forward.

14             Your Honor, before the break, indicated that the

15   Court had questions regarding damages for injury to a

16   person.  And I don't think opposing counsel mentioned that.

17   Does Your Honor --

18             THE COURT:  I was really cataloging the arguments

19   that I think the parties had raised in the case and making

20   sure everyone had an opportunity to address those.  I don't

21   have particular questions about that one.

22             MR. CARDOZO:  I would just reiterate, under both

23   D.C. and Maryland case law, privacy torts are per se

24   injuries to a person, and that's what we have alleged here.

25             Thank you.

1          THE COURT:  Did you have anything further on the

2     preemption argument, on the field preemption argument?

3          MR. CARDOZO:  No, Your Honor.  I think that this

4     is not a case where field preemption exists.  And *Leong*

5     *versus Carrier IQ* in the Central District of California

6     supports us.

7          THE COURT:  Okay.  Thank you.  Anything further?

8     Are you tired?

9          MR. CHARROW:  Two hours and 20 minutes.

10          THE COURT:  I thank you all.  This has been

11     extremely helpful for the Court.  And I apologize for

12     keeping you so long.  But, actually, both arguments were

13     very, very helpful and have helped me at least beginning to

14     formulate my views on this.  And I'll do my best to provide

15     a decision as soon as I can.  I still want to mull over the

16     question of whether I should at least give the United States

17     an opportunity to be heard, if they want to be heard at this

18     stage.

19          I recognize that they often wait to be heard in

20     the Court of Appeals, which puts District Courts in the

21     awkward position of not having all the arguments in front of

22     them that may actually be before the Court of Appeals when

23     the Court of Appeals decides a case.

24          So I'll mull that over and render a decision on

25     that, render a decision on the merits as soon as I can.

1          MR. CHARROW:  Your Honor, we had a recent

2    experience with the Department of Justice and they said wait

3    until the case gets to the Court of Appeals.

4          THE COURT:  Okay.  All right.  Anything further?

5          MR. CARDOZO:  Thank you.

6          THE COURT:  Thank you.  Thank you all.

7                          *   *   *

8

9

10          CERTIFICATE OF OFFICIAL COURT REPORTER

11

12

13          I, JANICE DICKMAN, do hereby certify that the above

14    and foregoing constitutes a true and accurate transcript of

15    my stenograph notes and is a full, true and complete

16    transcript of the proceedings to the best of my ability.

17                    Dated this 27th day of July, 2015.

18

19

20                    /s/_____

21                    Janice E. Dickman, CRR, RMR
                       Official Court Reporter
22                    Room 6523
                       333 Constitution Avenue NW
23                    Washington, D.C. 20001

24

25